Jason B. Aamodt, OK Bar No. 16974
The Indian & Environmental Law Group, PLLC
406 South Boulder Avenue, Suite 830
Tulsa, Oklahoma 74103
Tel: (918) 347-6169
Jason@iaelaw.com

Attorney for all Plaintiffs

*[Additional Counsel Listed on Signature Page]*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

WATERKEEPER ALLIANCE, INC., *et al.*, )
                                  )
        Plaintiffs,              )
                                  )
v.                                     )         Case No. 3:18-cv-3521-RS
                                    )
ANDREW R. WHEELER, *et al.*,        )
                                    )
        Defendants.           )

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

i

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

FACTUAL BACKGROUND...............................................................................................3

    I.   Prior to the 2015 Rule, the Agencies' regulatory definitions of "waters of the United States" broadly protected the Nation's waters .............................................................................................................3

    II.  The 2015 Rule narrowed CWA jurisdiction ...........................................4

LEGAL BACKGROUND .................................................................................................7

    I.   Clean Water Act.......................................................................................7

        A.  The CWA has long provided broad protections for the Nation's waters ..........................................................................8

        B.  Courts have consistently upheld broad jurisdiction over the Nation's waters under the CWA.................................................9

    II.  Endangered Species Act .........................................................................11

    III. National Environmental Policy Act.........................................................12

    IV. Plaintiffs possess standing to pursue these claims..................................13

STANDARD OF REVIEW ..............................................................................................14

ARGUMENT & AUTHORITIES .....................................................................................17

    I.   The Agencies violated the Endangered Species Act...............................17

        A.  The Agencies' promulgation of the 2015 Rule was a discretionary federal action triggering ESA consultation....................................17

        B.  The 2015 Rule "may affect" ESA-listed species and their critical habitats .................................................................................18

    II.  The Agencies violated the National Environmental Policy Act ............21

        A.  The Corps failed to take a "hard look" at the significant impacts of the 2015 Rule's likely loss of jurisdiction over many wetlands and other waters .................................................22

        B.  The Corps failed to adequately assess a reasonable range of alternatives to the final Rule ............................................24

    III. The 2015 Rule violates the CWA and the Administrative Procedure Act...........................................................................................25

        A.  The 2015 Rule's definition of "tributary" and its categorical exclusion of all "ephemeral features" are unsupported by the record and arbitrary and capricious..........................................26

B.  The exclusion of certain ditches that otherwise meet
the definition of tributary lacks any basis in the record,
and is arbitrary and capricious .........................................................29

C.  The Agencies' use of agricultural discharges to define "waters of
the United States" violates the CWA and Administrative
Procedure Act.....................................................................................31

D.  The 4,000-foot cutoff is in excess of the Agencies' statutory
authority .............................................................................................34

E.  The Agencies' categorical exclusion of groundwater
from the Clean Water Rule is arbitrary and capricious
and lacks record support ...................................................................35

F.  The Agencies failed to evaluate and provide a reasoned
basis for eliminating jurisdiction over waters based on
interstate commerce impacts.............................................................36

IV. The promulgation of several provisions of the 2015 Rule
violate the procedural requirements of the APA....................................39

A.  The waste treatment system exemption violates APA notice
and comment requirements because it is not a logical
outgrowth nor was it discussed in the proposed rule ......................40

B.  The 2015 Rule's exclusions for agriculture and waste
treatment in not a logical outgrowth .................................................43

**CONCLUSION STATEMENT OF ISSUES TO BE DECIDED AND
REMEDY REQUESTED** ...............................................................................44

# TABLE OF AUTHORITIES

## Cases

*Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428 (D.C. Cir. 1991)..........................................40

*Alaska Oil and Gas Ass'n v. Jewell*, 815 F.3d 544 (9th Cir. 2016) .......................................16

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*,

    389 F.3d 536 (6th Cir. 2004) ...................................................................................14

*Am. Fuel & Petrochemical Manufactures, et al., v. U.S. Environmental Protection Agency*,

    937 F.3d 559 (D.C. Cir. Sept. 6, 2019).....................................................................18

*Am. Med. Ass'n v. U.S.*, 887 F.2d 760 (7th Cir. 1989) ..........................................................40

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)...................................................................13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................................14

*California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999 (9th Cir. 2009) ..................19

*Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)...............................................15, 33

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015).................14

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,

    538 F.3d 1172 (9th Cir. 2008) .................................................................................13

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

    698 F.3d 1101 (9th Cir. 2012) ...........................................................................18, 21

*Chocolate Mfrs. Ass'n of the U.S. v. Block*, 755 F.2d 1098 (4th Cir. 1985)...........................40

*Citizens for Better Forestry v. U.S. Dep't of Agriculture.*,

    481 F.Supp.2d 1059 (N.D. Cal 2007) .................................................................11, 12

*Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254 (D.D.C. 2014) ............................44

*Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454 (D.C. Cir. 1997)................................44

*Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014)....................................13

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000) ...............13, 14

*Encino Motorcars v. Navarro*, 136 S. Ct. 2117 (2016) .....................................................41, 42

*Envtl. Def. Fund, Inc. v. EPA*, 898 F.2d 183 (D.C. Cir. 1990) ...............................................45

*Envtl. Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005)............................................40

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009)..........................................................9, 39

*Georgia v. Wheeler*, No. 2:15-CV-00079, 2019 WL 3949922 (S.D. Ga. Aug. 21, 2019) ......39

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992)..................................................9

*Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001)...............................9

*Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) .................................44

*Humane Soc. of U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010)..........................................13, 22

*Innova Solutions, Inc. v. Baran*, 399 F.Supp.3d 1004 (N.D. Cal. 2019) ................................15

*International Paper Co. v. Ouellette*, 479 U.S. 481 (1987)................................................9, 36

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*,

    482 F.3d 79 (2d Cir. 2006).......................................................................................24

*Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445 (9th Cir. 2016)............................12

*Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012)...............18, 21

*Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402 (6th Cir. 2013) ......................16, 21, 24

*Long Island Care at Home, Ltd. v. Coke*, 661 U.S. 158 (2007)..............................................40

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................................14

*Lynch v. Dawson*, 820 F.2d 1014 (9th Cir. 1987)....................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...16, 39, 41

*N. California River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).....................9

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018).....................................................11

*Nat'l Cotton Council v. United States Environmental Protection Agency*,

    553 F.3d 927, 934 (6th Cir. 2009) ......................................................................16, 32

*Nat'l Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000).......................................................45

*Nat'l Parks Conservation Ass'n v. Jewell*, 62 F.Supp.3d 7 (D.D.C. 2014) ...........................11

*Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953 (9th Cir. 2005)............15, 16

*Negusie v. Holder*, 555 U.S. 511 (2008)..................................................................................39

*North Dakota v. U.S. E.P.A.*, 127 F. Supp. 3d 1047 (D.N.D. 2015).......................................39

*NRDC v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975) .........................................................3, 36

*NRDC v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977) ......................................................33, 34, 35

*NRDC v. EPA*, 966 F.2d 1292 (9th Cir. 1992)........................................................................36

*Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006 (9th Cir. 2008) ................................................34

*Nw. Motorcycle Ass'n v. U.S. Dep't. of Agric.*, 18 F.3d 1468 (9th Cir. 1994) .................14, 15

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) ......................13

*Rapanos v. United States,* 547 U.S. 715 (2006).......................................................4, 10, 11, 45

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)......................................12

*Safer Chemicals, Healthy Families v. U.S. Env. Protection Agency*,

     943 F.3d 397 (9th Cir. 2019) ...................................................................................15

*San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 707 (9th Cir. 2007)...........10, 38

*Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012)....................................................42

*Sierra Club v. United States Environmental Protection Agency*,

     793 F.3d 656 (6th Cir. 2015) ...................................................................................14

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983) ..........40

*Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*,

     531 U.S. 159 (2001) .....................................................................................9, 10, 38

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ....................................................................11

*Texas v. U.S. E.P.A.*, 389 F. Supp. 3d 497 (S.D. Tex. 2019)..................................................39

*Thomas v. Peterson*, 753 F. 2d 754 (9th Cir. 1985).................................................................11

*United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317 (6th Cir. 1974)............................9

*United States v. Cundiff*, 555 F.3d 200 (6th Cir. 2009) ...........................................................10

*United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1979) ....................................10

*United States v. Holland*, 373 F. Supp. 665 (M.D. Fla. 1974).................................................3

*United States v. Krillich*, 152 F.Supp.2d 983 (N.D. Ill. 2001) ...............................................38

*United States v. Moses*, 496 F.3d 984 (9th Cir. 2007).........................................................9, 10

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985)........................8, 9, 36

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2010)....................11, 16, 19

*Washington Toxics Coal. v. U.S. Dep't of Interior*,

     457 F.Supp.2d 1158 (W.D. Was. 2006)......................................................................12

**Federal Regulations and Code**

33 C.F.R. § 230.10 ....................................................................................12

33 C.F.R. § 323.2 ......................................................................................4

33 C.F.R. § 328.3 ................................................................................ *passim*

40 C.F.R. § 122.2 .....................................................................................37

40 C.F.R. § 122.3 ....................................................................................3, 4

40 C.F.R. § 1508.9 ...................................................................................12

40 C.F.R. § 1508.13 .................................................................................12

40 C.F.R. § 1508.18 .............................................................................12, 22

40 C.F.R. § 1508.27 .............................................................................13, 22

50 C.F.R. § 402.02 ...................................................................................11

50 C.F.R. § 402.14 ...................................................................................18

5 U.S.C. § 706 .................................................................................. *passim*

16 U.S.C. § 1536 ...................................................................................2, 17

33 U.S.C. § 407 .........................................................................................9

33 U.S.C. § 1251 ...........................................................................1, 4, 7, 25

33 U.S.C. § 1311 ....................................................................................2, 7

33 U.S.C. § 1313 .....................................................................................32

33 U.S.C. § 1321 .....................................................................................33

33 U.S.C. § 1331 .....................................................................................33

33 U.S.C. § 1344 .....................................................................................31

33 U.S.C. § 1362 ....................................................................................7, 25

42 U.S.C. § 4331 .....................................................................................12

42 U.S.C. § 4332 ....................................................................................3, 21

**Other**

38 Fed. Reg. 10,834 .................................................................................37

38 Fed. Reg. 13,528 ...............................................................................3, 15

39 Fed. Reg. 12,115 ....................................................................................................3

42 Fed. Reg. 37,122 ..................................................................................................37

45 Fed. Reg. 33,290 .......................................................................................4, 40, 41

45 Fed. Reg. 48,620 .......................................................................................40, 41, 42

47 Fed. Reg. 31,794 ....................................................................................................4

51 Fed. Reg. 19,926 ............................................................................................18, 19

66 Fed. Reg. 11,202 ..................................................................................................19

72 Fed. Reg. 64,286 ....................................................................................................5

76 Fed. Reg. 24,479 ....................................................................................................5

79 Fed. Reg. 22,188 ....................................................................................4, 25, 27, 41

80 Fed. Reg. 37,054 ............................................................................................ *passim*

81 Fed. Reg. 67,270 ..................................................................................................20

Cong. Rec. 33,756 (1972) ...........................................................................................8

House Report No. 92-911 (1972) .................................................................................8

Senate Report No. 92-414 (1972) ................................................................................8

Senate Report No. 92-1236 (1972) ....................................................................7, 8, 9, 3

# INTRODUCTION

This case centers on the 2015 final rule issued by the Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies") that impermissibly weakens the regulatory definition of "waters of the United States." *See Clean Water Rule: Definition of "Waters of the United States,"* 80 Fed. Reg. 37,054 (June 29, 2015) (herein the "2015 Rule"). While many provisions of the 2015 Rule accord with the Clean Water Act ("CWA"), several aspects are unlawful and clearly violate the central goal of the CWA, which is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251. The resulting loss of CWA protections for the Nation's waters has broad ramifications for the implementation of nearly every regulatory program under the CWA.

The 2015 Rule violates the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), the CWA, and the Administrative Procedure Act ("APA"). As the Agencies noted in the 2015 Rule Preamble, "the scope of jurisdiction in this rule is narrower than that under the existing regulation. Fewer waters will be defined as 'waters of the United States' under the rule than under the existing regulations, in part because the rule puts important qualifiers on some existing categories such as tributaries." 80 Fed. Reg. at 37,054; *see also id.* at 37,102.

For decades, the CWA has broadly applied to virtually all of the nation's waters, including rivers, streams, lakes, wetlands, ponds, and other waters of which the use, degradation, or destruction could affect interstate or foreign commerce. *See*, *e.g.*, 33 C.F.R. § 328.3. The 2015 Rule, in part, reaffirms CWA jurisdiction over waters that have been protected under the Agencies' definitions since the 1970s—such as navigable-in-fact waters and interstate waters. However, contrary to the prevailing law and science, the 2015 Rule eliminates longstanding CWA protections by imposing severe and unsupported limitations or exclusions from CWA jurisdiction, thereby abandoning crucial

1  federal protections for many rivers, streams, wetlands, lakes, ponds, and hydrologically-connected

2  groundwater.

3         These limits on CWA jurisdiction—some of which were inserted in the 2015 Rule at the

4  eleventh-hour, with no public involvement—are also contrary to the Agencies' own science, and are

5  wholly unsupported by the administrative record. Additionally, the Agencies violated the notice-and-

6  comment requirement of the APA by denying Plaintiffs the opportunity to comment, or by refusing

7  to consider their comments, on relevant exclusions. Among other things, the 2015 Rule impermissibly

8  eliminated CWA protections from seven broad categories as set out in the section entitled "Factual

9  Background" at page 7, below.

10        The 2015 Rule will result in a substantial loss of CWA jurisdiction as compared to the

11 Agencies' prior regulatory definition, and will adversely impact many threatened and endangered

12 species. The Agencies' regulatory decision to abandon its own jurisdiction means that the CWA's

13 essential safeguard—the prohibition on unauthorized discharges, *see* 33 U.S.C. § 1311(a)—would

14 not apply, and that such waters may be dredged, filled, or polluted without complying with statutory

15 requirements. This endangers not only those waters, but also all downstream waters including

16 navigable-in-fact and interstate waters.

17        The Agencies failed to ensure that the 2015 Rule "is not likely to jeopardize the continued

18 existence of any endangered species or threatened species or result in the destruction or adverse

19 modification of habitat of such species" as required by ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2),

20 and failed to consult with the Fish and Wildlife Service ("FWS") and National Marine Fisheries

21 Service ("NMFS") (collectively "the Services") regarding the potential species impacts. *Id*. Further,

22 the jurisdictional limitations and resulting impacts—which are apparent on the Agencies' own

23 record—render the Corps' "finding of no significant impact" ("FONSI") arbitrary and capricious,

1   meaning that the agency should have prepared an environmental impact statement ("EIS") under

2   NEPA section 102(C), 42 U.S.C. § 4332(C).

3                              **FACTUAL BACKGROUND**

4   **I.      Prior to the 2015 Rule, the Agencies' regulatory definitions of "waters of the United**
5   **States" broadly protected the Nation's waters**

6           For nearly thirty years, the Agencies implemented Congress' vision to fully protect waters of

7   the United States. EPA issued rules in 1973 covering a wide range of waters, including many that

8   were not navigable-in-fact and waters with an interstate commerce nexus. 38 Fed. Reg. 13,528,

9   13,529 (May 22, 1973). Although the Corps initially adopted regulations protecting only the waters

10  previously regulated[1]—largely tidal and navigable-in-fact waters—a court quickly rejected that

11  narrow interpretation, holding that (1) by defining "navigable waters" as "waters of the United

12  States," Congress "asserted federal jurisdiction over the nation's waters to the maximum extent

13  permissible under the Commerce Clause of the Constitution," and (2) the Corps was "without

14  authority to amend or change the statutory definition of navigable waters," and – accordingly –

15  ordering the agency adopt regulations "recognizing the full regulatory mandate" of the CWA. *NRDC*

16  *v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975), *see also United States v. Holland*, 373 F. Supp.

17  665, 668-74 (M.D. Fla. 1974).

18          By 1982, both EPA and the Corps issued regulations defining "waters of the United States"

19  that remained largely unchanged until replaced by the 2015 Rule. Those regulations covered

20  navigable-in-fact waters, interstate waters, the territorial seas, impoundments of waters of the United

21  States, tributaries to other waters of the United States, wetlands adjacent to waters of the United

22  States, and "[a]ll other waters . . . the use, degradation, or destruction of which would affect or could

---

[1]      *See* 39 Fed. Reg. 12115 and 12119 (April 3, 1974); Technical Support Document ("TSD")
JA[20869] at 19-22.

1  affect interstate or foreign commerce." 40 C.F.R.§ 122.3 (1981) (45 Fed. Reg. 33,290, 33,424 (May

2  19, 1980)); *see also* 33 C.F.R.§ 323.2 (1983) (47 Fed. Reg. 31,794, 31,810 (July 22, 1982)).

3       No court has ever overturned or vacated the Agencies' 1980s regulatory definitions or any

4  portion thereof. Those regulatory definitions are fully consistent with the Clean Water Act's goal of

5  restoring and maintaining "the chemical, physical, and biological integrity of the Nation's waters."

6  33 U.S.C. § 1251(a).

7  **II.     The 2015 Rule narrowed CWA jurisdiction**

8       After the Supreme Court's fragmented decision in *Rapanos v. United States,* 547 U.S. 715

9  (2006), the Agencies revised their implementation of the rule of law. Even though *Rapanos* did not

10  invalidate any provision in the Agencies' longstanding regulatory definitions and only addressed

11  jurisdiction over wetlands adjacent to a non-navigable tributaries or ditches, the Agencies retreated

12  from enforcing the regulations on the books. After issuing agency guidance,[2] the Agencies

13  commenced a rulemaking and released the proposed Clean Water Rule for public comment in April

14  2014. *See* Definition of "Waters of the United States" Under the Clean Water Act; Proposed Rule, 79

15  Fed. Reg. 22,188 (April 21, 2014) (herein the "2014 Proposed Rule"). The final Rule followed just

16  over a year later, in June of 2015.

17       As part of the rulemaking, EPA's Office of Research and Development prepared a draft report

18  (herein the "Science Report") that synthesized the published, peer-reviewed scientific literature

19  discussing the connectivity between streams, wetlands, and other waters, and downstream water

20  bodies. JA[0004]. Independent experts and the public vetted the Science Report: EPA obtained an

21  external, independent peer-review of an initial draft, JA[0005], and released an updated draft for

---

[2]       EPA and Corps, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008) ("Rapanos Guidance"), a*vailable    at*    https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf (last visited January 8, 2020). The Agencies later released— but never finalized—a revised guidance document *See* 76 Fed. Reg. 24,479 (May 2, 2011).

1   public review, JA[0004]. EPA then sought further review by an expert panel of EPA's Science

2   Advisory Board ("SAB"), which was concluded near the end of the 2015 Rule comment period. The

3   comment period on the 2015 Rule closed on November 14, 2014. *See* 80 Fed. Reg. at 37,103. The

4   final Science Report and the EPA's response to the SAB Report were published in January 2015 –

5   after the close of public comments. The Science Report and the SAB Report are state-of-the-art

6   analyses of the connectivity and functions of streams, wetlands, and other waters and their findings

7   and conclusions are contrary to many of the exclusions and limitations adopted by the Agencies in

8   the final 2015 Rule. JA[20859] (Science Report); Final Rule, 80 Fed. Reg. at 37,057 and 37,065.

9       Both the *Rapanos* Guidance and the 2015 Rule relied upon the significant nexus test

10   articulated by Justice Kennedy in *Rapanos* to redefine jurisdiction over waters, 80 Fed. Reg. at

11   37,060, but the 2015 Rule does not apply that test consistently to all waters. Many of these *previously*

12   protected waters are broadly described under the heading "Waters and Features That Are Not 'Waters

13   of the United States'" in the 2015 Rule. *See* 80 Fed. Reg. at 37,096; *see also id*. at 37,084 ("The final

14   rule does not protect all waters that were protected under the 'other waters' provision of the existing

15   regulation"). Plainly, many waters with a significant nexus are excluded under the 2015 Rule through

16   exceptions and categorical exemptions described below.

17       The 2015 Rule divides waters into three groups: (1) waters categorically protected, (2) waters

18   protected upon a case-by-case showing of a significant nexus, and (3) waters categorically excluded

19   from protection. Six types of waters receive automatic protection under the 2015 Rule. The first three

20   are traditional navigable waters, interstate waters, and the territorial seas (hereafter "foundational

21   waters"). 33 C.F.R. § 328.3(a)(1)-(3).[3] The 2015 Rule also categorically protects impoundments and

22   certain tributaries and waters adjacent to foundational waters. *Id*. § 328.3(a)(4)-(6). The Agencies

---

[3]       The 2015 Rule makes these same changes to several sections of the Code of Federal
Regulations but for ease of reference, this brief will refer to the changes as codified in 33 C.F.R. §
328.

1    relied on the Science Report to determine that waters in these three categories have a significant nexus

2    to foundational waters, but also excluded some of these waters through definitional requirements.

3    Final Rule, 80 Fed. Reg. at 37,068-69; Technical Support Document 224-29, JA[20869].

4           Certain waters in two other categories qualify for protection if a case-by-case analysis shows

5    they have a "significant nexus" to foundational waters. Similar to Justice Kennedy's test, this analysis

6    considers whether waters—individually or in combination with "similarly situated" waters in a

7    watershed draining to a foundational water—significantly affect the chemical, physical, or biological

8    integrity of foundational waters. 33 C.F.R. § 328.3(c)(5). The first category includes five types of

9    waters that the Agencies found are "similarly situated" for purposes of analyzing their effects on the

10   chemical, physical, and biological integrity of downstream waters. *Id.* § 328.3(a)(7); Final Rule, 80

11   Fed. Reg. at 37,071-73; SAB Letter at 3, JA[7531]. These five types of waters are: prairie potholes,

12   Carolina bays and Delmarva bays, pocosins, western vernal pools, and Texas coastal prairie wetlands,

13   which are protected due to the combined effects of all waters of the same type in a watershed. The

14   second category includes waters that fall into no other category under the 2015 Rule yet may be found

15   on a case-by-case basis to meet the significant-nexus standard, but *only* when located: (1) within the

16   100-year floodplain of a foundational water; or (2) within 4,000 feet of a foundational water,

17   impoundment, or tributary. 33 C.F.R. § 328.3(a)(8).

18          The 2015 Rule entirely excludes several categories of waters from the CWA, regardless of

19   whether waters in those categories meet the significant-nexus standard, or would otherwise qualify

20   as tributaries, adjacent waters, or waters eligible for protection on a case-by-case basis. 33 C.F.R. §

21   328.3(b). These exclusions include, but are not limited to: "[w]aste treatment systems, including

22   treatment ponds or lagoons designed to meet the requirements of the Clean Water Act," *id.* §

1    328.3(b)(1); "[e]rosional features, including gullies, rills, and other ephemeral features that do not

2    meet the definition of tributary," *id.* § 328.3(b)(4)(vi); and groundwater, *id.* § 328.3(b)(5).

3          Ultimately, the 2015 Rule eliminated CWA protection from broad swaths of water through,

4    among other things, adoption of the following provisions: 1) 4,000-foot distance limitation on any

5    application of the "significant nexus" test, *see* 33 C.F.R. § 328.3(a)(8);[4] 2) Categorical exclusion for

6    all waste treatment systems, *see id.* § 328.3(b)(1); 3) Categorical exclusion for most ephemerally or

7    intermittently flowing ditches, *see id.* § 328.3(b)(3); 4) Categorical exclusion of all "ephemeral

8    features," *see id.* § 328.3(b)(4)(vi); 5) Categorical exclusion of all groundwater, *see id.* § 328.3(b)(5);

9    6) Definition of "adjacent" that excludes waters used for established normal farming, ranching, and

10   silviculture activities, *see id.* § 328.3(c)(1); and 7) Definition of "tributary" that requires a bed, banks,

11   and ordinary high water mark, *see id.* § 328.3(c)(3).

12                                    **LEGAL BACKGROUND**

13   **I.     Clean Water Act**

14         Congress enacted the CWA with the express goal of restoring and maintaining "the chemical,

15   physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA protects

16   "navigable waters," by *inter alia*, prohibiting discharges unless permitted under either CWA sections

17   402 or 404. The CWA prohibits discharging "any radiological, chemical, or biological warfare agent,

18   any high-level radioactive waste, or any medical waste" and protects against the discharge of oil or

19   hazardous substances. *Id*. §§ 1311(a), 1311 (f), 1321, and 1362(12) (hereinafter "protections"). The

20   CWA broadly defines the term "navigable waters" to mean, in pertinent part, "the waters of the United

21   States." *Id*. § 1362(7). While Congress left this latter term undefined, the accompanying Conference

---

[4]      *See* 80 Fed. Reg. at 37,104–05. The regulatory citations are to the Corps' definition of "waters of the United States."

1  Report indicates that Congress intended it to "be given the broadest possible constitutional

2  interpretation." S. Rep. No. 92-1236, p. 144 (1972).

3  **A.**     **The CWA has long provided broad protections for the Nation's waters**

4        Congress recognized that these protections would not achieve the Act's goals if applied only

5  to traditionally navigable water, their tributaries,[5] and interstate waters. *See* EPA & Corps, JA[20869]

6  at 6-10. Achieving the CWA's goal of restoring and protecting our Nation's waters required

7  maintaining the natural function and structure of the entire aquatic ecosystem, and Congress

8  recognized this and "demanded broad federal authority to control pollution, for '[w]ater moves in

9  hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'" *United*

10  *States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132–33 (1985) (citing S.Rep. No. 92–414, p.

11  77 (1972), USCCAN 1972, pp. 3668).

12        Congress' discussion centered in part on ensuring the term "navigable waters" would not be

13  defined or construed narrowly, which would defeat the intent of the Act. H.R. Rep. No. 92-911 at 76–

14  77 (1972) and S. Rep. No. 92-414 at 77 (1971). *See also* 118 Cong. Rec. 33,756–57 (Oct. 4, 1972).

15  Therefore, the Act applied far more broadly to the "waters of the United States," a recognition that

16  waters are hydrologically connected, necessitating broad application in order to ensure that the

17  Nation's waters would be protected. S. Rep. No. 92-414 at 77 (1972) and H.R. Rep. No. 92-911 at

18  76-77 (1972). The Senate Conference Report stated that the "conferees fully intend that the term

---

[5]        The 1899 Refuse Act, the predecessor to the Clean Water Act Section 402 permitting program, governed discharges to traditionally navigable waters and "into any tributary of any navigable water from which the same shall float or be washed into such navigable water  . . .." 33 U.S.C. § 407.

1  'navigable waters' be given the broadest possible constitutional interpretation . . . ." S. Rep. No. 92-

2  1236, at 144 (1972) (Conf. Rep.).

B.    **Courts have consistently upheld broad jurisdiction over the Nation's waters under the CWA**

5  The courts honored Congress' "intention . . . to eliminate or drastically reduce water pollution

6  throughout the waters of the United States." *United States v. Ashland Oil & Transp. Co.*, 504 F.2d

7  1317, 1321 (6th Cir. 1974); *see* Technical Support Document 24-26, JA[20869] (citing cases). *See N.*

8  *California River Watch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir. 2007). Congress could not

9  achieve that ambitious goal without controlling pollution at its source: otherwise, the "tributaries

10  which join to form the river could . . . be used as open sewers," and downstream waters "could become

11  a mere conduit for upstream waste." *Ashland Oil*, 504 F.2d at 1326.

12  In 1985, the Supreme Court unanimously upheld the Corps' application of the CWA to

13  wetlands adjacent to other "waters of the United States," including navigable-in-fact waters and other

14  lakes, rivers, streams and other bodies of water. *See United States v. Riverside Bayview Homes*, 474

15  U.S. 121, 131, 135-36 (1985). "Congress chose to define the waters covered by the Act broadly" to

16  achieve the Act's objective of restoring and protecting the Nation's waters and observed that

17  excluding adjacent wetlands from the definition of "waters of the United States" would not do justice

18  to "the realities of the problem of water pollution that the Clean Water Act was intended to combat."

19  *Id.* at 132 -133. The Supreme Court, in *International Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)

20  (citations omitted), recognized that the Act was designed to establish an "all-encompassing program

21  of water pollution regulation" and "applies to all point sources and virtually all bodies of water."[6]

22  The Supreme Court reaffirmed its holdings in *Bayview* regarding the breadth of "waters of the

23  United States" in *Solid Waste Agency of Northern Cook County v. United States Army Corps of*

---

[6]    Other courts followed suit.  *See e.g. Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001) ("irrigation canals were 'waters of the United States' because they are tributaries to the natural streams with which they exchange water."); *United States v. Moses*, 496 F.3d 984, 989

1   *Engineers,* 531 U.S. 159 (2001) ("S*WANCC*"). In that case, the Court narrowly rejected the Corps'

2   assertion of jurisdiction over an abandoned, water-filled sand and gravel pit under the Corps'

3   "Migratory Bird Rule," which interpreted the Agencies' regulatory definitions, finding that use of the

4   pit by migratory birds could not alone provide a basis for the Corp's assertion of jurisdiction. *Id*. 531

5   U.S. at 162, 164, 174 (2001).

6       In *Rapanos*, the Supreme Court grappled with the permissibility of the Agencies' assertion of

7   jurisdiction over wetlands adjacent to non-navigable tributaries.[7] Remanding the Corps' initial

8   determination that certain wetlands were "waters of the United States," there was no majority opinion

9   from which the "law" could be determined because "there is quite little common ground between

10  Justice Kennedy's and the plurality's conceptions of jurisdiction under the Act, and both flatly reject

11  the other's view." *United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009).

12      A four-Justice plurality devised one test to apply on remand, which includes wetlands with a

13  continuous surface connection to "relatively permanent, standing, or continuously flowing bodies of

14  water". *Rapanos*, 547 U.S. at 757 (Scalia, J., plurality opinion); Justice Kennedy concluded the Corps

15  could regulate wetlands adjacent to non-navigable tributaries where they "possess a 'significant

16  nexus' to waters that are or were navigable in fact or that could reasonably be so made" and noted

17  that, "[a]bsent more specific regulations . . . the Corps must establish a significant nexus on a case-

18  by-case basis[.]"*Rapanos*, 547 U.S. at 759, 782 (Kennedy, J., concurring in the judgment); and four

---

(9th Cir. 2007) (finding that a dry stream bed was water of the United States and both adopting the 11th Circuit's Analysis that "[T]here is no reason to suspect that Congress intended to exclude from 'waters of the United States' tributaries that flow only intermittently," while also noting that *Rapanos* does not modify the prior rule laid down by the Circuits (quoting *United States v. Eidson*, 108 F.3d 1336, 1342 (11th Cir. 1997). Indeed, as the 9th Circuit pointed out, even the *Rapanos* plurality's decision that looks to "relatively permanent" bodies of water "do[es] not necessarily exclude seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months...." *Moses*, 496 F.3d at 990, quoting *Rapanos*, 547 U.S. at 732, n. 5. *See also United States v. Earth Sciences, Inc.*, 599 F.2d 368, 375 (10th Cir. 1979).

[7]      *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 707 (9th Cir. 2007) ("*Rapanos,* like *Riverside Bayview,* concerned the scope of the Corps' authority to regulate adjacent *wetlands*.")*.*

1   dissenting Justices would have deferred to the Corps' broader regulations as the proper test for

2   wetlands adjacent to tributaries, *id*. at 810 (Stevens, J., dissenting), which fully encompasses waters

3   identified in both Justice Kennedy's and Justice Scalia's opinions.

4   **II.      Endangered Species Act**

5          The Endangered Species Act represents "the most comprehensive legislation for the

6   preservation of endangered species ever enacted by any nation" with the goal of preventing extinction

7   "whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173, 194 (1978). Central to the Act's

8   implementation is the Section 7 consultation process, which imposes both procedural and substantive

9   requirements. *See Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) ("The strict substantive

10  provisions of the ESA justify more stringent enforcement of its procedural requirements, because the

11  procedural requirements are designed to ensure compliance with the substantive provisions.").

12         Section 7 "consultation" is required for "any action [that] may affect listed species or critical

13  habitat." 50 C.F.R. §402.14. The ESA requires federal agencies to consult on "actions," broadly

14  defined to include "the promulgation of regulations." 50 C.F.R. § 402.02. As the Supreme Court has

15  noted, Congress "has spoken in the plainest of words" in ESA section 7, and this "affirmative

16  command . . . admits of no exception." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173, 194 (1978).

17         Notably, only "discretionary" federal action mandates section 7 consultation. 50 C.F.R. §

18  402.03. The promulgation of a regulation defining "waters of the United States" under the CWA is a

19  discretionary action, and any regulations that may affect endangered species must be the subject of

20  consultation with the Services. *See*, *e.g.*, *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495

21  (9th Cir. 2010); *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F.Supp.3d 7 (D.D.C. 2014); *Citizens*

1   *for Better Forestry v. U.S. Dep't of Agriculture*., 481 F.Supp.2d 1059 (N.D. Cal 2007); *Washington*

2   *Toxics Coal. v. U.S. Dep't of Interior*, 457 F.Supp.2d 1158 (W.D. Was. 2006).

3   **III.    National Environmental Policy Act**

4          Section 101 of NEPA declares a "broad national commitment to protecting and promoting

5   environmental quality" and "to ensure that this commitment is 'infused into the ongoing programs

6   and actions of the Federal Government, the act also establishes some important 'action-forcing'

7   procedures.'" 42 U.S.C. §4331; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348

8   (1989) (internal citations omitted). NEPA is designed to ensure that agencies take a required "hard

9   look" at the environmental consequences of their actions. *Id. at* 350-54 (1989); *Japanese Vill., LLC*

10  *v. Fed. Transit Admin*., 843 F.3d 445, 467 (9th Cir. 2016). Under NEPA, agencies must prepare a

11  "detailed statement" assessing the environmental impacts of all "major Federal actions significantly

12  affecting the quality of the human environment." 42 U.S.C. §4332(2)(C). Promulgation of a rule is a

13  "Federal action" under NEPA. 40 C.F.R. §1508.18(b)(1).

14         An agency uncertain of the impacts of its proposal may begin with an environmental

15  assessment ("EA"), a "concise public document" that "provide[s] sufficient evidence and analysis"

16  for determining whether to prepare an EIS. 40 C.F.R. § 1508.9(a). The EA must discuss the potential

17  environmental impacts of the proposed action, *see* 40 C.F.R. § 1508.9(b); provide sufficient analysis

18  for determining whether an EIS is appropriate; and discuss "appropriate alternatives if there are

19  unresolved conflicts concerning alternative uses of available resources[.]" 33 C.F.R. § 230.10(a).

20         If, after preparing an EA, the agency determines that the proposed action is not likely to

21  significantly affect the environment, it may issue a Finding of No Significant Impact ("FONSI")

22  instead of an EIS. 40 C.F.R. § 1508.13. A FONSI is a final agency action that is independently subject

1   to judicial review, and may be "set aside" under APA section 706(2)(A), 5 U.S.C. §706(2)(A).

2   *Anderson v. Evans*, 371 F.3d 475, 494 (9th Cir. 2004).

3       An agency's ultimate NEPA decision must be the product of "reasoned decisionmaking," and

4   "simple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under

5   NEPA." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (internal

6   quotations omitted); see also e.g. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admi*n.,

7   538 F.3d 1172, 1224 (9th Cir. 2008). Agency conclusions based upon "unexplained conflicting

8   findings about the environmental impacts" violate the APA. *Organized Vill. of Kake v. U.S. Dep't of*

9   *Agric.*, 795 F.3d 956, 969 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 1509 (2016). Moreover, a

10  "significant effect may exist even if the Federal agency believes that on balance the effect will be

11  beneficial." 40 C.F.R. § 1508.27(b)(1); *see also Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1056

12  (9th Cir. 2010), ("We see no basis for holding that an agency can avoid NEPA review altogether when

13  it believes that an agency action will have beneficial impacts on the environment when we have not

14  even excused an agency from producing an EIS when its EA shows that its action will have

15  exclusively beneficial impacts on the environment.").

16  **IV.    Plaintiffs possess standing to pursue these claims**

17      Plaintiffs have standing to pursue their claims as demonstrated in the declarations submitted

18  with this brief.[8] "An organization has standing to bring suit on behalf of its members when: "(a) its

19  members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect

20  are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested

21  requires the participation of individual members in the lawsuit." *Ecological Rights Found. v. Pac.*

22  *Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). Those members have standing where the member

23  demonstrates particularized injury, traceable to the conduct in question, that the court can redress. *See*

---

[8]     Plaintiffs filed standing declarations which are found in the Addendum to this brief.

1  *id.* at 661–63; *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542

2  (6th Cir. 2004).

3  The members of each of the citizen groups prosecuting this case use, recreate on or near,

4  derive myriad aesthetic and spiritual benefits from, and work to protect many different types of water

5  bodies across the United States. Several of these members actively use and enjoy waters that are

6  excluded from CWA jurisdiction by the 2015 Rule, some of which provide habitat for endangered or

7  threatened species. The 2015 Rule's inadequate protection for, and exclusion from protection of,

8  certain categories of waters will harm these members by enabling pollution of waters they use and

9  enjoy, or by making the protection of these waters uncertain or more difficult to ensure. *See Sierra*

10  *Club v. United States Environmental Protection Agency*, 793 F.3d 656, 663–65 (6th Cir. 2015) (citing

11  *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 153 n. 3 (2010)). A decision in Plaintiffs' favor

12  will allow the members of these citizen groups to use tools available under the CWA to protect the

13  waters they use and enjoy.

14  Plaintiffs' NEPA and ESA claims in particular are procedural in nature, and Plaintiffs need

15  not "meet[] all the normal standards for redressability and immediacy." *Lujan v. Defs. of Wildlife*,

16  504 U.S. 555, 573, n.7 (1992). Thus, the uncertain outcome of ESA consultation or NEPA review—

17  that is, whether such review would in fact change the Clean Water Rule—does not defeat

18  redressability. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1083 (9th Cir.

19  2015), *cert. denied*, 2016 WL 2840129 (Oct. 11, 2016). Accordingly, Plaintiffs have standing to bring

20  these claims regarding the Clean Water Rule.

21  **STANDARD OF REVIEW**

22  Summary judgment is appropriate if there is no genuine issue of material fact and the moving

23  party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*,

24  477 U.S. 242, 247 (1986). In the context of a record review case, resolution of plaintiffs' claims,

25  however, does not require traditional fact finding by the court but rather court review of the

1    administrative record. *Nw. Motorcycle Ass'n v. U.S. Dep't. of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir.

2    1994) (citations omitted). Because this case involves review of final agency action and an

3    administrative record, it does not present any genuine issues of material fact, and resolution of the

4    case on a motion for summary judgment is appropriate. *See Innova Solutions, Inc. v. Baran*, 399

5    F.Supp.3d 1004, 1011 (N.D. Cal. 2019) (quoting *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769

6    (9th Cir. 1985)).

7         This challenge to a CWA regulation falls under the APA, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*,

8    138 S. Ct. 617, 199 L. Ed. 2d 501 (2018). First, applying the principles set forth in *Chevron U.S.A.,*

9    *Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), the Court must

10   determine "whether Congress has directly spoken on the precise question at issue." *Safer Chemicals,*

11   *Healthy Families v. U.S. Env. Protection Agency*, 943 F.3d 397, 422 (9th Cir. 2019) (quoting *Akhtar*

12   *v. Burzynski*, 384 F.3d 1193, 1198 (9th Cir. 2004)). "If the intent of Congress is clear, 'that is the end

13   of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed

14   intent of Congress.'" *Id.* (quoting *Chevron*, 467 U.S. at 842-43). "But if 'the statute is silent or

15   ambiguous with respect to the specific issue'" then the Court asks whether the agency's answer is

16   "based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 843).

17        If the agency's construction is permissible, its decision may still be set aside if the decision is

18   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. §

19   706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,"

20   *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D). The Court

21   engages in a "substantial inquiry," and while an agency action is entitled to a presumption of

22   regularity, it is not immune to "probing" examination by the Court. *Native Ecosystems Council v.*

1  *U.S. Forest Service*, 418 F.3d 953, 960 (9th Cir. 2005) (quoting *Citizens to Preserve Overton Park,*

2  *Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).

3       An agency rule is arbitrary and capricious if the agency relied on factors Congress did not

4  intend it to consider, entirely failed to consider an important aspect of the problem, offered an

5  explanation for its decision that is counter to the evidence, or is so implausible that it could not be

6  ascribed to a difference in view or agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

7  *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Nat'l Cotton Council v. United States Environmental*

8  *Protection Agency*, 553 F.3d 927, 934 (6th Cir. 2009). That same standard of review applies to claims

9  alleging noncompliance with NEPA, as well as claims alleging a failure to consult and ensure no

10  jeopardy under ESA section 7(a)(2). *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th

11  Cir. 2013) (NEPA); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011)

12  (ESA).

13       Although the APA standard of review is deferential, it does not permit the reviewing court to

14  merely "'rubber-stamp' administrative decisions." *Alaska Oil and Gas Ass'n v. Jewell*, 815 F.3d 544,

15  554 (9th Cir. 2016). Rather, it is incumbent upon the agency to articulate a "rational connection

16  between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43. It

17  requires the reviewing court to determine whether the agency correctly interpreted the law, and

18  agencies must "examine the relevant data and articulate a satisfactory explanation for [their] action."

19  *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State*

20  *Farm Mut. Automobile Ins. Co.*, 463 U.S. at 43).

21       Additionally, agencies must provide "a more detailed justification" when they adopt a new

22  policy that "rests upon factual findings that contradict those which underlay its prior policy…." *FCC*

23  *v. Fox Television Stations*, 556 U.S. at 513. An agency cannot depart from prior findings or positions

24  without "supply[ing] a reasoned analysis for that change." *Lynch v. Dawson*, 820 F.2d 1014, 1021

25  (9th Cir. 1987) (relying on *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins.*

1   *Co.*, 463 U.S. 29, 57 (1983)). In NEPA cases specifically, the reviewing court must "ensure that an

2   agency has taken the requisite 'hard look' at the environmental consequences of its proposes action,

3   carefully reviewing the record to ascertain whether the agency decision is 'founded on reasoned

4   evaluation of the relevant factors.'" *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir.

5   1992) (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373-74 (1989)).

6                                       **ARGUMENT & AUTHORITIES**

7   **I.      The Agencies violated the Endangered Species Act**

8          In the 2015 Rule, the Agencies arbitrarily removed from federal jurisdiction thousands of

9   acres of wetlands, lakes, rivers, streams, ponds, and ditches which support endangered and threatened

10  species nationwide. Despite the dramatic impacts on listed endangered or threatened species, the

11  Agencies failed to ensure that the 2015 Rule "is not likely to jeopardize the continued existence of

12  any endangered species or threatened species or result in the destruction or adverse modification of

13  habitat of such species" as required by the ESA 16 U.S.C. § 1536(a)(2). Further, the Agencies failed,

14  or refused, to consult with the Services regarding impacts to ESA-listed species. *Id.*[9]  These actions

15  by the Agencies in passage of the 2015 Rule are violations of the ESA.

16           **A.      The Agencies' promulgation of the 2015 Rule was a discretionary federal action**
17                   **triggering ESA consultation**

18         There is no doubt that the Agencies' promulgation of the 2015 Rule was discretionary. The

19  CWA does not require the Agencies to define "waters of the United States" nor does it require the

20  Agencies to issue a rule limiting the reach of the Act. Instead, the Agencies have, in their own words,

21  relied upon their "discretion to interpret the bounds of CWA jurisdiction." 80 Fed. Reg. at 37,082.

22  More importantly, the specific choices within the 2015 Rule as to where the Agencies would "draw

23  lines" of jurisdiction, its choices regarding which types of waters to protect or not protect, and which

_____

[9]        Waterkeeper's notice of its intent to sue is included alongside this brief.

1   exemptions it would grant all represent discrete policy choices — discretionary actions — that clearly

2   fall within the ESA's consultation requirement. 80 Fed. Reg. at 37,057.

3   **B.      The 2015 Rule "may affect" ESA-listed species and their critical habitats**

4          Federal agencies are required to consult under ESA section 7(a)(2) if the proposed action "may

5   affect" listed species or their critical habitat. 50 C.F.R. § 402.14(a). The "may affect" threshold for

6   triggering ESA consultation is low: "*Any possible effect*, whether beneficial, benign, adverse, or of

7   an undetermined character, triggers the formal consultation requirement." Interagency Cooperation—

8   Endangered Species Act of 1973, as Amended, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (emphasis

9   added). In other words, federal actions that have "*any chance* of affecting listed species or critical

10  habitat . . . require at least some consultation under the ESA," and an agency may avoid consultation

11  only when it affirmatively determines "that its action will have 'no effect' on a listed species or critical

12  habitat." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012)

13  (emphasis added). To satisfy their burden in this litigation, therefore, Plaintiffs need only show "that

14  an effect on listed species or critical habitat is plausible." *Ctr. for Biological Diversity v. U.S. Bureau*

15  *of Land Mgmt.*, 698 F.3d 1101, 1122 (9th Cir. 2012).

16         As recently held by the D.C. Circuit, even if an agency believes its rule will have "no effect"

17  on listed species, the agency must still expressly "make an appropriate effects determination." *Am.*

18  *Fuel & Petrochemical Manufactures, et al., v. U.S. Environmental Protection Agency*, 937 F.3d 559,

19  598 (D.C. Cir. Sept. 6, 2019). In the 2015 Rule, the Agencies do not even mention endangered species.

20  They completely failed to make any appropriate effects determination, nor do they provide any

21  justification for not consulting under the ESA with the Services.

22         Many of the 2015 Rule's provisions, and the discretionary choices they represent, easily

23  surpass the low "may affect" threshold, triggering both the statutory obligation to ensure no jeopardy

24  to listed species and to consult. First, the breadth of the 2015 Rule—establishing the framework for

25  determining the jurisdictional status of every waterbody in the nation—strongly suggests that ESA

1   consultation was required. *See Kraayenbrink*, 632 F.3d at 496 ("The sheer number of acres affected

2   by the 2006 Regulations and number of special status species who reside on those lands alone suggest

3   that the proposed amendments 'may affect' a listed species or its critical habitat"). As EPA notes,

4   "more than one-third of the United States' threatened and endangered species live only in wetlands,

5   and nearly half use wetlands at some point in their lives." EPA, Why are wetlands important?

6   *available at* https://www.epa.gov/wetlands/why-are-wetlands-important (last visited Dec. 29,

7   2019)).[10]

8          While the 2015 Rule is definitional in nature, it directly impacts the need for, and issuance of,

9   CWA permits in fundamental ways. The consequences of its promulgation are direct and immediate,

10  both for those waters that will lose their jurisdictional status as well as the cumulative impacts that

11  occur downstream.[11] *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1019 (9th

12  Cir. 2009) (rejecting an argument that the agency action "independently would have no effect on the

13  environment," and finding ESA section 7 applied because the action resulted in the loss of

14  "substantive protections afforded to" areas protected by prior regulation). The Corps recognizes that

15  "individual permits [to fill a wetland] cannot be issued until Section 7 consultation is complete,"

16  Updated Standard Operating Procedures for U.S. Army Corps of Engineers, 66 Fed. Reg. 11,202,

17  11,216 (Feb. 22, 2001), yet concedes that such consultation "would not occur if [the waters] were not

---

[10]    The Court is not bound by the administrative record in its consideration of Plaintiffs' ESA claim, which is brought pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1), not the APA. *See Kraayenbrink*, 632 F.3d at 497.

[11]    The Corps suggests that Clean Water Act jurisdiction is "expected to have a beneficial impact on fish and wildlife for which the protected waters provide habitat," including threatened and endangered species. [JA]#20867, EA at 24. Even were that true, such a benefit itself "triggers the formal consultation requirement" under ESA section 7. 51 Fed. Reg. at 19,949.

1   subject to [CWA] jurisdiction." [JA]#20867, EA at 23. Thus, waters excluded from jurisdiction under

2   the 2015 Rule will lose all benefits that may flow from future ESA consultation.

3         Equally troubling is the Agencies' failure to consult regarding the 2015 Rule's several

4   provisions that reduce the reach of CWA jurisdiction as compared to the Agencies' historic practice,

5   which not only cross the "may effect" threshold for listed species and their habitats, but *will* adversely

6   affect listed species and their habitats. For example, the 2015 Rule's 4,000-foot limitation on the

7   application of the significant nexus test "remove[s] from CWA jurisdiction what is potentially as

8   much as 10% of the currently jurisdictional aquatic resources," mostly wetlands that would not meet

9   the 2015 Rule's definition of "adjacent." Doc. 32-1, Exhibit C, Moyer Memo at ¶¶ **7-**8. The Agencies'

10  own record establishes that these non-adjacent wetlands provide essential habitat for threatened and

11  endangered species. *See, e.g.*, [JA]#20869, TSD at 303 (wetlands in the Great Lakes region support

12  "many endangered and threatened species"); *id.* at 111 ("Non-floodplain wetlands provide unique and

13  important habitats for many species, both common and rare."). For example, the record identifies a

14  large wetlands complex that lies beyond 4,000 feet from Chickasawhatchee Creek in Georgia that has

15  previously been found jurisdictional by the Corps, but would no longer be jurisdictional under the

16  2015 Rule. Doc. 32-1, Exhibit D, Appx. A, Ex. 13. The creek is also designated critical habitat for

17  five ESA-listed mussel species. 72 Fed. Reg. 64,286, 64,308 (Nov. 15, 2007). The regulatory change

18  of those wetlands is expected to allow for the modification of the mussels' critical habitat resulting

19  from discharges that would no longer be regulated under the CWA.

20        Similarly, the record makes clear that the 2015 Rule's last-minute exclusion of all ephemeral

21  features and most ditches has serious implications for ESA-listed species. *See, e.g.*, [JA]#8046, SAB

22  Panel Comments on Draft Connectivity Report, at 20 (waters that are "seasonally dry or even dry for

23  several years in a row can be critical to . . . a wide range of species" and their degradation "can result

24  in the listing of new threatened and endangered species"); [JA]#20872, Clean Water Rule Comment

25  Compendium Topic 6, at 230 (irrigation ditches are important for "the highly endangered silvery

1    minnow in New Mexico"); [JA]#7617 at 26 (certain ditches are used for "reintroducing fish that are

2    listed as threatened or endangered . . . because they are the best remaining aquatic habitat in the

3    region"); [JA]#20872, Clean Water Rule Comment Compendium Topic 8, at 286 (several species

4    "classified as State and/or federal threatened, endangered or candidate" species in New Mexico rely

5    on intermittent or ephemeral waters).

6           Further, the categorical exclusion of groundwater is likely to affect ESA-listed species. *See,*

7    *e.g.*, [JA]#20872, Clean Water Rule Comment Compendium Topic 7, at 244–45 (explaining that

8    groundwater provides the base flow for several southwestern rivers that are used as habitat by ESA-

9    listed species). Indeed, there are several groundwater-dependent crustaceans listed under the ESA.

10    *See, e.g.,* 81 Fed. Reg. 67,270, 67,277 (Sept. 30, 2016) (noting that degraded groundwater quality

11    would impact Buck Creek, Kentucky and in turn would likely harm 30 species of freshwater mussels,

12    including the listed Cumberlandian combshell and the listed Oyster Mussel); Curry Declaration,

13    attached hereto.

14           Because, as shown, the 2015 Rule "may effect" listed species and their habitats, the Agencies'

15    consultation obligations have been triggered under the ESA. Within those obligations, the Agencies,

16    in consultation with the Services, bore the burden of demonstrating that their Rule would not

17    jeopardize listed species or adversely modify critical habitats. *Karuk Tribe,* 681 F.3d at 1027–28; *Ctr.*

18    *for Biological Diversity*, 698 F.3d at 1122. Their failure to do so and the Agencies' failure to consult

19    with the Services violated ESA section 7(a)(2), and was contrary to law under APA section 706(2)(A).

20    **II.**    **The Agencies violated the National Environmental Policy Act**

21           The Corps' decisions, through the 2015 Rule, to eliminate CWA jurisdiction for thousands of

22    acres and entire categories of waters covered under the prior definition of "waters of the United

23    States" will have serious ecological implications. Nonetheless, the Corps failed to fully assess the

24    2015 Rule's potential impacts as required by NEPA. Instead, the Corps prepared a cursory

25    environmental assessment ("EA") that it paired with an unsupported FONSI. Indeed, documents

1  within the record demonstrate that the Corps had serious doubts about its own findings within the EA

2  — and the Corps believed the impacts of the 2015 Rule were significant. It is clear that the Corps

3  should have completed a full Environmental Impact Statement ("EIS") based on the record before

4  it.[12] Because the EA and FONSI are deeply flawed, counter to the scientific evidence in the record,

5  the 2015 Rule is arbitrary and capricious under APA section 706(2)(A).

6       **A.    The Corps failed to take a "hard look" at the significant impacts of the 2015**
7       **Rule's likely loss of jurisdiction over many wetlands and other waters**

8       NEPA contains a set of "action-forcing" procedures that require federal agencies to take a

9  "hard look at [the] environmental consequences" of their proposed actions. *Kentucky Riverkeeper,*

10 *Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (internal citations omitted). Agencies must prepare

11 a "detailed statement" assessing the environmental impacts of all "major Federal actions significantly

12 affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Promulgation of a rule is a

13 "Federal action" under NEPA. 40 C.F.R. § 1508.18(b)(1). Moreover, a "significant effect may exist

14 even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. §

15 1508.27(b)(1); *see also Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1056 (9th Cir. 2010).

16      Here, the Corps' EA relies on a deeply flawed and wholly unsupported assumption that the

17 2015 Rule would likely result in an "incremental increase in Clean Water Act jurisdiction[.]"

18 [JA]#20867, EA at 21. The Corps somehow reached this conclusion without expressly identifying,

19 let alone considering, the impacts of the last-minute changes made to the final Rule. At least five

20 significant changes were made after notice and comment on the Proposed Rule was completed, all of

21 them narrowing the scope of CWA jurisdiction, and none of them are assessed in the EA: 1) The

22 4,000-foot distance limitation on the case-specific application of the "significant nexus" test for most

---

[12]     "During discussions with EPA staff on April 9, 2015, EPA representatives suggested that, … the proposed abandonment of substantial parts of the CWA 's long-standing jurisdiction would cause significant adverse effects on the human environment, . . . ." *See* Doc. 32-1, Exhibit B, Wood Memo, p. 3.

1   waters; 2) The categorical exclusion for most ephemerally or intermittently flowing ditches; 3) The

2   categorical exclusion of all "ephemeral features"; 4) The modified definition of "adjacent," excluding

3   waters used for established normal farming, ranching, and silviculture activities; and 5) The modified

4   definition of "tributary," requiring a bed, banks, and ordinary high water mark (OHWM).[13]

5          The Corps' erroneous conclusion about the purported "incremental increase" in jurisdiction

6   appears to be based entirely upon EPA's May 20, 2015 Economic Analysis, in which EPA estimated

7   that promulgation of the 2015 Rule would result in an increase of approximately 2.8 to 4.7% in the

8   number of positive jurisdictional determinations. [JA]#20866, Econ. Analysis at 14.[14] But that

9   analysis itself contained an essential caveat that the Corps ignored in its EA:

10         The available data only can inform the agencies how many currently negative
11         determinations may become positive based on the final rule. The agencies note that
12         there will be some waters that will no longer meet the definition of "waters of the U.S."
13         and therefore, this analysis may over-estimate the increase in positive determinations.
14

15   *Id*. at 5; *see also id*. at 7 (stating that "reviewing how current positive [Jurisdictional Determinations]

16   may become negative as a result of the final rule was determined to be outside the scope of this

17   analysis").

18         The Corps makes a passing reference to the 4,000-foot limitation in the EA, stating without

19   explanation that "the vast majority of wetlands with a significant nexus are located within the 4,000

20   foot boundary" and asserting that any impact to waters outside that boundary are "speculative and

---

[13]   Corps' Assistant Chief Counsel Lance Wood wrote, "the abandonment of CWA jurisdiction over important parts of the tributary system . . . cannot be done without first preparing an environmental impact statement (EIS) to identify . . . what significant adverse environmental effects would result from that loss of jurisdiction." Doc. 32-1, Exhibit B, Wood Memo, p. 2. Of course, no EIS was ever prepared.

[14]   The Economic Analysis is cited repeatedly in the EA for this very point, *see* [JA]#20867, EA at 21, 25, 28, and no other document or study is referenced for the alleged "incremental increase in Clean Water Act jurisdiction."

1    hypothetical[.]" [JA]#20867, EA at 23.[15] That conclusion is arbitrary and not supported by the Corps'

2    own documents. The record shows that the impact of the 4,000-foot cutoff, in particular, will be

3    significant. As the Moyer Memorandum explains, "approximately 10% of all waters over which the

4    Corps has asserted jurisdiction under its 1986 regulations and current guidance are non-abutting

5    adjacent wetlands," some of which undoubtedly "fall outside of 4,000 linear feet of the OHWM[.]"

6    Doc. 32-1, Exhibit C, Moyer Memo at 2. Indeed, as Ms. Moyer herself pointed out,

7          To remove from CWA jurisdiction what is potentially as much as 10% of the currently
8          jurisdictional aquatic resources without the benefit of a detailed analysis, such as one
9          that would be performed as part of an EIS, would present the potential for significant
10         adverse effects on the natural and human environment.

11    *Id*. at 3.[16]

12    Here, the Corps has failed "to support its pronouncements" regarding its *presumed* increase

13    in jurisdictional waters "with data or evidence," *Islander E. Pipeline Co., LLC v. Conn. Dep't of*

14    *Envtl. Prot.*, 482 F.3d 79, 103 (2d Cir. 2006), and these defects cannot be cured by the agency's

15    "conclusory final-decision statements" in the EA. *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402,

16    411 (6th Cir. 2013). The Corps' EA is deeply flawed and based upon unsupported conclusions

17    regarding the extent to which the 2015 Rule actually affects the number and area of jurisdictional

18    waters, and its FONSI was arbitrary and capricious.

19    **B.**    **The Corps failed to adequately assess a reasonable range of alternatives to the**
20           **final Rule**

21    In its EA, the Corps assessed only the "no action" alternative to the promulgation of the Clean

22    Water Rule. [JA]#20867, EA at 13. The Corps specifically declined to consider the 2014 Proposed

---

[15]    Even assuming, *arguendo*, that the 2015 Rule provides some environmental benefits, the Corps may not avoid its obligation to take a hard look at the adverse impacts of its action. *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1056 (9th Cir. 2010).

[16]    Appendix A to the Moyer Memorandum provides fifteen "representative examples" of such waters, totaling more than 2,000 acres of wetlands, ponds, and ditches previously found jurisdictional by the Corps, but which would be non-jurisdictional under the 2015 Rule due to the 4,000-foot distance cutoff. Doc. 32-1, Exhibit C, Moyer Memo at 1–2, ¶3.

1   Rule, stating without explanation that "it [the earlier version] is no longer a viable option to

2   accomplish the purpose and need for action." *Id*. That is, the Agencies refused to even *consider* their

3   originally proposed rule as an alternative to the rule it modified. The EA presents no other alternatives.

4   A full Environmental Impact Statement that would have considered, for example, a range of distance

5   options as to where CWA jurisdiction for non-adjacent wetlands should or could be made — 1,000

6   feet, 4,000 feet, 5,000 feet, 10,000 feet — and would have allowed the public a meaningful

7   opportunity to weigh in and provide the Agencies with exactly the type of information that NEPA is

8   designed to solicit. The Corps' refusal to consider any alternatives, and its failure to consider the

9   approach discussed in the 2014 Proposed Rule specifically, was arbitrary and capricious.

10      The Corps' suggestion that the language of the 2014 Proposal was not "a viable option to

11   accomplish the purpose and need" of the CWA is baseless. *See* [JA]#20867, EA at 13. The 2014

12   Proposed Rule was developed specifically to offer "clarity to regulated entities as to whether

13   individual water bodies are jurisdictional and discharges are subject to permitting," 79 Fed. Reg. at

14   22,188, which is squarely in line with the Corps' statement of purpose in the 2015 Rule. *See*

15   [JA]#20867, EA at 1 (purpose of the 2015 Rule is to "clarify the scope of the regulatory term 'waters

16   of the United States'" and "simplify implementation of the Clean Water Act"). Indeed, the Agencies

17   expressly recognized in the 2014 Proposed Rule that "there may be more than one way to determine

18   which waters are jurisdictional as 'other waters'" and thus sought comment on a variety of

19   "alternatives" to the proposed language, *see* 79 Fed. Reg. at 22,214–15. And yet none of these

20   alternatives were considered in the EA. In short, the Corps failed to consider a reasonable range of

21   alternatives, as required by NEPA. As a result, the 2015 Rule was arbitrary and capriciously passed

22   and is contrary to law pursuant to APA section 706(2)(A).

23   **III.**    **The 2015 Rule violates the CWA and the Administrative Procedure Act**

24      The CWA mandates that the Agencies apply pollution-control measures to "navigable

25   waters," 33 U.S.C. § 1251 *et seq*., defined as the "waters of the United States," *id*. § 1362(7). The

1    Agencies have concluded that "[w]aters are 'waters of the United States' if they . . . significantly

2    affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters,

3    or the territorial seas." 80 Fed. Reg. at 37,060. While Plaintiffs dispute that standard reflects the full

4    extent of waters protected by the CWA, having determined that the significant-nexus standard is the

5    "key" to protection under the Act, *id.*, the Agencies lack authority to deny protection to waters that

6    meet that standard. Yet, the Rule purports to exclude from the Act's protections waters that the

7    evidence shows have met, or may meet, the significant-nexus standard. The Agencies' exclusion of

8    these waters violates the Act and is "in excess of statutory jurisdiction, authority, or limitations, or

9    short of statutory right" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

10       Additionally, the Agencies' exclusion of waters discussed below is "arbitrary, capricious, an

11   abuse of discretion, or otherwise not in accordance with law," and several of the exclusions were

12   adopted "without observance of procedure required by law," *id.* § 706(2)(A) and (D). First, the

13   exclusion of certain tributaries and "ephemeral features" is unsupported in the record. Second, the

14   exclusion of certain ditches that otherwise meet the definition of tributary lacks any basis in the

15   record. Third, the redefinition of waters based on their use by agriculture is not supported in the

16   record, did not comply with notice and comment requirements and is contrary to law. Fourth, the

17   application of a 4,000' limitation on significant nexus determinations is not supported in the record,

18   did not comply with notice and comment requirements and is contrary to law. Fifth, and finally, the

19   exclusion of groundwater is arbitrary because, *inter alia*, it ignores the Agencies' own science

20   concerning the "significant nexus" that groundwater often has with surface waters.

21       **A.    The 2015 Rule's definition of "tributary" and its categorical exclusion of all**
22       **"ephemeral features" are unsupported by the record and arbitrary and**
23       **capricious**

24       The 2015 Rule deviates from long-standing agency practice by imposing two separate

25   requirements in the definition of "tributary": (1) a bed and banks, and (2) an ordinary high water mark

1   ("OHWM").[17] *See* 80 Fed. Reg. at 37,076, 37,079; 33 C.F.R. § 328.3(c)(3). The 2015 Rule also

2   expressly excludes "ephemeral features that do not meet the definition of tributary," even where they

3   would otherwise be jurisdictional as an adjacent water or by application of the significant nexus test.

4   33 C.F.R. § 328.3(b)(4)(vi).[18] Taken together, these two provisions mean there is no middle ground

5   for streams, particularly ephemeral ones: they are either *per se* jurisdictional if they meet the

6   definition of tributary, or they are *per se* excluded if they do not. *See* 80 Fed. Reg. at 37,058 (noting

7   the 2015 Rule explicitly excludes "ephemeral streams that do not have a bed and banks and

8   [OHWM]"). These provisions lack support in the record, are contrary to the Agencies' own science,

9   and are arbitrary and capricious.[19]

10         The requirement for tributaries to have an OHWM is arbitrary and capricious, and the record

11   is devoid of support for that requirement. The Science Report concluded that the evidence was

12   "unequivocal[]" that "*[a]ll* tributary streams, including perennial, intermittent, and ephemeral

13   streams, are physically, chemically, and biologically connected to downstream rivers . . . ." Science

14   Report at ES-2, JA[20859] (emphasis added). Because of that, the SAB "recommended that the

15   presence of OHWM not be a required attribute of a tributary and suggested that the wording in the

16   definition be changed to 'bed, bank, and other evidence of flow.'" [JA]#7617, SAB Comments at 2.

17   *See also* [JA]#20869, TSD at 242 (noting that SAB members "expressed the view that from a

---

[17]    Prior to the 2015 Rule, all tributaries—including ephemeral streams—were considered jurisdictional under the regulatory definition. *See* Rapanos Guidance at 10.

[18]    The 2015 Rule as it was proposed did not contain an express exclusion for "ephemeral features." *See* 79 Fed. Reg. at 22,263-64.

[19]    Corps' Assistant Chief Counsel Lance Wood wrote, "many provisions of the draft rule have . . . introduced indefensible provisions," such as "exclud[ing] from jurisdiction of the CWA large areas of lakes, ponds, and similar water bodies that are important components of the tributary system of the navigable waters . . ." *See* Doc. 32-1, Exhibit B, Wood Memo at 1 & 2.

1  scientific perspective there are tributaries that do not have an [OHWM] but still affect downstream

2  waters").

3       Further, the Agencies' record makes clear that ephemeral streams—waters that "flow briefly

4  . . . during and immediately following precipitation" and "are above the water table at all times," are

5  a critically important part of the hydrologic landscape. [JA]#20869, TSD at 131. A joint peer-

6  reviewed report by EPA and the U.S. Department of Agriculture on the importance of ephemeral and

7  intermittent streams in the desert Southwest, which the Agencies call "a state-of-the-art synthesis of

8  current knowledge of the ecology and hydrology in these systems," *id*. at 259, recognizes that

9  ephemeral streams "perform the same critical hydrologic functions as perennial streams: they move

10  water, sediment, nutrients, and debris through the stream network and provide connectivity within the

11  watershed." [JA]#8280, Ephemeral Streams Report at 13; s*ee also* 80 Fed. Reg. at 37,063;

12  [JA]#20869, TSD at 104-05, 259-60 (noting the ecological importance of ephemeral streams).

13       The ability to protect ephemeral streams under the CWA is critically important in areas like

14  the desert Southwest, where ephemeral streams comprise the vast majority of waters. [JA]#8280,

15  Ephemeral Streams Report at 5. In such contexts, ephemeral streams "provide much of the ecological

16  and hydrological connectivity in a landscape," and their disturbance or loss "has dramatic physical,

17  biological, and chemical impacts" on the watershed. *Id*. at 8.

18       Notwithstanding their importance to arid landscapes in particular, ephemeral streams often

19  lack an OHWM. *See*, *e.g.*, [JA]#7617, Comments to the chartered SAB, at 2 (noting that "[t]he

20  absence of OHWM is relatively common in ephemeral streams within arid and semi-arid

21  environments or low gradient landscapes"). Even the Agencies concede that "regional variation in

22  hydrology, climate and other factors" can make identification of an OHWM difficult in the arid west.

23  *See* [JA]#20872, Response to Comments – Topic 8, at 313-14.

24       The arbitrary and capricious exclusion of all tributaries that lack an OHWM and perennial

25  features is perhaps best demonstrated with an example. Under the 2015 Rule, a tributary that lacks an

1   OHWM is excluded and an ephemeral stream is categorically exempt, even when those streams

2   contribute direct surface flow to a "water of the United States." By contrast, a wetland or pond with

3   no apparent surface hydrologic connection to that same tributary at any time of the year is *per se*

4   jurisdictional as an "adjacent water" if it is within 1,500 feet of the tributary, and may be jurisdictional

5   under the significant nexus test if it is up to 4,000 feet away. The record contains no rational basis for

6   this disparate result.

7        In short, the Agencies narrowed the definition of "tributary" and interposed an "ephemeral

8   features" exclusion that will leave many ephemeral streams unprotected, contrary to the

9   overwhelming science in the record regarding the importance of these streams to the hydrologic

10  system, especially in the arid Southwest where an OHWM is often absent. There is no support in the

11  record for the Agencies' decision; it is simply arbitrary and capricious under the APA 706(A)(2) as

12  action without basis.

13     **B.    The exclusion of certain ditches that otherwise meet the definition of tributary**
14            **lacks any basis in the record, and is arbitrary and capricious**

15       The 2015 Rule expressly excludes three types of ditches: 1) Ditches with ephemeral flow that

16  are not a relocated tributary or excavated in a tributary; 2) Ditches with intermittent flow that are not

17  a relocated tributary, excavated in a tributary, or drain wetlands; and 3) Ditches that do not flow,

18  either directly or through another water, into a navigable water, interstate water, or territorial sea. 80

19  Fed. Reg. at 37,105 (citing 33 C.F.R. § 328.3(b)(3)). These ditches are excluded even if they meet the

20  Agencies' already-arbitrary requirements for tributaries — (1) they possess a bed and bank, and an

21  OHWM; (2) they contribute flow to downstream jurisdictional waters. *See* 80 Fed. Reg. at 37,097-

22  98. The Agencies' exclusion of ditches that meet their own definition for tributaries is contrary to

23  prevailing science, unsupported by the record, and arbitrary and capricious.

24       The record offers no scientific support for treating man-made ditches differently from natural

25  tributaries. To the contrary, the record is replete with the Agencies' own explanations as to why

1   ditches *should be* jurisdictional as "tributaries" if they function like tributaries. The Agencies candidly

2   admit "it is not relevant whether a water is man-altered or man-made for purposes of determining

3   whether a water is jurisdictional under the CWA." [JA]#20869, TSD at 74. The Agencies explain

4   that:

5       Tributary ditches and other man-made or man-altered waters that meet the definition
6       of "tributary" have a significant nexus to (a)(1) through (a)(3) waters due to their
7       impact, either individually or with other tributaries, on the chemical, physical, or
8       biological integrity of those downstream waters.

9   *Id*. at 257. In their response to comments, the Agencies note that ditches meeting the definition of

10  tributary provide the same chemical, physical, and biological functions as other water bodies defined

11  as tributaries under the proposed rule." [JA]#20872, Response to Comments – Topic 6, at 28.

12      Similarly, EPA's Science Report provides no basis for the Agencies' disparate treatment of

13  ditches and tributaries. [JA]#20859, Science Report at 1–11 (hydrologic connectivity can be increased

14  by ditches); *id*. at 4–21 (ditches can introduce nutrients to downstream waters); *id*. at 6–10 (drainage

15  ditches can increase connectivity between different types of waters). The SAB found a "lack of

16  scientific knowledge to determine whether ditches should be categorically excluded." *Id*. at 163*; see*

17  *also* [JA]#7617, SAB Comments at Attachment p. 9 (Dr. Ali) (noting the disparate treatment between

18  ditches and tributaries "suggests a lack of consistent framework").[20]   Individual SAB members

19  pointed out the lack of scientific justification to classify ditches based upon their flow regime. *See,*

20  *e.g.*, [JA]#7617, SAB Comments at Attachment p. 36 (Dr. Harvey) ("there would appear to be no

21  reason [intermittently flowing ditches] should not be considered jurisdictional."); *id*. at 41 (Dr.

22  Johnson) (ditches with less than perennial flow "exist in heavily agricultural areas which are subject

---

[20]     Indeed, there was near-universal condemnation among SAB members reviewing the ditch
exclusion, nearly all of whom noted the lack of scientific basis for the exclusion given the ecological
importance of many ditches. [JA]#7617, SAB Comments at Attachment pages 14, 19, 51, 70, 97, 106,
and 121.

1   to runoff containing high concentrations of sediments, nutrients, and pesticides"). The ditches

2   exclusion is arbitrary and capricious, and should be vacated.

3       **C.    The Agencies' use of agricultural discharges to define "waters of the United**
4       **States" violates the CWA and Administrative Procedure Act**

5       Under the 2015 Rule, waters "adjacent" to foundational waters, impoundments, and tributaries

6   are categorically protected. However, the 2015 Rule asserts that these very same waters are not

7   "adjacent" if they are used for activities that are ordinarily exempt from permitting under section

8   404(f) of the CWA, namely "established normal farming, ranching, and silviculture activities." The

9   2015 Rule protects waters used for such purposes only if they qualify for a case-by-case analysis

10  under the restrictive criteria of paragraphs (a)(7) or (a)(8) of the Rule, and the analysis shows that

11  they have a significant nexus to foundational waters. 80 Fed. Reg. at 37,080.

12      This activity-based exclusion violates the CWA and the APA. It unlawfully expands a

13  statutory exemption for specified activities into an exclusion that affects entire water bodies in which

14  those activities are conducted, applying to discharges and CWA programs Congress did not intend to

15  exempt. Additionally, even assuming that this exclusion does not violate the plain language of the

16  CWA, it is not a permissible interpretation of the CWA because the Agencies failed to offer a rational,

17  non-arbitrary basis for treating adjacent waters as non-adjacent simply because they are used for

18  agricultural activities. The exclusion also violates the APA's requirements for notice and comment

19  because the proposal gave no indication the Agencies were considering such an exclusion, depriving

20  the public – including the Plaintiffs – of the opportunity to meaningfully comment on it.

21      Denying water bodies the guaranteed protection afforded to all other adjacent waters, simply

22  because those water bodies are used for certain agricultural activities, violates the plain language of

23  the CWA. Congress specified a limited exemption in section 404(f): it chose to exempt discharges of

24  dredged or fill material associated with "normal farming, ranching, and silvicultural activities" from

25  certain permitting requirements. 33 U.S.C. § 1344(f)(1). Nothing in the Act suggests Congress

1   intended to exclude waters affected by those activities generally from the CWA's protections, or to

2   subject the waters themselves to narrower, more restrictive criteria for regulation. In fact, the

3   Agencies expressly acknowledge this in explaining their conclusion that certain ditches may fall

4   under the CWA's protections, notwithstanding permitting exemptions for certain discharges that

5   might affect such ditches: "Consistent with longstanding practice, these exempt *activities* do not

6   change the jurisdictional status of the water body as a whole, or the potential need for CWA permits

7   for non-exempted activities in these waters or non-exempted discharges to these waters." Response

8   to Comments, Topic 6 at 30-31, JA[20872]; *see also id*. at 217 (stating that "404(f)(1)(A) does not

9   change the jurisdictional status of a water, but allows certain activities to be conducted without the

10   need for a CWA 404 permit").

11       Excluding waters polluted by agricultural activities from the "adjacent" category exempts

12   such waters from regulation and protection under the CWA. As such, the Agencies made it more

13   likely that those waters will be subject to discharges of pollutants without permitting oversight. The

14   two provisions of the 2015 Rule governing case-by-case analyses *fail* to fill the gap created by this

15   change. Paragraph (a)(7) applies only to five specific types of waters; if a water used for agriculture

16   is not a prairie pothole, Carolina or Delmarva bay, pocosin, western vernal pool, or Texas coastal

17   prairie wetland, it is ineligible for protection under that section. *See* 33 C.F.R. § 328.3(a)(7).

18   Paragraph (a)(8) limits the scope of the significant-nexus analysis by providing that other "adjacent"

19   waters must be ignored in the assessment of aggregate impact. *See id*. § 328.3(a)(8).

20       Under the CWA and prior regulations, waters receiving discharges of dredged or fill material

21   associated with normal agricultural and silvicultural activities still benefited generally from other

22   CWA protections. For example, consistent with *Nat'l Cotton Council v. EPA*, 553 F.3d at 936,

23   permitting requirements and effluent limitations for discharges of chemical and biological pesticides

24   applied to these waters. These waters could also be identified as impaired, triggering a requirement

25   to establish a pollution budget for the water body. 33 U.S.C. § 1313(d). Additionally, these waters

1  benefited from provisions of the CWA that assign liability and impose cleanup costs for spills of oil

2  and other hazardous substances. *Id.* § 1321. The exemption of all waters used by agriculture under

3  the 2015 Rule allows *all* dischargers to those waters to evade the Act's pollution controls. This

4  violates the CWA's requirement that all discharges of pollutants to navigable waters obtain a permit

5  or, otherwise, the discharges are illegal. *See* 33 U.S.C. § 1331(a).

6       The Agencies can point to no provision of the CWA authorizing them to provide lesser

7  protection for waters based on activities that may pollute those waters. To the contrary, that approach

8  conflicts with the limited activity-based statutory exemption in section 404(f). The attempt to treat

9  waters affected by agricultural activities as not "adjacent" thus fails at Chevron Step One because it

10  plainly conflicts with the text of the Act. *Chevron*, 467 U.S. at 842 ("If the intent of Congress is clear,

11  that is the end of the matter.").

12       Even if the exclusion of waters used by agriculture from the definition of "adjacent" did not

13  contravene the plain language of the CWA, it fails at Chevron Step Two because it has no scientific

14  or legal basis. An adjacent water's pollution from "established normal farming, ranching, and

15  silviculture activities" has no bearing on whether it is a "water of the United States" or meets the

16  criteria for adjacency. The Agencies implicitly acknowledge as much, justifying the provision with a

17  *non-sequitur*: it "reflects the intent of the agencies to minimize potential regulatory burdens on the

18  nation's agriculture community." 80 Fed. Reg. at 37,080. But the Agencies' desire to ease burdens

19  for agricultural interests is irrelevant to the legal question of whether the waters are "waters of the

20  United States." The Agencies cannot do indirectly – i.e., exempt waters traditionally polluted by an

21  industry segment – what they cannot do directly under the CWA – i.e., exempt a particular industry

22  segment from CWA Sections 402 and 404 permitting requirements. *See, e.g., NRDC, Inc. v. Costle*,

1    568 F.2d 1369, 1377 (D.C. Cir. 1977); *Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1021 (9th Cir.

2    2008).

3    　　　　The preamble to the 2015 Rule illustrates the perverseness of excluding waters polluted by

4    agriculture from the definition of "adjacent," by highlighting the importance of adjacent waters in

5    mitigating the impact of pollution from agricultural activities; adjacent waters improve water quality

6    downstream through the "assimilation, transformation, or sequestration of pollutants," including

7    pollutants commonly discharged by agricultural activities like "excess nitrogen and phosphorus" and

8    "pesticides." 80 Fed. Reg. at 37,070. Indeed, the Agencies state that "floodplain waters" categorically

9    defined under the 2015 Rule as "adjacent" waters are "the most effective buffer to protect downstream

10   waters" from agricultural pollution. *Id.* at 37,085 (emphasis added). Because the Agencies failed to

11   marshal scientific support or reasoned explanation for their treatment of waters used for agricultural

12   activities, that treatment is arbitrary, capricious, an abuse of discretion, and not in accordance with

13   law.

14   　　　　**D.** 　　　**The 4,000-foot cutoff is in excess of the Agencies' statutory authority**

15   　　　　The 2015 Rule denies all protection under the CWA to waters outside the floodplain of a

16   foundational water, and more than 4,000 feet from a foundational water, impoundment, or tributary,

17   33 C.F.R. § 328.3(a)(8). Additionally, the 2015 Rule provides that waters that do not qualify for

18   protection under any other section, and that are not expressly excluded, may be protected if a case-

19   by-case analysis shows they have a significant nexus to foundational waters—but *only* if they fall

20   within the geographic boundaries just described. *Id.*

21   　　　　The Agencies lack authority to exclude waters beyond these boundaries. As the Agencies

22   acknowledge, some waters past the 4,000-foot cutoff meet the significant-nexus standard: "While in

23   the agencies' experience the vast majority of wetlands with a significant nexus are located within the

24   4,000 foot boundary, . . . there are a few waters that have been determined to be jurisdictional that are

25   located beyond this boundary . . . ." 80 Fed. Reg. at 37,090. Despite this admission, the Agencies

1   opted to exclude these waters for the sake of "enhancing regulatory clarity, predictability and

2   consistency." *Id.* This irrespective of the fact that many of these waters "are important to the physical,

3   chemical, and biological integrity of the entire tributary system of the navigable waters and to the

4   navigable waters themselves."  Doc. 32-1, Exhibit B, Wood Memo at 2. Indeed, the only reason that

5   the Federal government would stop regulating these waters is "merely because they happen to lay

6   outside and beyond a distance of 4000 feet from a stream's [OHWM] or high tide line. . . ." *Id.* This

7   bright-line rule "has no basis in science or law" and, accordingly to the Corps' internal memo, is

8   "arbitrary." *Id.* Abandoning jurisdiction over such waters "would lead to significant adverse effects

9   on the environment, because, shorn of CWA protection, those [waters] can be polluted, filled, drained,

10  and degraded at will, with no Federal regulation to prevent, regulate, or mitigate for those destructive

11  activities." *Id.*

12      The Agencies may not privilege administrative convenience over their statutory duty to

13  protect waters of the United States. *See NRDC v. Costle*, 568 F.2d at 1374. While the Agencies can

14  define factors to consider in making a significant-nexus determination—including distance—they

15  lack authority to exclude wholesale a category of waters, some of which the Agencies have concluded

16  meet the significant-nexus standard. The 4,000-foot cutoff violates the Act and is "in excess of

17  statutory jurisdiction, authority, or limitations, or short of statutory right" under the Administrative

18  Procedure Act, 5 U.S.C. § 706(2)(C). Further, the 4,000-foot distance limitation is not supported by

19  the record, and is, in fact, contrary to findings in the Science Report.

20      **E.      The Agencies' categorical exclusion of groundwater from the Clean Water Rule**
21              **is arbitrary and capricious and lacks record support**

22      The Agencies embraced the "significant nexus" analysis as the primary basis for defining

23  "waters of the United States" and thereby establishing CWA jurisdiction, *see* 80 Fed. Reg. at 37,057–

24  58; TSD at 2, only to abandon that very framework in their sweeping exclusion of all groundwater.

25  The record makes abundantly clear that waters can, and often do, have such a nexus regardless of

1   whether they flow on the surface or underground, and the unexplained disparate treatment of

2   groundwater renders the exclusion unlawful. *See NRDC v. EPA*, 966 F.2d 1292, 1306 (9th Cir. 1992)

3   (finding EPA decision arbitrary and refusing to defer to EPA's line-drawing due to a lack of data

4   supporting the decision). Because the categorical groundwater exclusion lacks any scientific support

5   in the record[21] and creates a striking internal inconsistency that the Agencies leave unexplained, the

6   exclusion is arbitrary and capricious and must be vacated.[22]

7   **F.    The Agencies failed to evaluate and provide a reasoned basis for eliminating**
8   **jurisdiction over waters based on interstate commerce impacts**

9   To achieve the CWA's goal of restoring and protecting the Nation's waters, Congress defined

10  the waters covered by the CWA broadly and designed an "all-encompassing program of water

11  pollution regulation," that "applies to all point sources and virtually all bodies of water." *United States*

12  *v. Riverside Bayview Homes*, 474 U.S. *Id.* at 132 -133; *International Paper Co. v. Ouellette*, 479 U.S.

13  at 492. The intended breadth of the CWA is confirmed by its legislative history and the plain text of

14  the Act. See e.g. *NRDC v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975) ("[Congress] asserted

15  federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce

16  Clause of the Constitution."). For example, the Conference Committee Report for the final bill states

17  "[t]he conferees fully intend that the term 'navigable waters' be given the broadest possible

18  constitutional interpretation unencumbered by agency determinations which have been made or may

19  be made for administrative purposes." S. Rep. No. 92-1236, at 144 (Sept. 28, 1972) (Conf. Rep.).

20  In order to effectuate Congressional intent and to achieve the goals of the CWA, the Agencies

21  historically defined waters of the United States broadly, including asserting jurisdiction over all

---

[21]    [JA]#7531, SAB Consideration at 3 (noting that the groundwater exclusion "do[es] not have scientific justification").

[22]    The record is replete with evidence demonstrating that groundwater may in many cases be critical to preserving water quality in down-gradient navigable waters. *See e.g.*, [JA]#7531, SAB Consideration at 3; [JA]#7617, SAB Comments at 6; [JA]#7617, SAB Comments, Attachment pp. 4, 14, 23, 33-34, 53, 61, 106

1  waters "the use, degradation, or destruction of which would affect or could affect interstate or foreign

2  commerce."[23] *See,* 33 C.F.R. § 328.3(a)(3) (2014). In the 2015 Rule, the Agencies wrongly rejected

3  *all* ability to regulate waters on this basis, believing their hands tied by the following sentence from

4  *SWANCC:*

5    "The term 'navigable' has at least the import of showing us what Congress had in mind
6    as its authority for enacting the CWA: its traditional jurisdiction over waters that were
7    or had been navigable in fact or which could reasonably be so made."

8   [JA]#20869, TSD at 78 (quoting *SWANCC*, 531 U.S. at 172 (internal citation omitted)). On the basis

9  of that statement alone, the Agencies "concluded that the general other waters provision in the existing

10  regulation based on [Commerce Clause effects unrelated to navigation] was not consistent with

11  Supreme Court precedent." *Id.*

12     This is an arbitrary and capricious and deliberate misreading of *SWANCC*, as even the

13  Agencies themselves seem to tacitly recognize. [JA]#20869, TSD at 77–78 (noting that the Supreme

14  Court in *SWANCC* "did not vacate (a)(3) of the existing regulation" and that "[n]o Circuit Court has

15  interpreted *SWANCC* to have vacated the other waters provision of the existing regulation").

16  *SWANCC* dealt only with an administrative interpretation of 33 C.F.R. § 328.3(a)(3) (1999), dubbed

17  the "Migratory Bird Rule," that purported to assert jurisdiction based on the mere fact that particular

---

[23]     *See e.g.* 40 C.F.R. § 122.2 and 33 C.F.R. § 328.3. The EPA adopted this approach in 1973, 38 Fed. Reg. 10834 (1973), and the Corps adopted this approach in 1977, 42 Fed. Reg. 37122 (1977). In so doing, the Corps noted "[t]he regulation of activities that cause water pollution cannot rely on . . . artificial lines . . . but must focus on all waters that together form the entire aquatic system" and other waters that are not interstate or part of the tributary system to navigable waters will have an effect on interstate commerce. *Id.*

1    waters were or could be used by migratory birds. In rejecting this interpretation, the Supreme Court

2    took pains to emphasize the narrowness of its holding:

3            We hold that 33 C.F.R. § 328.3(a)(3) (1999), as clarified and applied to petitioner's
4            balefill site pursuant to the "Migratory Bird Rule," 51 Fed.Reg. 41217 (1986), exceeds
5            the authority granted to respondents under § 404 of the CWA.

6    *SWANCC*, 531 U.S. at 174*; see also United States v. Krillich*, 152 F.Supp.2d 983, 988 (N.D. Ill.

7    2001), *aff'd* 303 F.3d 784 (7th Cir. 2002) ("*SWANCC* does not reach the question of whether, on a

8    basis other than being visited by migratory birds, isolated wetlands may fall under the definition of

9    navigable waters/waters of the United States").[24] It would have been easy for the Court in *SWANCC*

10   to invalidate all of the interstate commerce based provisions of the rule, including section 328.3(a)(3),

11   but it did not, and this Court should reject the Agencies' position that *SWANCC* means more than it

12   says.

13           Needless to say, the Agencies have made no attempt to estimate the effects that the loss of

14   these waters—limiting tributaries to only foundational waters with an OHWM and excluding the

15   many waters "lost to CWA jurisdiction as a result of the application of the 4,000 linear foot

16   limitation," Doc. 32-1, Exhibit C, Moyer Memo at 2—may have on interstate commerce. But it is

17   clear that, absent a commerce clause basis for jurisdiction, waters of great cultural, recreational, and

18   economic significance will lose CWA protections. Among these are: (1) "closed basins" that include

19   rivers, streams, lakes and wetlands important for recreation, fishing, and water supply in arid regions

20   – such as 20% of the land area in New Mexico; (2) wholly intrastate waters that do not flow directly

21   into navigable-in-fact waters such as the Little Lost River – a high quality trout stream in southern

22   Idaho that attracts anglers from across the country, and (3) any number of the Corps' own-identified

---

[24]     Nothing in *Rapanos* is contrary. *See* 80 Fed. Reg. at 37,061 (recognizing that nothing in *Rapanos* "invalidated any of the current regulatory provisions defining 'waters of the United States'"); *see also San Fransisco Baykeeper v. Cargill Salt Div.*, 481 F.3d at 707.

1  currently-adjacent waters which would lose protections due to the imposition of the 4,000' cutoff. *See*

2  [JA]#16413, Waterkeeper Comments at 29; Doc. 32-1, Exhibit D, Appx. A.

3       The Agencies failed to demonstrate that their approach is permissible under the CWA, *see e.g.*

4  *FCC v. Fox Television*, 556 U.S. at 515-16, and have not provided any valid basis for disregarding

5  the statute, case law, legislative history, and long-standing regulations that have protected waters

6  under the CWA where their use, degradation, or destruction may affect interstate commerce

7  throughout the history of the Act. At a minimum, the Agencies must provide a reasonable and valid

8  explanation for such a major shift in their interpretation of the Act rather than misinterpreting the

9  dicta of one Supreme Court case as the basis for such a change. *Motor Vehicle Mfrs. Assn. v. State*

10 *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *See Negusie v. Holder*, 555 U.S. 511, 521–23

11 (2008) (ordering remand where the agency's mistaken conclusion that Supreme Court precedent was

12 controlling under the circumstances "prevented [it] from a full consideration of the statutory

13 question").

14  **IV.**   **The promulgation of several provisions of the 2015 Rule violate the procedural**
15         **requirements of the APA[25]**

16       The APA requires that the public be put on notice as to the choices and decisions being

17 contemplated by an agency when it promulgates regulations. 5 U.S.C. § 553. Three vital purposes are

18 served through notice and comment: "First, notice improves the quality of agency rulemaking by

19 ensuring that agency regulations will be 'tested by exposure to diverse public comment'[;] Second,

---

[25]     Several other district courts have determined that the Final Rule suffers from procedural defects under the APA. The District Court of North Dakota found that the Clean Water Rule was promulgated under "a process that [was] inexplicable, arbitrary, and devoid of a reasoned process." *North Dakota v. U.S. E.P.A.*, 127 F. Supp. 3d 1047, 1055 (D.N.D. 2015). *See also Georgia v. Wheeler*, No. 2:15-CV-00079, 2019 WL 3949922 (S.D. Ga. Aug. 21, 2019) (remanding the Clean Water Rule to the agencies and enjoining its application during appeals process); *Texas v. U.S. E.P.A.*, 389 F. Supp. 3d 497 (S.D. Tex. 2019) (remanding the Clean Water Rule to the Agencies and enjoining its application during appeals process). The North Dakota Court took specific exception to the 4,000' boundary, whereas the Georgia Court took specific exception to the 1,500' and 100-year floodplain limitations.

1   notice and the opportunity to be heard are an essential component of 'fairness to affected parties'[;

2   and] Third, by giving affected parties an opportunity to develop evidence in the record to support

3   their objections to a rule, notice enhances the quality of judicial review." *Small Refiner Lead Phase-*

4   *Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations omitted). For a

5   regulation to satisfy notice-and-comment requirements under the APA, "the final rule the agency

6   adopts must be 'a logical outgrowth' of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*,

7   661 U.S. 158, 174 (2007). If aspects of the final rule are not logical outgrowths of the proposed rule,

8   those offending provisions violate the APA. *See*, *e.g., Chocolate Mfrs. Ass'n of the U.S. v. Block*, 755

9   F.2d 1098 (4th Cir. 1985); *Am. Med. Ass'n v. U.S.*, 887 F.2d 760 (7th Cir. 1989); *Envtl. Integrity*

10  *Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) ("Something is not a logical outgrowth of

11  nothing." (quoting *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994))). The purpose of the

12  logical outgrowth requirement is that an interested party be provided "fair notice" of what might be

13  imposed by the final rule. *Coke*, 551 U.S. at 174; *Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428, 446

14  (D.C. Cir. 1991).

15          **A.**    **The waste treatment system exemption violates APA notice and comment**
16                    **requirements because it is not a logical outgrowth nor was it discussed in the**
17                    **proposed rule**

18         Although EPA first promulgated a waste treatment system exclusion in 1980, EPA limited

19  that exclusion to "manmade bodies of water" that "neither were originally created in waters of the

20  United States (such as a disposal area in wetlands) nor resulted from the impoundment of waters of

21  the United States." 45 Fed. Reg. 33,290, 33,424 (May 19, 1980). After industry objected, EPA

22  published a notice suspending the language limiting the exclusion to manmade systems, but explained

23  that the suspension was temporary and that EPA would "promptly" amend the rule or "terminate the

24  suspension." 45 Fed. Reg. 48,620, 48,620 (July 21, 1980). It never did.

25         Instead, in the 2015 Rule, the Agencies not only adopted the 1980 exclusion permanently —

26  abandoning any intent to correct the problem through rulemaking and treating the suspension as a

1  settled matter — but the Agencies *expanded* the exclusion to waste treatment systems built in natural

2  waters, such as streams and wetlands, that are newly impounded and pressed into service as industrial

3  waste dumps. 80 Fed. Reg. at 37,097 (discussing waste treatment systems "built in a 'water of the

4  United States.'"). Yet, concerningly, none of this was discussed in the Proposed Rule. Instead, the

5  Agencies failed to explain their interpretation of the exclusion, and changed what was originally

6  adopted as a temporary measure into a permanent exclusion without explanation. Their latest action

7  on the exclusion is thus arbitrary and capricious. *See Encino Motorcars v. Navarro*, 136 S. Ct. 2117,

8  2125 (2016).

9      First, the exclusion flies in the face of the Agencies' own statements that impoundments

10  remain waters of the United States, based on the significant nexus analysis. *See* 79 Fed. Reg. at

11  22,201; 80 Fed. Reg. at 37,075; Technical Support Document, JA[20869] at 224-29; Response to

12  Comments, Topic 2 at 77, JA[20872]. The Agencies provide no explanation—scientific, technical, or

13  otherwise—for their decision to treat so-called "waste treatment systems" differently from other

14  impoundments. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

15  (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its

16  action including a rational connection between the facts found and the choice made." (internal

17  quotation marks omitted)).

18      Second, EPA has never explained the shift to permanently extending the exclusion in natural

19  waters. When EPA first adopted the exclusion, it explained that the Act "was not intended to license

20  dischargers to freely use waters of the United States as waste treatment systems," 45 Fed. Reg. 33,290,

21  33,298, and that the exclusion was limited to manmade waters "to ensure that dischargers did not

22  escape treatment requirements by impounding waters of the United States and claiming the

23  impoundment was a waste treatment system, or by discharging wastes into wetlands." 45 Fed. Reg.

1   48,620, 48,620 (July 21, 1980). The Agencies' failure to explain their decision makes their action

2   arbitrary. *See*, *e.g.*, *Encino Motorcars*, 136 S. Ct. at 2125.

3         The damage from this permanent exclusion is real. *See* Response to Comments, Topic 7 at 52,

4   JA[20872]; Comments of Waterkeeper Alliance, JA[16650] at 60-62; Earthjustice, JA[14564] at 14-

5   15; and NRDC, JA[15437] at 58-59. Moreover, the Agencies failed to provide any explanation

6   regarding how or why the waste treatment system exclusion is warranted by scientific or technical

7   information in the record. The Agencies' action on the exclusion is arbitrary and capricious, in

8   violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

9         As described above, the language limiting the exclusion to manmade systems was intended to

10  be temporarily suspended so as not to undermine the status of pre-existing manmade features. By re-

11  codifying the suspension and reaffirming an interpretation of the exclusion that covers newly created

12  waste impoundments in natural waters, the Agencies made the suspension a permanent part of the

13  regulations. They state that the exclusion "reflect[s] the agencies' long-standing practice," 80 Fed.

14  Reg. at 37,096, and that "[t]he agencies do not intend to change how the waste treatment exclusion is

15  implemented . . . ." *Id.* at 37,097.

16        Converting the temporary suspension to a permanent one is an important substantive change

17  that needs explanation and requires the Agencies provide the public with an opportunity to comment

18  on the change. Courts have, in other contexts, found that even temporary suspensions or delays in

19  duly promulgated rules are substantive and subject to notice-and-comment requirements. *See, e.g.,*

20  *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 27-28 (D.D.C. 2012) (discussing cases, particularly

21  *NRDC v. Abraham*, 355 F.3d 179, 194 (2d Cir. 2004) and *Council of S. Mountains, Inc. v. Donovan*,

22  653 F.2d 573, 580, 582 (D.C. Cir. 1981)). The Agencies failed to comply with notice-and-comment

23  requirements and, thus, deprived the public of the opportunity to comment on permanently codifying

24  a large exclusion for using waters as waste dumps, in violation of the Administrative Procedure Act.

1    5 U.S.C. § 706(2)(D) (giving reviewing courts authority to hold unlawful and set aside agency action

2    "without observance of procedure required by law").

3          The Agencies cannot insulate the exclusion from the Administrative Procedure Act's

4    requirements by asserting that they are making "no substantive changes" to the exclusion and refusing

5    to accept comments on it. *See* 80 Fed. Reg. at 37,097 (noting that "the final rule does not reflect

6    changes suggested in public comments"). Otherwise, an agency could avoid mandatory notice-and-

7    comment procedures by calling a rule change "temporary" for some period of time, then later making

8    the change permanent and arguing the agency had taken no substantive action. The Agencies must

9    follow lawful rulemaking procedures. The Agencies' failure to do so violates the Administrative

10   Procedure Act, 5 U.S.C. § 706(2)(D).

11   **B.     The 2015 Rule's exclusions for agriculture and waste treatment is not a logical
12           outgrowth**

13         When the Agencies issued the 2014 proposed rule for public comment, the definition of

14   "adjacent" did not exclude waters used for agricultural activities, and the Agencies gave no indication

15   that they were considering such a provision. *See, e.g.*, 79 Fed. Reg. at 22,210. Members of the public

16   could not have reasonably anticipated the 2015 rule's treatment of waters used for farming as not

17   "adjacent," and they were denied the opportunity to comment on the legal and technical merits of that

18   exclusion. Had they been given an opportunity to comment, Plaintiffs would have objected to the

19   proposed language, along with the Agencies' legally and scientifically defective rationale.

20   Accordingly, the provision of the 2015 Rule treating waters used for agricultural activities as not

21   "adjacent" is invalid, as the Agencies promulgated it "without observance of procedure required by

22   law."

23         The Corps' own documents candidly highlight the import and impropriety of this definitional

24   modification: *after* the close of public comment, the EPA added a sentence in the definition of

25   "adjacent" that would exclude large areas of water from being classified as adjacent and, thus, not

1   subject to CWA protection. The Corps noted of this eleventh-hour addition: "On its face, the sentence

2   is indefensible" and the "sentence must be removed or modified to retain credibility and legal

3   defensibility for the final rule's definition of adjacent."  Doc. 32-1, Exhibit B, Wood Memo at 5. The

4   Corps noted that the Proposed Rule "did not propose to exclude from the definition of 'adjacent' any

5   categories of adjacent waters based on the activities that occur in those waters, so the public did not

6   have an opportunity to comment on the new definition. . . ." *Id*; *see also* Doc. 32-1, Exhibit E, Appx.

7   B at 2 (currently defined "adjacent" waters subject to agricultural uses "would now require a case-

8   specific significant nexus determination" in order to garner protection under the Act). The 'must-be-

9   removed' sentence was never removed and, now, excludes a category of waters without any notice

10  to, or involvement from, the public.

11                    **CONCLUSION STATEMENT OF ISSUES TO BE DECIDED**
12                                **AND REMEDY REQUESTED**

13          APA section 706(2) instructs a reviewing court to "hold unlawful and set aside" agency

14  actions that are arbitrary, capricious, or not in accordance with law. 5 U.S.C. § 706(2). Nonetheless,

15  even in APA cases, courts have considerable equitable discretion to fashion an appropriate remedy.

16  *See*, *e.g*., *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009).

17          Several unlawful provisions of the 2015 Rule are isolated exemptions that are easily severed

18  from the 2015 Rule and can be vacated without impairing the function of the 2015 Rule as a whole.

19  *See Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997); *Conservation Law*

20  *Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014) (vacating "only a few discrete provisions"

21  of a challenged regulation because they "are isolated and severable"). In this category are the 2015

22  Rule's exclusions for ditches, ephemeral features, waste treatment systems, and groundwater.

23  Similarly, the late modification to the definition of "adjacent" that excludes "established normal

24  farming, ranching, and silviculture activities," as well as that part of the definition of "tributary" that

25  requires "an ordinary high water mark," can be easily severed and vacated. The seriousness of the

1    Agencies' violations with respect to these exemptions warrant vacatur, and because they are discrete

2    provisions, their severance would not be disruptive. So too for the Corp's EA and FONSI; because

3    they are arbitrary and capricious, they should be set aside.

4         The remainder of the 2015 Rule should be remanded without vacatur. This will permit the

5    Agencies to rectify their ESA, NEPA, and APA violations while still relying on the 2015 Rule's well-

6    justified categorical assertion of jurisdiction over waters of great ecological importance, such as

7    adjacent wetlands and many tributaries. Remand without vacatur is consistent with Waterkeeper's

8    goals and the purpose of the CWA itself: "the enhanced protection of the environment." *Nat'l Lime*

9    *Ass'n v. EPA*, 233 F.3d 625, 635 (D.C. Cir. 2000), *as amended on denial of reh'g* (Feb. 14, 2001);

10   *accord*, *Envtl. Def. Fund, Inc. v. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990).

11        Because the 2015 Rule impermissibly narrowed the scope of CWA jurisdiction without

12   adequate record justification and without the consultation required by both the ESA and NEPA, one

13   additional remedial step is warranted to protect those waters left vulnerable by the 2015 Rule. The

14   Court should declare the Agencies' artificial 4,000 foot limitation on case-by-case determinations

15   unlawful, and clarify, until the Agencies satisfy their procedural obligations under the ESA and

16   NEPA, at least those "other waters" that would be protected under the 1986 regulations as informed

17   by the significant nexus text (in addition to waters that are categorically protected under the 2015

18   Rule) are "waters of the United States." *See Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting) (noting

19   that CWA jurisdiction is found "in all . . . cases in which either the plurality's or Justice Kennedy's

20   test is satisfied"). Given the clear and immediate risks posed to the waters abandoned by the 2015

21   Rule and the threatened and endangered species that rely upon them, such a declaration is warranted

22   here.

1    Dated:  January 9, 2020

2

3                                              Respectfully submitted,

4

5                                              */s/ Jason Aamodt*
6                                              Jason B. Aamodt, OK Bar No. 16974
7                                              The Indian & Environmental Law Group, PLLC
8                                              406 South Boulder Avenue, Suite 830
9                                              Tulsa, Oklahoma 74103
10                                             Tel: (918) 347-6169
11                                             Jason@iaelaw.com
12
13                                             Lisa T. Belenky (CA Bar No. 203225)
14                                             CENTER FOR BIOLOGICAL DIVERSITY
15                                             1212 Broadway, Suite 800
16                                             Oakland, CA 94612
17                                             Telephone: (510) 844-7107
18                                             Facsimile: (510) 844-7150
19                                             lbelenky@biologicaldiversity.org
20