Christopher Sproul (State Bar No. 126398)
Stuart Wilcox (State Bar No. 327726)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Emails: csproul@enviroadvocates.com
wilcox@enviroadvocates.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WATERKEEPER ALLIANCE, INC.;
HUMBOLDT BAYKEEPER, a program of
Northcoast Environmental Center; LAKE
WORTH WATERKEEPER; MISSOURI
CONFLUENCE WATERKEEPER;
MONTERREY COASTKEEPER, a program of
The Otter Project, Inc.; RIO GRANDE
WATERKEEPER, a program of WildEarth
Guardians; RUSSIAN RIVERKEEPER;
SNAKE RIVER WATERKEEPER, INC.;
SOUND RIVERS, INC.; UPPER MISSOURI
WATERKEEPER, INC.; TURTLE ISLAND
RESTORATION NETWORK; WILDEARTH
GUARDIANS; ECOLOGICAL RIGHTS
FOUNDATION,

Plaintiffs,

v.

ANDREW R. WHEELER, in his official
capacity as Administrator of the U.S.
Environmental Protection Agency; U.S.
ENVIRONMENTAL PROTECTION
AGENCY; RICKY DALE JAMES, in his
official capacity as Assistant Secretary of the
Army for Civil Works; and U.S. ARMY CORPS
OF ENGINEERS,

Defendants.

Civil Case No. 18-cv-3521

**AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

Plaintiffs Waterkeeper Alliance, Inc.; Humboldt Baykeeper; Lake Worth Waterkeeper; Missouri Confluence Waterkeeper; Monterrey Coastkeeper; Rio Grande Waterkeeper; Russian Riverkeeper; Snake River Waterkeeper, Inc.; Sound Rivers, Inc.; Upper Missouri Waterkeeper, Inc.; Turtle Island Restoration Network; WildEarth Guardians; and Ecological Rights Foundation allege as follows:

**INTRODUCTION**

1.      Congress passed the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251 *et seq.*, commonly known as the Clean Water Act ("CWA"), with a singular objective - "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" – and it intended to achieve that objective, primarily by regulating pollution at its source. *Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1473 (2020) (citing *EPA v. Cal. ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 202-04 (1976) (basic purpose of Clean Water Act is to regulate pollution at its source). The CWA, as a result, has long been recognized as "an all-encompassing program of water pollution regulation" that "applies to all point sources and virtually all bodies of water." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (internal quotations omitted).

2.      Defendants, however, stand alone in their attempt to reimagine the CWA as a narrow program of water pollution regulation intended to protect only large waterbodies that serve as channels of interstate commerce. In recent years, the United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers ("Corps") have engaged in a series of rulemaking actions to narrow the CWA and limit state and federal authorities to control pollution in violation of Administrative Procedure Act ("APA"), CWA, Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), and United States Supreme Court precedent.

3.      By this action, Plaintiffs challenge three closely related final rules issued by Defendants redefining the statutory phrase "waters of the United States," a phrase that proscribes the jurisdictional reach of the CWA. 33 U.S.C. § 1362. Consistent with the objectives of the CWA, for more than four decades, Defendants' regulatory definitions of "waters of the United States" broadly protected traditionally navigable waters; territorial seas; interstate waters; other waters, including intrastate lakes, rivers, streams, wetlands, and other waters where their use or destruction could affect interstate

commerce; and impoundments of and tributaries to other waters of the United States, and wetlands adjacent to any of these waters (excluding other wetlands). *See, e.g.,* 40 C.F.R. § 122.2 (2015); 33 C.F.R. § 328.3 (2015).

4.      The CWA regulatory definition of "waters of the United States" is of critical importance to the protection of human health; the well-being of communities; the success of local, state, and national economies; and the functioning of our nation's vast, interconnected aquatic ecosystems, as well as the many threatened and endangered species that depend upon those resources. If a stream, river, lake, or wetland is not included in the definition of "waters of the United States," untreated toxic, biological, chemical, and radiological pollution can be discharged directly into those waters without meeting any of the CWA's permitting and treatment requirements. Excluded waters can be dredged, filled, and polluted with impunity because the CWA's most fundamental human health and environmental safeguard – the prohibition of unauthorized discharges in 33 U.S.C. § 1311(a) – would no longer apply.

5.      Starting in 2015, Defendants began improperly narrowly redefining and introducing novel and arbitrary limitations on CWA protections for the nation's waters that are contrary to the language of the CWA and its objectives. These changes became more severe in 2017 when Defendants announced that they intended to pursue a radical and arbitrary change in their longstanding interpretation of the CWA, which constituted an extreme departure from the text of the CWA, settled legal precedent, and science. Following this announcement, Defendants made a series of regulatory changes that effectuated these extreme, arbitrary changes.

6.      Defendants' actions have left vast swaths of the Nation's waters unprotected against dangerous pollution discharges and destructive dredging and filling that harm drinking water supplies, fisheries, and recreational waters, as well as people, threatened and endangered species, and the nation's vast, interconnected aquatic ecosystems that will be exposed to dangerous levels of pollution and destruction in both directly impacted and downstream waters.

7.      Defendants first changed their longstanding interpretation of the waters that are subject to the CWA's critical safeguards in the June 29, 2015 "Clean Water Rule." *Clean Water Rule: Definition of 'Waters of the United States*,' 80 Fed. Reg. 37054 (June 29, 2015). The Clean Water Rule, in part,

reaffirms CWA jurisdiction over waters historically protected by Defendants, such as many tributaries and their adjacent wetlands; for this reason, Plaintiffs do not seek vacatur of the Clean Water Rule in its entirety. However, a number of provisions of the Clean Water Rule are legally or scientifically indefensible and must therefore be excised from the Rule, vacated, and remanded to Defendants. These flawed provisions impermissibly exclude waters for the first time that must be protected under the CWA as a matter of law; unreasonably exclude waters over which Defendants have historically asserted jurisdiction based on their commerce clause authority; arbitrarily deviate from the best available science; and were promulgated without compliance with Defendants' notice and comment obligations.

8.    Defendants' second change to their longstanding interpretation of CWA jurisdiction comes from the October 22, 2019 rule repealing the Clean Water Rule ("Repeal Rule"). *Definition of "Waters of the United States"—Recodification of Pre-Existing Rules*, 84 Fed. Reg. 56626 (October 22, 2019). Defendants' promulgation of the Repeal Rule was designed to exclude the public from the decision-making process by avoiding providing substantive evaluations of the decision that the public could evaluate, evading requirements for providing reasoned bases for the decision, and preventing meaningful opportunities for public comment in violation of the law. In place of the Clean Water Rule, Defendants reinstated the text of the previous longstanding regulatory definition - but as modified and reinterpreted by undisclosed agency views of Supreme Court precedent, agency practice, applicable agency guidance documents, training, and experience. *Id*. This completely opaque definition is the epitome of agency exercise of arbitrary power because it leaves the public in the dark about "what the law demands" and allows "prosecutors and courts to make it up." *See, e.g., Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring in part and concurring in the judgment). Defendants intended this new enigmatic definition to serve as the first step in a two-step process to redefine and seriously narrow their interpretation of "waters of the United States" consistent with an Executive Order signed on February 28, 2017 so as to exclude additional waters from CWA jurisdiction. *Definition of "Waters of the United States"— Recodification of Pre-Existing Rules*, 82 Fed. Reg. 34899 (July 27, 2017) ("Proposed Repeal Rule").

9.      Defendants' third change to their longstanding interpretation of CWA jurisdiction comes from their April 21, 2020 rule that, once again, redefines "waters of the United States," but this time Defendants disregarded a significant amount of the applicable legal precedent and provided an erroneous legal analysis in support of their decision to narrow the categories of protected waters in an extreme and arbitrary manner that upends the intentionally crafted state and federal partnership underpinning the entire national CWA program and leaves the Nation's waters unprotected. *Navigable Waters Protection Rule: Definition of "Waters of the United States,"* 85 Fed. Reg. 22250 (April 21, 2020) ("Replacement Rule").

10.     Contrary to more than 40 years of legal precedent and longstanding, well-settled agency interpretations of the CWA, Defendants concocted unsupportable legal theories and utilized arbitrary, non-scientific line drawing and undisclosed "policy choices" to attempt to justify a definition of "waters of the United States" that radically constrains the CWA's protections to only *certain* commercially navigable waters, the territorial seas, and a narrow subset of the waters with certain types of connections to these other covered waters. Unlike every court and agency in the history of the CWA, Defendants misconstrued the plain statutory text of the CWA to wrongly determine, among other things, that a large portion of the Nation's waters are not "waters of the United States," 85 Fed. Reg. at 22,253, and that protection of those waters, or lack thereof, was no longer their concern. *See* U.S. EPA, The Navigable Waters Protection Rule—Public Comment Summary Document (Response to Comments), EPA Docket ID No. EPA-HQ-OW-2018-0149-11574 (Apr. 21, 2020) ("Replacement Rule, RTC"). Defendants' determination is arbitrary and capricious and contrary to law.

11.     Defendants did not evaluate whether the Replacement Rule achieves the objectives of the CWA for the Nation's waters and failed to meaningfully assess which waters would remain protected under their new definition of waters of the United States. *See, e.g.,* Replacement Rule RTC, Topics 5 at 44 and 11 at 103. Claiming their first of its kind interpretation of the CWA was so clear they lacked discretion to protect important rivers, streams, lakes, and other waters across the country, Defendants also refused to consider scientific information in the record demonstrating their narrow jurisdictional definition eliminates protections for waters that are essential to the integrity of the Nation's waters and

1   will endanger drinking water supplies, recreational waters, fisheries, endangered and threatened species,

2   and myriad other beneficial uses of waters across the Nation. *See, e.g.,* Replacement Rule RTC, Topics

3   11, at 3, 8-9, 13.

4        12.    Each of the above rules abandon waters that have long been, and must continue to be,

5   protected under the CWA as a matter of law; unreasonably exclude waters over which Defendants have

6   historically asserted jurisdiction based on the Commerce Clause and their statutory obligations to protect

7   and restore the Nation's waters; arbitrarily eliminate protections for various waters without a rational

8   basis; deviate from the best available science; and/or were promulgated without compliance with

9   Defendants' notice and comment rulemaking obligations.

10        13.    By this Amended Complaint, Plaintiffs allege that Defendants violated the CWA, APA, 5

11   U.S.C. §§ 551, *et seq.*; NEPA, 42 U.S.C. §§ 4321, *et seq.*; and the ESA, 16 U.S.C. §§ 1531, *et seq.* when

12   they promulgated the Clean Water Rule, Repeal Rule, and Replacement Rule (collectively "Final

13   Rules").

14        14.    Among other remedies, Plaintiffs seek an order holding specific portions of the Clean

15   Water Rule unlawful and setting them aside because they are "arbitrary, capricious, an abuse of

16   discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or

17   limitations," and/or were promulgated "without observance of procedure required by law." 5 U.S.C. §

18   706(2)(A), (C), (D). Plaintiffs further seek an order declaring the Repeal Rule and Replacement Rule

19   unlawful in their entirety and vacating those Rules because they are "arbitrary, capricious, an abuse of

20   discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or

21   limitations," and/or were promulgated "without observance of procedure required by law." *Id.*

22        15.    Plaintiffs also seek an order holding specific portions of the Clean Water Rule unlawful

23   and setting them aside because the Corps failed to adequately comply with NEPA prior to promulgation

24   of the Clean Water Rule. Plaintiffs further seek an order declaring the Repeal Rule and Replacement

25   Rule unlawful in their entirety and vacating those Rules because the Corps failed to comply with NEPA

26   prior to promulgation of the Repeal Rule and Replacement Rule.

27

16.     Plaintiffs also seek an order holding specific portions of the Clean Water Rule unlawful and setting them aside because Defendants failed to comply with the ESA prior to promulgation of the Clean Water Rule. Plaintiffs further seek an order declaring the Repeal Rule and Replacement Rule unlawful in their entirety and vacating those Rules because Defendants failed to comply with the ESA prior to promulgation of the Repeal Rule and Replacement Rule. In addition, Plaintiffs seek an order enjoining Defendants from taking certain actions implementing the Clean Water Rule, Repeal Rule, and Replacement Rule pending their completion of ESA section 7 consultation.

## JURISDICTION

17.     This Court has jurisdiction over the claims set forth in this Amended Complaint pursuant to 16 U.S.C. § 1540(g)(1) (Endangered Species Act ("ESA") citizen suit), 28 U.S.C. § 1331 (civil action arising under the laws of the United States), 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. § 702 (Administrative Procedure Act ("APA")). The relief sought is authorized by 16 U.S.C. § 1540(g), 5 U.S.C. § 706(1), and 28 U.S.C. §§ 2201(a) and 2202.

18.     This Court has subject matter jurisdiction over violations of the ESA by Defendants pursuant to 16 U.S.C. § 1540(g)(1), which authorizes citizens to bring suit to enjoin any person that is in violation of the ESA. As required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(2)(a)(i), Plaintiffs provided Defendants and the required federal wildlife management agencies with written notice of the ESA violations alleged herein by letters dated August 5, 2015 (for claims related to the Clean Water Rule); December 17, 2019 (for claims related to the Repeal Rule); and February 13, 2020 and February 24, 2020 (for claims related to the Repeal and Replacement Rules). More than 60 days have passed since Plaintiffs provided their notice of intent to sue.

19.     This Court has personal jurisdiction over Defendants because Defendants are agencies of the federal government operating within the United States and/or are officials of those agencies sued in their official capacities. The Corps also maintains a district office in San Francisco, California and the EPA Region IX's headquarters office is located in San Francisco, California.

20.     Plaintiffs and their members are aggrieved by Defendants' failures to comply with the law. Defendants' Clean Water Act ("CWA") decisions are arbitrary, capricious, an abuse of discretion,

and otherwise not in accordance with law. Those decisions weaken the CWA and remove protections that have helped protect clean water and species habitat for decades. Defendants' decisions to take these actions without compliance with the notice and comment requirements of the APA eliminated Plaintiffs' ability to have meaningful input into these decisions, which has negatively impacted Plaintiffs' interests and those of their members. Defendants' decision to take these actions without complying with the National Environmental Policy Act ("NEPA") again eliminated Plaintiffs' opportunity to provide meaningful input into these decisions while also preventing Defendants from adequately assessing the effects of their decision on the environment. Defendants' lack of ESA consultation concerning the numerous adverse impacts that Defendants' decisions are causing to ESA-listed species and their critical habitat means that Defendants' decisions are causing harm to those species and their habitats without the ESA's substantive and procedural protections accorded to those species and habitats. Plaintiffs and their members visit lands impacted by Defendants' decisions for wildlife viewing; scientific observation; educational study; aesthetic enjoyment; spiritual contemplation; recreation, including kayaking, fishing, and photography; and other actions. Defendants' failures to comply with the law have harmed, impaired, and diminished, and will continue to harm, impair, and diminish, Plaintiffs' members' use and enjoyment of these areas.

## VENUE

21.     Venue in the United States District for the Northern District of California is proper under 28 U.S.C. § 1391(e)(1)(C) because the Defendants are officers or agencies of the United States and one or more plaintiffs reside in the district within the meaning of 28 U.S.C. § 1391(d).

## INTRADISTRICT ASSIGNMENT

22.     Assignment to the San Francisco Division is appropriate because several of the plaintiffs (including Humboldt Baykeeper, Russian Riverkeeper, Turtle Island Restoration Network, Monterey Coastkeeper, and Ecological Rights Foundation) have their primary place of business within this Division.

//

//

AMENDED COMPLAINT FOR DECLARATORY          7
AND INJUNCTIVE RELIEF

## THE PARTIES

23.    Plaintiff **Waterkeeper Alliance**, Inc. ("Waterkeeper") is a global not-for-profit environmental organization dedicated to protecting and restoring water quality to ensure that the world's waters are drinkable, fishable, and swimmable. Waterkeeper comprises more than 350 Waterkeeper Member Organizations and Affiliates working in 48 countries on 6 continents, covering over 2.75 million square miles of watersheds. In the United States, Waterkeeper represents the interests of its 175 U.S. Waterkeeper Member Organizations and Affiliates, as well as the collective interests of thousands of individual supporting members that live, work, and recreate in and near waterways across the country – many of which are severely impaired by pollution. The CWA is the bedrock of Waterkeeper's and its Member Organizations' and Affiliates' work to protect rivers, streams, lakes, wetlands, and coastal waters for the benefit of its Member Organizations, Affiliate Organizations, and its respective individual supporting members, as well as to protect the people and communities that depend on clean water for their survival. In many ways, Waterkeeper and its members depend on the CWA to protect waterways, and the people who depend on clean water for drinking water, recreation, fishing, economic growth, food production, and all of the other water uses that sustain our way of life, health, and wellbeing. Waterkeeper has many members that use, enjoy, and recreate on and near waters affected by the Clean Water Rule, the Repeal Rule, and the Replacement Rule.

24.    Plaintiff **Humboldt Baykeeper** is a program of Northcoast Environmental Center, a California nonprofit public interest and environmental advocacy organization committed to safeguarding the coastal resources of Humboldt Bay, California, for the health, enjoyment, and economic strength of the Humboldt Bay community. Humboldt Baykeeper is a licensed Waterkeeper Member Organization and uses community education, scientific research, water-quality monitoring, pollution control, and enforcement of laws to protect and enhance Humboldt Bay and near-shore waters of the Pacific Ocean, including its tributaries, adjacent coastal waterways, ephemeral streams, wetlands, ditches, and ditched tributaries that will lose CWA protections directly or become polluted as a result of upstream waters losing protections under the Clean Water Rule, Repeal Rule, and/or Replacement Rule. Uncontrolled pollution of waters in the Humboldt Bay watershed will harm endangered species and threatened species

such as Coho Salmon, Chinook Salmon, and Steelhead Trout. Humboldt Baykeeper has roughly 1,500 members residing within this District, many of whom use, enjoy, and recreate on and near waters adversely affected by the Clean Water Rule, the Repeal Rule, and the Replacement Rule.

25.     Plaintiff **Lake Worth Waterkeeper** is a 501(c)(3) nonprofit organization based in Lake Worth, Florida and is a licensed Waterkeeper Member Organization. Lake Worth Waterkeeper's mission is to advocate for the protection and restoration of the historic Lake Worth Lagoon – a 21-mile-long coastal estuary running along the eastern edge of Palm Beach County - and its watershed spanning from Lake Okeechobee to offshore waters in the Atlantic Ocean. Lake Worth Waterkeeper and its members, many of whom live, work, and recreate in the watershed, have protected interests in preserving waterways in the watershed as drinkable, fishable, and swimmable and in protecting endangered, threatened, and other important species and their habitats in and around Lake Worth Lagoon. The watershed, including lakes and wetlands, are connected by hundreds of canals that move water – the area's critical lifeblood - between these wetlands, lakes, and Lake Worth Lagoon, most of which are inhabited by rare and protected species. Under the Clean Water Rule, Repeal Rule, and Replacement Rule, many of the lakes, wetlands and canals in the Lake Worth watershed will likely lose CWA protections against pollution discharges, dredging, and filling – endangering people, wildlife and aquatic life in those waters, in Lake Worth Lagoon, and along the beaches of the Atlantic Ocean.

26.     Plaintiff **Missouri Confluence Waterkeeper** is a grassroots, citizen-led nonprofit conservation organization focused on clean water and dedicated to protecting fishable, swimmable, drinkable water for all Missourians. Missouri Confluence Waterkeeper is a licensed Waterkeeper Member Organization and engages in water quality monitoring, pollution investigations, advocacy for compliance with clean water laws, and bringing legal actions to address violations of the law. The Clean Water Rule, Repeal Rule, and Replacement Rule will eliminate or diminish CWA protections for a wide range of Missouri waterways – directly by rendering many rivers, lakes, streams, ditches/canals, and wetlands non-jurisdictional under the CWA and indirectly by eliminating federal CWA programs on waters upstream from other important jurisdictional waters like the Meramec and Missouri Rivers. Waters that become non-jurisdictional, such as the large numbers of ephemeral and losing/gaining

streams in Missouri's karst regions, lose CWA prohibitions on discharges and dredging/filling under the Clean Water Rule, Repeal Rule, and Replacement Rule, which will degrade water quality; threaten public health; destroy habitat; and endanger wildlife, fish, amphibians, reptiles and other aquatic life. Uncontrolled pollution and destruction of habitat, including streams and wetlands, also threatens ten species of mussels listed as endangered and one species of mussel listed as threatened under the ESA, which are adversely affected by increased pollutants from domestic wastewater sources such as ammonia as well as from habitat loss caused by sand and gravel mining. Missouri Confluence Waterkeeper's members live, work, or recreate on or near various waterways, and their interests will be harmed by elimination of CWA protections for those and upstream waterways under the Clean Water Rule, Repeal Rule, and Replacement Rule.

27.     Plaintiff **Monterey Coastkeeper,** a project of The Otter Project, Inc., is a California non-profit public interest and environmental advocacy organization committed to the protection and restoration of the central California coast. Monterey Coastkeeper has over 2,000 members residing within this District, many of whom use, enjoy, and recreate on and near waters that will be harmed by the Clean Water Rule, the Repeal Rule, and the Replacement Rule. For example, pollution discharges into, and dredging/filling of, rivers, streams, lakes, canals, ditches, sloughs, wetlands, and vernal pools that will no longer be protected under the CWA will degrade water quality in those waters resulting in numerous harms, including to ESA-listed species and will adversely impact California sea otters, a threatened species under the ESA of central importance to Monterey Coastkeeper, The Otter Project, and their members, and other marine life along the Central Coast of California, a focal landscape for Monterey Coastkeeper, The Otter Project, and their members.

28.     Plaintiff **Russian Riverkeeper** is a California nonprofit public interest and environmental advocacy organization committed to the conservation and protection of the Russian River, its tributaries, and the broader watershed through education, citizen action, scientific research, and expert advocacy. The organization is a licensed Waterkeeper Member Organization and relies on the CWA and its implementing regulations to address pollution in the Russian River and its watershed, including nearly 100 major tributaries; 238 perennial, intermittent, or ephemeral streams – some of which have

1   subsurface flow; 23 named springs; 14 natural lakes; 15 named reservoirs; wetlands and vernal pools;

2   and ditches and canals that will either lose CWA protections directly or be adversely impacted by

3   upstream waters that lose CWA protections as a result of the Clean Water Rule, the Repeal Rule, and the

4   Replacement Rule. Uncontrolled pollution of waters in the Russian River watershed will further harm

5   endangered species and threatened species such as Coho Salmon, Chinook Salmon, and Steelhead Trout.

6   Russian Riverkeeper has over 1,400 members residing within this District, many of whom use, enjoy,

7   and recreate on and near waters affected by the Clean Water Rule, the Repeal Rule, and the

8   Replacement Rule.

9       29.     Plaintiff **Snake River Waterkeeper**, Inc. is an Idaho nonprofit public interest and

10   environmental advocacy organization committed to protecting water quality and fish habitat in the

11   Snake River and its surrounding watershed. Snake River Waterkeeper is a licensed Waterkeeper

12   Member Organization and uses water-quality monitoring, investigation of citizen concerns, and

13   advocacy for enforcement of environmental laws. Rivers, streams, lakes, wetlands, ditches, and canals

14   throughout the Snake River basin will either lose CWA protections directly or be impacted by pollution

15   from upstream sources of pollution discharged without CWA controls as a result of the Clean Water

16   Rule, the Repeal Rule, and the Replacement Rule, including roughly 14,800 miles of canals/ditches and

17   a roughly 5,185 sq. mile area of "closed" basins that contain rivers, streams and other waters essential to

18   recreation, tourism, wildlife, and endangered or threatened species. Snake River Waterkeeper has more

19   than 50 members, including members who reside, explore, and enjoy recreating on and near waters

20   affected by the Clean Water Rule, the Repeal Rule, and the Replacement Rule.

21       30.     Plaintiff **Sound Rivers Inc.** ("Sound Rivers") is a North Carolina 501(c)(3) organization

22   whose mission is to monitor and protect the Neuse and Tar-Pamlico River watersheds covering nearly

23   one quarter of North Carolina, and to preserve the health and beauty of the river basin through

24   environmental justice. Sound Rivers partners with concerned citizens to monitor, protect, restore, and

25   preserve these watersheds, which encompass 12,000 square miles of North Carolina's landmass, in order

26   to provide clean water to communities for consumption, recreation, nature preservation, and agricultural

27   use. Sound Rivers is the parent organization for three licensed Waterkeeper Member Organizations –

Upper Neuse Riverkeeper, Lower Neuse Riverkeeper, and Pamlico-Tar Riverkeeper. Sound Rivers, and the Neuse and Pamlico-Tar Riverkeepers, represent the interests of more than 2,500 individual members, many of whom live, work, recreate, fish, and/or swim in, and obtain their drinking water from, the Neuse and Tar-Pamlico River Basins. Some of Sound Rivers' members also live on property that directly abuts the waters of these river basins and some members also depend on the water quality in the river basins for their livelihoods, such as commercial fishermen, recreational fishing guides, crab fishermen, and marina owners and kayak rental/guides. Many members enjoy coastal pocosin wetlands for bird watching, photography, hunting, and use and enjoyment, including visits to the Pocosin Lakes National Wildlife Refuge. These members' interests will be harmed by the Clean Water Rule, Repeal Rule, and the Replacement Rule, which will eliminate federal CWA controls over mining, dredging, filling, and discharges of pollution into waters throughout the Neuse and Tar-Pamlico River Basins, including wetlands in the Pocosin Lakes National Wildlife Refuge that provide habitat for endangered and threatened species. Rivers, streams, wetlands, lakes, ponds, and ditches that will lose protection under the Clean Water Rule, Repeal Rule, and Replacement Rule are hydrologically connected to the Neuse and Tar-Pamlico Rivers. Loss of Clean Water Act protections for all of these upstream waters will directly and cumulatively degrade and pollute downstream waters like the Neuse River, Tar River, and Albemarle-Pamlico estuary, which is the Nation's second largest estuary.

31.     Plaintiff **WildEarth Guardians** ("Guardians") is a regional 501(c)(3) non-profit environmental advocacy and conservation organization headquartered in Santa Fe, New Mexico that has been working for 30 years to protect and restore the wildlife, wild places, wild rivers, and health of the American West. Guardians is the parent organization of Rio Grande Waterkeeper, a licensed Waterkeeper Member Organization. Plaintiff **Rio Grande Waterkeeper** is a program within WildEarth Guardians that works to safeguard clean water and healthy flows in the Rio Grande and its tributaries from its headwaters in the San Juan Mountains of Colorado through Southern New Mexico. Rio Grande Waterkeeper and Guardians use education, public outreach, advocacy, legislation, and legal enforcement tools to achieve their goals, including actively advocating for clean water, endangered species, healthy flows, and sustainable river and riparian ecosystems and communities in the 336,000 square mile Rio

Grande basin in Colorado and New Mexico. Guardians and Rio Grande Waterkeeper represent 308,000

members and activists, including more than 20,000 members and supporters that reside in Colorado and

New Mexico, many in the Rio Grande watershed, which is endangered by the Clean Water Rule, Repeal

Rule, and Replacement Rule. The Replacement Rule is estimated to eliminate Clean Water Act

protections – such as federal permitting standards and systems for controlling discharges of pollution

and the dredge and fill materials – from over 68 percent of waterways in Colorado and 90 percent of

waterways in New Mexico, including many rivers, streams, creeks, arroyos, washes, and wetlands that

contribute significant flows to and influence the water quality of the Rio Grande and its tributaries. This

allows unlimited discharges of pollutants, along with unregulated dredging and filling activities, in these

unprotected waters, degrading the water quality of the waters used and enjoyed by Rio Grande

Waterkeeper and Guardians' members and threatening the survival and recovery of numerous imperiled

aquatic and riparian species, including endangered and threatened species listed under the ESA.

32.    Plaintiff **Upper Missouri Waterkeeper**, Inc. is a Montana nonprofit public interest and

environmental advocacy organization committed to protecting and improving ecological and community

health throughout Montana's Upper Missouri River Basin. Upper Missouri Waterkeeper is a licensed

Waterkeeper Member Organization and uses a combination of strong science, community action, and

legal expertise to defend the Upper Missouri River, its tributaries, and communities against threats to

clean water and healthy rivers. Upper Missouri Waterkeeper has over 70 members, including members

who reside, explore, and enjoy recreating on and near waters that are affected by the Clean Water Rule,

the Repeal Rule, and the Replacement Rule. Under the Repeal Rule and Replacement Rule, important

rivers, streams, and wetlands in the watershed, such as many of the tributaries to Big Hole River – a

world-class trout fishery – and tributaries to the Madison River – arising in Yellowstone National Park

and providing habitat for Yellowstone cutthroat trout –will likely lose CWA protections against

pollution discharges, dredging, and filling under the CWA. The elimination of CWA protections

endangers people, wildlife, and aquatic life in those waters and in the Upper Missouri River, including

species listed as endangered, like the pallid sturgeon, and threatened, like the shovelnose sturgeon, under

the ESA.

33. Plaintiff **Turtle Island Restoration Network**, Inc. is a national nonprofit public interest and environmental advocacy organization committed to the protection of the world's oceans and marine wildlife. Turtle Island Restoration Network works with people and communities to accomplish its mission, using grassroots empowerment, consumer action, strategic litigation, hands-on restoration, and environmental education. Turtle Island Restoration Network has hundreds of thousands of supporters worldwide, including hundreds of members who reside in this District, many of whom use, enjoy, and recreate on or near waters affected by the Clean Water Rule, the Repeal Rule, and the Replacement Rule. Turtle Island Restoration Network's Salmon and Watershed Network (SPAWN), is working to rebuild populations of severely endangered species like Coho Salmon and freshwater shrimp in Bay Area watersheds. These species rely on ephemeral streams for their survival. The loss of protections to ephemeral streams will accelerate the extinction of over 75 endangered species in the Bay Area, including red-legged frogs, freshwater shrimp, and Coho Salmon - specifically the largest remaining wild population of Central California Coast Coho Salmon, which are already struggling to survive.

34. Plaintiff **Ecological Rights Foundation** is a non-profit, public benefit corporation, organized under the laws of the State of California, devoted to furthering the rights of all people to a clean, healthful, and biologically diverse environment. To further its environmental advocacy goals, Ecological Rights Foundation actively seeks federal and state agency implementation of state and federal environmental and wildlife laws and, as necessary, directly initiates enforcement actions on behalf of itself and its members. Ecological Rights Foundation has many members throughout California, including within this district, and the United States more generally. Many of Ecological Rights Foundation's members use, enjoy, and recreate on and near waters affected by the Clean Water Rule, the Repeal Rule, and the Replacement Rule.

35. Each Plaintiff has one or more members who reside in, explore, and/or recreate in areas impacted by the Replacement Rule's definition of "waters of the United States." Many of Plaintiffs' members will suffer recreational, aesthetic, and/or other environmental injuries due to the Defendants' final actions. Specifically, the Defendants' promulgation of the Replacement Rule will result in the loss of CWA protections for many rivers, streams, lakes, canals, ditches, wetlands, and other waters used and

enjoyed by Plaintiffs' members, ultimately facilitating the degradation or destruction of those waters, harm to the greater ecosystems they are a part of, and harm to species, including endangered and threatened species, that depend on those waters and ecosystems.

36.     Each Plaintiff has one or more members who reside in, explore, and/or recreate in areas impacted by the Repeal Rule's definition of "waters of the United States." Many of Plaintiffs' members will suffer recreational, aesthetic, and/or other environmental injuries due to the Defendants' final actions. Specifically, the Defendants' promulgation of the Repeal Rule will result in the loss of CWA protections for many rivers, streams, lakes, canals, ditches, wetlands, and other waters used and enjoyed by Plaintiffs' members, ultimately facilitating the degradation or destruction of those waters, harm to the greater ecosystems they are a part of, and harm to species, including endangered and threatened species, that depend on those waters and ecosystems.

37.     Each Plaintiff has one or more members who reside in, explore, and/or recreate in areas impacted by the Clean Water Rule's definition of "waters of the United States." Many of Plaintiffs' members will suffer recreational, aesthetic, and/or other environmental injuries due to the Defendants' final actions. Specifically, the Defendants' promulgation of the Clean Water Rule will result in the loss of CWA protections for many ephemeral streams, tributaries, ditches, wetlands, and other waters used and enjoyed by Plaintiffs' members, ultimately facilitating the degradation or destruction of those waters, harm to the greater ecosystems they are a part of, and harm to species, including endangered and threatened species, that depend on those waters and ecosystems.

38.     Plaintiffs bring this action on their own behalf and on behalf of their adversely affected members and staff. Plaintiffs and their members and staff have been, are being, and will continue to be injured by Defendants' failure to comply with the law, and a favorable outcome of this litigation will redress those injuries.

39.     Defendants EPA and the Corps are agencies of the United States Government that implement the CWA. EPA and the Corps promulgated the Clean Water Rule, the Repeal Rule, and the Replacement Rule.

40. Defendant Andrew R. Wheeler is the Administrator of EPA, acting in his official capacity. Administrator Wheeler signed the Repeal Rule and the Replacement Rule.[1] In his role as the EPA Administrator, Mr. Wheeler oversees the EPA's implementation of the CWA.

41. Defendant Ricky Dale James is the Assistant Secretary of the Army for Civil Works, acting in his official capacity. Mr. James signed the Repeal Rule and the Replacement Rule. Mr. James' predecessor, former Acting Assistant Secretary of the Army for Civil Works Ryan A. Fisher, signed the "Delay Rule," which delayed application of the Clean Water Rule,[2] and his predecessor Jo-Ellen Darcy, former Assistant Secretary of the Army for Civil Works signed the Clean Water Rule. In his role as Assistant Secretary of the Army for Civil Works, Mr. James oversees the Corps' implementation of the CWA.

## LEGAL BACKGROUND

### I. Overview of the CWA

42. In 1972, Congress adopted significant amendments to the Federal Water Pollution Control Act of 1948 in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As amended in 1972, the law become what we know today as the CWA, which established, among other things, a national goal that the "discharge of pollutants into the navigable waters be eliminated by 1985" and an "interim goal of water quality which provides for

---

[1] At the time of Plaintiffs' initial Complaint, E. Scott Pruitt was the current Administrator of EPA. Mr. Pruitt signed the Delay Rule in his capacity as EPA Administrator. He is succeeded as EPA Administrator, and thereby in this litigation, by Administrator Wheeler, the current EPA Administrator. Former EPA Administrator Gina McCarthy signed the Clean Water Rule.

[2] *See* Final Rule, Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018) ("Delay Rule").

[3] The ESA delegates responsibility for section 7 consultation with action agencies to two cabinet-level Secretaries, Interior and Commerce. 16 U.S.C. §§ 1532(15), 1536(a). The Secretary of the Interior has sub-delegated authority to FWS, who has primary responsibility for terrestrial species and freshwater species of fish, and the Secretary of Commerce has sub-delegated authority to NMFS, who has primary responsibility for marine species. *See Final Rule, Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018) ("Delay Rule"). Streams & Wetlands to Downstream*

the protection and propagation of fish, shellfish, and wildlife, and provides for recreation in and on the water . . . by July 1, 1983." *Id.*

43.     The CWA is a comprehensive regulatory statute for the Nation's waters. *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't. of Ecology*, 511 U.S. 700, 704 (1994). Congress' intention in amending the CWA in 1972 was "clearly to establish an all-encompassing program of water pollution regulation . . . [and] '*to establish a comprehensive long-range policy for the elimination of water pollution.*' S.Rep.No.92–414, at 95,  2 Leg.Hist. 1511 (emphasis supplied). No Congressman's remarks on the legislation  were complete without reference to the 'comprehensive' nature of the Amendments." *City of Milwaukee v. Ill. & Mich.,* 451 U.S. 304, 318 (1981) (internal footnotes omitted).

44.     The national goal of the CWA is the elimination of discharges of pollutants into the navigable waters, with the interim goal of achievement of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(1), (2). "To do this, the [CWA] does not stop at controlling the 'addition of pollutants,' but deals with 'pollution' generally, see § 1251(b), which Congress defined to mean 'the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water,' § 1362(19)." *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 385 (2006).

45.     With the CWA and many other federal environmental laws, Congress employed a program of cooperative federalism under which States are given the "choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation" and, as such, the CWA "anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *See New York v. United States*, 505 U.S. 144, 167 (1992) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992)).

46.     CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person, unless such discharge complies with the terms of any applicable permits and with CWA sections 301, 302, 306, 307, 318, 402, and 404. 33 U.S.C. §§ 1311, 1312, 1316, 1317, 1328, 1342, 1344. "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point

source." 33 U.S.C. § 1362(12). "Navigable waters" are broadly defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

47.     CWA section 402, 33 U.S.C. § 1342, establishes the statutory permitting framework for regulating pollutant discharges under the National Pollutant Discharge Elimination System ("NPDES") program. CWA section 404, 33 U.S.C. § 1344, establishes the permitting framework for regulating the discharge of dredged or fill material into waters of the United States. CWA section 401, 33 USC §1341, establishes a program for states to provide water quality certifications for federal licenses.

48.     The CWA "applies to all point sources and virtually all bodies of water." *Ouellette*, 479 U.S. at 492. "Protection of aquatic ecosystems, Congress recognized, demanded broad federal authority to control pollution, for '[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.' [This is precisely why] Congress chose to define the waters covered by the Act broadly." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132-33 (1985) (citing S. Rep. No. 92414, p. 77 (1972)).

**II.     Regulatory Definition of "Waters of the United States"**

49.     The definition of "waters of the United States" significantly impacts the Defendants' and the States' implementation of the CWA, as it circumscribes which waters are within the Defendants' regulatory authority under the CWA, *i.e.,* which waters are jurisdictional. The CWA does not protect waters that are not "waters of the United States" from pollution, degradation, or destruction, and it is not unlawful under the CWA to dredge and fill non-jurisdictional waters or discharge pollutants into them without a permit.

50.     Defendants first addressed the definition of "waters of the United States" by promulgating rules in the mid-1970s. Those regulations asserted jurisdiction over traditionally navigable waters, interstate waters, tributaries to those (and other) jurisdictional waters, wetlands adjacent to other jurisdictional waters, and any "other waters," the use, degradation, or destruction of which could affect interstate or foreign commerce. *See, e.g.*, 40 C.F.R. § 122.2 (2015); 33 C.F.R. § 328.3 (2015) ("1970s Regulatory Definition").

51.     When the Corps adopted its definition of "waters of the United States" in 1977, consistent with Congressional intent, it recognized that "[t]he regulation of activities that cause water pollution cannot rely on . . . artificial lines . . . but must focus on all waters that together form the entire aquatic system." 42 Fed. Reg. 37128 (July 19, 1977). Defendants' longstanding regulatory definition of "waters of the United States" was applied for more than 40 years and was never overturned by any court.

52.     In 2015, Defendants promulgated the Clean Water Rule in an attempt to re-define "waters of the United States." The impact of the Clean Water Rule was sweeping; it resulted in a massive net loss of CWA jurisdiction as compared to the Defendants' 1970s Regulatory Definition and their longstanding interpretations of the CWA.

53.     In 2019, Defendants promulgated the Repeal Rule, again redefining "waters of the United States." Defendants' Repeal Rule nominally reinstated the 1970s Regulatory Definition but did so subject to modification by their own undisclosed reinterpretations.

54.     In 2020, Defendants promulgated the Replacement Rule, redefining "waters of the United States for the third time in 5 years. The Replacement Rule was designed to, and did, eliminate a huge number of waters across the Nation from CWA jurisdiction. This is the most extreme change in CWA jurisdiction since its inception.

55.     These limitations on CWA jurisdiction are arbitrary, capricious, contrary to law, and in violation of the language and purpose of the CWA.

### III.     The CWA's Permit Exclusion for Farming Activities

56.     CWA section 404(f)(1) excludes certain activities from regulation. 33 U.S.C. § 1344(f)(1). As relevant here, section 404(f)(1)(A) states that "the discharge of dredged or fill material … from normal farming, silviculture, and ranching activities ... is not prohibited by or otherwise subject to regulation under" CWA sections 402, 404, or 301(a). 33 U.S.C. § 1344(f)(1)(A).

57.     CWA section 404(f)(2) provides an exception to this exclusion, commonly referred to as the "Recapture Provision":

Any discharge of dredged or fill material into the navigable waters incidental to any

activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters is reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2).

58. Notably, section 404(f) does not affect the jurisdictional status of waters under the CWA. Rather, sections 404(f)(1) and (2), read together, mean that a person does not need a CWA section 404 permit to discharge dredged or fill material from normal farming, silviculture, and ranching activities into a jurisdictional water *unless* (1) such discharge brings the water "into a use to which it was not previously subject", *e.g.*, a new use; and (2) the discharge impairs the flow or circulation of the navigable water or the reach of the water.

59. The fact that the Recapture Provision refers several times to "navigable waters," a term which the CWA defines to mean waters of the United States, further demonstrates that waters in which activities subject to the section 404(f)(1) permit exemption take place are still jurisdictional. This interpretation is borne out by Defendants' long-standing policies as well as the legislative history of CWA section 404(f). *See, e.g.,* CONG. REC. S19654 (daily ed. Dec. 15, 1977) (Senator Muskie noting that the Section 404(f)(1) exemption was only intended to eliminate permitting requirements for certain "narrowly defined activities that cause little or no adverse effects either individually or cumulatively.").

60. As discussed below, the Clean Water Rule and Replacement Rule are inconsistent with the CWA's permit exclusion for farming activities.

## IV. Overview of NEPA

61. NEPA, enacted by Congress in 1969, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). One of the core goals of NEPA is to "promote efforts which will prevent or eliminate damage to the environment…" 42 U.S.C. § 4321. As such, NEPA directs all federal agencies to assess the environmental impacts of proposed actions that may significantly affect the quality of the human environment.

62. The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. Those regulations are designed to ensure "that environmental information is available to public officials and citizens before decisions are made and

actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)–(c). The Corps has its own NEPA regulations, codified at 33 C.F.R. part 230, which the Corps uses in conjunction with the CEQ regulations.

63.     NEPA requires all federal agencies to prepare a "detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is known as an Environmental Impact Statement ("EIS"). CEQ's regulations establish a standard format for EISs, including a summary, statement of purpose and need for action, alternatives analysis, statement of the affected environment, and analysis of environmental consequences. 40 C.F.R. § 1502.10. A "major Federal action" is an action "with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Promulgation of a rule is an expressly identified "Federal action" under NEPA. *Id*. § 1508.18(b)(1).

64.     NEPA regulations define significance in terms of an action's context and intensity. *See* 40 C.F.R. § 1508.27. An action's context must be analyzed nationally, regionally, and locally. *See* 40 C.F.R. § 1508.27(a). An action's intensity must be analyzed on the basis of at least 10 factors, any one of which can indicate that an EIS is required. *See* 40 C.F.R. § 1508.27(b). For example, an EIS may be required if a major action is in proximity of "wetlands, wild and scenic rivers, or ecologically critical areas," is "likely to be highly controversial," "establish[es] a precedent for future actions with significant effects," or "may adversely affect an endangered or threatened species" or their designated critical habitat *See id.* Moreover, a "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1).

65.     An agency that is uncertain whether an EIS is required may first develop an Environmental Assessment ("EA"). An EA is a "concise public document" that "provide[s] sufficient evidence and analysis" for determining whether to prepare an EIS or issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.9(a). The EA must discuss the need for the proposed project, as well as environmental impacts and alternatives, *see* 40 C.F.R. § 1508.9(b); it must provide sufficient

evidence and analysis for determining whether an EIS is appropriate; and it must include a discussion of "appropriate alternatives if there are unresolved conflicts concerning alternative uses of available resources[.]" 33 C.F.R. § 230.10. If, after preparing an EA, the federal agency determines that the proposed action is not likely to significantly affect the environment, it may issue a FONSI.

66.     NEPA requires an agency to take a "hard look" at the environmental consequences of the agency's proposed action, and, should it decide not to prepare an EIS, to base that decision on "a convincing statement of reasons why potential effects are insignificant." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (citation omitted).

67.     The information presented in an EA or an EIS must be of high quality. NEPA regulations provide that "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

68.     Although the CWA exempts many actions taken by the EPA Administrator under the CWA from NEPA, 33 U.S.C. § 1371(c)(1), it contains no such exemption for actions taken by the Corps. The Corps is subject to NEPA obligations for its rule promulgation actions referred to in this Amended Complaint, and its failure to comply with those obligations, as discussed below, violates NEPA.

**V.     Overview of the ESA**

69.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA declares that endangered and threatened species are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Accordingly, the ESA's purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…. " 16 U.S.C. § 1531(b). To accomplish this purpose, the ESA includes both substantive and procedural provisions that are designed to protect and recover imperiled species. To meet these obligations, the ESA provides that "endangered species [have] priority over the 'primary missions' of federal agencies." *TVA v. Hill*, 437 U.S. at 185. To this end, the ESA

directs all federal agencies to work to conserve endangered and threatened species and to use their authorities to further the purposes of the ESA. *See* 16 U.S.C. §§ 1531(c)(1), 1536(a). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

70. ESA section 4 requires the National Marine Fisheries Service ("NMFS") and the U.S. Fish and Wildlife Service ("FWS") to protect imperiled species by listing them as either "endangered" or "threatened" and to designate their "critical habitat." 16 U.S.C. § 1533. Critical habitat is defined as habitat that is essential to the conservation of the species. 16 U.S.C. § 1532(5)(A).

71. ESA section 7(a)(2) requires that each federal agency (the "action agency"), in consultation with the NMFS and/or FWS,[3] ensure "that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of" listed species or result in the destruction or adverse modification of critical habitat of such species. 16 U.S.C. § 1536(a)(2).

72. ESA section 7(a)(2) also establishes a procedural duty in the form of an interagency consultation process to assist federal agencies in complying with their duty to ensure against jeopardy to listed species or destruction or adverse modification of critical habitat. An agency must initiate consultation under section 7 with NMFS and/or FWS *before* it takes an action that "may affect" a listed species. 50 C.F.R. § 402.14(a). The action agency must "review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." *Id.* The scope of "agency actions" subject to consultation is construed broadly. *See* 50 C.F.R. § 402.02 (defining "agency action"); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054–55 (9th Cir. 1985). This includes "the promulgation of regulations." 50 C.F.R. § 402.02(b).

---

[3] The ESA delegates responsibility for section 7 consultation with action agencies to two cabinet-level Secretaries, Interior and Commerce. 16 U.S.C. §§ 1532(15), 1536(a). The Secretary of the Interior has sub-delegated authority to FWS, who has primary responsibility for terrestrial species and freshwater species of fish, and the Secretary of Commerce has sub-delegated authority to NMFS, who has primary responsibility for marine species and anadromous fish.

73.     If any ESA-listed species may be present in the action area, the action agency must prepare a Biological Assessment ("BA"). *See* 16 U.S.C. § 1536(c)(1). The BA must "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary." 50 C.F.R. § 402.12(a).

74.     If the action agency determines that its action may affect, but is not likely to adversely affect, a proposed or listed species or its proposed or designated critical habitat, it may engage in "informal consultation" with NMFS and/or FWS. *See* 50 C.F.R. §§ 402.13(a), 402.14(b)(1). If, as a result of informal consultation, NMFS and/or FWS issues a written "concurrence" to the action agency that its proposed action is not likely to adversely affect a listed species or its critical habitat, the consultation process ends. *See id.* However, if either agency believes that adverse effects are possible, the agencies must engage in formal consultation.

75.     After formal consultation, NMFS and/or FWS issues a Biological Opinion ("BO") to explain whether the agency action is likely to "jeopardize" any ESA-listed species' existence or "result in the destruction or adverse modification" of an ESA-listed species' critical habitat. 16 U.S.C. § 1536(a)(2). The BO must include a summary of the information on which it is based and must adequately detail and assess how the proposed action affects listed species and their critical habitat. 50 C.F.R. § 402.14(h). The BO must also include an evaluation of the "cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3).

76.     If the action is likely to cause jeopardy or destruction or adverse modification of critical habitat, then the BO shall specify reasonable and prudent alternatives ("RPAs") that avoid jeopardy or adverse modification of critical habitat. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If NMFS and/or FWS concludes that the action or the RPAs will not cause jeopardy, it will issue an incidental take statement ("ITS") that specifies "the impact, i.e., the amount or extent, of . . . incidental taking" that may occur. *See* 50 C.F.R. § 402.14(i)(1).

77.     However, the action agency's and NMFS and/or FWS's consultation duties do not end with the issuance of a BO. The action agency, FWS, and NMFS are all required to reinitiate consultation

"where discretionary Federal involvement or control over the action has been retained or is authorized by law . . ." and:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16. This is consistent with the agencies' ongoing substantive duties to ensure that their actions do not cause jeopardy to ESA-listed species or destruction or adverse modification of their critical habitat.

78.     Similarly, as a result of the agencies' substantive duties to ensure that their actions do not cause jeopardy or destruction or adverse modifications of critical habitat, the agencies must take, and avoid taking, actions during the pendency of consultation that risk violating that substantive duty. *See, e.g., Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034-35 (9th Cir. 2005).

79.     Once consultation is initiated or reinitiated, ESA section 7 prohibits the agency from "mak[ing] any irreversible or irretrievable commitment of resources" toward a project that would "foreclos[e] the formulation or implementation of any reasonable and prudent alternative measures . . ." 16 U.S.C. § 1536(d). The section 7(d) prohibition "is in force during the consultation process and continues until the requirements of Section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. This section 7(d) duty is in addition to the substantive section 7(a)(2) duties that the agency has during the pendency of consultation.

80.     The ESA's goals cannot be met where the action agencies, NMFS, and FWS fail to comply with the ESA's procedural and substantive requirements. Compliance is critical to conserve endangered and threatened species and the habitat they rely on. Therefore, failure to consult where the

ESA requires consultation and to take other actions necessary to conserve listed species and their designated critical habitat are serious violations of the ESA.

81.     The ESA's citizen suit provision authorizes citizens to commence suit against, *inter alia*, federal agencies that are alleged to be in violation of any ESA provision. 16 U.S.C. § 1540(g)(1)(A).

82.     Defendants failed to comply with both their procedural and substantive duties under the ESA when they promulgated the Replacement Rule.

83.     Defendants failed to comply with both their procedural and substantive duties under the ESA when they promulgated the Repeal Rule.

84.     Defendants failed to comply with both their procedural and substantive duties under the ESA when they promulgated the Clean Water Rule.

## VI.     Overview of the APA

85.     The APA imposes procedural requirements on federal agency rulemaking. 5 U.S.C. § 553. Under the APA, agencies are required to publish notice of proposed rules in the Federal Register, including "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

86.     Following notice of a proposed rulemaking, agencies are required to provide the public with the opportunity to submit "written data, views, or arguments," which the agency must then consider and respond to. 5 U.S.C. § 553(c).

87.     APA section 702 provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute…" 5 U.S.C. § 702.

88.     Only final agency actions are reviewable under the APA. 5 U.S.C. § 704. Promulgation of a final rule is a "final agency action" for APA purposes.

89.     Under the APA, a court must "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

90.     As discussed below, Defendants' Replacement Rule, and the procedures it followed in promulgating the Replacement Rule, violates the APA.

91.     As discussed below, Defendants' Repeal Rule, and the procedures it followed in promulgating the Repeal Rule, violates the APA.

92.     As discussed below, Defendants' Clean Water Rule, and the procedures it followed in promulgating the Clean Water Rule, violates the APA.

## FACTUAL BACKGROUND

**I.   General Factual Background.**

93.     As Defendants correctly noted in the preamble to *Definition of 'Waters of the United States' Under the Clean Water Act* ("Proposed Clean Water Rule"), 79 Fed. Reg. 21,188, 21,191 (Apr. 21, 2014):

> "Waters of the United States," which include wetlands, rivers, streams, lakes, ponds and the territorial seas, provide many functions and services critical for our nation's economic and environmental health.  In addition to providing habitat, rivers, lakes, ponds and wetlands cleanse our drinking water, ameliorate storm surges, provide invaluable storage capacity for some flood waters, and enhance our quality of life by providing myriad recreational opportunities, as well as important water supply and power generation benefits.

The inclusion of these broad categories of waters in the definition of "waters of the United States" is necessary to implement the CWA's "comprehensive regulatory program" that established "a new system of regulation under which it is illegal for anyone to discharge pollutants into the Nation's waters except pursuant to a permit." *Cty. of Milwaukee*, 451 U.S. at 310-11, 317.

94.     Additionally, many types of waters are connected in a hydrologic cycle and the central objective of the CWA is to ensure broad protections for the Nation's waters by controlling pollution at its source – protecting those waters to protect their beneficial uses and also the uses of any downstream

surface waters to which they are connected. As EPA's own Office of Research and Development has summarized:[4]

- "The scientific literature unequivocally demonstrates that streams, individually or cumulatively, exert a strong influence on the integrity of downstream waters. All tributary streams, including perennial, intermittent, and ephemeral streams, are physically, chemically, and biologically connected to downstream rivers via channels and associated alluvial deposits where water and other materials are concentrated, mixed, transformed, and transported."

- "The literature clearly shows that wetlands and open waters in riparian areas and floodplains are physically, chemically, and biologically integrated with rivers via functions that improve downstream water quality, including the temporary storage and deposition of channel-forming sediment and woody debris, temporary storage of local ground water that supports baseflow in rivers, and transformation and transport of stored organic matter."

- "Wetlands and open waters in non-floodplain landscape settings (hereafter called 'non-floodplain wetlands') provide numerous functions that benefit downstream water integrity. These functions include storage of floodwater; recharge of ground water that sustains river baseflow; retention and transformation of nutrients, metals, and pesticides; export of organisms or reproductive propagules to downstream waters; and habitats needed for stream species. This diverse group of wetlands (*e.g.*, many prairie potholes, vernal pools, playa lakes) can be connected to downstream waters through surface-water, shallow subsurface-water, and ground-water flows and through biological and chemical connections."

95.     In addition, EPA's own Science Advisory Board ("SAB") concluded, "groundwater connections, particularly via shallow flow paths in unconfined aquifers, can be critical in supporting the hydrology and biogeochemical functions of wetlands and other waters. Groundwater also can connect waters and wetlands that have no visible surface connections."[5]

96.     If not included within the definition of "waters of the United States," waters will be excluded from CWA jurisdiction and, as a result, lose federal (and State) protection despite such waters

---

[4] U.S. EPA, Office of Research and Development, *Connectivity of Streams & Wetlands to Downstream Waters: A Review & Synthesis of the Scientific Evidence* (January 2015) at ES-3, 4, *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=296414 ("Connectivity Report").

[5] Letter from Dr. David T. Allen, Chair, EPA Science Advisory Board, to EPA Administrator Gina McCarthy, *Science Advisory Board (SAB) Consideration of the Adequacy of the Scientific and Technical Basis of the EPA's Proposed Rule titled "Definition of Waters of the United States under the Clean Water Act"* (Sept. 30, 2014) ("SAB Report"), at 2-3, *available at* http://yosemite.epa.gov/sab/sabproduct.nsf/0/518D4909D94CB6E585257D6300767DD6/$File/EPA-SAB-14-007+unsigned.pdf.

providing important habitat for fish, wildlife, and threatened and endangered species. For example, salmon and steelhead in the Pacific Northwest regularly use and require certain types of streams, ditches, and ditched or channelized streams during their life cycle. Small wetlands and ponds are important habitat for numerous amphibians and reptiles. Moreover, fish, wildlife, and threatened and endangered species found within traditionally navigable waters are often very sensitive to pollution and are harmed from the cumulative impacts to headwater tributaries and wetlands upstream. These species will receive less, and in many cases no, protection against pollution and/or habitat destruction under the Final Rules herein challenged than they did under Defendants' longstanding 1970s definition of "waters of the United States."

97.     At the same time, some types of waters that are more clearly protected under the Clean Water Rule than under the 1970s Regulatory Definition also provide habitat for numerous ESA-listed species. For example, several categories of wetlands, including prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands provide habitat for threatened and endangered species such as whooping cranes, Northern Great Plains piping plovers, and prairie shrimp, among others. However, the Clean Water Rule also removed protections from various waters that serve as important habitat for many ESA-listed species, and the Repeal Rule and the Replacement Rule removed protections for even more waters that are important habitat for ESA-listed species.

**II. The Clean Water Rule**

98.     On April 21, 2014, Defendants published in the Federal Register the Proposed Clean Water Rule. 79 Fed. Reg. 21,188–22,274.

99.     The Proposed Clean Water Rule allowed the public to file comments on the proposal until July 21, 2014. The comment period was extended twice, ultimately requiring that comments be filed comments no later than November 14, 2014. *See* 79 Fed. Reg. 35,712 (June 24, 2014); 79 Fed. Reg. 61,590 (Oct. 14, 2014).

100.     Numerous Plaintiffs in this action submitted written comments on the Proposed Clean Water Rule during the public comment period, including the following: a letter dated November 14,

2014 and submitted electronically to EPA Docket No. EPA-HQ-OW-2011-0880 on behalf of

Waterkeeper Alliance, Humboldt Baykeeper, Russian Riverkeeper, Monterey Coastkeeper, Snake River

Waterkeeper, Upper Missouri Waterkeeper, Upper and Lower Neuse Riverkeepers, Pamlico-Tar

Riverkeeper, and others, and a letter dated November 14, 2014 and submitted electronically to EPA

Docket No. EPA-HQ-OW-2011-0880 on behalf of Turtle Island Restoration Network and others.

101.    On May 26, 2015, the Corps issued a Final Environmental Assessment ("Final EA") for
the Clean Water Rule.[6] As part of its Final EA, the Corps issued a Finding of No Significant Impact
("FONSI") after concluding "that adoption of the [Clean Water Rule] is not a major Federal action
significantly affecting the quality of the human environment within the meaning of the National
Environmental Policy Act for which an environmental impact statement is required." *Id.*

102.    On June 29, 2015, Defendants issued the final Clean Water Rule. 80 Fed. Reg. 37,054
(June 29, 2015). The Clean Water Rule revised eleven regulatory provisions where the phrase "waters of
the United States" is defined, 40 C.F.R. Parts 110, 112, 116, 117, 122, 230, 232, 300, 301, and 401,
which govern various regulatory programs implemented by EPA or the Corps under their CWA
authorities.

103.    The Clean Water Rule effectively placed all of the Nation's waters into one of three
categories for purposes of CWA jurisdiction:

(1) Waters that are *per se* jurisdictional, including traditional navigable waters; interstate waters;
the territorial seas; tributaries (as defined elsewhere in the rule) of traditional navigable
waters, interstate waters, and territorial seas; impoundments of other jurisdictional waters;
and all waters that are adjacent to (as defined elsewhere in the rule) the waters described
above;

---

[6] *See* Finding of No Significant Impact: Adoption of the Clean Water Rule: Definition of Waters of the
United States (May 26, 2015), available at http://www2.epa.gov/sites/production/files/2015-
05/documents/finding_of_no_significant_impact_the_clean_water_rule_52715.pdf ("CWR FONSI").

(2) Waters that are *per se* non-jurisdictional, including (among others) waters converted to waste treatment systems; certain types of ditches; ephemeral features that do not meet the definition of a tributary; groundwater; and waters outside the 100-year floodplain and more than 4,000 feet of the high tide line or ordinary high water mark of a traditional navigable water, interstate water, the territorial seas, impoundment of other jurisdictional waters, or tributary; and

(3) Waters which will be assessed for jurisdiction on a case-specific basis by applying a significant nexus analysis, including (among others) all adjacent waters being used for established normal farming, ranching, and silviculture activities; all of certain categories of waters, including prairie potholes, pocosins, and western vernal pools; all waters within the 100-year floodplain of a traditional navigable water, interstate waters, or the territorial seas; and all waters located within 4,000 feet of the high tide line or ordinary high water mark of a traditional navigable water, interstate water, the territorial seas, impoundment of other jurisdictional waters, or tributary.

*See* 80 Fed. Reg. at 37,104. Substantially the same definition of "waters of the United States" was incorporated into the relevant definition sections of eleven separate regulations implementing the CWA. *See id.* at 37,104-127.

104.    By its terms, the Clean Water Rule became operative on July 13, 2015 and thus became a "final agency action" for the purposes of judicial review within the meaning of 5 U.S.C. § 704. *See* 80 Fed. Reg. at 37,054 ("this regulation shall be considered issued for purposes of judicial review at 1 p.m. Eastern time on July 13, 2015.").

**A.  Tributaries under the Clean Water Rule**

105.    The Clean Water Rule defines "tributary" as "a water that contributes flow, either directly or through another water" to a traditional navigable water, interstate water, or territorial sea, and "that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark." 80 Fed. Reg. at 37,105; 33 C.F.R. § 328.3(c)(3) (2016). As Defendants explain in the preamble to the Clean Water Rule, this definition "requires the presence of a bed and banks and an additional

indicator of ordinary high water mark such as staining, debris deposits, or other indicator[.]" 80 Fed. Reg. at 37,076.

106.    As EPA has noted, the definition of tributary in the Clean Water Rule "narrows the waters that meet the definition of tributary compared to [the then] current practice that simply require[d] one indicator of ordinary high water mark"—*e.g.*, the presence of defined bed and banks.[7]

107.    The Clean Water Rule's definition of tributary, which includes only those waters that have a bed and banks and an additional indicator of an ordinary high water mark, lacks legal and scientific support. EPA's SAB "advised EPA to reconsider the definition of tributaries because not all tributaries have ordinary high water marks" and urged EPA to change the definition's wording to "bed, bank, and other evidence of flow." 80 Fed. Reg. at 37,064. The SAB explained that "[a]n ordinary high water mark may be absent in ephemeral streams within arid and semi-arid environments or in low gradient landscapes where the flow of water is unlikely to cause an ordinary high water mark."[8]

108.    EPA's own scientific analyses underpinning the Clean Water Rule do not provide support for the requirement that a tributary have both bed and banks and an ordinary high water mark to have a significant nexus with downstream waters and thus to be *per se* jurisdictional under the CWA. While EPA noted that available science "supports the conclusion that sufficient volume, duration, and frequency of flow are required to create a bed and banks and ordinary high water mark" within a tributary, TSD at 171, this self-evident conclusion has no bearing on whether a particular tributary (or group of similarly situated tributaries) "provide[s] many common vital functions important to the chemical, physical, and biological integrity of downstream waters" and should thus be *per se* jurisdictional. *Id.* at 235. Indeed, the TSD explicitly recognized, and did not dispute, the SAB's view that "from a scientific perspective there are tributaries that do not have an ordinary high water mark but still affect downstream waters." *Id.* at 242.

---

[7] U.S. EPA and U.S. Dept. of the Army, *Technical Support Document for the Clean Water Rule: Definition of Waters of the United States* (May 27, 2015) at 67 ("TSD").
[8] SAB Report at 2.

AMENDED COMPLAINT FOR DECLARATORY                   32
AND INJUNCTIVE RELIEF

1    //

2    //

3    **B. Ditches and Ephemeral Features under the Clean Water Rule**

4    109.    In the Proposed Clean Water Rule, Defendants stated that certain ditches meet the

5    definition of "tributary," and are therefore "waters of the United States," if they satisfy the following

6    criteria: "they have a bed and banks and ordinary high water mark and they contribute flow directly or

7    indirectly through another water to [traditional navigable waters, the territorial seas, interstate waters, or

8    impoundments of other waters of the United States]." 79 Fed. Reg. at 22,203.

9    110.    Under the Proposed Clean Water Rule, two types of ditches were *per se* excluded,

10    regardless of whether they satisfied the requirements of another category of "water of the United

11    States": (1) "[d]itches that are excavated wholly in uplands, drain only uplands, and have less than

12    perennial flow," and (2) "[d]itches that do not contribute flow, either directly or through another water,

13    to a traditional navigable water, interstate water, the territorial seas or an impoundment of a

14    jurisdictional water." 79 Fed. Reg. at 22,273–74. The Proposed Clean Water Rule also exempted gullies,

15    rills, and "non-wetland swales." *Id.* at 22,263.

16    111.    The SAB provided comments on this aspect of the Proposed Clean Water Rule, and

17    specifically rejected the exclusion of ditches as "not justified by science." The SAB explained: "There is

18    . . . a lack of scientific knowledge to determine whether ditches should be categorically excluded.  Many

19    ditches in the Midwest would be excluded under the proposed rule because they were excavated wholly

20    in uplands, drain only uplands, and have less than perennial flow.  However, these ditches may drain

21    areas that would be identified as wetlands under the Cowardin classification system and may provide

22    certain ecosystem services."  SAB Report at 3.

23    112.    Members of the SAB panel also expressed concerns regarding the Proposed Clean Water

24    Rule's exclusion of ephemeral streams, noting for example that such waters are ecologically important

25    to downstream water quality (especially in the arid southwest), *see SAB Report at 2 -3 and TSD at 67*;

26

27

can deliver nutrients and other agricultural pollutants to downstream waters when tiled;[9] and may provide valuable habitat for certain organisms that have adapted to them.[10]

113.    In the final Clean Water Rule, Defendants significantly altered the provision regarding ditches, changing the exclusion to include: "[d]itches with ephemeral flow that are not a relocated tributary or excavated in a tributary"; "[d]itches with intermittent flow that are not a relocated tributary, excavated in a tributary, or drain wetlands"; and, "[d]itches that do not flow, either directly or through another water, into a water identified in paragraphs (a)(1) through (3) of this section." 80 Fed. Reg. at 37,105.

114.    In the final Clean Water Rule, Defendants also significantly expanded the exclusion for ephemeral features so that it applies to "[e]rosional features, including gullies, rills, and other ephemeral features that do not meet the definition of tributary, non-wetland swales, and lawfully constructed grassed waterways." *Id.* In the Preamble to the Clean Water Rule, Defendants explained that the term "ephemeral features" broadly encompasses "ephemeral streams that do not have a bed and banks and ordinary high water mark." *Id.* at 37,058.

115.    EPA's own scientific analyses underpinning the final Clean Water Rule do not provide support for its categorical exemptions of certain types of ditches and ephemeral features. According to EPA, "[t]he scientific literature documents that tributary streams*, including perennial, intermittent, and ephemeral streams*, and certain categories of ditches are integral parts of river networks." TSD at 243 (emphasis added). Additionally, in the preamble to the Proposed Clean Water Rule, EPA noted that "tributary streams, *including perennial, intermittent, and ephemeral streams*, are chemically, physically, or biologically connected to downstream rivers via channels and associated alluvial deposits where

---

[9] Memorandum from Dr. Amanda D. Rodewald, Chair of the SAB Panel for the Review of the EPA Water Body Connectivity Report, to Dr. David Allen, Chair of the SAB, Comments to the Chartered SAB on the Adequacy of the Scientific and Technical Basis of the Proposed Rule Titled "Definition of 'Waters of the United States' Under the Clean Water Act" (Sep. 2, 2014) at 8.

[10] *Id.* at 25, Revised Comments by Kurt D. Fausch on the proposed rule "Definition of 'Waters of the United States' Under the Clean Water Act."

water and other materials are concentrated, mixed, transformed, and transported." 79 Fed. Reg. at 22,224 (emphasis added).

116.   In the preamble to the final Clean Water Rule, EPA explained that the effects tributaries exert on downstream waters "occur even when the covered tributaries flow infrequently (such as ephemeral covered tributaries), and even when the covered tributaries are great distances from the traditional navigable water, interstate water, or the territorial sea." 80 Fed. Reg. at 37,069.

117.   EPA has also noted that man-made and man-altered tributaries—such as "ditches, canals, channelized streams, piped streams, and the like,"—"likely enhance the extent of connectivity" between streams and downstream rivers, "because such structures can reduce water losses from evapotranspiration and seepage." TSD at 256-57. In other words, to the extent perennial, intermittent, and ephemeral tributaries have significant impacts on downstream waters, the increased flow associated with man-made or man-altered ditches may actually exacerbate these effects.

118.   Despite noting the significant impacts that ditches and ephemeral streams have on downstream waters, Defendants have provided no legal or scientific basis for excluding ditches that are ephemeral, intermittent, or indirectly connected to traditional navigable waters, interstate waters, or the territorial seas, nor have Defendants provided a legal or scientific basis for *per se* excluding ephemeral features such as ephemeral streams that do not meet the definition of a tributary.

119.   Defendants provided no justification, legal, scientific, or otherwise, for concluding in the final Clean Water Rule that all tributaries are "waters of the United States," yet categorically exempting certain types of ditches—a category of tributary under the Clean Water Rule—and other ephemeral waters that may have a significant nexus with traditional navigable waters, interstate waters, or the territorial seas.

120.   Finally, Defendants have provided no legal or scientific basis for exempting from CWA jurisdiction ditches that flow into traditional navigable waters, interstate waters, or the territorial seas, despite concluding that such waters are "waters of the United States" in the Proposed Clean Water Rule. *Compare* 79 Fed. Reg. 22,273–74 (excluding "[d]itches that do not contribute flow . . . to water identified in paragraphs (l)(1)(i) through (iv) of this section") *with* 80 Fed. Reg. 37,105 (excluding

"[d]itches that do not flow, either directly or through another water, into a water identified in paragraphs (a)(1) through (3) of this section").

## C. Limits on the Application of the Significant Nexus Test under the Proposed and Final Clean Water Rules

121.    In the final version of the Clean Water Rule, Defendants defined waters of the United States to include "all waters located within 4,000 feet of the high tide line or ordinary high water mark of" a *per se* jurisdictional water (other than adjacent waters), "where they are determined on a case-specific basis to have a significant nexus" with such water.  80 Fed. Reg. at 37,114.

122.    As a result of the above language, under the final Clean Water Rule, most waters located more than 4,000 feet of the high tide line or ordinary high water mark of a *per se* jurisdictional water other than an adjacent water are automatically excluded from CWA jurisdiction, even if those waters possess a significant nexus with the jurisdictional water or otherwise have a significant effect on interstate commerce.[11] *See* 80 Fed. Reg. at 37,086 (describing the "exclusive" and "narrowly targeted circumstances" under which case-specific significant nexus determinations can be made under the Clean Water Rule).

123.    The Proposed Clean Water Rule did not include the 4,000-foot limitation—or any other distance limitation—on the application of the significant nexus test.  Instead, the Proposed Clean Water Rule would have extended CWA jurisdiction to all "other waters, including wetlands, provided that those waters alone, or in combination with other similarly situated waters, including wetlands, located in the same region, have a significant nexus to" traditional navigable waters, interstate waters, and the territorial seas. 79 Fed. Reg. at 22,268. For example, under the Proposed Clean Water Rule, a wetland complex located 5,000 feet from a qualifying *per se* jurisdictional water could be subject to CWA

---

[11] Under the Clean Water Rule, a case-by-case significant nexus analysis also applies to five categories of waters that Defendants "have determined are 'similarly situated' for purposes of a significant nexus determination" (such as prairie potholes and western vernal pools), as well as to waters within the 100-year floodplain of a traditional navigable water, interstate water, or territorial sea.  80 Fed. Reg. at 37,086.

jurisdiction if it was shown to possess a significant nexus with a traditional navigable water, an interstate water, or a territorial sea.

124.   In the preamble to the Proposed Clean Water Rule, Defendants identified and solicited public comment on several alternatives to their proposal to codify the significant nexus test as the basis for determining jurisdiction over all other non-adjacent waters. *See* 79 Fed. Reg. at 22,214-17. None of these alternatives suggested the possibility that Defendants might establish an outermost limit on the application of the significant nexus test at 4,000 feet or might use any other distance as the basis for excluding waters from CWA jurisdiction.

125.   In establishing the "4,000 foot bright line boundaries for these case-specific significant nexus determinations" in the Clean Water Rule, Defendants purport to be "carefully applying the available science." 80 Fed. Reg. at 37,059. But the opposite is true; indeed, as noted in the preamble to the Clean Water Rule, EPA's own SAB "found that distance could not be the sole indicator used to evaluate the connection of 'other waters' to jurisdictional waters." *Id.* at 37,064.

### D. Adjacent Waters and Normal Farming Activities under the Proposed and Final Clean Water Rule

126.   Prior to the Clean Water Rule, Defendants considered all wetlands adjacent to a traditional navigable water to have a "significant nexus" to that water, in recognition of the fact that waters and their adjacent wetlands are properly viewed as one system due to their hydrological connection with one another. Thus, prior to the Proposed Clean Water Rule or the final version of the Clean Water Rule, Defendants considered all adjacent wetlands to be jurisdictional under the CWA.

127.   Under both the Proposed Clean Water Rule and the final version of the Clean Water Rule, "waters of the United States" include all waters that are "adjacent" to a traditional navigable water, interstate water, territorial sea, impoundment of a jurisdictional water, or tributary. *See* 79 Fed. Reg. at 22,206-07; 80 Fed. Reg. at 37,058.

128.   In the Proposed Clean Water Rule Defendants proposed to define "adjacent" as follows:

The term *adjacent* means bordering, contiguous or neighboring.   Waters, including wetlands, separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent waters."

79 Fed. Reg. at 22,270 (citing proposed 40 C.F.R. § 232.2).

129.    In the preamble to the Proposed Clean Water Rule, Defendants stated that the Rule "does not affect any of the exemptions from CWA section 404 permitting requirements provided by CWA section 404(f), including those for normal farming, silviculture, and ranching activities." 79 Fed. Reg. at 22,199 (citing 33 U.S.C. § 1344(f); 40 C.F.R. § 232.3; 33 C.F.R. § 323.4).

130.    In the final version of the Clean Water Rule, however, Defendants added the following language to the definition of adjacent:

> "Waters being used for established normal farming, ranching, and silviculture activities
> (33 U.S.C. 1344(f)) are not adjacent."

*See, e.g.*, 80 Fed. Reg. at 37,105; 33 C.F.R. § 328(c)(1).

131.    This addition was made by EPA on "the day that the draft final rule was sent to [the Office of Management and Budget] to begin the inter-agency review process,"[12] was not subjected to Defendants' scientific review, the Corps' NEPA evaluation, or public comment.

132.    In the preamble to the Clean Water Rule, Defendants state that the language added to the definition of adjacent "interprets the intent of Congress[.]" 80 Fed. Reg. at 37,080. But by enacting section 404(f) of the CWA, Congress sought to exempt discharges from certain types of *activities* from the requirement to obtain a permit pursuant section 404; it did not intend to remove any category of waters from the CWA's jurisdiction.

133.    As a result of this addition to the definition of "adjacent" from the Proposed Clean Water Rule to the final Clean Water Rule, waters being used for established normal farming, ranching, and silviculture activities now must satisfy the significant nexus test in order to be jurisdictional—even if they are physically adjacent to a traditional navigable water and would therefore have been *per se* jurisdictional under the Proposed Clean Water Rule or prior agency practice.

---

[12] Memorandum from Lance Wood, Assistant Chief Counsel for Environmental Law and Regulatory Programs, U.S Army Corps of Engineers, to Maj. Gen. John Peabody, Deputy Commanding General for Civil and Emergency Operations, U.S. Army Corps of Engineers, Legal Analysis of Draft Final Rule on Definition of "Waters of the United States" (Apr. 24, 2015) at 5 ("Wood Memorandum").

134.    Defendants' only stated reasoning for this last-minute addition to the Clean Water Rule is that farmers play a "vital role" in providing the United States with food, fiber, and fuel, and thus Defendants wanted to "minimize potential regulatory burdens on the nation's agriculture community." 80 Fed. Reg. at 37,080. Defendants do not attempt to explain how the CWA section 404(f)(1) exemption is related to "adjacent" waters; nor do Defendants provide any scientific justification for changing how they treat waters adjacent to traditionally navigable waters.

135.    In addition, in the preamble to the Clean Water Rule, Defendants purport to include all waters "adjacent" to traditional navigable waters, interstate waters, and the territorial seas as waters of the United States "based upon their hydrological and ecological connections to, and interactions with, those waters." 80 Fed. Reg. at 37,058. But in the preamble to the Clean Water Rule Defendants state that a wetland "being used for established normal farming, ranching, and silviculture activities" "shall not be combined" with other adjacent wetlands when conducting the significant nexus analysis, regardless of the hydrological connection between the wetlands or the effects that the entire wetlands system, as a whole, have on the chemical, physical, or biological integrity of adjacent traditional navigable waters, interstate waters, territorial seas, or tributaries.

136.    Nothing in the record or the available science suggests that the mere presence of established normal farming, ranching, and silviculture activities reduces a water's hydrological and ecological connections to other waters.[13]

137.    Moreover, nothing in the preamble to the Proposed Clean Water Rule suggested that Defendants were considering the creation of an entirely new concept of adjacency that excludes all waters in which established normal farming, ranching, and silviculture activities occur—even when those waters are bordering, contiguous, or neighboring another jurisdictional water as a matter of geographic fact. *See* 79 Fed. Reg. at 22,207-11.

---

[13] *See* Wood Memorandum at 5 (describing the addition of this sentence as "indefensible," "a textbook example of rulemaking that cannot withstand judicial review," and "highly problematic, both as a matter of science and for purposes of implementing the final rule").

138.    Indeed, nothing in the preamble to the Proposed Clean Water Rule even hinted that Defendants might conclude that established farming practices played any role whatsoever in identifying which waters are subject to CWA jurisdiction. *See, e.g., id*. at 22,210 ("The agencies proposal to determine 'adjacent waters' to be jurisdictional by rule is supported by the substantial physical, chemical, and biological relationship between adjacent waters" and other jurisdictional waters.)  Instead, Defendants noted that the "existing definition of 'adjacent' would be generally retained under" the Proposed Clean Water Rule. *Id.* at 22,207.

### E.  Waste Treatment Systems under the Proposed and Final Clean Water Rule

139.    On May 19, 1980, EPA promulgated a rule establishing the requirements for several environmental permitting programs, including the NPDES program. *See* 45 Fed. Reg. 33,290 (May 19, 1980). As part of this action, EPA promulgated a definition of the term "waters of the United States." That rule stated:

> Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the CWA (other than cooling ponds as defined in 40 C.F.R. § 423.11(m) which also meet the criteria of this definition) are not waters of the United States.  *This exclusion applies only to manmade bodies of water which neither were originally created in waters of the United States (such as disposal area in wetlands) nor resulted from the impoundment of waters of the United States.*

45 Fed. Reg. 33,290, 33,424 (emphasis added); *see also* 40 C.F.R. § 122.3 (1980). The preamble to this 1980 rule explains that the second sentence of this regulation was included "[b]ecause CWA was not intended to license dischargers to freely use waters of the United States as waste treatment systems[.]" 45 Fed. Reg. 33,290, 33,298.

140.    Two months later EPA suspended the second sentence of this regulation (italicized above) by removing it from the regulation entirely.  In its place, EPA inserted a footnote stating that the sentence was "suspended until further notice." 45 Fed. Reg. 48,620 (July 21, 1980). EPA explained in a Federal Register notice that it was suspending this sentence due to industry's objections that the regulation "would require them to obtain permits for discharges into existing waste water treatment systems, such as power plant ash ponds, which had been in existence for many years." *Id.*

141.     EPA did not provide the public with an opportunity to comment on the suspension at the time the action was taken in 1980.  Instead, EPA noted its intent to "promptly develop a revised definition and to publish it as a proposed rule for public comment.  At the conclusion of that rulemaking, EPA will amend the rule, or terminate the suspension." *Id.*

142.     EPA never developed a revised definition, and thus never submitted a proposed rule regarding this limitation on the waste treatment system exclusion for notice and comment. The public has therefore never had the opportunity to comment on or legally challenge the suspension of the sentence.

143.     Due to the "suspension" of the second sentence of the waste treatment system exclusion found at 40 C.F.R. § 122.3 in 1980, subsequently promulgated regulatory definitions of "waters of the United States" did not include that sentence. As such, this suspension—and the Defendants' obligation to take action to resolve it— has seemingly been forgotten, as the Defendants continue to promulgate definitions of "waters of the United States" that do not, because of the ongoing suspension, contain this limitation on the exclusion for waste treatment systems.

144.     The Proposed Clean Water Rule included the "suspended" second sentence of the waste treatment system exclusion but noted in a footnote that the suspension was still in effect. *See* 79 Fed. Reg. at 22,268. In addition, in the preamble to the Proposed Clean Water Rule the Defendants purport to make only "ministerial" changes to the waste treatment system exclusion, and thus stated that they were not seeking comment on this exclusion. *Id.* at 22,190, 22,217. However, these "ministerial" changes included the addition of a comma not in the existing exclusion.

145.     The definition of "waters of the United States" in 40 C.F.R. § 122.2, as revised by the Clean Water Rule, provides that "[t]he following are not 'waters of the United States' even where they otherwise meet the terms of (1)(iv) through (viii) of the definition" [*i.e.*, even if they are otherwise jurisdictional as impoundments, tributaries, adjacent waters, or waters with a significant nexus to traditional navigable waters, interstate waters, or the territorial seas]:

> Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the Clean Water Act.  This exclusion applies only to manmade bodies of water which neither were originally created in waters of the United States (such as

disposal area in wetlands) nor resulted from the impoundment of waters of the United States.  [*See* Note 1 of this section.]

80 Fed. Reg. at 37,114. As it did before, "Note 1" of the revised 40 C.F.R. § 122.2 purports to continue the suspension of the last sentence of the waste treatment system exclusion.

146.    In the Clean Water Rule, the Defendants lifted the suspension of the last sentence in 40 C.F.R. § 122.2's exclusion for waste treatment system, and then reinstated the suspension. *See* 80 Fed. Reg. at 37,114. The preamble to the Clean Water Rule describes the changes to the waste treatment system exclusion as "ministerial" and notes that "[b]ecause the agencies are not making any substantive changes to the waste treatment system exclusion, the final rule does not reflect changes suggested in public comments." *Id.* at 37,097.

147.    However, the Defendants note in the preamble to the Clean Water Rule that they did, in fact, respond to comments that the addition of the comma narrowed the exclusion, by removing the comma. 80 Fed. Reg. at 37,114. Thus, the Defendants responded to some substantive comments on the scope of the exclusion, but not others.  Several plaintiffs submitted comments on the Proposed Clean Water Rule that were not addressed by the Defendants. And, moreover, in responding to some of the comments, the Defendants adopted a broader exclusion (*e.g.*, excluding more waste treatment systems) than had been contemplated by the Proposed Clean Water Rule.

148.    The Clean Water Rule does not define "waste treatment systems."  Thus, under the waste treatment system exclusion in the Rule (including the ongoing suspension of the last sentence of that exclusion), certain types of waters such as adjacent wetlands, ponds, or tributaries are not subject to CWA jurisdiction if they are deemed to be part of a "waste treatment system"— even if they are naturally occurring waters, were created entirely within a naturally occurring water, or were created by impounding another water of the United States.

149.    For example, under the Clean Water Rule an industrial facility could unilaterally destroy CWA jurisdiction over a naturally occurring wetland or tributary merely by using that wetland or tributary as part of its on-site "waste treatment system." This exemption is contrary to the fundamental purposes of the CWA and flies in the face of any permissible reading of "waters of the United States." *See* 33 U.S.C. § 1251(a).

150.     In the Preamble to the Clean Water Rule, the Defendants unambiguously recognize that adjacent waters, tributaries, and impoundments are jurisdictional by rule because "the science confirms that they have a significant nexus to traditional navigable waters, interstate waters, or territorial seas." 80 Fed. Reg. at 37,058, 37,075. Thus, the Defendants construe the Clean Water Rule as making these waters jurisdictional "in all cases" and suggest that "no additional analysis is required" to assert CWA jurisdiction over them. *Id.* at 37,058. These statements, however, are flatly contradicted by the waste treatment system exclusion, which excludes adjacent waters, tributaries, and impoundments of jurisdictional waters (among others) that are deemed to be part of a "waste treatment system."

## F.  Abandonment of "Other Waters" Under the Clean Water Rule

151.     For decades prior to the Clean Water Rule, the Defendants asserted jurisdiction over all other waters "the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce." *See, e.g.*, 33 C.F.R. § 328.3(a)(3) (2015). Under this regulatory definition, many waters of regional or national importance were properly afforded CWA protections, consistent with stated Congressional policy.

152.     Among these previously protected "other waters" are closed basins in New Mexico that include many non-tributary rivers, streams and wetlands; wholly intrastate waters such as the Little Lost River in southern Idaho that does not flow into a traditionally navigable water but instead flows into the Snake River Plain Aquifer; and hundreds of "isolated" glacial kettle ponds such as those found on Cape Cod in Massachusetts that, in addition to being tourist attractions, are vital to protecting that region's drinking water.

153.     Purportedly on the basis of a single sentence from the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159 (2001) ("*SWANCC*"), in the Clean Water Rule, the Defendants "concluded that the general other waters provision in the existing regulation based on [Commerce Clause effects unrelated to navigation] was not consistent with Supreme Court precedent." TSD at 78 (citing *SWANCC*, 531 U.S. at 172). Thus, in the Clean Water Rule, the Defendants rely almost exclusively on the significant nexus test.  As a result, because many of these "other waters" are not themselves navigable in fact, and lie beyond 4,000 feet

from otherwise jurisdictional navigable waters, tributaries, or adjacent wetlands, they are now *per se* non-jurisdictional under the Clean Water Rule.

154.    Elsewhere in the rulemaking record, however, the Defendants recognize that the Supreme Court in *SWANCC* "did not vacate (a)(3) of the existing regulation" and that "[n]o Circuit Court has interpreted *SWANCC* to have vacated the other waters provision of the existing regulation." TSD at 77-78.

155.    The Defendants do not provide any further factual, scientific, legal, or policy reasons for their change of course with respect to these other waters that are abandoned by the Clean Water Rule, notwithstanding the Defendants' decades-old practice of asserting jurisdiction over them.

**G.  The Corps' EA/FONSI for the Clean Water Rule**

156.    Concurrently with the issuance of the Clean Water Rule, the Corps released its Final EA and FONSI, in which the Corps concluded that the adoption of the Clean Water Rule would not significantly affect the quality of the human environment and thus that an EIS was not required.  CWR FONSI at 1.

157.    The Corps based its FONSI largely upon an analysis in which it purported to review a random selection of 188 "negative jurisdictional determinations" made by Corps personnel in the years 2013 and 2014. The Corps estimated that "there would be an increase of between 2.8 and 4.6 percent in the waters found to be jurisdictional with adoption of the rule." Final EA at 21. These assumptions echo statements found in the Defendants' economic analysis of the finalized Clean Water Rule, which projects "increases in jurisdictional determinations ranging from a 2.84 percent to a 4.65 percent relative to recent practice, utilizing the FY13 and FY14 jurisdictional determination dataset."[14]

158.    However, the analyses referenced in the Final EA and the Clean Water Rule's Economic Analysis were incomplete; they only looked at negative jurisdictional determinations that *might* become *positive* under the Clean Water Rule; they did not consider whether any waters found to be jurisdictional

---

[14] U.S. EPA and U.S. Army Corps of Engineers, Economic Analysis of the EPA-Army Clean Water Rule (May 20, 2015) at 14.

under then-current policy might be found non-jurisdictional under the final version of the Clean Water

Rule:

> Reviewing how current positive JDs may become negative as a result of the final rule
> was determined to be outside the scope of this analysis.  Analyzing only negative JDs
> allows for an estimation of only the potential increase in assertion of CWA jurisdiction,
> as viewed through the lens of CWA 404 activity during the baseline period of these fiscal
> years.  The agencies recognize that the rule may result in some currently-jurisdictional
> waters being found to be non-jurisdictional.

Clean Water Rule Economic Analysis at 7-8.

159.    The Final EA and the Economic Analysis, and in particular their reliance on the

Defendants' analysis of prior negative jurisdictional determinations as the basis for a "no significant

impact" finding, was deeply flawed. With respect to the Economic Analysis of the Clean Water Rule,

one senior Corps officer stated:

> [T]he Corps data provided to EPA has been selectively applied out of context, and mixes
> terminology and disparate data sets. . . . In the Corps' judgment, the documents contain
> numerous inappropriate assumptions with no connection to the data provided, misapplied
> data, analytical deficiencies, and logical inconsistencies.[15]

160.    Other analyses in the record also refute the Defendants' conclusion that there will be a

net increase in the number of waters found to be jurisdictional under the Clean Water Rule. For

example, a technical analysis performed by Jennifer Moyer, Acting Chief of the Corps' Regulatory

Program, concluded that as many as 10% of wetlands previously found to be jurisdictional would lose

their CWA protections as a result of the Clean Water Rule.  In fact, the preamble to the Rule expressly

recognizes that the scope of CWA jurisdiction under the Clean Water Rule "is narrower than that under

the existing regulation." 80 Fed. Reg. at 37,054.

161.    The EA barely mentions impacts to fish and wildlife resulting from promulgation of the

Clean Water Rule and gives no particular attention to threatened or endangered species protected by the

ESA. *See* EA at 24. In a cursory two-paragraph discussion, the EA merely references the dubious

---

[15] Memorandum from Maj. Gen. John Peabody, Deputy Commanding General for Civil and Emergency
Operations, U.S. Army Corps of Engineers, to Jo-Ellen Darcy, Assistant Secretary of the Army for Civil
Works (May 15, 2015).

"additional protections associated with the incremental increase" in the amount of waters covered by the CWA as a result of the Clean Water Rule, and presumes that there would be an "expected . . . beneficial impact on fish and wildlife for which the protected waters provide habitat." *Id.*

### H.  The Defendants' Failure to Consult Under the ESA

162.    Although the Clean Water Rule results in the loss of CWA protections for certain tributaries, potentially thousands of miles of ditches and ephemeral streams, thousands of acres of wetlands that lie more than 4,000 feet from a traditionally navigable water, and other waters that provide habitat for dozens of ESA-listed threatened and endangered species, the Defendants failed to consult with FWS and NMFS (collectively, the "Services") under Section 7(a)(2) of the ESA prior to the promulgation of the Clean Water Rule.

### III. The Repeal and Replacement Rules

163.    Promptly after assuming office, President Trump took executive action to eliminate the Clean Water Rule and further limit CWA jurisdiction. On February 28, 2017, President Trump issued Executive Order 13,778, which says: "[i]t is in the national interest to ensure that the Nation's navigable waters are kept free from pollution, while at the same time promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles of the Congress and the States under the Constitution." *See* Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United States' Rule," Exec. Order No. 13,778, § 1 (Feb. 28, 2017); 82 Fed. Reg. 12,497 (March 3, 2017). The deregulatory implication in these words is clear, and Section 2 of Executive Order 13,778 then explicitly directed the Defendants to review the Clean Water Rule for consistency with this policy statement in the Executive Order and to publish a proposed rule rescinding or revising the Clean Water Rule. *Id.* at § 2(a).

164.    Without even reviewing the Clean Water Rule under Executive Order 13,778, Defendants' began the process of repealing it and replacing it with a rule that would eliminate CWA protections for myriad waters across the United States, allowing industries to shirk their duties to control their pollution discharges, clean up polluted waterways, and obtain permits prior to dredging and filling waters, among many other things essential for protecting and restoring the Nation's waters.

165.     Shortly after issuance of Executive Order 13,778, the Defendants issued a one-page Notice of Intention To Review and Rescind or Revise the Clean Water Rule ("Notice of Intention"), 82 Fed. Reg. 12,532 (March 6, 2017), informing the public that this rulemaking was to be "consistent with the principles outlined in the Executive Order…." Notice of Intention, 82 Fed. Reg. at 12,532. The Notice of Intention describes the Defendants' intention that the rulemaking "will consider interpreting the term 'navigable waters,' as defined in the CWA in a manner consistent with the opinion of Justice Scalia in *Rapanos*." *Id*. The Notice of Intention does not identify anything else that Defendants intended to consider in the rulemaking.

166.     The Defendants devised a two-step process to reach their predetermined outcome, constraining federalism consultations with the states to the single option chosen by the Defendants and avoiding APA rulemaking requirements for agency decision making and meaningful public participation. Step One sought to circumvent the APA and public comment by mischaracterizing the repeal and replacement of a regulation - the Clean Water Rule - as a non-substantive, temporary, interim measure that simply codified the legal status quo. With the Clean Water Rule out of the way – but without having considered its merits or the impact of changing the definition on the Nation's waters – the Defendants would then take Step Two and adopt a new, much narrower reading of CWA jurisdiction as directed by the policy directives of Executive Order 13,778.

167.     Consultations with the states were a sham as they only sought comments that agreed with their predetermined goal of repealing the Clean Water Rule and replacing it with a new definition of Waters of the United States that is based on Justice Scalia's *Rapanos* plurality opinion.[16]

---

[16] *See, e.g.,* U.S. EPA and U.S. Army News Release, "EPA and U.S. Army Solicit State Input on Redefining 'Waters of the U.S." "EPA is restoring states' important role in the regulation of water" – Administrator Pruitt'" (May 9, 2017) (Defendants were soliciting input from the states on "a new definition of protected waters that is in-line with a Supreme Court Justice Antonin Scalia's opinion in the 2006 *Rapanos v. United States* case.") available at https://archive.epa.gov/epa/newsreleases/epa-and-us-army-solicit-state-input-redefining-waters-us.html; EPA's Local Government Advisory Committee (LGAC) Draft Charge On 'Waters of the U.S.' (WOTUS), (Defendants would "[p]ropose a new definition of Waters of the U.S. that would replace the 2015 [Clean Water Rule] that reflects the

168.   The lack of information provided on this proposal was another way in which Defendants prevented meaningful comment opportunities and led, for example, the Association of Clean Water Defendants to respond:

> We appreciate the opportunity to provide [EPA] and the [Corps] with comments on the development of a new rule interpreting the term "navigable waters" as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in Rapanos v. United States, 547 U.S. 715 (2006) and as part of EPA's federalism consultation under Executive Order 13132 . . . Unfortunately, states have received limited information in the way of draft rule text or even broad inclinations of how EPA and the Corps expect to write the rule... ACWA will . . . be able to provide state perspectives crucial to drafting a practically sound and legally defensible rule, if EPA shares proposed regulatory text or more specific regulatory options that are under consideration before EPA begins drafting the anticipated proposed rule of 'step 2'.[17]

**A.   Step One – Repeal the Clean Water Rule**

169.   On July, 27, 2017, Defendants initiated "step one" of the two-step repeal-and-replace process with a proposed rule to rescind the Clean Water Rule and, in its place, substitute in the "exact same regulatory text that existed prior to" the Clean Water Rule, as modified by "applicable guidance documents (e.g., the 2003 and 2008 guidance documents, as well as relevant memoranda and regulatory guidance letters), and consistent with the *SWANCC* and *Rapanos* Supreme Court decisions, applicable case law, and longstanding agency practice." Definition of "Waters of the United States"–Recodification of Existing Rules ("Proposed Repeal Rule"), 82 Fed. Reg. 34,899, 34,900, 34,903 (July 27, 2017). In their rulemaking notice, Defendants instructed the public to withhold any comments about which waters should be protected by the CWA, 82 Fed. Reg. at 34,902–03, including comments about repealing the Clean Water Rule and replacing it with the 1970s Regulatory Definition that the Repeal Rule would generally revive, subject to certain unidentified interpretations. *Id.* at 34,903.

---

principles outlined by Justice Scalia (Rapanos plurality opinion)), available at: https://www.epa.gov/sites/production/files/2017-06/documents/lgac-wotus-charge-05-17-17-.pdf.
[17] *See* Letter from Association of Clean Water Agencies to The Honorable Scott Pruitt re: Federalism Process and WOTUS Rule Development (June 19, 2017) available at https://www.epa.gov/sites/production/files/2017-09/documents/us-acwa_2017-06-19.pdf.

170.     Defendants characterized their repeal of the Clean Water Rule as a non-substantive "temporary, interim measure," that simply codified the then-current status quo as "[t]he first step in a comprehensive, two-step process intended to review and revise" the definition of "waters of the United States." *Id*.  Although the express purpose of the Proposed Repeal Rule was to modify the definitional term "waters of the United States," the Defendants expressly stated they would *not* be "soliciting comment on the scope of the definition of 'waters of the United States' that the agencies should ultimately adopt," as that, the Defendants promised, would be addressed later during the replacement rule rulemaking process. Proposed Repeal Rule, 82 Fed. Reg. 34,903. Indeed, as part of the Repeal Rule rulemaking process, the Defendants made it clear that they would not be "undertak[ing] any substantive reconsideration" regarding the 1970s Regulatory Definition, nor would the Defendants address "the specific content of those longstanding regulations." *Id.* Rather, the Defendants would only be engaging in "recodification" of those regulations. *Id.* at 34,901-02.

171.     Contrary to the Defendants' characterizations of this rulemaking, it was a legislative rulemaking that revised federal law by formally withdrawing the Clean Water Rule and replacing it with different regulatory definitions, which were codified in the Code of Federal Regulations. For example, the definition determines which point source water pollution discharges require an NPDES permit under CWA Section 402, 33 U.S.C. § 1342, which bodies of water may be destroyed through dredging or filling without a permit issued under CWA Section 404, 33 U.S.C. § 1344, and whether citizens or the EPA can bring an enforcement action to address unpermitted pollution discharges to a particular water body, 33 U.S.C. §§ 1319, 1362.

172.     Despite the significance of the regulatory action and its impacts on the public, the Notice for the Proposed Rule was very terse. The Notice did not contain meaningful information regarding the Defendants' rationale and legal justification for withdrawing the Clean Water Rule or replacing it with a different definition of "waters of the United States." The Notice and supporting materials did not discuss or evaluate the extensive record supporting the Clean Water Rule. The public was deprived of any meaningful opportunity to understand or comment on the definition, in part because the Defendants rejected substantive comments on it, but also because it was impossible to understand or apply the new

definition as, after its adoption, waters would only be jurisdictional according to the Defendants'
unexplained and unidentified interpretations of case law, as well as other undisclosed agency guidance,
practice, letters, and memoranda. Proposed Repeal Rule, 82 Fed. Reg. 34,902.

173.    The Defendants proceeded as if their two-step process was the only choice available, and
the only question on which they allowed comment at the repeal stage was "whether it is desirable and
appropriate to re-codify in regulation the *status quo* as an interim first step pending a substantive
rulemaking to reconsider the definition of 'waters of the United States' and the best way to accomplish
it." Proposed Repeal Rule, 82 Fed. Reg. 34,903. In fact, the Defendants expressly stated that they "do
not intend to engage in substantive reevaluation of the definition of 'waters of the United States' until
the second step," which was a completely separate rulemaking that had not even been initiated.
Proposed Repeal Rule, 82 Fed. Reg. 34,903.

174.    Before finalizing their step one repeal process, in February 2018, the Defendants
finalized their attempt to retroactively delay the effective date of the Clean Water Rule. *See* Delay Rule,
83 Fed. Reg. 5,200. On August 16, 2018, the United States District Court for the District of South
Carolina vacated and issued a nationwide injunction of the Delay Rule, holding "that the agencies'
refusal to consider or receive public comments on the substance of the [Clean Water] Rule or the 1980s
regulation did not provide a 'meaningful opportunity for comment' as set forth in *N. Carolina Growers'
Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755 (4th Cir. 2012)." *S.C. Coastal Conservation League
v. Pruitt*, 318 F. Supp. 3d 959, 963 (D.S.C. 2018). The United States District Court for the Western
District of Washington also vacated the Delay Rule on November 26, 2018 on the basis that "the
Agencies deprived the public of a meaningful opportunity to comment on relevant and significant issues
in violation of the APA's notice and comment requirements." *Puget Soundkeeper Alliance v. Wheeler*,
No. 15-01342, 2018 WL 6169196, at *5 (W.D. Wash. Nov. 26, 2018).

175.    Following the court orders vacating the Delay Rule, the Clean Water Rule was in effect,
though it was enjoined in several states and remanded to the Defendants as a result of litigation
challenges. *See Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1343–44 (S.D. Ga. 2019), *dismissed as moot*,
No. 2:15-cv-79, Doc. 294 (S.D. Ga. January 7, 2020); *Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D.

Tex. 2019); *see also* Replacement Rule, 85 Fed. Reg. at 22,258–59 (summarizing litigation in other states that resulted in the denial or grant of injunctive relief against the Clean Water Rule).

176.    In another facially inadequate attempt to repeal the Clean Water Rule and replace it with an incoherent web of regulatory text and unbounded agency discretion, the Defendants published a supplemental notice for the Proposed Repeal Rule. *See* Supplemental Notice of Proposed Rulemaking, Definition of "Waters of the U.S."—Recodification of Pre-Existing Rules, 83 Fed. Reg. 32,227 (July 12, 2018) ("Supplemental Notice"). This Supplemental Notice provided the public with just 30 days to comment on a complex, discursive 26-page Supplemental Notice and 112-page Supporting Document that purported to "clarify, supplement and give interested parties an opportunity to comment on certain important considerations and reasons for" the Defendants' 11-page Proposed Repeal Rule. Supplemental Notice, 83 Fed. Reg. at 32,227.

177.    As with the Proposed Repeal Rule and the Delay Rule, the Defendants failed to evaluate and accept public comments on the substance and merits of the Clean Water Rule or the proposed replacement definition. The Defendants did not evaluate or seek input from the public on how the Repeal Rule would impact the Nation's waters or achieve the goals of the CWA.  None of the material, analysis, or "concerns" expressed in the Supplemental Notice provide a reasoned explanation for repealing the 2015 Clean Water Rule, nor did the Supplemental Notice demonstrate that the Defendants' action constitutes a permissible construction of the CWA. Instead, the Supplemental Notice posited unresolved questions, concerns, and potential legal theories about the Clean Water Rule and the basis for the Proposed Repeal Rule (which had been proposed a year earlier). *See, e.g.,* Supplemental Notice, 83 Fed. Reg. at 32,240-43, 32,249. Defendants sought comment on some vaguely described alternatives to the repeal and whether the Repeal Rule "is the best and most efficient approach to address the potential deficiencies identified in this notice and to provide the predictability and regulatory certainty that alternative approaches may not provide." Supplemental Notice, 83 Fed. Reg. at 32,249.

178.    Contrary to Defendants' stated primary basis for the Proposed Repeal Rule – establishing "regulatory certainty" – Defendants' notice created extreme uncertainty because it did not identify or evaluate what waters are protected under the "re-codified" definition (as informed by undisclosed

1    interpretations). Additionally, even with the Supplemental Notice, Defendants continued to avoid

2    informing the public about, and allowing comment on, the substance of what the definition of "waters of

3    the United States" should be after they repeal the Clean Water Rule. As a result, the public was not told

4    what Defendants' new definition of waters of the United States was, did not have an opportunity to

5    comment on that definition, and was not provided with Defendants' justification for why their definition

6    is a permissible construction of the CWA. *See, e.g.*, Supplemental Notice, 83 Fed. Reg. at 32,250.

7        179.    The final public comment period on the Proposed Repeal Rule closed on August 13,

8    2018, and on December 11, 2018, Defendants published a joint report titled *Resource and*

9    *Programmatic Assessment for the Proposed Revised Definition of "Waters of the United States"*[18]

10   ("Repeal Rule RPA"). The Repeal Rule RPA indicated the Repeal Rule would eliminate CWA

11   protections for some waterways, though Defendants did not provide an explanation of the extent of that

12   jurisdictional loss, instead stating that such loss was not identifiable.[19] By failing to undertake any actual

13   consideration of the extent to which waters would lose CWA protections, Defendants did not determine

14   whether Defendants' nebulous Repeal Rule definition would protect the chemical, physical and

15   biological integrity of the Nation's waters. In other words, Defendants entirely failed to determine

16   whether their definition, whatever it was, complied with the CWA, and, once again, the public was

17   deprived of the opportunity to meaningfully review and comment on Defendants' proposal.

18       180.    Several Plaintiffs in this action submitted written comments on the Proposed Repeal Rule

19   and/or Supplemental Notice during the public comment period, including at least the following: a letter

20   dated September 27, 2017 and submitted electronically to EPA Docket No. EPA-HQ-OW-2017-0203

21   (the docket number for this rulemaking) on behalf of Waterkeeper Alliance, Turtle Island Restoration

22   Network, Humboldt Baykeeper, Rio Grande Waterkeeper, Russian Riverkeeper, Snake River

23   Waterkeeper, Sound Rivers, Upper Missouri Waterkeeper, and others and a letter dated August 13, 2018

24   and submitted electronically to EPA Docket No. EPA-HQ-OW-2017-0203 (the docket number for this

---

[18] https://www.regulations.gov/document?D=EPA-HQ-OW-2017-0203-15649.

[19] *See* Repeal Rule RPA at 39, 44.

rulemaking) on behalf of Waterkeeper Alliance, Turtle Island Restoration Network, Humboldt

Baykeeper, Missouri Confluence Waterkeeper, Rio Grande Waterkeeper, Russian Riverkeeper, Snake

River Waterkeeper, Sound Rivers, Upper Missouri Waterkeeper, and others.

181.     On October 22, 2019, Defendants published its final Repeal Rule, which took effect on

December 23, 2019. Repeal Rule, 84 Fed. Reg. 56,626. As initially proposed and submitted for public

comment, the Repeal Rule rescinded the Clean Water Rule in its entirety and "recodif[ied] the

regulatory definition of 'waters of the United States' that existed prior to the August 28, 2015 effective

date of the [Clean Water] Rule." *Id.* As discussed above, the Repeal Rule provides the opaque

"definition" that Defendants will interpret the "term 'waters of the United States' to mean the waters

covered by the regulations consistent with Supreme Court Decisions and longstanding practice, as

informed by applicable agency guidance documents, training, and experience." *Id.* The Repeal Rule also

codified the so-called "waste treatment exclusion," which, as discussed above, had never been subjected

to notice-and-comment rulemaking. *See, e.g., id.* at 56,667.

182.     In the Repeal Rule, promulgated as a final rule more than two years after the Proposed

Repeal Rule was first published and more than a year after the close of the last public comment

opportunity on the proposal, Defendants for the first time provided the public with some information

regarding Defendants' proffered bases for repealing the Clean Water Rule. As discussed above,

Defendants unequivocally informed the public in two public notices that Defendants were refusing to

engage in any substantive evaluation of the definition of "waters of the United States" until Step Two

and refused to accept public comment on that definition. However, in the final phase of Step One,

promulgation of the Repeal Rule, Defendants substantively evaluated Clean Water Rule definition of

"waters of the United States" and found it lacking for various reasons, largely on the basis of flawed

legal theories. Repeal Rule, 84 Fed. Reg. 56,626 -27.[20] The timing of these statements totally deprived

---

[20] Defendants identified the following legally- and factually-deficient bases for the Repeal Rule: "First, the agencies conclude that the 2015 Rule did not implement the legal limits on the scope of the agencies' authority under the Clean Water Act (CWA) as intended by Congress and reflected in Supreme Court cases, including Justice Kennedy's articulation of the significant nexus test in *Rapanos*. Second, the

the public of its opportunity to meaningfully review and comment on Defendants' erroneous bases for the Repeal Rule.

### i. The Corps' Failure to Conduct Any NEPA Analysis Considering the Effects of the Repeal Rule on the Environment

183.    The Corps undertook no NEPA analysis for the Repeal Rule.  It did not consider or assess the potential impacts from repealing the Clean Water Rule's *per se* protections for certain tributaries, adjacent wetlands, and other waters, nor did it consider or assess the impacts of repealing Defendants' asserted jurisdiction over categories of waters like prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands that provide important habitat for many aquatic species, including threatened and endangered species. This failure is a violation of NEPA.

### ii. Defendants' Failure to Consult on the Effects of Their Promulgation of the Repeal Rule Under the ESA

184.    By repealing the Clean Water Rule and replacing it with the Repeal Rule, which relied on an unspecified standard based on undisclosed agency interpretations and practices, Defendants admitted that they removed waters from the CWA's jurisdiction. However, despite the loss of protection for these waters, Defendants failed to consult with the Services under Section 7(a)(2) of the ESA regarding how the Rule's lesser protections may adversely impact threatened and endangered species and their designated critical habitats. The loss of CWA protections for certain bodies and categories of waters – including certain tributaries, potentially thousands of miles of ditches and ephemeral streams, and

---

agencies conclude that in promulgating the 2015 Rule the agencies failed to adequately consider and accord due weight to the policy of the Congress in CWA section 101(b) to 'recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution' and 'to plan the development and use . . . of land and water resources.' 33 U.S.C. 1251(b). Third, the agencies repeal the 2015 Rule to avoid interpretations of the CWA that push the envelope of their constitutional and statutory authority absent a clear statement from Congress authorizing the encroachment of federal jurisdiction over traditional State land-use planning authority. Lastly, the agencies conclude that the 2015 Rule's distance-based limitations suffered from certain procedural errors and a lack of adequate record support." Repeal Rule, 84 Fed. Reg. at 56,626.

---

AMENDED COMPLAINT FOR DECLARATORY                    54
AND INJUNCTIVE RELIEF

hundreds of thousands of acres of wetlands – jeopardizes the continued existence of endangered and threatened species and will result in the destruction or adverse modification of their critical habitat. Defendants violated their procedural and substantive ESA duties when they failed to consult with the Services under Section 7(a)(2) of the ESA prior to enactment of the Repeal Rule.

## B.  Step Two - The Replacement Rule

185.    On February 14, 2019, Defendants published their Proposed Replacement Rule - a radical rewrite of the meaning and scope of the CWA that strips protections against uncontrolled industrial, municipal, agricultural, and other pollution discharges into many, and in some parts of the country most, rivers, streams, lakes, ponds, wetlands, and other waters. *See* Proposed Replacement Rule, 84 Fed. Reg. 4,154.

186.    Several Plaintiffs in this action submitted extensive written comments on the Preproposal Notice and Proposed Replacement Rule during the public comment period, including at least the following: a letter dated November 28, 2017 and submitted electronically to EPA Docket No. EPA-HQ-OW-2017-0480 (the docket number for the preproposal notice) on behalf of Waterkeeper Alliance, Turtle Island Restoration Network, Humboldt Baykeeper, Rio Grande Waterkeeper, Sound Rivers (Upper Neuse Riverkeeper), Upper Missouri Waterkeeper, and others and a letter dated April 15, 2019 and submitted electronically to EPA Docket No. EPA-HQ-OW-2018-0149 (the docket number for this rulemaking) on behalf of Waterkeeper Alliance, Humboldt Baykeeper, Lake Worth Waterkeeper, Missouri Confluence Waterkeeper, Rio Grande Waterkeeper, Russian Riverkeeper, Snake River Waterkeeper, Sound Rivers, Upper Missouri Waterkeeper, and others. Plaintiffs also submitted extensive evidence into the record showing that important water resources would lose CWA protections under the Replacement Rule without any sound legal or scientific basis, and also demonstrating the serious resulting harms to waters, people, aquatic systems, and endangered and threatened species and their designated critical habitats.  *See, e.g.,* Comments of Waterkeeper Alliance on Replacement Rule with supporting attachments ("Waterkeeper Replacement Rule Comments"), submitted to the EPA Docket: EPA-HQ-OW-2018-0149-11318 on April 15, 2019.

187.    Defendants state that they developed the Proposed Replacement Rule for the purpose of "defining the scope of waters subject to federal regulation under the Clean Water Act ("CWA"), *in light of* the U.S. Supreme Court cases in *United States v. Riverside Bayview Homes* (*Riverside Bayview*), *Solid Waste Agency of Northern Cook County v. United States* (*SWANCC*), and *Rapanos v. United States* (*Rapanos*), and *consistent with* EO 13778, signed on February 28, 2017, entitled 'Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule.'" *See* Proposed Replacement Rule, 84 Fed. Reg. 4,155 (emphasis added).

188.    Defendants also claimed that "[t]he fundamental basis . . . for the revised definition proposed today is the text and structure of the CWA, as informed by its legislative history and Supreme Court precedent, taking into account agency policy choices and other relevant factors." Proposed Replacement Rule, 84 Fed. Reg. 4,156. However, Defendants only considered isolated portions of the CWA, legislative history, and case law and reinterpreted or selectively quoted (or misquoted) them to support their predetermined, extreme, and narrow definition of "waters of the United States."

189.    Although it is well-settled that the CWA is a comprehensive regulatory statute with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), through cooperative federalism, for the first time in the history of the CWA, Defendants put forth the notion that "the Nation's waters" has a meaning separate and distinct from "waters of the United States." Defendants contend "waters of the United States" are but a "subset" of "the Nation's waters" and that, although the CWA endeavored to protect all of the Nation's waters, only a subset of "waters of the United States" are "subject to regulation" and are protected from discharges of pollutants. Proposed Replacement Rule, 84 Fed. Reg. 4,157, 4,202.

190.    Defendants also wrongly determined that Congress empowered them to make jurisdictional determinations under the CWA by fiat based on indeterminate criteria including vague policy choices and to consider "other relevant factors" to achieve the proper balance of federal and state interests to further narrow that subset of the Nation's waters that they deem to be "waters of the United States." All the rest of the Nation's waters, according to Defendants, are "non-regulatory" in nature – subject to discharges of pollutants entirely free from the CWA's permitting and regulatory oversight. *Id.*

191.     The prior longstanding views of Defendants and abundant, binding case law interpreting and applying the CWA were not discussed, considered, or evaluated in the Proposed Replacement Rule in any meaningful way, and Defendants did not meaningfully elucidate the "agency policy choices and other relevant factors" that they relied on or exactly how those policies support their decision to exclude so many of the Nation's waters from CWA protections. Defendants instead indicated only that they intended to reinterpret the CWA consistent with Executive Order 13,778 and those policies that they deemed "most important in shaping the jurisdiction of the CWA: Prioritizing the text of the statute, adherence to constitutional limitations, including the autonomy of States, and providing clarity for the regulated community." *See* Proposed Replacement Rule, 84 Fed. Reg. 4,169. Defendants shaped their definition of waters of the United States based on impermissible policy choices rather than the objectives, goals, policies, and programs that Congress included in the CWA. Proposed Replacement Rule, 84 Fed. Reg. 4,146. Defendants lack authority to make such decisions.

192.     Additionally, the Proposed Replacement Rule dramatically altered CWA jurisdiction and directly removed CWA protections from many different types of waters across the Nation based on arbitrary decisions that lack factual and scientific basis. Though Defendants also asserted that the Proposed Replacement Rule was "informed by science," Proposed Replacement Rule, 84 Fed. Reg 4,175, they do not describe how science was employed to craft the definition of waters of the United States and the exclusions that Defendants developed.

193.     While it is certain that these changes will cause fundamental harm to waters and the people and species that rely on them, Defendants admitted that they could not adequately assess the impacts of the proposed definition on waters and CWA programs. *See, e.g.,* Proposed Replacement Rule, 84 Fed. Reg. 4,200; Replacement Rule Resource and Programmatic Assessment, Docket ID No. EPA-HQ-OW-2018-0149-0005 ("Replacement Rule RPA") (Defendants identify inadequacies of their data throughout the document resulting in inconclusive, vague statements about impacts on waters, resources, and programs under the CWA with no real quantification of impacts attempted). Despite the fact that Defendants admittedly relied on their own "policy choices and other relevant factors" to severely restrict and narrow the categories of protected waters, the Defendants also depend on the

1   contradictory assertion that the unquantified harms to the Nation's waters, aquatic resources, and

2   programs resulting from the Proposed Replacement Rule were not relevant to their decision because

3   these new, dramatic restrictions were mandated by the CWA – *i.e.* Defendants claimed without basis

4   that they lacked discretion to make a different choice. *See, e.g.,* Replacement Rule RTC, Topics 11, at 3

5   and 13, at 8-9.

6        194.    As they did with the Step One process, at Step Two Defendants again refused to consider

7   the impacts of eliminating CWA protections for waters across the Nation and denied the states and the

8   public adequate information to understand and evaluate the basis for and impacts of the new definition

9   on the waters of this Nation. *See, e.g.,* Waterkeeper Replacement Rule Comments, at 36-40. Instead of

10  providing a reasoned basis for their proposed definition upon which the public could comment,

11  Defendants presented the public with a lengthy series of questions that should have been resolved by

12  Defendants prior to putting the Proposed Replacement Rule out for public comment, such as whether

13  there are data, tools, or methods available to apply their arbitrary definitional requirements to waterways

14  and determine whether they would be protected by the CWA. *See, e.g.,* Proposed Replacement Rule, 84

15  Fed. Reg. at 4,172 (interstate waters), 4,173 (impoundments), 4,177-78 (tributaries), 4,181-82 (ditches),

16  and 4,189 (wetlands). Defendants' failure to adequately develop their definition at this stage also

17  deprived the public of key information necessary to understand the proposed definition, and it precluded

18  the opportunity for meaningful comment because Defendants' explanation and proposal of the key

19  issues took place after the public comment period ended.

20       195.    The public comment period on Defendants' Proposed Replacement Rule closed on April

21  15, 2019.

22       196.    The EPA's own SAB criticized the Replacement Rule, and how Defendants understood

23  and represented the science that they used to support the Rule. *See* EPA, SAB, Draft Commentary on the

24  Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act (Oct. 16,

25  2019), https://perma.cc/RBC7-V58V. The SAB's review found that the Replacement Rule "depart[s] . . .

26  from EPA recognized science[, and] threatens to weaken protection of the Nation's waters by

27

disregarding the established connectivity of groundwaters and by failing to protect ephemeral streams and wetlands which connect to navigable waters below the surface." *Id.*

197.    Further, the SAB concluded that, by proposing these changes "without a fully supportable scientific basis," Defendants have "potentially introduc[ed] substantial new risks to human and environmental health." *Id.*; *see also* EPA, SAB, Final Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act 4 (Feb. 27, 2020) ("The proposed Rule does not present new science to support [its] definition, thus the SAB finds that the proposed Rule lacks a scientific justification, while potentially introducing new risks to human and environmental health."), https://perma.cc/76UW-LW9R.

198.    In its final commentary, the SAB concluded that the Replacement Rule "does not incorporate best available science" and that "a scientific basis for the proposed Rule, and its consistency with the objectives of the Clean Water Act, is lacking." *Id.* More acutely, the SAB found that the Rule "decreases protection for our Nation's waters and does not provide a scientific basis in support of its consistency with the objective of restoring and maintaining 'the chemical, physical and biological integrity' of these waters." *Id.* The SAB further noted that the Replacement Rule failed to account for the findings of the 2015 Connectivity Report, which emphasized that hydrological "connectivity is more than a matter of surface geography." *Id.*

199.    Though Defendants specifically solicited comments for the Replacement Rule relating to "if and under what circumstances subsurface water connections between wetlands and jurisdictional waters could be used to determine adjacency," SAB criticized Defendants' failure to consider an extensive body of science available to them in EPA's 2015 Connectivity Report, which was reviewed by the SAB, and which provided a basis for answering this request for comment. *Id.* The SAB was clear that the Replacement Rule's absolute requirement for a *surface* water connection "is inconsistent with the body of science. . . ." *Id.*

## C.  The Final Replacement Rule Definition

200.    On April 21, 2020, Defendants published the final version of the Replacement Rule, largely unchanged in substance and support from the Proposed Replacement Rule. As a result,

1    Defendants carried all of the above-described error into the final version of the Replacement Rule.

2    According to the Replacement Rule, pollution could now be discharged into many new waters without

3    Section 402 or 404 permits – harming not only those waters, but all of the waters to which they are

4    hydrologically connected. The central objective (protection and restoration of the Nation's waters) and

5    one of the key regulatory innovations (regulating pollution at its source) of the CWA were officially

6    thwarted by unlawful administrative action.

7        201.    Under the Replacement Rule, "waters of the United States" encompasses only "relatively

8    permanent flowing and standing waterbodies that are traditional navigable waters in their own right or

9    that have a specific surface water connection to traditional navigable waters, as well as wetlands that

10   abut or are otherwise inseparably bound up with such relatively permanent waters." Replacement Rule,

11   85 Fed. Reg. at 22,273. As an example of the effects of this change in definition, the Replacement

12   Rule's definition excludes many other categories of waters, including interstate waters and all

13   waterways that flow only in response to precipitation. These newly excluded waters could encompass 90

14   percent of streams and rivers in New Mexico that contribute significant flows to and influence the water

15   quality of the Rio Grande and its tributaries. *See, e.g.,* Waterkeeper Repeal Rule Comments, Attachment

16   11 Rio Grande Case Study.

17       202.    Defendants assert that their final definition is the only permissible, legal reading of the

18   CWA "in light of the U.S. Supreme Court cases *United States v. Riverside Bayview Homes* (*Riverside*

19   *Bayview*), *Solid Waste Agency of Northern Cook County v. United States* (*SWANCC*), and *Rapanos v.*

20   *United States* (*Rapanos*), and consistent with Executive Order 13778 . . .." Replacement Rule, 85 Fed.

21   Reg. 22,251; *see also, e.g.,* Replacement Rule RTC, Topic 5 at 7.

22       203.    In truth, Defendants impermissibly substituted the policy directive from Executive Order

23   13,778 in place of the congressional directives of the CWA and the entirety of Supreme Court precedent

24   on this issue to arrive at their impermissibly narrow definition of "waters of the United States." *See, e.g.,*

25   Replacement Rule RTC, Topic 1 at 57 ("[T]he agencies do not view any of the opinions as precluding

26   the agencies from promulgating a definition of 'waters of the United States' different from the standards

27

that the Supreme Court articulated in reviewing the agencies' prior regulatory definition . . . Rather the Court's opinions serve as guideposts that informed the scope of this final rule.").

204.    Defendants' interpretation of the CWA's "statutory framework" is inconsistent with the plain text and legislative history of the CWA, the scientific record, case law interpreting the CWA, Defendants' own long-standing interpretations of the CWA, and even Defendants' own regulations implementing the CWA. By formulating a wholly novel legal interpretation that, contrary to the plain text of the CWA, splits "the Nation's waters" into two subsets, only one of which is subject to regulatory protection against pollution, Defendants' final Replacement Rule brings an unprecedented narrowing of the term "waters of the United States." *See, e.g.,* Replacement Rule, 85 Fed. Reg. 22,253. Building on this unstable foundation, Defendants erroneously conclude the CWA is focused solely on protecting the "channels of interstate commerce" to justify limiting the CWA to the protection of only large, commercially navigable waters, the territorial seas, and an extremely limited mix of waters that are connected to the other two types of waters based on various arbitrary and non-scientific criteria. *See, e.g., id*. at 22,262, 22,282.

205.    Defendants refused to evaluate whether their new definition of "waters of the United States" would protect the Nation's waters and restore their chemical, physical, and biological integrity based on the incorrect notion that the CWA prevented it. Claiming that their hands were tied, and that they were forced to draw the line between protected and unprotected waters exactly where they drew it as a matter of law, Defendants acknowledged the resulting loss of jurisdiction and the importance of protecting rivers, streams, lakes, wetlands, and other waters against pollution but left achievement of that objective to voluntary programs and state or tribal programs to the extent they exist independent of the CWA. *See, e.g.,* Replacement Rule RTC Topic 13, at 8-9, Topic 5, p. 7 (acknowledging importance of protecting waters but claiming "[t]he agencies are precluded from exceeding their authority under the CWA to achieve specific scientific, policy, or other outcomes").

206.    At the same time, however, Defendants asserted unbounded discretion to draw lines between protected and unprotected waters when it suited their objective of reducing the reach of the CWA. For example, Defendants state that they "looked to the text and structure of the CWA, as

informed by its legislative history and Supreme Court guidance, and took into account the agencies' expertise, policy choices, and scientific principles" to define "waters of the United States," Replacement Rule, 85 Fed. Reg. at 22,252, but they do not explain how any of that alleged analysis was utilized to develop the four narrow categories of protected waters and draw jurisdictional lines for the small subset of "waters of the United States" that remain protected under the Replacement Rule.

207.    Defendants' elusive policy decisions drawing the line drawing between protected and unprotected waters appear to be impermissibly based on Executive Order 13,778, including a novel and incorrect reading of CWA section 101(b) and unsupported "federalism" theories. Defendants then balanced this interpretation of section 101(b) in some undisclosed manner with the objective of the CWA in section 101(a) in order to eliminate CWA protections for the Nation's waters. However, it is impossible to determine how any of this resulted in Defendants' specific choices regarding protected categories and definitional restrictions in the Proposed Replacement Rule. The unreasonableness and arbitrariness of this approach is evident from the fact that Defendants do not have any idea which waters actually remain protected under their definition.

208.    Robust scientific information in the record demonstrates the Replacement Rule leaves significant rivers, streams, lakes, wetlands, and other waters essential to the integrity of the Nation's waters unprotected. *See, e.g.,* Connectivity Report, Clean Water Rule TSD; Clean Water Rule SAB Report. The Replacement Rule is contrary to the scientific information in the record demonstrating the importance of broadly protecting the Nation's waters against unregulated pollution. *See, e.g.,* Replacement Rule, 85 Fed. Reg. 22,261 (stating that Defendants can disregard the scientific record because "science cannot dictate where to draw the line between Federal and State waters, as this is a legal question that must be answered based on the overall framework and construct of the CWA.") For example, the Replacement Rule excludes from CWA jurisdiction all rivers and streams that flow

ephemerally even though Defendants admit the scientific record demonstrates these waterways are

important to regulating water quality and significantly impact downstream waters.[21]

209.    In essence, Defendants concocted a post-hoc and internally inconsistent legal and policy

basis for their predetermined objective of eliminating broad CWA protections for the Nation's waters in

accordance with Executive Order 13,778. Defendants pursued their objective with blatant disregard for

the law, the scientific record, rulemaking requirements and input from the general public. The result is a

hopelessly vague and non-scientific definition that generates regulatory uncertainty and leaves all of the

Nation's waters unprotected by failing to control pollution at its source.

### D.  Unlawful Limitations on the Categories of Protected Waters Under the Replacement Rule

210.    The Replacement Rule establishes four narrow categories of jurisdictional water and any

other river, stream, lake, wetland, and other water that is either expressly excluded or falls outside one of

those categories is deemed non-jurisdictional. The four categories are (1) territorial seas and traditional

navigable waters; (2) certain tributaries to those waters; (3) certain lakes, ponds, and impoundments of

jurisdictional waters; and (4) certain wetlands adjacent to jurisdictional waters. Replacement Rule, 85

Fed. Reg. at 22,273. Express exclusions encompass, for example, all ephemeral waters, all wetlands not

possessing a direct surface connection with or directly abutting other covered waters, certain ditches,

and waters used as waste treatment systems. *Id.* These categories are further narrowed by vague and

arbitrary definitions and limitations that are not based in science or law and are unrelated to protecting

the chemical, physical, or biological integrity of the Nation's waters.

211.    In addition to establishing these new extremely narrow categories of jurisdictional waters,

the Defendants stated that even categorically jurisdictional waters – such as the traditionally navigable

---

[21] *See* Final Economic Analysis at 107 (quoting SAB's finding that "[t]he literature review provides strong scientific support for the conclusion that ephemeral . . . streams exert a strong influence on the character and functioning of downstream waters . . . ." (quotations omitted)); *see also, e.g.,* Connectivity Report at ES-5 ("[T]he aggregate contribution of [a specific ephemeral stream] over multiple years, or by all ephemeral streams draining [a] watershed in a given year or over multiple years, can have substantial consequences on the integrity of the downstream waters."), ES-7 ("[T]he evidence for connectivity and downstream effects of ephemeral streams was strong and compelling . . . .").

waters and the territorial seas - are excluded from the CWA if they fall within an express exclusion, such as the waste treatment exclusion. Replacement Rule, 85 Fed. Reg. at 22,325 ("If the water meets any of the [exclusions], the water is excluded even if the water satisfies one or more conditions to be a [jurisdictional] water."); *Id.* at 22,338 (stating that the jurisdictional categories are "subject to" the non-jurisdictional exclusions). Defendants have provided no reasonable basis for excluding foundational waters from the CWA.

### i. Traditional Navigable Waters and the Territorial Seas Under the Replacement Rule

212.    The first category of jurisdictional waters under the Replacement Rule includes the "territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." Replacement Rule, 85 Fed. Reg. at 22,338. The latter are commonly referred to as "traditional navigable waters" or "traditionally navigable waters." These are foundational waters that were jurisdictional long before the 1972 CWA Amendments.

213.    Contrary to Defendants' claim that they "have not changed their interpretation of traditional navigable waters in this final rule," Replacement Rule, 85 Fed. Reg. at 22,281, they, in fact, have drastically changed their interpretation and narrowed the term in a manner that is contrary to law to include only waters that are commercially navigable. *See* Replacement Rule RTC, Topic 2, at 4 ("The agencies note, however, that whether a water is susceptible to use in interstate commerce . . . requires evidence of physical capacity for commercial navigation and that the water was, is, or actually could be used for that purpose."). For example, Defendants state that "[t]he key is whether the water has supported commercial navigation, does support commercial navigation, or can support commercial navigation through reasonable improvement," Replacement Rule RTC, Topic 2, at 8, and Defendants admit that the Replacement Rule could exclude waters that support "shallow draft vessels like canoes and kayaks," 85 Fed. Reg. at 22,282, which were previously protected under the CWA's jurisdiction.

214.    Under the Replacement Rule, waters outside this first category of jurisdictional waters are only jurisdictional if they possess the right types of connections to territorial seas or traditional navigable waters. However, Defendants have not identified which waters will be classified as traditional

1  navigable waters, have provided a flawed legal basis for narrowing jurisdiction over these foundational

2  waters, and have stated that whether a river will be deemed traditionally navigable depends on a

3  nebulous case-specific analysis that "requires the application of relevant portions of EPA and Corps

4  regulations, prior determinations by the Corps and by the federal courts, and case law," consultation of

5  "guidance," and even "interpretive questions to be reviewed by senior legal staff at each of the agencies'

6  respective headquarters." *See* Replacement Rule RTC, Topic 2, at 2. As a result, it is impossible for

7  anyone to glean a coherent standard for determining what constitutes a traditional navigable water under

8  the Replacement Rule. Defendants failed to provide a reasoned legal or factual basis for this arbitrary

9  approach to identifying traditional navigable waters.

10  215.  Additionally, by improperly narrowing this category in a manner that is contrary to law

11  and providing only vague standards for identifying which waters remain jurisdictional, Defendants have

12  also improperly narrowed all of the other categories of jurisdictional waters whose status depends on

13  their relationship to these foundational waters in a manner that is contrary to law and lacks a reasoned

14  legal and factual basis. Because Defendants made all other rivers, streams, lakes, pond, wetlands, and

15  other waters across the country jurisdictional only if they possess particular types of connections to

16  traditional navigable waters or the territorial seas, Defendants' failure to provide a workable definition

17  of what constitutes a traditional navigable water under the Replacement Rule makes it impossible to

18  know whether any of those other waters are jurisdictional either.

19  ### ii.  Interstate Waters Under the Replacement Rule

20  216.  Contrary to the explicit objectives and text of the CWA, Congressional intent,

21  longstanding agency interpretations, and binding case law, Defendants illegally excluded important

22  interstate waters and waters with interstate commerce impacts from the Replacement Rule, rendering

23  them non-jurisdictional. Replacement Rule, 85 Fed. Reg. 22,282-86. Defendants eliminated protections

24  for these waters without evaluating which waters would lose protections and how that would impact the

25  Nation's waters and CWA programs. Replacement Rule RTC, Topic 3. Defendants admit fewer

26  interstate waters will be protected under the Replacement Rule but claim they do not know how many

27  and do not have any data or maps that identify them. Replacement Rule RPA, at 22.

217. Interstate waters have been protected under the nation's water quality laws since the 1948 Water Pollution Control Act[22] and under the CWA since its inception. *See, e.g.,* 33 U.S.C §§ 1313, 1319, 1341, 1342. Defendants provided no valid legal or scientific basis for removing interstate waters from CWA jurisdiction under the Replacement Rule. *Compare* Replacement Rule, 85 Fed. Reg. at 22,282-83 *with* Repeal Rule, 84 Fed. Reg. at 56,669–70 (reinstating 1986 definition, including interstate waters); National Pollutant Discharge Elimination System, 38 Fed. Reg. 13,528, 13,529 (May 22, 1973) (EPA's first "navigable waters" definition, including interstate waters).

218. Defendants asserted that "[i]nterstate waters without any connection to traditional navigable waters are not within the agencies' authority under the CWA and may be more appropriately regulated by the states and tribes under their sovereign authorities." Replacement Rule RTC, Topic 11 at 26. Defendants did not explain how they expect states and tribal governments to regulate pollution outside their boundaries and they did not provide a reasoned basis for rejecting their own legal analysis supporting jurisdiction as reflected in the Clean Water Rule Technical Support Document. *See, e.g.,* Clean Water Rule TSD; Replacement Rule RTC, Topic 3, p. 5.

219. Contrary to Defendants' theories, the CWA's coverage of, and regulatory programs for, interstate waters are so broad and comprehensive that it eliminated alternative remedies in interstate pollution cases according to the Supreme Court in *City of Milwaukee,* 451 U.S. 304 (displaced federal common law), *Ouellette,* 479 U.S. 481 (preempted downstream state's common law), and *Arkansas v. Oklahoma,* 503 U.S. at 98–100 (a downstream state's remedy is to enforce its water quality standard against an upstream state through the CWA's NPDES permitting process). Eliminating CWA jurisdiction and programs for interstate waters by removing them from the definition of "waters of the United States" would leave states in a worse position to address interstate water pollution than they were

---

[22] Water Pollution Control Act of 1948, Pub. L. No. 80-845, 2(d)(1), (4), 62 Stat. 1156-57.

for the century preceding the CWA contrary to Congressional intent, the plain text of the CWA[23] and extensive Supreme Court and lower court precedent.[24]

### iii.  Waters that Impact Interstate Commerce Under the Replacement Rule

220.    Additionally, as discussed above with the Clean Water Rule, for decades, the CWA and its longstanding implementing regulations have also encompassed closed basins and intrastate rivers, lakes, streams, wetlands, and other waters where their use or destruction could affect interstate commerce, such as protection for waters "[w]hich are or could be used by interstate or foreign travelers for recreational or other purposes," and waters "[f]rom which fish or shellfish are or could be taken and sold in interstate or foreign commerce." *See, e.g.,* 33 C.F.R. § 328.3(a)(3) (2015); Repeal Rule, 84 Fed. Reg. at 56,670 (reinstating 1970s definition).

221.    Under this longstanding regulatory definition, which has never been overturned by any court, many waters of regional or national importance were properly afforded CWA protections, consistent with the CWA and Congressional intent. Defendants provided no valid factual, legal or scientific basis for removing CWA protections for these waters. Plaintiffs provided Defendants with extensive information documenting the importance of maintaining CWA jurisdiction over these waters, the legal requirements to do so and the harms that will result by removing those protections. *See, e.g.,* Waterkeeper Comments, Attachment 11 Snake River, Rio Grande and Rogue River/Crater Lake Case Studies.

---

[23] *See, e.g.,* 33 U.S.C. § 1313(a)(1) (This section provides "any water quality standard applicable to interstate waters which was adopted by any State and submitted to, and approved by, or is awaiting approval by, the Administrator pursuant to this Act as in effect immediately prior to [October 18, 1972], shall remain in effect unless the Administrator determined that such standard is not consistent with the applicable requirements of this Act as in effect immediately prior to [October 18, 1972].").

[24] *See, e.g., Am. Farm Bureau Fed'n v. EPA,* 792 F.3d 281, 304 (3d Cir. 2015) ("At the same time, federal power over interstate waterways, 'from the commencement of the [federal] government, has been exercised with the consent of all, and has been understood by all to be a commercial regulation.' *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1, 190, 6 L.Ed. 23 (1824). And for at least a century, federal common law has governed disputes over interstate water pollution. *Arkansas v. Oklahoma,* 503 U.S. at 98, 112 S. Ct. 1046 (citing *Missouri v. Illinois,* 200 U.S. 496 (1906); *Georgia v. Tennessee Copper Co.,* 206 U.S. 230 (1907)").

1

### iv.  Rivers and Streams Under the Replacement Rule

2      222.    The Replacement Rule eliminates jurisdiction over rivers and streams by defining

3  tributaries to only include "a river, stream, or similar naturally occurring surface water channel that

4  contributes surface water flow to a territorial sea or traditional navigable water in a typical year either

5  directly or through [another jurisdictional water]." Replacement Rule, 85 Fed. Reg. at 22,251 "A

6  tributary must [now] be perennial or intermittent in a typical year" as defined by the Replacement Rule

7  to receive protection. *Id*. All ephemeral rivers and streams, which the Replacement Rule defines as

8  flowing or pooling only in direct response to precipitation, are now expressly excluded from CWA

9  jurisdiction by the Replacement Rule and will no longer be afforded CWA protections. *Id*. at 22,287,

10  22,319.

11      223.    Defendants did not provide a reasoned basis for their disparate treatment of intermittent

12  and ephemeral streams, and indeed Justice Kennedy pointed out the arbitrary nature of this distinction in

13  *Rapanos* by explaining that requiring a stream to be "relatively permanent" for CWA jurisdiction to

14  attach makes little sense, considering the "merest trickle, if continuous," would be protected, "while

15  torrents thundering at irregular intervals" would not. *See Rapanos*, 547 U.S. at 769 (Kennedy, J.,

16  concurring in the judgment).

17      224.    Because the Replacement Rule's definitional limitations for rivers and streams are

18  arbitrary and are not based in the law or science, neither Defendants nor the public can fully discern

19  which rivers and streams will or will not be protected under this proposed definition. *See, e.g.,*

20  Replacement Rule RPA, at 36-43. Defendants admit in their Final Economic Analysis that the

21  Replacement Rule's jurisdictional definition will eliminate jurisdiction over some portions of all classes

22  of rivers and streams – perennial, intermittent, and ephemeral – but they claim they lack the data to

23  describe or quantify the number and types of waters that will be excluded. *See, e.g.,* U.S. EPA & Dep't

24  of the Army, Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the

25  United States" (Jan. 22, 2020) ("Final Economic Analysis"), at 22-23, https://perma.cc/5LHN-UUG4.

26      225.    First, the Replacement Rule's convoluted jurisdictional requirements for surface flow to

27  commercially navigable waters or the territorial seas arbitrarily eliminates long-recognized jurisdiction

for an undetermined number of waters in a manner that is contrary to law. Second, the Replacement Rule's arbitrary, non-scientific surface flow requirements (*i.e.* typical year, breaks, subsurface connections) and artificial distinctions between flow sources (*i.e.* eliminating jurisdiction for snowfall but leaving jurisdiction for snowmelt and leaving jurisdiction for groundwater flow sources but eliminating jurisdiction for precipitation flow sources)[25] exclude many important waterways with no reasonable scientific or legal basis.

226.    For example, the Replacement Rule makes arbitrary distinctions that are not based in science or the law and are contrary to the regulatory text itself. Rivers and streams will not be jurisdictional if they go subsurface briefly and emerge in the stream channel or spring a short distance later (*i.e.* losing/gaining streams) but if a river or stream goes subsurface in a "subterranean river" for long period of time and resurfaces it will be jurisdictional (as long it meets all the other definitional requirements). *See, e.g.,* Replacement Rule, 85 Fed. Reg. at 22,279. In either event, the subsurface section of a river or stream is always non-jurisdictional. *Id.* This will have significant adverse impacts on waters throughout Missouri and other areas with karst geology. *See, e.g.,* Waterkeeper Comments, Attachment 11 Missouri Confluence Case Study.

227.    Additionally, "[t]he agencies conclude in the final rule that features that flow only in direct response to rain do not have a sufficient connection to downstream traditional navigable waters to warrant federal jurisdiction and they are non-jurisdictional regardless of whether they cross state boundaries." Replacement Rule RTC, Topic 3 at 12. However, Defendants do not provide any valid legal support for those requirements or scientific support for their conclusion, which is contradicted by substantial scientific evidence in the record to the contrary.[26] Defendants also attempt to justify the

---

[25] *See, e.g.*, Replacement Rule, 85 Fed. Reg. at 22,293 (noting, in their CWA Section 404 permitting finalized in 2017, the Corps defines perennial, intermittent and ephemeral in a manner that "adhere[s] more closely to the generally-accepted scientific definitions . . .."

[26] *See, e.g.,* Final Connectivity Report; Replacement Rule RTC, Topic 1, p. 67. In fact, most ephemeral streams evaluated by Defendants from 2013 through 2018 were deemed to be jurisdictional due to their connections to, and impacts on the physical, chemical and biological integrity of, other covered waters. *See* Replacement Rule RPA at 22.

exclusion of ephemeral streams by asserting that the "science cannot dictate where to draw the line between federal and state or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." Replacement Rule RTC, Topic 10 at 3. However, they never explain what the legal distinctions are or how they were used to draw the lines.

228.    Similarly, the Replacement Rule would allow a river or stream to shift between being jurisdictional and non-jurisdictional, and the boundaries between jurisdictional and non-jurisdictional waters can shift as well. *See, e.g.,* Replacement Rule RTC, Topic 5, p. 14 ("the point at which a tributary becomes ephemeral may fluctuate upstream and downstream in a typical year based on climatic conditions, changes in topography and surrounding development, water input and water withdrawals."). Under the Replacement Rule, the fluctuating jurisdictional status of these rivers and streams can also be caused by water withdrawals. 85 Fed. Reg. at 22,291. Under such a regime, pollution control requirements and, thus, protections for the public and aquatic life, could shift from year to year in unpredictable ways – endangering the public and creating regulatory uncertainty for regulated entities.

229.    Under the Replacement Rule, rivers and streams that are dominated by pollution discharge flows are jurisdictional only if the discharges flow perennially or they flow intermittently and there is also a groundwater source of flow, as defined by the Rule, allowing industries to discharge large slugs of harmful pollution either episodically or into precipitation fed waterways and to avoid the CWA requirements for jurisdictional waters. *See, e.g.,* 85 Fed. Reg. at 22,275; Replacement Rule RTC, Topic 5, p. 2.

230.    Further, relatively permanent jurisdictional waters that are separated from downstream jurisdictional water by "certain ephemeral features" remain jurisdictional under the Replacement Rule only as long as such features satisfy certain vaguely described and arbitrary conditions. *See, e.g.,* 85 Fed. Reg. at 22,277. However, other ephemeral reaches of a river or stream will render the otherwise jurisdictional upstream water non-jurisdictional under the Replacement Rule. In either event, the ephemeral reach will be non-jurisdictional under the Replacement Rule and will not have its own water quality standards to protect its beneficial uses – allowing pollution of that reach and downstream waters. *Id*. at 22,277-78.

231.    These and other requirements of the Replacement Rule have no basis in the law or

science and are impossible to apply in many, if not most, watersheds. *See, e.g.,* Replacement Rule, 85

Fed. Reg. at 22,292-295; Replacement Rule RTC, Topic 12 at 2, 9 ("the agencies lack the requisite

national data sets and mapping tools to reliably map waters of the United States, but are committed to

closing the long-standing data gap in the future . . ." and "[t]he agencies agree with commenters that

there are significant limitations to the extent to which currently available data can be used to identify the

scope of all jurisdictional waters, as discussed further in the RPA and the preamble to the final rule in

Section IV.").

232.    Despite all of this, Defendants assert that they "believe the final rule defines the scope of

CWA jurisdiction in terms that are more easily understood by property owners than under prior

regimes." Replacement Rule RTC, Topic 5 at 4 (Referencing complex topographic maps, models,

statistics, gage data, soil maps, and other data the public could use to evaluate a waterway's

jurisdictional status). In order to know whether a stream or river is jurisdictional now, a person would

need to know its path and flow in a "typical year," including whether there are any breaks or

subterranean segments and whether it is fed by precipitation or groundwater throughout, and the person

would need to know those same things for every connecting waterway all the way to a "commercially"

navigable water (which, according to Defendants, requires considering an opaque mixture application of

case law, guidance, agency expertise, etc.) or the territorial seas. This definition is arbitrary, nebulous,

and does not provide "regulatory certainty."

233.    Additionally, Defendants did not meaningfully evaluate the adverse impacts of the

Replacement Rule eliminating CWA protections for rivers and streams on programs, resources, and

water quality, and they failed to determine whether their Replacement Rule was consistent with the

objectives laid out in the CWA. Perennial, intermittent, and ephemeral streams are important in their

own right for drinking water, recreation, aquatic life, industrial waters supply, and many other uses, and

they have chemical, physical, and biological connections to and influence on water quality in

downstream waters. *See, e.g.,* Final Economic Analysis at 10–11, 22–23. As a result, Defendants' failure

to assess the adverse effects of the Replacement Rule on these waters was arbitrary.

234.    According the EPA's own science, "[s]treams are the dominant source of water in most rivers, and the majority of tributaries are perennial, intermittent, or ephemeral headwater streams." Final Connectivity Report at ES-2, ES-7-8 ("For example, headwater streams, which are the smallest channels where streamflows begin, are the cumulative source of approximately 60% of the total mean annual flow to all northeastern U.S. streams and rivers."). As Defendants acknowledge, the SAB found "strong scientific support for the conclusion that ephemeral, intermittent, and perennial streams exert a strong influence on the character and functioning of downstream waters and that tributary streams are connected to downstream waters" in EPA's Draft Connectivity Report for the Clean Water Rule. Replacement Rule RTC, Topic 1, p. 67.

235.    Defendants recognized "the importance of protecting water resources and as a general matter do not dispute the important role of headwaters, including certain ephemeral and intermittent streams, in supporting outdoor recreation and ecosystem services such as providing habitat and promoting biodiversity, among other values and functions." Replacement Rule RTC, Topic 1, p. 115. However, contrary to this recognition, Defendants claimed that they could not rely on science for "where to draw the line between federal and state or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." *Id*. In order words, Defendants did not evaluate or consider the harm their definition would cause to the Nation's waters on the basis of their purported belief that the CWA prohibits consideration of that issue in determining jurisdiction.

236.    Instead of making a good faith effort to determine the likely loss of jurisdiction resulting from their definition, Defendants simply looked at two datasets they claim are not adequate to evaluate the effects and/or impacts of their proposed action and concluded that they do not know how the loss of jurisdiction over tributaries will impact the Nation's waters and CWA Programs. Replacement Rule RPA, pp. 34-43 (Evaluating NHD and ORM-2 Data and finding it inadequate). Many other valid and relevant datasets exist that Defendants could have used, and in fact, Defendants mention several examples in the Proposed Replacement Rule Notice itself, but they do not explain why these additional datasets were not utilized in the Resource and Programmatic Assessment. *See, e.g.,* Proposed

Replacement Rule, at pp. 4176-77. Defendants also refused to consider evidence provided by the Plaintiffs and the public demonstrating massive reductions in jurisdiction and showing serious adverse impacts to the Nation's waters that would result from their definition. *See, e.g.,* Waterkeeper Comments, Attachment 11.

237.    For example, Plaintiffs and others provided Defendants with numerous examples of harmful impacts that will occur as a result of removing CWA protections from ephemeral streams, such as the currently CWA-permitted pollution discharges from Los Alamos National Laboratories, a site that has become synonymous with radioactivity and other types of pollution, into an ephemeral stream above one of the City of Santa Fe's drinking water intakes. This change is all the more harmful given that New Mexico does not have either a delegated CWA program or its own state law water quality program to in any way ameliorate this new loss of protection. Waterkeeper Comments, Attachment 11 Rio Grande Watershed Case Study. Defendants did not find that issue relevant and simply responded that "[t]he applicability of the final rule to site-specific discharge scenarios as described in the comments regarding the Los Alamos National Labs is outside of the scope of this rulemaking . . ." Replacement Rule RTC, Topic 11 at p. 49. In other words, Defendants felt they were allowed to completely ignore this threat that their Replacement Rule exacerbates.

238.    Additionally, public comments documented how eliminating ephemeral rivers and streams as jurisdictional waters would pollute waters that serve drinking water sources, recreational waters, and essential aquatic habitat, as well as adversely impact downstream waters. In response, Defendants posited that these waters may be "potential point sources subject to NPDES permitting requirements" that may protect downstream waters. Replacement Rule RTC, Topic 1 at 57-58. Transforming large numbers of the Nation's waters into conveyances for the discharge of pollutants is antithetical to the CWA.

239.    Defendants claim that it is not necessary to protect ephemeral streams under the CWA in order to achieve the CWA's objectives or to protect them as sources of drinking water. Defendants' unsupportable position is that whatever "controls that states, tribes, and local entities choose to exercise over their land and water resources" and "the CWA's non-regulatory measures" will fill in the gap. *See,*

*e.g.,* Replacement Rule RTC, Topic 5 at 9 and Topic 11 at 61. However, Defendants failed to provide any support for these assertions and their position is without basis in law or fact.

240.    Additionally, Defendants have failed to meaningfully explain how they can apply their jurisdictional definition in the real world to make jurisdictional determinations for rivers and streams. For example, to implement the Replacement Rule's definition, Defendants say they have "many different methods and tools to identify and determine whether a feature meets the definition of 'tributary' . . ." including remote data such as "stream gage data, elevation data, historic or current water flow records, flood predictions, statistical evidence, aerial imagery, and USGS maps" and "available models, including models developed by Federal, State, tribal and local governments, academia, and the regulated community." Replacement Rule, 85 Fed. Reg. 22,292-94.

241.    However, Defendants had all of that data available during the rulemaking process as well, but repeatedly stated that data was inadequate to identify and quantify jurisdictional and non-jurisdictional waters. *See, e.g.,* Replacement Rule RPA, at 34-43; Replacement Rule RTC, Topic 11 at p. 2-8. As a result, Defendants' claims are mutually inconsistent and point up their baseless nature. This is even more alarming considering Defendants say they will bear the burden in making jurisdictional determinations and, if the evidence is uncertain or unavailable, waters will be treated as non-jurisdictional. *See, e.g.,* Replacement Rule RTC, Topic 5 at 35, Topic 6 at 21. Therefore, Defendants have both (1) created what they tacitly admit is an unworkable definition that will remove many waters from CWA jurisdiction and (2) decided that they will also remove additional waters from jurisdiction in the predictable eventuality that their doomed-to-fail definition in fact fails to produce a jurisdictional determination. This is not an acceptable agency decision.

### v.  Ditches and Canals Under the Replacement Rule

242.    CWA jurisdiction over canals and ditches is also extremely limited by the terms of the Replacement Rule's tributary category and definitions, and also by exclusions.

243.    Under the Replacement Rule, "the term 'tributary' includes a ditch that either relocates a tributary, is constructed in a tributary, or is constructed in an adjacent wetland as long as the ditch satisfies the flow conditions of the 'tributary' definition. A ditch can also be a traditional navigable

water if it meets the conditions of that category. The agencies are excluding all other ditches from the definition of 'waters of the United States.' . . .." Replacement Rule, 85 Fed. Reg. 22,287-88.

244.    Accordingly, Defendants' limitations on jurisdiction over canals and ditches are flawed for the same reasons as Defendants' jurisdictional limitations for rivers and streams. In addition, however, the Replacement Rule further limited CWA jurisdiction over ditches and canals by virtue of narrowly defining tributaries and wetlands, and the resulting non-jurisdictional waters being treated as if they are "upland"[27] – *i.e.* classifying ditches and canals as *upland ditches*, which are not protected by the CWA. *See, e.g.,* Replacement Rule, 85 Fed. Reg. 22,297 ("This provision is also consistent with the agencies' longstanding, historic position that non-tidal ditches excavated in upland (and historically described as 'dry land') are not jurisdictional"); Replacement Rule RTC, Topic 6 at 22. Rivers, streams, wetlands, lakes, and other waters rendered non-jurisdictional by the Replacement Rule are not reasonably treated the same as "dry land," and the Replacement Rule's contrary categorization in order to eliminate jurisdiction over ditches and canals is arbitrary.

245.    Plaintiffs and other pointed out that it would be impossible to apply the Replacement Rule in jurisdictional determinations because information about whether ditches or canals, some of which were constructed near time of the Nation's birth, were constructed in or relocated a tributary. Because these waters have been in existence for so long, information necessary to determine whether they meet the Replacement Rule's arbitrary definition for flow regimes and connections to certain types of waterways is simply not available. *See, e.g.,* Waterkeeper Comments, at 78-83. It is also unclear how Defendants would evaluate the flow regime in a "typical year" for these ditched tributaries given that the tributary no longer exists in its original state. *Id*.

246.    Defendants responded by acknowledging it "may be challenging" in some instances but "[u]ltimately, the burden of proof is on the agencies to determine the historic status of the ditch

---

[27] The Replacement Rule defines upland as "any land area that under normal circumstances does not satisfy all three wetland factors (i.e., hydrology, hydrophytic vegetation, hydric soils) identified in paragraph (3)(xvi) of this definition, and does not lie below the ordinary high water mark or the high tide line of a jurisdictional water. Replacement Rule, 85 Fed. Reg. 22,339, subsection (c)(14).

AMENDED COMPLAINT FOR DECLARATORY          75
AND INJUNCTIVE RELIEF

construction, and to demonstrate that a ditch relocated a tributary or was constructed in a tributary or an adjacent wetland . . ." and "[a]bsent such evidence, the agencies will determine the ditch is non-jurisdictional." Replacement Rule RTC, Topic 6 at 21. This will inevitably lead to Defendants wrongfully removing CWA jurisdiction from waters merely because they lack sufficient knowledge to make the correct determination. It is not reasonable for Defendants to eliminate CWA protections in this manner.

247.    Substantial case law,[28] the text of the CWA,[29] and a robust scientific record[30] supports the conclusion that ditches and canals are jurisdictional waters, and Defendants have failed to provide a reasonable basis for failing to continue to protect them under the CWA. *See, e.g.,* Replacement Rule RTC, Topic 6 at 10-11. Plaintiffs and others presented evidence demonstrating the importance of maintaining jurisdiction over ditches and canals to protect the Nation's waters. However, Defendants improperly refused to consider it on the bases that states or tribal governments may address the resulting pollution and/or that some ditches and canals may be treated as point sources. *Id*; *see also, e.g.,* Waterkeeper Comments, Attachment 11 Boulder Creek, Cape Fear, Puget Sound, and Rio Grande Case Studies. Defendants' exclusions for ditches and canals are arbitrary and capricious, and contrary to law.

### vi. Wetlands Under the Replacement Rule

248.    In terms of wetlands, the Replacement Rule only protects "adjacent wetlands,' which are narrowly defined to include only wetlands that: (1) abut, meaning to touch, at least one point or side of another jurisdictional water excluding wetlands; (2) are inundated by flooding from another

---

[28] *See, e.g., United States v. Eidson*, 108 F.3d 1336, 1342 (11th Cir. 1997), *cert. denied*, 522 U.S. 899 (1997); *United States v. Holland*, 373 F. Supp. 665, 673-74 (M.D. Fla. 1974); *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F. 3d 526, 533-34 (9th Cir. 2001); *United States v. St. Bernard Parish*, 589 F. Supp. 617, 620 (E.D. La. 1984); *United States v. Gerke Excavating, Inc*., 412 F.3d 804, 805-06 (7th Cir. 2005) ("A stream can be a tributary; why not a ditch? A ditch can carry as much water as a stream, or more; many streams are tiny. It wouldn't make much sense to interpret the regulation as distinguishing between a stream and its man-made counterpart."), *vacated*, 126 S. Ct. 2964 (2006), *on remand*, 464 F.3d 723 (7th Cir. 2006) (remanding to district court to apply *Rapanos*), *cert. denied*, 128 S. Ct. 45 (2007); *Comm. Assn. for Restoration of Env't v. Henry Bosma Dairy*, 305 F.3d 943, 954-955 (9th Cir. 2002).
[29] *See, e.g.,* 33 U.S.C. §1344 (providing limited exclusions for discharges to ditches under the CWA).
[30] *See, e.g.,* Connectivity Report pp 1-3, TSD, and SAB Report Member Comments

1  jurisdictional water excluding wetlands; (3) are physically separated from another jurisdictional water,

2  excluding wetlands, only by a natural berm, bank, dune, or similar natural feature; or (4) are physically

3  separated from another jurisdictional water, excluding wetlands, only by an artificial dike, barrier, or

4  similar artificial structure so long as that structure allows for a direct hydrologic surface connection

5  between the wetlands and the other jurisdictional water in a typical year, such as through a culvert, flood

6  or tide gate, pump, or similar artificial feature." Replacement Rule, 85 Fed. Reg. at 22,338.

7    249.    Defendants' limitations on CWA protections for wetlands are premised on erroneous

8  legal theories that are inconsistent with the CWA and arbitrary line drawing that is contrary to

9  established science. Defendants attempt to justify their departure from past practice and extreme

10  narrowing of protections for wetlands by saying that the Replacement Rule "adopts an alternative

11  interpretation" that "is based on the text, structure, and legislative history of the CWA, additional

12  Supreme Court instruction developed since *Bayview*, the reasoned policy choices of the executive

13  branch agencies authorized by Congress to implement the Act, and the agencies' technical and scientific

14  expertise administering the CWA over nearly five decades." Replacement Rule RTC, Topic 1 at 150.

15  Defendants never explain how these sources translated into the regulatory text and definitional

16  limitations Defendants chose, and which radically limit wetland jurisdiction. As a result, Defendants

17  claims completely lack substance and amount merely to a call for blind deference to a wholly

18  unexplained decision.

19    250.    As an example of the new limitations of the Replacement Rule, Defendants will deem an

20  abutting wetland jurisdictional if its boundary physically touches the boundary of a traditional navigable

21  water, tributary, or lake, pond, or impoundment – without regard to whether it has any surface or

22  subsurface water connections to the adjacent water. Replacement Rule, 85 Fed. Reg.at 22,315. By

23  contrast, Defendants will only deem a wetland that is actually inundated by flooding by a traditional

24  navigable water, tributary, or lake, pond, or impoundment jurisdictional if there is a surface water

25  connection between the wetland and another jurisdictional water that originates from the jurisdictional

26  water. Replacement Rule, 85 Fed. Reg. at 22,315-16. Defendants failed to provide a reasonable basis for

27  distinguishing between these types of wetlands for jurisdictional purposes.

251.    Other than these two narrow categories, a limited number of wetlands very near jurisdictional waters may by jurisdictional, but only if (1) the feature separating the wetland from the other jurisdictional water is natural or (2) there is a surface hydrological connection to the other jurisdiction water through an artificial feature at least once in a typical year. Replacement Rule, 85 Fed. Reg. at 22,338.

252.    Defendants failed to provide a reasoned basis for treating wetlands separated by natural or artificial features in a different manner even when they are of an identical type, function, and proximity to a jurisdictional water. *Compare* Replacement Rule, 85 Fed. Reg. at 22,338, 22,311 (natural feature) *with id.* at 22,338, 22,312 (artificial feature). Indeed, for other categories of waters, Defendants rejected distinctions between natural and artificial features. Replacement Rule RTC, Topic 7 at 15 ("[T]he agencies have not . . . identified [] a persuasive legal basis for distinguishing between natural and artificial flows.").

253.    The Replacement Rule contains many other arbitrary, non-scientific limitations such as: (1) a wetland separated by a single berm is jurisdictional, but a wetland separated by two or more berms is non-jurisdictional, Replacement Rule, 85 Fed. Reg. at 22,312, (2) a wetland that is adjacent to another jurisdictional water is jurisdictional, but a wetland next to a jurisdictional wetland is not, and (3) only wetlands with surface connections to jurisdictional waters can be jurisdictional under the Replacement Rule even though surface and subsurface connections between wetlands and downstream waters both provide water quality and ecological benefits. Replacement Rule RTC, Topic 8 at 12, 20-21.

254.    Defendants adopted this narrow coverage despite their scientific findings that *surface* connectivity does not serve as an adequate proxy as to whether a wetland has a significant impact on surrounding waters. *See* Connectivity Report at ES-3 (wetlands can have significant connectivity with "downstream waters through surface-water, shallow subsurface-water, and ground-water flows and through biological and chemical connections"). Indeed, the science demonstrates that many wetlands have a significant, beneficial impact on downstream waters precisely *because* of their isolation – it is isolation that allows such wetlands to "sink" or filter pollutants, thereby preventing their introduction into other waters. *See id.* at ES-4. Defendants' contrary conclusion is unsupported and unsupportable.

255.    The Replacement Rule will leave many important wetlands, including those with a significant nexus to other jurisdictional waters, wholly unprotected. This includes Western vernal pools, Texas coastal prairie wetlands, prairie potholes, pocosins, Carolina bays, Delmarva bays, and myriad other important wetlands across the country. Defendants acknowledge that these and other wetlands provide many "ecological, recreational, economic, flood control, and other benefits," but they claimed the authority to disregard them on the basis of balancing the objective of the CWA with the need to respect state and tribal authority. Replacement Rule RTC, Topic 8 at 12. Defendants also disregarded information submitted by Plaintiffs documenting the importance and requirement of maintaining broad protections for wetlands. *See, e.g.,* Waterkeeper Comments, Attachment 11.

256.    Additionally, Defendants failed to evaluate and consider the chemical, physical, and biological effects on downstream waters of eliminating CWA protections for these wetlands. This is because Defendants both never collected data to inform their arbitrary and non-scientific definition of waters of the United States and failed to consider the data that was available. Defendants admitted that they only considered two datasets – the U.S. Geological Survey's National Hydrography Dataset ("NHD") at high resolution and the U.S. Fish and Wildlife Service's National Wetlands Inventory ("NWI") – and stated they believe those datasets "represent the most comprehensive national datasets of the potential location and extent of . . . wetlands of which the agencies are aware. After attempting the [missing change in jurisdiction] analysis, however, the agencies concluded that because neither dataset was created for regulatory purposes, even where streams and wetlands are identified in the datasets, the question of CWA jurisdiction under the baseline and the final rule often cannot be answered." Replacement Rule RTC, Topic 8 at p. 7. Not only does this further emphasize the unworkable nature of the Replacement Rule's jurisdictional analysis, but there are also many other sources of valid scientific data on wetlands that Defendants failed to consider. *See, e.g.,* Replacement Rule RTC, Topics 8, 12. Defendants improperly failed to consider this additional data.

//

//

//

### vii. Lakes, Ponds, and "Impoundments of Jurisdictional Waters" Under the Replacement Rule

257.     The Replacement Rule improperly eliminates jurisdiction over lakes, ponds, and "impoundments of jurisdictional waters" primarily through the limitations reducing the types of protected waters described above and through some additional definitional limitations.

258.     Under the Replacement Rule, lakes, ponds, and impoundments include only "standing bodies of open water that contribute surface water flow to a [commercially navigable water or territorial sea in] a typical year either directly or through one or more [jurisdictional tributaries, lakes, ponds, impoundments or adjacent wetlands]." Lakes, ponds, and impoundments are also jurisdictional under the Replacement Rule if they are inundated by a commercially navigable water; territorial sea; or a jurisdictional tributary, lake, pond, or impoundment. Replacement Rule, 85 Fed. Reg. at 22,340-41.

259.     Accordingly, jurisdiction for these waters was eliminated by (1) requiring a surface connection to a narrowly and vaguely defined class of commercially navigable waters or the territorial seas and (2) requiring that surface connection be direct or through one of three narrowly and vaguely defined categories of jurisdictional waters. Jurisdiction over impoundments was further limited by narrowing the scope of defined "jurisdictional waters" to which these waters must be connected.

260.     Defendants did not provide a reasoned legal, factual, or scientific basis for the limitations on protecting the Nation's lakes, ponds, and impoundments, many of which are important for drinking water, recreation, aquatic habitat, and other essential uses. As with all of the other narrow categories of waters protected under the Replacement Rule, Defendants acknowledged that waters would lose CWA protections, but failed to quantify or even meaningfully describe the waters that would remain jurisdictional and the waters that would lose CWA protections. *See, e.g.,* Replacement Rule RPA, at 23-25 (finding that fewer lakes, ponds and impoundments would be jurisdictional and claiming they were unable to quantify the change compared to any baseline using their chosen data sets). Defendants also failed to evaluate the impact of reducing CWA jurisdiction on the quality of the Nation's waters and ignored evidence and information provided by the public explaining threatened harms, including information provided by Plaintiffs. *See, e.g.,* Waterkeeper Comments, Attachment 11, including Rogue River and Crater Lake, Cape Fear, Rio Grande, and Boulder Creek Case Studies.

261.    Defendants admitted "the ecological, economic, and public health benefits of protecting water resources;" "that lakes and ponds serve a variety of important functions;" and that "lakes and ponds may influence water chemistry via pathways beyond just hydrologic surface flow." However, despite these admissions, Defendants claimed that they lacked authority to adequately protect these resources based on "a legal analysis of the limits on CWA jurisdiction reflected in the statute and Supreme Court case law" and that [t]he agencies are precluded from exceeding their authority under the CWA to achieve specific scientific, policy, or other outcomes." Replacement Rule RTC, Topic 7 at 11. Defendants' attempt to artificially constrain their authority must fail because they did not provide a reasoned basis for their position, which is contrary to the CWA, case law and longstanding agency interpretations.

### viii.    The Replacement Rule's Reliance on the "Typical Year"

262.    For each category of jurisdictional waters, with the exception of commercially navigable waters and territorial seas, Defendants further limit CWA jurisdiction through the use of the arbitrary and enigmatic phrase "typical year." For example, under the Replacement Rule, rivers and streams are only jurisdictional if they contribute flow to a commercially navigable water in a "typical year" so long as that flow is perennial or intermittent in a "typical year." Replacement Rule, 85 Fed. Reg. at 22,340-41. Lakes, ponds, and impoundments are jurisdictional if they contribute flow to a commercially navigable water or territorial sea in a "typical year." *Id.* Wetlands are only jurisdictional if they are inundated or flooded by a jurisdictional water in a "typical year" or if they are separated for a jurisdictional water by an artificial structure but have a direct hydrologic surface connection between them in a "typical year." *Id.*

263.    Besides being a non-scientific term with no basis in the law, the term is so vague that it is impossible to understand how to apply it or how it will impact CWA jurisdiction when Defendants employ it in jurisdictional determinations. The Replacement Rule defines "typical year" as a year "when precipitation and other climatic variables are within the normal periodic range (*e.g.,* seasonally, annually) for the geographic area of the applicable aquatic resource based on a rolling thirty-year average." Replacement Rule, 85 Fed. Reg. at 22,294.

264.    Defendants did not provide an explanation or clear definition of "typical year" in the Proposed Replacement Rule. As a result, the public could not meaningfully comment on Defendants' adoption of that limitation on jurisdictional waters. Instead, Defendants presented the public with a variety of questions about the concept of a "typical year" and how Defendants could use it to restrict CWA jurisdiction. For example, Defendants asked the public to provide input on foundational questions that should have been resolved by Defendants prior to proposing the Replacement Rule. This included whether Defendants should define typical year, what tools they should use to apply it, whether there were available alternatives to it, and what watershed scale they should use. *See, e.g.,* Proposed Replacement Rule, 84 Fed. Reg. at 4,177-79 (lengthy questions regarding "typical year" in relation to tributaries). The Proposed Replacement Rule thus failed to offer a true proposal on this issue on which the public could comment. Instead, the public was left guessing and was forced to provide input on this nebulous, ill-conceived phrase.

265.    In the final Replacement Rule, Defendants left most of the questions they had posed in the Proposed Replacement Rule unanswered, giving only limited information on what is a "typical year" for the first time in the preamble and response to comments. As a result, the public is still very much in the dark with regard to this phrase in many ways. Defendants, instead of creating a standard, have attempted to leave themselves full, unbounded discretion to give "typical year" whatever *ad hoc* meaning they choose when applying it to make jurisdictional determinations.

266.    For example, the Replacement Rule preamble indicates the "typical year" will have precipitation between the "30th and 70th percentiles for totals from the same date range over the preceding 30 years." Replacement Rule, 85 Fed. Reg. at 22,311. However, Defendants also state that they will "consider alternative methods . . . , including different statistical percentiles, evaluation periods, or weighting approaches for condition values." Replacement Rule RTC, Topic 9 at 5. Additionally, Defendants fail to identify – within the Replacement Rule or elsewhere – what "other climatic variables" they will consider, the scope of the "aquatic resource" they will evaluate, or the extent of the "geographical area" they will utilize in this assessment. These failures are unreasonable and render the Replacement Rule arbitrary, capricious, and contrary to law.

### ix.  The Waste Treatment Exclusion Under the Replacement Rule

267.     Defendants falsely claim that the Replacement Rule's exclusion from CWA jurisdiction for waste treatment systems has "been expressly included in regulatory text for decades, but [that] the agencies are defining [the exclusion] for the first time to enhance implementation clarity." Replacement Rule, 85 Fed. Reg. at 22,317, 22,324. In fact, the waste treatment exclusion in the Replacement Rule improperly expands the exclusions reflected in prior definitions and agency interpretations, which, as noted above, were also inconsistent with and/or were adopted in violation of the law. By attempting to obscure the fact that they were expanding the waste treatment exclusion, Defendants have completely failed to provide a reasoned legal, scientific, or factual basis for the new, expanded exclusion that they promulgated in the Replacement Rule.

268.     The exclusion for "waste treatment systems" in the Replacement Rule excludes *any* jurisdictional water from CWA protections if it was used for a waste treatment system prior to 1972 or if it is converted to a waste treatment system thereafter "in accordance with the requirements of the CWA." Replacement Rule, 85 Fed. Reg. at 22,325. Under the Replacement Rule, and contrary to the CWA, Defendants are "affirmatively relinquishing jurisdiction" over otherwise jurisdictional waters that are converted to waste treatment systems through CWA Sections 402 and 404 permits. Replacement Rule, 85 Fed. Reg. at 22,322. And, for the first time, Defendants are defining waste treatment systems to include cooling ponds, which encompasses large public lakes – often used for boating, fishing, recreation, and other public uses - that were created by impounding jurisdictional waters to provide cooling water for industry. Replacement Rule, 85 Fed. Reg. at 22,328-39.

269.     This exclusion is premised on a rewriting of the CWA and is not based on a permissible construction of the law. It would allow industries to transform the Nation's waters into waste treatment systems and thereby strip them of CWA jurisdiction contrary to the CWA, legislative history, and case law. *See, e.g.,* 45 Fed. Reg. 48,620, 48,620 (July 21, 1980). Even navigable-in-fact lakes, important for navigation, interstate commerce, drinking water, and recreation, could be rendered non-jurisdictional, destroyed, and turned into treatment systems for industrial waste under the Replacement Rule.

Defendants have provided no reasoned basis for this decision, which is antithetical to the CWA and its goals.

### x. Defendants' Economic Analysis and Resource and Programmatic Analysis for the Replacement Rule

270. Defendants failed to complete a reliable evaluation of how the Replacement Rule would impact the Nation's waters; future CWA jurisdictional determinations; CWA programs; and the interests of states, tribal governments, and the public. Accordingly, Defendants lack any scientific, technical, or factual basis for the Replacement Rule and adopted the new definition of waters of the United States with complete disregard for whether it would be consistent with the singular objective of the CWA.

271. In lieu of any of these considerations, Defendants completed something they called a Resource and Programmatic Assessment and an Economic Analysis, which they claim "complement" each other and describe "the agencies' assessment of the potential effects of the revised definition on the federal regulation of aquatic resources across the country, as well as the potential effects of the revised definition on CWA programs and certain other programs under other federal statutes." Replacement Rule RPA at 6. Defendants' position is that the Replacement Rule RPA "also provides snapshots of the applicable regulatory and legal framework currently in place in states and some tribes to provide context for how aquatic resources are regulated. The two documents together present an assessment of the final rule's potential impacts." *Id.*

272. However, these two documents do not meaningfully evaluate the issues here. *See, e.g.,* Waterkeeper Comments, at 99-103. Defendants claim they were unable to "quantify the change in jurisdiction, and therefore must describe the change qualitatively" because no "national dataset was identified through the comment period that would enable an accurate and reliable quantification of potential changes in the scope of jurisdiction as a result of revising the definition of 'waters of the United States.'" Replacement Rule RPA, at 10. But this is insufficient.

273. First, Defendants provided no support for the idea that only a national dataset would be useful in evaluating the effects of their definition on the Nation's waters. Second, Defendants adopted a definition of waters of the United States that was not based on established scientific principles and longstanding classifications of waters resources. As a result, extensive data collected by Defendants,

researchers, scientists, and the states do not fit with Defendants' arbitrary categories of waters. Third, Defendants ignored available data and information provided by the public that demonstrated negative impacts from the Replacement Rule and artificially constrained their own analysis in a manner that precluded them from meaningfully evaluating the effects of the Replacement Rule.

274.    For example, the Replacement Rule RPA conducts an analysis of only some of the waters impacted by the Proposed Replacement Rule using only a subset of the relevant, available data.[31] Indeed, Defendants repeatedly admit that the data they chose as their sole focus is inadequate to assess the effects of their action. *See, e.g., id.* at 7. ("While the National Hydrography Dataset (NHD) and National Wetlands Inventory (NWI) datasets are widely used and recognized as the most comprehensive national datasets of their kind, they nonetheless have technical limitations that present significant challenges for the purpose of determining potential effects of the final rule with regard to the baseline . . . Therefore, the agencies did not attempt to use these datasets to assess the potential effects of the final rule.").

275.    The NHD and NWI classify waters based on well-established science and, thus, were incapable of application to several of Defendants' new, arbitrary categories, which were not based on science but were instead based on other unspecified, nebulous factors like "agency expertise." Replacement Rule, 85 Fed. Reg. at 22,252. Still, however, those datasets provided extensive information that could have been used Defendants to provide at least a partial evaluation of the Replacement Rule's

---

[31] For example, Defendants could have sought state, tribal and local government data, which is often extensive and detailed. Defendants could also have evaluated data from the sources referenced in their Proposed Replacement Rule Notice, as well as (1) massive datasets possessed by Defendants themselves but not mentioned in the Proposed Rule, (2) data from other government agencies like USGS Elevation Derivatives for National Applications, https://edna.usgs.gov/watersheds/index.htm, the National Streamflow Statistics Program, https://water.usgs.gov/osw/programs/nss/summary.html and likely thousands of other datasets; Natural Resource Conservation Service Data; National Oceanic and Atmospheric Administration data; U.S. Department of Interior data; and many other federal agencies and (3) data from Universities and researchers across the country. Much of this data is readily available for access through the Internet.

impacts on the Nation's waters. *See, e.g.,* Waterkeeper Comments, Attachment 11. Instead, Defendants made no attempt to quantify the harm that the Replacement Rule will cause.

276. Defendants also looked at a partial set of data (2013-2018) maintained by the Corps that is called the Operation and Maintenance Business Information Link, Regulatory Module (ORM2) database that "documents Corps decisions regarding the jurisdictional status of various aquatic resource types." Replacement Rule RPA, at 9. However, again, that database does not directly correlate to the terms used in the Replacement Rule. *Id.* at 7. Not surprisingly, that data was also incapable of application to determining the effects of the Replacement Rule. *See, e.g., id.* at 20 (interstate waters and territorial seas), 20-23 (rivers and streams), 23-25 (lakes, ponds and impoundments), 25-29 (wetlands). However, despite this admitted shortcoming, Defendants declined to consider additional relevant data, including data submitted and referenced by Plaintiffs and other commenters.

277. The Replacement Rule RPA did not evaluate the loss of CWA protections for the Nation's waters by comparing the Replacement Rule to the longstanding 1970s definition or to the Clean Water Rule. Instead, Defendants purported to compare the Replacement Rule to the Repeal Rule erroneously arguing that it "has been implemented consistent with Supreme Court decisions and informed by applicable agency guidance and longstanding agency practice." Replacement Rule RPA, at 6. The Repeal Rule, in place for only a few months and the subject of multiple court challenges, as modified by those vague agency opinion modifiers is not a sound baseline for comparison. It is apparent that Defendants are attempting to avoid having to compare the Replacement Rule to the 1970s definition or the Clean Water Rule, and their extensive supporting scientific and technical records.

278. Defendants' evaluation of the impacts of the Replacement Rule on CWA programs is no better. The evaluation looked at only a subset of CWA programs, and proceeded to make a series of "assumptions" about how states may or may not step in to fill the massive gaps in protections that the Replacement Rule has created. Despite this, Defendants' analysis still demonstrates that eliminating CWA protections for the Nation's waters will harm the public and water resources through reducing the scope of CWA programs such as those identified in the following chart in the Defendants' equally flawed Economic Analysis. *See, e.g.,* Final Economic Analysis, at 105.



279.    Defendants' Final Economic Analysis is flawed, in part, because it relies on the flawed Replacement Rule RPA, but also because it is replete with unresolved questions and uncertainty. For example, to increase the purported benefits and decrease the costs of the Replacement Rule, Defendants baselessly speculate by predicting how states may step in at some point in the future to pass state laws to cover gaps in the CWA that are created by the Replacement Rule. Based on this unwarranted speculation, Defendants make assumptions about the costs and benefits of the Replacement Rule based on speculation about changes that will allegedly be made by states adopting their own theoretical, stringent, comprehensive programs to regulate pollution. *See* Final Economic Analysis, at 28-46. This is not a real analysis of the effects of Defendants' action.

280.    As with the Replacement Rule RPA, Defendants also relied on an unrepresentative and unreliable methodology in reaching their incorrect conclusions. Defendants stated that evaluating the impacts of their decision to completely alter the scope of the CWA across the county would be too

1  difficult, and then concluded they simply could not "conduct a national-level analysis to evaluate 1)

2  waters changing jurisdictional status; 2) the relationship between these waters and facilities and

3  activities covered under the CWA; and 3) the potential impacts of changes in the level of regulation of

4  jurisdictional and non-jurisdictional waters." Final Economic Analysis, at 51. As a result, Defendants

5  acknowledge that jurisdiction would be eliminated but neglected to quantify the losses or impacts of

6  eliminating CWA jurisdiction for any waters. *See, e.g.,* Final Economic Analysis at xi, xviii (claiming

7  "limitations of the data curtailed the agencies' ability to quantify or monetize some of the potential

8  environmental effects and forgone benefits of the final rule"), 8-9 (interstate waters), 9-11 (tributaries),

9  11 (ditches), 12-13 (lakes and ponds), 14 (impoundments), 15-17 (wetlands). This left a vital

10  consideration for the Replacement Rule completely unconsidered.

11  281.   Additionally, Defendants attempted to support their approach to the Final Economic

12  Analysis and the Replacement Rule by alleging, without citing any source, that "[t]he federalism

13  literature illustrates that states may actually be in a better position than the federal government to

14  regulate local environmental public goods (*e.g.*, water quality). When given more flexibility over which

15  waters to regulate, states may be able to direct resources toward their high priority waters and limit

16  expenditures on their low priority waters, thereby maximizing the net benefits derived from their

17  waters." *See* Final Economic Analysis, at xii.

18  282.   This statement illustrates a fundamental flaw with the Replacement Rule - it plainly

19  contravenes what Congress intended under the CWA, which was enacted precisely because the states

20  had been unable to adequately control pollution and their failure was harming national interests. *See,*

21  *e.g., EPA v. Cal. ex rel. State Water Res. Control Bd*., 426 U.S. at 202-09; *Am. Farm Bureau Fed'n v.*

22  *EPA*, 792 F.3d at 309. Defendants' proposed, theoretical water pollution regime, led by the states based

23  on heretofore undrafted and un-passed state legislation, is thus foreclosed by the language, structure, and

24  legislative history of the CWA. Defendants are without authority to rewrite the CWA in this way.

25  283.   Defendants attempt to avoid review of their flawed scientific and technical basis for the

26  Replacement Rule and the impacts of that Rule by claiming they did not rely on the information in the

27  Replacement Rule RPA or the Final Economic Assessment "for their revised definition 'waters of the

United States." Replacement Rule RPA, at 6; *see also* Replacement Rule, 85 Fed. Reg. at 22,331-32, 22,335. However, this statement only proves this decision was arbitrary and capricious. If Defendants really did not rely on the information in the Replacement Rule RPA or the Final Economic Assessment, then they failed to provide a basis, flawed or otherwise, for the Replacement Rule's definition of "waters of the United States." Such an unsupported decision cannot stand.

### xi. Defendants' Failure to Comply with Notice and Comment Requirements for the Replacement Rule

284.    Additionally, Defendants provided the public with more than 140 supporting documents related to the Replacement Rule rulemaking; Replacement Rule RPA; and Defendants' federalism theories, valuation approaches, and other issues in the Economic Analysis for the first time on April 21, 2020, at the same time they published the final version of the Replacement Rule in the Federal Register. *See, e.g.,* Environmental Protection In The Federalist System: The Political Economy Of NPDES Inspections, EPA-HQ-OW-2018-0149-11615; Environmental regulatory competition: a status report and some new evidence, EPA-HQ-OW-2018-0149-11643; Identification of Putative Geographically Isolated Wetlands of the Conterminous United States, EPA-HQ-OW-2018-0149-11638; Letter from David Ross and Ryan Fisher to the Department of Interior on Aquatic Resource Mapping (September 17, 2019) EPA-HQ-OW-2018-0149-11659; NPDES State Program Information (September 19, 2019), EPA-HQ-OW-2018-0149-11678. Additionally, Defendants provided another 46 documents to the public related to the Replacement Rule between May 11, 2020 and May 15, 2020. *See* EPA-HQ-OW-2018-0149-11799, EPA-HQ-OW-2018-0149-11820. By failing to share these supporting documents with the public during the notice and comment period, and by waiting until the Replacement Rule was already finalized to make the documents available, Defendants denied Plaintiffs the opportunity to understand the bases for the Proposed Rule and to provide meaningful public comment. This is not only poor governance bound to result in poor, unvetted regulations, it is also in violation of the APA.

285.    Defendants did not explain how they relied upon the information in this eleventh-hour dump of supporting documents to develop, evaluate, and finalize the Replacement Rule. However, many of these documents existed during the Replacement Rule public comment period and should have been provided to the public for their evaluation during that comment period. *See, e.g.,* Memorandum for

Commanding General, U.S. Army Corps of Engineers: Clean Water Act Section 404(g) - Non-Assumable Waters (July 30, 2018), EPA-HQ-OW-2018-0149-11710; EPA and Corps Joint Memorandum: Assert Jurisdiction for NWP-2007-945 (2008), EPA-HQ-OW-2018-0149-11700.

286.    These documents also reflect the type of analysis that either was done (and available during the comment period) or should have been done prior to proposing the rule and which Defendants claim they were unable to do. For example, some of these documents reflect data and methodology Defendants used to evaluate how potential changes to CWA jurisdiction under the Replacement Rule would affect the Nation's waters and CWA programs. *See, e.g.,* Preliminary Results of Attempted Drinking Water Analysis Using the National Hydrography Dataset, EPA-HQ-OW-2018-0149-11765; Preliminary Results of Attempted Clean Water Act Section 402 Permit Analysis, EPA-HQ-OW-2018-0149-11764; Preliminary Results Of Attempted Analyses Of The National Hydrography Dataset And The National Wetlands Inventory, EPA-HQ-OW-2018-0149-11767; Preliminary Results of Attempted Clean Water Act Section 303(d) Analysis of Impaired Ephemeral Streams, EPA-HQ-OW-2018-0149-11763.

287.    Defendants are required to provide these and other late produced documents to the public during the comment period. Several Plaintiffs provided detailed legal, factual, and technical comments on the Replacement Rule and were improperly deprived of access to a large amount of information regarding Defendants' factual and technical basis for the Rule. The proper course of action would have been to provide them to the public as part of a new public comment opportunity. *See, e.g.*, *Ober v. EPA*, 84 F.3d 304, 314-15 (9th Cir. 1996) (remanding to reopen for public comment where post-comment materials were relied on and critical to the agency action). Instead, Defendants chose to arbitrarily attempt to stack the record and force through a rule that had not been tested and informed by the Congressionally required procedures for agency decision making. Defendants' failure to comply with the proper rulemaking procedures, on its own, necessitates that the Replacement Rule be vacated.

### xii. The Corps' Failure to Conduct Any NEPA Analysis Considering the Effects of the Replacement Rule on the Environment

288.    The Replacement Rule will result in the massive loss of CWA protections for rivers, streams, lakes, wetlands, ponds, and other waters across the country. However, unlike for the 2015

Clean Water Rule, the Corps failed to undertake any NEPA evaluation for the Replacement Rule whatsoever. Extensive information indicates that the Replacement Rule will cause severe harm to the environment. As a result, the Corps was required to engage in a NEPA analysis before approving the Replacement Rule. *See, e.g.,* Final Economic Analysis; Final Resource and Programmatic Analysis; and Waterkeeper Comments, Attachment 11. The Corps' failure to engage in this NEPA analysis prevented it from understanding the environmental effects of the Replacement Rule and was in clear violation of NEPA.

### xiii. Defendants' Failure to Consult on the Effects of Their Promulgation of the Replacement Rule Under the ESA

289.    Although the Replacement Rule results in a massive losses of CWA protections for rivers, streams, lakes, wetlands, and other waters across the country, waters that provide habitat for dozens of ESA-listed threatened and endangered species, Defendants failed to consult with the Services under Section 7(a)(2) of the ESA prior to the promulgation of the Replacement Rule. *See, e.g.,* Final Economic Analysis, Final Resource and Programmatic Analysis, and Waterkeeper Comments, Attachment 11. As a result, Defendants failed to ensure through consultation that their promulgation of the Replacement Rule will not jeopardize listed species or result in the destruction or adverse modification of their designated critical habitat. This violated both the procedural and substantive Section 7 requirements of the ESA.

### FIRST CLAIM FOR RELIEF
**The Corps' and the Assistant Secretary of the Army for Civil Works' Substantive Violations of NEPA and the APA With Regard to the Replacement Rule**
**Request for Declaratory and Injunctive Relief to Compel**
**Defendants to Comply with NEPA**

290.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

291.    NEPA regulations require that EAs include a "brief discussion[] of the need for the proposal, of alternatives as required by [NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

292.   NEPA regulations require that a FONSI "present[] the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13.

293.   NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

294.   The Corps' and the Assistant Secretary of the Army for Civil Works' promulgation of the Replacement Rule is a major Federal action significantly affecting the quality of the human environment because the Replacement Rule fundamentally alters the CWA's regulatory landscape and establishes regulatory exclusions from the protections of the CWA where none existed before.

295.   The Replacement Rule's effects on the environment are significant for the additional reasons that it affects the regulation of myriad activities in the proximity of "wetlands, wild and scenic rivers, or ecologically critical areas;" is "highly controversial;" establishes "a precedent for future actions with significant effects;" and may adversely affect numerous endangered and threatened species and their critical habitat. 40 C.F.R. § 1508.27(b)(3), (4), (6), (9).

296.   Despite the fact that the Corps and the Assistant Secretary of the Army for Civil Works were required to prepare an EIS to assess the impacts of the Replacement Rule, the Corps and the Assistant Secretary of the Army for Civil Works did not carry out any NEPA analysis whatsoever. The Corps' and the Assistant Secretary of the Army for Civil Works' decision not to comply with NEPA for the Replacement Rule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

297.   In the alternative, the Corps' and the Assistant Secretary of the Army for Civil Works' failure to prepare a NEPA analysis represents "agency action unlawfully withheld or unreasonably delayed" under the APA, 5 U.S.C. § 706(1).

//

//

//

//

AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

92

**SECOND CLAIM FOR RELIEF**
**Defendants' Substantive Violations of the APA**
**With Regard to the Replacement Rule**
**Request for Declaratory Relief Holding that Defendants' Replacement Rule Determination Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law and is in Excess of the Defendants' Statutory Authority and Vacatur of the Rule**

298.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

299.    As Plaintiffs and other commenters described in their comments, and this Amended Complaint explains above, in promulgating the Replacement Rule, Defendants relied on factors which Congress has not intended the Defendants to consider, entirely failed to consider an important aspect of the problem, offered an explanation for their decision that runs counter to the evidence before the Defendants, and based their decisions on reasons so implausible that they could not be ascribed to a difference in view or the product of agency expertise. Defendants' Replacement Rule is also contrary to the objective, goals, and dictates of the CWA.

300.    Defendants failed to provide a meaningful opportunity for comment on the Replacement Rule. Defendants also, *inter alia*, did not provide sufficient reasons for their policy and regulatory reversals; failed to support the Replacement Rule with substantial record evidence; did not address the facts and circumstances that underlay the prior "waters of the United States" definitions; left numerous inconsistencies between the 1970s Rule, the Clean Water Rule, the Repeal Rule, and the Replacement Rule unaddressed; failed to demonstrate that that the Replacement Rule was reasonable and a permissible construction of the CWA; did not provide a reasoned explanation for the lines drawn by or choices made in the Replacement Rule; did not consider alternatives; did not treat similar situations in a similar manner; and provided no reasonable criteria that can be used to differentiate between jurisdictional and non-jurisdictional waters.

301.    As a result, the Replacement Rule is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(A), (C).

//

### THIRD CLAIM FOR RELIEF
**Defendants' Procedural Violations of the APA**
**With Regard to the Replacement Rule**
**Request for Declaratory Relief Holding that Defendants Failed to Comply with the APA's Notice and Comment Requirements in Promulgating the Replacement Rule and Vacatur of the Rule**

302.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

303.    The APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register," and that the notice include "either the terms or substance of the proposed rule or a description of the subjects and issues involved[.]" 5 U.S.C. § 553(b), (b)(3).

304.    Once notice of a proposed rule has been given, an agency is required to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

305.    For the APA's notice requirements to be satisfied, a final rule need not be identical to the proposed rule, but it must at least be a "logical outgrowth" of the proposed rule. A final rule is a logical outgrowth of the proposed rule if "interested parties reasonably could have anticipated the final rulemaking" based on the proposed rule. *Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

306.    As this Amended Complaint explains above, multiple components of the Replacement Rule were neither included in nor a logical outgrowth of the Proposed Replacement Rule. In addition, Defendants' inclusion of many additional records in the rulemaking docket that were not even referenced in the Proposed Replacement Rule prevented Plaintiffs from providing meaningful input into the Replacement Rule.

307.    In addition, as this Amended Complaint explains, above, Defendants responded to some substantive comments, but not others.

308.    Defendants' failure to provide sufficient notice and comment opportunity on the Replacement Rule violated the APA, 5 U.S.C. § 553(b), (c), and this inadequate comment opportunity was without observance of procedures required by law. *Id*. § 706(2)(D).

//

1

2

3

**FOURTH CLAIM FOR RELIEF**
**Defendants' Procedural Violations of ESA Section 7(a)(2) with Regard to the Replacement Rule**
**Request for Declaratory and Injunctive Relief to Compel**
**Defendants to Comply with 16 U.S.C. § 1536(a)(2)**

4

5

309.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

6

7

8

9

310.    The ESA requires that federal agencies engage in interagency consultation under ESA section 7 to ensure that their agency actions are not likely to jeopardize the continued existence of endangered or threatened species or destroy or adversely modify those species' designated critical habitat. 16 U.S.C. § 1536(a)(2).

10

11

12

13

14

311.    Promulgation of the Replacement Rule is an "an action [that] may affect listed species or critical habitat" under ESA section 7(a)(2) and its implementing regulations, 50 C.F.R. § 402.02(b) (defining "the promulgation of regulations" as an action under the ESA), because it significantly reduces CWA protections for waters that are used as habitat for numerous ESA-listed species, thereby increasing the likelihood that such habitat will be destroyed and the species will be jeopardized.

15

16

312.    Defendants failed to consult with FWS and NMFS prior to the promulgation of the Replacement Rule, as required by ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.14.

17

18

19

20

313.    Defendants have thus violated these procedural requirements of the ESA and its implementing regulations by their ongoing failure to initiate and complete consultation with NMFS and FWS to ensure that the Replacement Rule, an action that may affect listed species and critical habitat, does not jeopardize the listed species or destroy or adversely modify their designated critical habitat.

21

22

23

**FIFTH CLAIM FOR RELIEF**
**Defendants' Substantive Violations of ESA Section 7(a)(2)**
**With Regard to the Replacement Rule**
**Request for Declaratory and Injunctive Relief to Compel**
**Defendants to Comply with 16 U.S.C. § 1536(a)(2)**

24

25

314.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

26

27

315.    The ESA requires that for any proposed action that may adversely affect a listed species, federal agencies have an independent ESA section 7(a)(2) substantive duty to ensure that any actions

authorized, funded, or carried out by the agencies are not likely to (1) jeopardize the continued existence of any threatened or endangered species or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).

316.    Defendants have violated their substantive ESA section 7(a)(2) duties by promulgating the Replacement Rule, which causes, facilitates, and exacerbates the destruction and/or adverse modification of critical habitat for listed species and which is also jeopardizing the continued existence of listed species. Defendants have failed to ensure that their actions do not have these effects in violation of the ESA. This applies to both Defendants' actions taken before engaging in consultation and to any actions taken after Defendants begin, but before they complete, consultation on promulgation of the Replacement Rule should they belatedly begin consultation.

## SIXTH CLAIM FOR RELIEF
**Defendants' Violations of ESA Section 7(d) With Regard to the Replacement Rule**
**Request for Declaratory and Injunctive Relief to Prevent Defendants from Committing**
**Resources Prior to Completion of Consultation in violation of 16 U.S.C. § 1536(d)**

317.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

318.    ESA section 7(d) prohibits Defendants from "mak[ing] any irreversible or irretrievable commitment of resources" that would "foreclos[e] the formulation or implementation of any reasonable and prudent alternative measures" after they have begun consultation. *See* 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09.

319.    If Defendants have belatedly begun, or do belatedly begin, to consult on the effects of their promulgation of the Replacement Rule, Defendants' ongoing activities implementing and supporting the Replacement Rule that harm ESA-listed species and/or their designated critical habitat before completing that consultation violate the requirements of the ESA by constituting an irreversible or irretrievable commitment of resources.

//

//

//

**SEVENTH CLAIM FOR RELIEF**
**The Corps' and the Assistant Secretary of the Army for Civil Works' Substantive Violations of NEPA and the APA With Regard to the Repeal Rule**
**Request for Declaratory and Injunctive Relief to Compel Defendants to Comply with NEPA**

320. Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

321. NEPA regulations require that EAs include a "brief discussion[] of the need for the proposal, of alternatives as required by [NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

322. NEPA regulations require that a FONSI "present[] the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13.

323. NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

324. The Corps' and the Assistant Secretary of the Army for Civil Works' promulgation of the Repeal Rule is a major Federal action significantly affecting the quality of the human environment because the Repeal Rule fundamentally alters the CWA's regulatory landscape and establishes regulatory exclusions from the protections of the CWA where none existed before.

325. The Repeal Rule's effects on the environment are significant for the additional reasons that it affects the regulation of myriad activities in the proximity of "wetlands, wild and scenic rivers, or ecologically critical areas;" is "highly controversial;" establishes "a precedent for future actions with significant effects;" and may adversely affect numerous endangered and threatened species and their critical habitat. 40 C.F.R. § 1508.27(b)(3), (4), (6), (9).

326. Despite the fact that the Corps and the Assistant Secretary of the Army for Civil Works should have prepared an EIS to assess the impacts of the Repeal Rule, the Corps and the Assistant Secretary of the Army for Civil Works did not carry out any NEPA analysis whatsoever. The Corps' and the Assistant Secretary of the Army for Civil Works' decision not to comply with NEPA for the Repeal

Rule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

327.     In the alternative, the Corps' and the Assistant Secretary of the Army for Civil Works' failure to prepare a NEPA analysis represents "agency action unlawfully withheld or unreasonably delayed" under the APA, 5 U.S.C. § 706(1).

**EIGHTH CLAIM FOR RELIEF**
**Defendants' Substantive Violations of the APA**
**With Regard to the Repeal Rule**
**Request for Declaratory Relief Holding that Defendants' Repeal Rule Determination Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law and is in Excess of the Defendants' Statutory Authority and Vacatur of the Rule**

328.     Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

329.     As Plaintiffs and other commenters described in their comments, and this Amended Complaint explains above, in promulgating the Repeal Rule, Defendants relied on factors which Congress has not intended the Defendants to consider, entirely failed to consider an important aspect of the problem, offered an explanation for their decision that runs counter to the evidence before the Defendants, and based their decisions on reasons so implausible that they could not be ascribed to a difference in view or the product of agency expertise. Defendants' Repeal Rule is also contrary to the objective, goals, and dictates of the CWA.

330.     Defendants failed to provide a meaningful opportunity for comment on the Repeal Rule. Defendants also, *inter alia*, did not provide sufficient reasons for their policy and regulatory reversals; failed to support the Repeal Rule with substantial record evidence; did not address the facts and circumstances that underlay the prior "waters of the United States" definitions; left numerous inconsistencies between the 1970s Rule, the Clean Water Rule, and the Repeal Rule unaddressed; failed to demonstrate that that the Repeal Rule was a reasonable and a permissible construction of the CWA; did not provide a reasoned explanation for the lines drawn by or choices made in the Repeal Rule; did not consider alternatives; did not treat similar situations in a similar manner; and provided no reasonable criteria that can be used to differentiate between jurisdictional and non-jurisdictional waters.

1    331.    As a result, the Repeal Rule is arbitrary and capricious, an abuse of discretion, and

2   otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants'

3   statutory authority. 5 U.S.C. § 706(2)(A), (C).

4                                   **NINTH CLAIM FOR RELIEF**
                          **Defendants' Procedural Violations of the APA**
5                              **With Regard to the Repeal Rule**
    **Request for Declaratory Relief Holding that Defendants Failed to Comply with the APA's Notice**
6   **and Comment Requirements in Promulgating the Repeal Rule and Vacatur of the Rule**

7    332.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and

8   all paragraphs of this Amended Complaint.

9    333.    The APA requires that "[g]eneral notice of proposed rule making shall be published in

10  the Federal Register," and that the notice include "either the terms or substance of the proposed rule or a

11  description of the subjects and issues involved[.]" 5 U.S.C. § 553(b), (b)(3).

12   334.    Once notice of a proposed rule has been given, an agency is required to "give interested

13  persons an opportunity to participate in the rule making through submission of written data, views, or

14  arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

15   335.    For the APA's notice requirements to be satisfied, a final rule need not be identical to the

16  proposed rule, but it must at least be a "logical outgrowth" of the proposed rule. A final rule is a logical

17  outgrowth of the proposed rule if "interested parties reasonably could have anticipated the final

18  rulemaking" based on the proposed rule. *Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th

19  Cir. 2002).

20   336.    As this Amended Complaint explains, above, multiple components of the Repeal Rule

21  were neither included in nor a logical outgrowth of the Proposed Repeal Rule. In addition, Defendants

22  expressly refused to consider the substance of the Repeal Rule and any substantive comments from the

23  public on the Repeal Rule. Defendants also failed to provide the public with meaningful description of

24  the actual "waters of the United States" definition that would apply under the Repeal Rule.

25   337.    In addition, as this Amended Complaint explains, above, Defendants responded to some

26  substantive comments, but not others.

27

338.     Defendants' failure to provide sufficient notice and comment opportunity on the Repeal Rule violated the APA, 5 U.S.C. § 553(b), (c), and this inadequate comment opportunity was without observance of procedures required by law. *Id*. § 706(2)(D).

### TENTH CLAIM FOR RELIEF
**Defendants' Procedural Violations of ESA Section 7(a)(2) with Regard to the Repeal Rule**
**Request for Declaratory and Injunctive Relief to Compel**
**Defendants to Comply with 16 U.S.C. § 1536(a)(2)**

339.     Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

340.     The ESA requires that federal agencies engage in interagency consultation under ESA section 7 to ensure that their agency actions are not likely to jeopardize the continued existence of endangered or threatened species or destroy or adversely modify those species' designated critical habitat. 16 U.S.C. § 1536(a)(2).

341.     Promulgation of the Repeal Rule is an "an action [that] may affect listed species or critical habitat" under ESA section 7(a)(2) and its implementing regulations, 50 C.F.R. § 402.02(b) (defining "the promulgation of regulations" as an action under the ESA), because it significantly reduces CWA protections for waters that are used as habitat for numerous ESA-listed species, thereby increasing the likelihood that such habitat will be destroyed or adversely modified and the species will be jeopardized.

342.     Defendants failed to consult with FWS and NMFS prior to the promulgation of the Repeal Rule, as required by ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.14.

343.     Defendants have thus violated these procedural requirements of the ESA and its implementing regulations by their ongoing failure to initiate and complete consultation with NMFS and FWS to ensure that the Repeal Rule, an action that may affect listed species and critical habitat, does not jeopardize the listed species or destroy or adversely modify their designated critical habitat.

//

//

//

### ELEVENTH CLAIM FOR RELIEF
**Defendants' Substantive Violations of ESA Section 7(a)(2)
With Regard to the Repeal Rule
Request for Declaratory and Injunctive Relief to Compel
Defendants to Comply with 16 U.S.C. § 1536(a)(2)**

344.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

345.    The ESA requires that for any proposed action that may adversely affect a listed species, federal agencies have an independent ESA section 7(a)(2) substantive duty to ensure that any actions authorized, funded, or carried out by the agencies are not likely to (1) jeopardize the continued existence of any threatened or endangered species or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).

346.    Defendants have violated their substantive ESA section 7(a)(2) duties by promulgating the Repeal Rule, which causes, facilitates, and exacerbates the destruction and/or adverse modification of critical habitat for listed species and which is also jeopardizing the continued existence of listed species. Defendants have failed to ensure that their actions do not have these effects in violation of the ESA. This applies to both Defendants' actions taken before engaging in consultation and to any actions taken after Defendants begin, but before they complete, consultation on promulgation of the Repeal Rule should they belatedly begin consultation.

### TWELFTH CLAIM FOR RELIEF
**Defendants' Violations of ESA Section 7(d) With Regard to the Repeal Rule
Request for Declaratory and Injunctive Relief to Prevent Defendants from Committing
Resources Prior to Completion of Consultation in violation of 16 U.S.C. § 1536(d)**

347.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

348.    ESA section 7(d) prohibits Defendants from "mak[ing] any irreversible or irretrievable commitment of resources" that would "foreclos[e] the formulation or implementation of any reasonable and prudent alternative measures" after they have begun consultation. *See* 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09.

349.    If Defendants have belatedly begun, or do belatedly begin, to consult on the effects of their promulgation of the Repeal Rule, Defendants' ongoing activities implementing and supporting the Repeal Rule that harm ESA-listed species and/or their designated critical habitat before completing that consultation violate the requirements of the ESA by constituting an irreversible or irretrievable commitment of resources.

**THIRTEENTH CLAIM FOR RELIEF**
**Clean Water Rule: Violations of the NEPA and the APA**

350.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

351.    NEPA regulations require that EAs include a "brief discussions of the need for the proposal, of alternatives as required by [NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

352.    NEPA regulations require that a FONSI "present[] the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13.

353.    NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

354.    Defendants' promulgation of the Clean Water Rule is a major Federal action significantly affecting the quality of the human environment because the Clean Water Rule fundamentally alters the CWA's regulatory landscape and establishes regulatory exclusions from the protections of the CWA where none existed before.

355.    The Clean Water Rule's effects on the environment are significant for the additional reasons that it affects the regulation of myriad activities in the proximity of "wetlands, wild and scenic rivers, or ecologically critical areas;" is "highly controversial;" establishes "a precedent for future actions with significant effects;" and may adversely affect numerous endangered species or their critical habitat. 40 C.F.R. § 1508.27(b)(3), (4), (6), (9).

356.    The Corps' EA and FONSI were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), for at least the following reasons:

    (a) The FONSI was based upon the incorrect assumption in the EA that the Clean Water Rule would increase jurisdictional determinations from 2.84 percent to 4.65 percent relative to recent agency practice, when in fact the Clean Water Rule is likely to lead to a net decrease in jurisdictional determinations of up to 10 percent;

    (b) The FONSI was based largely upon the Final Economic Analysis of the Clean Water Rule, which in turn was based upon flawed, incomplete, or selectively-chosen data regarding waters found to be jurisdictional under current agency practice;

    (c) The FONSI was reached without any consideration in the EA of several last-minute changes to the Clean Water Rule, including the exclusion of farmed wetlands from the definition of "adjacent" and the 4,000-foot distance limitation on the application of the case-by-case significant nexus analysis.

357.    Moreover, the Corps' decision not to prepare an EIS for the Clean Water Rule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), because the Corps failed to take a "hard look" at the potential environmental impacts of the Clean Water Rule and failed to provide a convincing statement of reasons why the potential effects of the Clean Water Rule are insignificant.

### FOURTEENTH CLAIM FOR RELIEF
### Clean Water Rule: Violation of the APA
### Failure to Provide Sufficient Notice and Comment Opportunities

358.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

359.    The APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register," and that the notice include "either the terms or substance of the proposed rule or a description of the subjects and issues involved[.]" 5 U.S.C. § 553(b), (b)(3).

360.    Once notice of a proposed rule has been given, an agency is required to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

361.    For the APA's notice requirements to be satisfied, a final rule need not be identical to the proposed rule, but it must at least be a "logical outgrowth" of the proposed rule. A final rule is a logical outgrowth of the proposed rule if "interested parties reasonably could have anticipated the final rulemaking" based on the proposed rule. *Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

362.    Multiple components of the Clean Water Rule were neither included in nor a logical outgrowth of the Proposed Rule, including at least the following:

(A) The definition of "adjacent," which states that "[w]aters being used for established normal farming, ranching, and silviculture activities (33 U.S.C. 1344(f)) are not adjacent." *See, e.g.,* 80 Fed. Reg. at 37,105;

(B) The 4,000-foot distance limit on the application of the significant nexus test included in subsection (a)(8) of the Clean Water Rule. *See, e.g.,* 80 Fed. Reg. at 37,105;

(C) The *per se* exclusion of three categories of ditches from CWA jurisdiction. See, e.g., 80 Fed. Reg. at 37,105;

(D) The *per se* exclusion of "[e]rosional features, including . . . other ephemeral features that do not meet the definition of tributary." *See, e.g.,* 80 Fed. Reg. at 37,058, 37,099;

(E) The suspension of the last sentence in the waste treatment system exclusion. *See, e.g.,* 80 Fed. Reg. at 37,097.

363.    In addition, Defendants responded to some substantive comments on the scope of the waste treatment exclusion system, but not others.

364.    Defendants' failure to provide sufficient notice and comment opportunities on these components of the Clean Water Rule violated the APA, 5 U.S.C. § 553(b), (b)(3), (c), and Defendants' inclusion of these components in the Clean Water Rule was without observance of the procedures required by law. *Id.* § 706(2)(D).

### FIFTEENTH CLAIM FOR RELIEF
### Clean Water Rule: Violations of the APA
### Definition of "Tributary"

365.     Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

366.     In the Clean Water Rule, Defendants defined "tributary" as "a water that contributes flow, either directly or through another water" to a traditional navigable water, interstate water, or territorial seas, and "that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark." 80 Fed. Reg. at 37,105.

367.     Defendants' requirement that waters must have both bed and banks and an ordinary high water mark in order to meet the definition of "tributary" and therefore be jurisdictional under the CWA lacks scientific basis and is contrary to the recommendations of EPA's own SAB.

368.     Defendants' requirement that tributaries must have both bed and banks and an ordinary high water mark in order to be jurisdictional under the CWA is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(A), (C).

### SIXTEENTH CLAIM FOR RELIEF
### Clean Water Rule: Violation of the APA
### Exclusion of Ditches and Ephemeral Features from CWA Jurisdiction

369.     Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

370.     In the Clean Water Rule, Defendants defined waters of the United States to exclude "[d]itches with ephemeral flow that are not a relocated tributary or excavated in a tributary"; "[d]itches with intermittent flow that are not a relocated tributary, excavated in a tributary, or drain wetlands"; "[d]itches that do not flow, either directly or through another water, into a water identified in paragraphs (a)(1) through (3) of this section"; and "[e]rosional features, including . . . other ephemeral features that do not meet the definition of tributary." 80 Fed. Reg. at 37,105.

371.     There is no legal or scientific basis for *per se* excluding these categories of waters from CWA jurisdiction.

372.    At a minimum, to the extent that these types of waters, either alone or in combination with other waters similarly situated, possess a significant nexus with traditional navigable waters, interstate waters, or the territorial seas, they are "waters of the United States" and therefore must be subject to the CWA's protections. *See Rapanos*, 547 U.S. at 780.

373.    The *per se* exclusion of these three categories of ditches and ephemeral streams from CWA jurisdiction is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(A), (C).

<u>SEVENTEENTH CLAIM FOR RELIEF</u>
**Clean Water Rule: Violation of the APA**
**Exclusion of Waters More than 4,000 Feet Beyond the High Tide Line or Ordinary High Water Mark of Qualifying Waters from CWA Jurisdiction**

374.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

375.    In the Clean Water Rule, Defendants defined waters of the United States to include "all waters located within 4,000 feet of the high tide line or ordinary high water mark of" a qualifying *per se* jurisdiction water "where they are determined on a case-specific basis to have a significant nexus" with a traditional navigable water, an interstate waters, or a territorial sea. 80 Fed. Reg. at 37,114.

376.    There is no legal or scientific basis for automatically excluding from CWA jurisdiction all waters more than 4,000 feet from a qualifying *per se* jurisdictional water.

377.    At a minimum, to the extent that waters located more than 4,000 feet of the high tide line or ordinary high water mark of a qualifying *per se* jurisdiction water, either alone or in combination with other waters similarly situated, possess a significant nexus with traditional navigable waters, interstate waters, or the territorial seas, they are "waters of the United States" and therefore must be subject to the CWA's protections. *See Rapanos*, 547 U.S. at 780.

378.    The automatic exclusion from CWA jurisdiction of all waters more than 4,000 feet from a qualifying *per se* jurisdictional water is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(A), (C).

AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

### EIGHTEENTH CLAIM FOR RELIEF
### Clean Water Rule: Violation of the APA
### Exclusion of Waters in Which 404(f) Activities Occur from the Definition of "Adjacent"

379.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

380.    The Clean Water Rule defines "adjacent" in a manner that excludes "[w]aters being used for established normal farming, ranching, and silviculture activities[.]" *See* 80 Fed. Reg. at 37,080, 37,118. In the Clean Water Rule, Defendants cite CWA section 404(f), 33 U.S.C. § 1344(f).

381.    By defining "adjacent" in this manner in the Clean Water Rule, Defendants changed their long-standing policy regarding their treatment of adjacent farmed wetlands without any legal, scientific, or technical justification or support for the change.

382.    Moreover, Defendants' exclusion of waters in which established normal farming, ranching, and silviculture activities occur from the definition of "adjacent" is inconsistent with CWA section 404(f)(1)(A); that provision creates a limited permitting exemption for discharges of dredged or fill material only that result from "normal farming, silviculture, and ranching acvities[.]" 33 U.S.C. § 1344(f)(1)(A). That permitting exemption does not affect the jurisdictional status of the waters into which the exempted discharges occur.

383.    Defendants' definition of "adjacent" in the Clean Water Rule is thus arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(A), (C).

### NINETEENTH CLAIM FOR RELIEF
### Clean Water Rule: Violation of the APA
### Exclusion of Waste Treatment Systems from CWA Jurisdiction

384.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

385.    The Clean Water Rule excludes "waste treatment systems" from the definition of waters of the United States, even where such systems would otherwise be jurisdictional as impoundments, tributaries, adjacent waters, or waters with a significant nexus to traditional navigable waters, interstate waters, or the territorial seas. 80 Fed. Reg. at 37,114; 40 C.F.R. § 122.2.

386.    This waste treatment system exclusion is not limited to man-made bodies of water, and indeed Defendants expressly continued the suspension of such a limitation in the Clean Water Rule. Thus, the exclusion on its face applies equally to naturally occurring waters (such as adjacent waters, tributaries, or ponds) and impoundments that have been determined to be a "waste treatment system," or part of such a system.

387.    To the extent the waste treatment system exclusion applies to waters (such as adjacent wetlands or permanently flowing tributaries) that are unambiguously "waters of the United States", the exclusion is contrary to the CWA.

388.    There is no rational scientific or technical reason to exclude waters such as adjacent wetlands, tributaries, or impoundments from the definition of waters of the United States simply because they are part of a waste treatment systems. In fact, Defendants' own conclusions are that such waters can "significantly affect the chemical, physical, or biological integrity of" downstream traditional navigable waters, interstate waters, and the territorial seas. 80 Fed. Reg. at 37,068, 37,075.

389.    The waste treatment system exclusion in the Clean Water Rule is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(A), (C).

**TWENTIETH CLAIM FOR RELIEF**
**Clean Water Rule: Violation of the APA**
**Abandonment of CWA Jurisdiction over "Other Waters"**

390.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

391.    Unlike Defendants' prior definition of waters of the United States, the Clean Water Rule does not assert jurisdiction over other waters "the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce." Instead, Defendants limit themselves in large part to waters that have a significant nexus to traditionally navigable waters.

392.    Defendants' only stated basis for abandoning CWA jurisdiction for other waters that may lack a significant nexus and yet which have other impacts on interstate commerce is a misreading of the

Supreme Court's decision in *SWANCC*. As such, Defendants have failed to supply a valid reason for their major shift in their interpretation of the CWA.

393.    Further, Defendants' failure to assert jurisdiction over waters long protected on the basis of their interstate commerce impacts unrelated to navigation is contrary to the language and purpose of CWA and Congress' intent that waters be protected to the fullest extent allowed by the commerce clause.

394.    To the extent it fails to assert jurisdiction over "other waters" that were previously protected on the basis of interstate commerce impacts unrelated to navigation, the Clean Water Rule is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(A), (C).

**TWENTY-FIRST CLAIM FOR RELIEF**
**Clean Water Rule: Violation of the ESA**

395.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Amended Complaint.

396.    Promulgation of the Clean Water Rule is an "an action [that] may affect listed species or critical habitat" under section 7(a)(2) of the ESA and its implementing regulations, 50 C.F.R. § 402.02(b), because, *inter alia*, it significantly reduces CWA protections for waters such as intermittent and ephemeral streams, ditches, wetlands, and groundwater that are used as habitat for numerous ESA-listed species, thereby increasing the likelihood that such habitat will be destroyed and the species will be harmed.

397.    Defendants failed to consult with the Services to prepare a Biological Opinion prior to the promulgation of the Clean Water Rule, as required by ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.14.

398.    Defendants failed to "insure" that promulgation of the Clean Water Rule "is not likely to jeopardize the continued existence of" any threatened or endangered species or "the destruction or adverse modification" of critical habitat, in violation of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2).

399.    The ESA violations set forth above will continue until they are abated by an order of this Court. This Court has jurisdiction to enjoin Defendants' violations of the ESA alleged above and such relief is warranted under 16 U.S.C. § 1540(g).

## PRAYER FOR RELIEF

WHEREFORE, EcoRights seeks the following relief:

A.  Declare that the Corps and the Assistant Secretary of the Army for Civil Works violated NEPA and the APA when they promulgated the Replacement Rule without completing a NEPA analysis;

B.  Declare that Defendants' issuance of the Replacement Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and is in excess of the Defendants' statutory authority;

C.  Declare that Defendants' promulgation of the Replacement Rule failed to comply with the APA's procedural requirements;

D.  Declare that Defendants violated the ESA's procedural requirements by failing to consult with NMFS and FWS as to the Replacement Rule's effects on ESA-listed species and their designated critical habitat;

E.  Declare that Defendants violated the ESA's substantive requirements by failing to ensure that the Replacement Rule is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of their critical habitat;

F.  Declare, should Defendants begin consultation, that Defendants have violated the ESA by irreversibly or irretrievably committing their resources by leaving the Replacement Rule in place and implementing the Replacement Rule during the pendency of consultation;

G.  Vacate the Replacement Rule;

H.  Issue an injunction requiring Defendants to comply with NEPA, the ESA, and the APA before promulgating new regulations, if any, that would serve as a replacement to the Replacement Rule;

I.  Issue an injunction prohibiting Defendants from taking actions that represent an irreversible or irretrievable commitment of resources during the pendency of consultation on any new regulations, if any, that would serve as a replacement to the Replacement Rule;

J.  Declare that the Corps and the Assistant Secretary of the Army for Civil Works violated NEPA and the APA when they promulgated the Repeal Rule without completing a NEPA analysis;

K.  Declare that Defendants' issuance of the Repeal Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and is in excess of the Defendants' statutory authority;

L.  Declare that Defendants' promulgation of the Repeal Rule failed to comply with the APA's procedural requirements;

M.  Declare that Defendants violated the ESA's procedural requirements by failing to consult with NMFS and FWS as to the Repeal Rule's effects on ESA-listed species and their designated critical habitat;

N.  Declare that Defendants violated the ESA's substantive requirements by failing to ensure that the Repeal Rule is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of their critical habitat;

O.  Declare, should Defendants begin consultation, that Defendants have violated the ESA by irreversibly or irretrievably committing their resources by leaving the Repeal Rule in place and implementing the Repeal Rule during the pendency of consultation;

P.  Vacate the Repeal Rule;

Q.  Issue an injunction requiring Defendants to comply with NEPA, the ESA, and the APA before promulgating new regulations, if any, that would serve as a replacement to the Repeal Rule;

R.  Issue an injunction prohibiting Defendants from taking actions that represent an irreversible or irretrievable commitment of resources during the pendency of consultation on any new regulations, if any, that would serve as a replacement to the Repeal Rule;

S.  Declare that the Corps' issuance of the FONSI prepared along with the Clean Water Rule was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

T.  Declare that portions of the Clean Water Rule are unlawful because they are arbitrary, capricious, an abuse of discretion, not in accordance with law, or in excess of Defendants' statutory authority;

U.  Declare that portions of the Clean Water Rule are unlawful because they were promulgated without observance of procedure required by law;

V.  Enter an order vacating the Corps' FONSI and instructing the Corps to comply with NEPA and the ESA for the Clean Water Rule;

W.  Enter an order vacating only those unlawful portions of the Clean Water Rule, leaving the remainder of the Rule in place;

X.  Award Plaintiffs their attorneys' fees and costs; and

Y.  Issue any other relief, including injunctive relief, which this Court deems necessary, just, or proper or relief that Plaintiffs may subsequently request.

**DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

Based on Plaintiffs' knowledge to date, pursuant to Civil Local Rule 7.1, the undersigned certifies that, as of this date, other than the named parties, there is no such interest to report.

Dated: December 22, 2020                    Respectfully submitted,


By:     _____
        Christopher Sproul
        *Attorney for Plaintiffs*