Christopher Sproul (State Bar No. 126398)
Stuart Wilcox (State Bar No.  327726)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Emails:  csproul@enviroadvocates.com
wilcox@enviroadvocates.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WATERKEEPER ALLIANCE, INC.; HUMBOLDT BAYKEEPER, a program of Northcoast Environmental Center; LAKE WORTH WATERKEEPER; MISSOURI CONFLUENCE WATERKEEPER; MONTERREY COASTKEEPER, a program of The Otter Project, Inc.; RIO GRANDE WATERKEEPER, a program of WildEarth Guardians; RUSSIAN RIVERKEEPER; SNAKE RIVER WATERKEEPER, INC.; SOUND RIVERS, INC.; UPPER MISSOURI WATERKEEPER, INC.; TURTLE ISLAND RESTORATION NETWORK; WILDEARTH GUARDIANS; ECOLOGICAL RIGHTS FOUNDATION, <br><br>            Plaintiffs, <br><br>        v. <br><br> MICHAEL REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. ENVIRONMENTAL PROTECTION AGENCY; TAYLOR N. FERRELL, in his official capacity as Assistant Secretary of the Army for Civil Works; and U.S. ARMY CORPS OF ENGINEERS, <br><br>            Defendants. | Civil Case No. 18-cv-3521 <br><br> **PLAINTIFFS' PARTIAL OPPOSITION TO DEFENDANTS' MOTION FOR REMAND WITHOUT VACATUR** <br><br> Date: July 29, 2021 <br> Time: 1:30 pm <br> Dept: San Francisco Courthouse, <br> Courtroom 3 – 17th Floor <br> Judge: Honorable Richard Seeborg <br><br> Action Filed: June 13, 2018 <br> Amended Complaint Filed: Dec. 23, 2020 |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

STANDARD OF REVIEW .............................................................................................3

ARGUMENT ..................................................................................................................5

    I.      EPA Has Admitted Serious Errors in the NWPR and in the Process By Which the NWPR was Promulgated That Weigh in Favor of Vacatur .................................6

    II.     EPA Has Not Identified Any Disruptive Consequences of Vacatur, Much Less Consequences Disruptive Enough to Outweigh the Serious Errors in the NWPR .............10

    III.    The Court Should Vacate the NWPR Because Retaining the NWPR During Remand Will Cause Serious Environmental Harm and Prejudice Waterkeeper ...........................11

        A.      EPA Has Admitted that the NWPR Has Caused and Will Cause Serious Environmental Harm.........................................................................................12

        B.      The NWPR Has Caused and Will Cause Serious Harm to Waterkeeper ...............14

        C.      Failing to Vacate the NWPR Would Effectively Indefinitely Stay This Litigation Without Offering Waterkeeper Any Relief From Their Ongoing Injuries ...............................................................................................................16

        D.      EPA Has Failed to Allege Any Competing Harm that Vacatur Would Cause.......19

    IV.    The Fundamental Failures of the NWPR, and EPA's Stated Intention to Abandon the NWPR on Remand, Support Vacating the NWPR .........................................................21

CONCLUSION...............................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. Civ. Aeronautics Bd.*,

    713 F.2d 795 (D.C. Cir. 1983) ...................................................................................11

*All. for the Wild Rockies v. U.S. Forest Serv.*,

    907 F.3d 1105 (9th Cir. 2018) ....................................................................................3

*Allina Health Servs. v. Sibelius*,

    746 F.3d 1102 (D.C. Cir. 2014) ..................................................................................4

*Alsea Valley All. v. DOC*,

    358 F.3d 1181 (9th Cir. 2004) ....................................................................................3

*Am. Forest Res. Council v. Ashe*,

    946 F. Supp. 2d 1 (D.D.C. 2013) .............................................................................11

*ASSE Int'l, Inc. v. Kerry*,

    182 F. Supp. 3d 1059 (C.D. Cal. 2016)..................................................................4, 10

*Bldg. Indus. Legal Def. Found. v. Norton*,

    231 F. Supp. 2d 100 (D.D.C. 2002) .........................................................................10

*Burke v. Coggins*,

    No. 20-667, 2021 U.S. Dist. LEXIS 29999 (D.D.C. Feb. 18, 2021) .......................11

*Cal. Cmtys. Against Toxics v. EPA*,

    688 F.3d 989 (9th Cir. 2012) ......................................................................................4

*Camp v. Pitts*,

    411 U.S. 138 (1973).....................................................................................................4

*Ctr. for Biological Diversity v. BLM*,

    698 F.3d 1101 (9th Cir. 2012) ..................................................................................12

*Ctr. for Envtl. Health v. Vilsack*,

    No. 15-01690, 2016 U.S. Dist. LEXIS 79984 (N.D. Cal. June 20, 2016)................4

*Ctr. for Native Ecosystems v. Salazar,*

    795 F. Supp. 2d 1236 (D. Colo. 2011)................................................................5, 10

*Chlorine Chemistry Council v. EPA,*

    206 F.3d 1286 (D.C. Cir. 2000)...........................................................................17

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*

    789 F.3d 1075 (9th Cir. 2015)............................................................................18

*Cty. of Maui v. Haw. Wildlife Fund,*

    140 S. Ct. 1462 (2020)....................................................................................1, 7

*Curtis v. Loether,*

    415 U.S. 189 (1974).........................................................................................4

*Dubois v. U.S. Dep't of Agric.,*

    102 F.3d 1273 (1st Cir. 1996)............................................................................18

*EPA v. Cal. ex rel. State Water Resources Control Bd.,*

    426 U.S. 200 (1976).........................................................................................1

*EPA v. National Crushed Stone,*

    449 U.S. 64 (1980).........................................................................................20

*Farmworker Ass'n of Fla. v. EPA,*

    No. 21-1079, 2021 U.S. App. LEXIS 16882 (D.C. Cir. June 7, 2021) .............................5, 17

*Great Basin Res. Watch v. BLM,*

    844 F.3d 1095 (9th Cir. 2016) ...........................................................................12

*Gresham v. Azar,*

    950 F.3d 93 (D.C. Cir. 2020)...............................................................................8

*Hoeun Yong v. INS,*

    208 F.3d 1116 (9th Cir. 2000) ...........................................................................18

*Idaho Farm Bureau Fed'n v. Babbitt,*

    58 F.3d 1392 (9th Cir. 1995) ..........................................................................4, 11

*In re EPA,*

    803 F.3d 804 (6th Cir. 2015) ...................................................................................11

*In the Matter of: NPDES for City of Fayetteville,*

    1988 EPA App. LEXIS 35; 2 E.A.D. 594 (June 28, 1988) ....................................20

*Int'l Paper Co. v. Ouellette,*

    479 U.S. 481 (1987)..................................................................................................2

*Klamath Siskiyou Wildlands Ctr. v. Grantham,*

    642 F. App'x 742 (9th Cir. 2016) ........................................................................11

*Leyva v. Certified Grocers of Cal., Ltd.,*

    593 F.2d 857 (9th Cir. 1979) ...............................................................................18

*Metcalf v. Daley,*

    214 F.3d 1135 (9th Cir. 2000) .............................................................................21

*Monsanto Co. v. Geertson Seed Farms,*

    561 U.S. 139 (2010).............................................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.,*

    463 U.S. 29 (1983)..............................................................................................10

*Nat'l Family Farm Coal. v. EPA,*

    960 F.3d 1120 (9th Cir.  2020) ...........................................................................16

*NRDC v. EPA,*

    489 F.3d 1250 (D.C. Cir. 2007)...........................................................................17

*NRDC v. EPA,*

    822 F.2d 104 (D.C. Cir. 1987).............................................................................20

*Pacific Rivers Council v. U.S. Forest Serv.,*

    942 F. Supp. 2d 1014 (E.D. Cal. 2013).................................................................12

*Pollinator Stewardship Council v. EPA,*

    806 F.3d 520 (9th Cir. 2015) ...................................................................... *passim*

*Tenn. Valley Auth. v. Hill,*

    437 U.S. 153 (1978)...........................................................................................18

*Tex. Mun. Power Agency v. Adm'r of EPA,*

    836 F.2d 1482 (5th Cir. 1988) .........................................................................18

*Util. Solid Waste Activities Grp. v. EPA,*

    901 F.3d 414 (D.C. Cir. 2018) ...................................................................16, 17


**Statutes**

5 U.S.C. § 706(2)(A)...............................................................................................4

33 U.S.C. §§ 1251, *et seq.*,.....................................................................................1

33 U.S.C. § 1251(a) .................................................................................................8

42 U.S.C. § 4331(a) ...............................................................................................18


**Regulations**

33 C.F.R. § 328.3 (2015) .........................................................................................2

40 C.F.R. § 122.2 (2015) .........................................................................................2


**Other Authorities**

Black's Law Dictionary (10th ed. 2014)..................................................................4

L.R. Civ 7-3 ............................................................................................................5

85 Fed. Reg. 22250 (April 21, 2020)......................................................................1

86 Fed. Reg. 7037 (Jan. 25, 2021) .........................................................................3

**INTRODUCTION**

Defendants (collectively "EPA") ask this Court to remand their 2020 Navigable Waters Protection Rule ("NWPR")[1] without vacatur and to dismiss Plaintiffs' (collectively "Waterkeeper's") claims challenging the NWPR. However, EPA has confessed that the NWPR is plagued with legal error; is causing significant, actual environmental harm to the nation's waters; and that this harm will continue so long as the NWPR is in place. EPA's briefing focuses only on whether remand is appropriate and provides no reasoning as to why the NWPR should not be vacated or as to why Waterkeeper's claims related to the NWPR should be dismissed. In fact, EPA does not even say that it opposes vacatur, only that it is "not including a request for vacatur" as part of its motion.

While Waterkeeper supports EPA's request for remand, Waterkeeper maintains that the NWPR must be vacated if it is remanded. Vacatur would restore the pre-2015 regulatory definition of "waters of the United States." The pre-2015 regulatory definition was consistent with the Federal Water Pollution Control Act of 1972, 33 U.S.C. §§ 1251, *et seq.*, commonly known as the Clean Water Act ("CWA") and was in place and provided significantly better protections than the NWPR, including for ephemeral waters and wetlands, for nearly four decades. Remanding and vacating the NWPR will restore these longstanding protections and immediately begin to address the significant, ongoing harms to the Nation's waters and the people, ecosystems, businesses, and endangered and threatened species that depend upon them.

If the Court grants vacatur, Waterkeeper would voluntarily dismiss its claims related to the NWPR. However, if the NWPR is not vacated, it would be an abuse of discretion to dismiss Waterkeeper's claims where Waterkeeper has received no relief and no challenged issues regarding the illegality of the NWPR have in fact been resolved. This outcome would force Waterkeeper to continue experiencing serious harm from the NWPR, harm that EPA itself admits is occurring, while also depriving Waterkeeper of access to the courts to seek to remedy that harm.

---

[1] Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22250 (April 21, 2020).

1

**BACKGROUND**

2     Congress passed the CWA, with a singular objective – "restore and maintain the chemical,

3 physical, and biological integrity of the Nation's waters" – and it intended to achieve that objective,

4 primarily by regulating pollution at its source. *Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462,

5 1473 (2020) (citing *EPA v. Cal. ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 202-04

6 (1976)). The CWA, as a result, has long been recognized as "an all-encompassing program of water

7 pollution regulation" that "applies to all point sources and virtually all bodies of water." *Int'l Paper Co.*

8 *v. Ouellette*, 479 U.S. 481, 492 (1987) (internal quotations omitted).

9     Consistent with the objectives of the CWA, for more than four decades, EPA's regulatory

10 definitions of "waters of the United States" broadly protected traditionally navigable waters; territorial

11 seas; interstate waters; other waters, including intrastate lakes, rivers, streams, wetlands, and other

12 waters where their use or destruction could affect interstate commerce; and impoundments of and

13 tributaries to other waters of the United States, and wetlands adjacent to any of these waters (excluding

14 other wetlands). *See, e.g.,* 40 C.F.R. § 122.2 (2015); 33 C.F.R. § 328.3 (2015) (hereinafter the "Pre-2015

15 Regulatory Definition" of "waters of the United States"). Starting in 2015, EPA initiated a series of

16 rulemaking actions to redefine "waters of the United States," culminating in the NWPR. The NWPR

17 radically redefines "waters of the United States" under the CWA in manner that is contrary to the

18 objective of the CWA and the scientific information in the administrative record. The NWPR strips

19 protections against uncontrolled industrial, municipal, agricultural, and other pollution discharges into

20 many, and in some parts of the country nearly all, rivers, streams, lakes, ponds, wetlands, and other

21 waters. *See* Declaration of Radhika Fox, Dkt. 110-1 ("Fox Dec.") ¶¶ 8, 10, 14-20; Declaration of Jaime

22 A. Pinkham, Dkt. 110-2 ("Pinkham Dec.") ¶¶ 8, 10, 14-20; Declaration of Daniel E. Estrin in Support of

23 Plaintiffs' Partial Opposition to Defendants' Motion for Remand Without Vacatur ("Estrin Dec.") ¶¶ 12,

24 17-22. On December 23, 2020 Waterkeeper filed its Amended Complaint challenging the NWPR, and

25 the prior regulatory changes that displaced the Pre-2015 Regulatory Definition. *See* Dkt. 93.

26

27

---

In June of 2021, EPA presented that it had "carefully reassessed" the administrative record and the legal and scientific basis for the NWPR under Executive Order No. 13990.[2] EPA's review identified "substantial concerns about the lawfulness of aspects of the NWPR and the harmful effects of the NWPR on the nation's waters." Fox Dec. ¶ 8; Pinkham Dec. ¶ 8. Accordingly, EPA announced on June 9, 2021 that it was seeking remand of the NWPR and that, at some unknown time in the future, it intends to "initiate a new rulemaking process that restores the protections in place prior to the 2015 WOTUS implementation," and later "anticipates developing a new rule that defines [water of the United States]...." U.S. EPA, "News Releases from Headquarters › Water (OW) EPA, Army Announce Intent to Revise Definition of WOTUS," ("EPA Press Release"), attached hereto as Exhibit 5 to the Estrin Dec. at 2.

In its announcement, EPA noted that a "broad array of stakeholders – including states, Tribes, local governments, scientist, and non-governmental organizations – are seeing *destructive impacts to critical water bodies* under the [NWPR]" and EPA Administrator Regan was quoted as saying that EPA had "determined that [the NWPR] is leading to *significant environmental degradation." Id.* at 1 (emphasis added). Following the June 9, 2021 announcement, EPA filed its motion for remand without vacatur in this case on June 22, 2021. Notably, granting EPA's motion without the addition of vacatur would leave the harmful NWPR in place during the indefinite, and likely long, remand period and would provide no interim protections to waters of the United States.

## STANDARD OF REVIEW

The default rule is that vacatur accompanies remand. *See, e.g., All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018) (citing *Alsea Valley All. v. DOC*, 358 F.3d 1181, 1185 (9th Cir. 2004)). Longstanding Ninth Circuit precedent makes clear that remand without vacatur is appropriate only in "limited circumstances," and the courts should only leave an invalid rule in place during remand "when equity demands." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th

---

[2] "Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." 86 Fed. Reg. 7037 (Jan. 25, 2021) ("EO 13990").

Cir. 2015) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)); *see also, e.g.,* 5 U.S.C. § 706(2)(A) (providing that "set[ting] aside," in other words vacating, agency action that violates the Administrative Procedure Act ("APA") is the presumptive remedy under the APA); Black's Law Dictionary (10th ed. 2014) (defining vacatur as "[t]he act of annulling or *setting aside*.") (emphasis added); *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (explaining that if an agency's decision "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [the agency] for further consideration.").

Because vacatur is the presumptive statutory remedy under the APA, any departure from that presumptive remedy would be a form of equitable relief to the agency that has acted unlawfully. *See Ctr. for Envtl. Health v. Vilsack*, No. 15-01690, 2016 U.S. Dist. LEXIS 79984, at *41 (N.D. Cal. June 20, 2016) (explaining that it is "Defendants' burden to show that vacatur is unwarranted."); *Curtis v. Loether*, 415 U.S. 189, 194–97 (1974) (distinguishing "legal rights and remedies" created by statute from "equitable relief"). The burden thus is on the defendant agency to show why "equity demands" anything less than vacatur of the unlawful agency action. *See Allina Health Servs. v. Sibelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (evaluating and rejecting government arguments that vacatur was inappropriate); *Vilsack*, 2016 U.S. Dist. LEXIS 79984, at *41 ("given that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted").

In determining whether to vacate an agency rule, the Ninth Circuit has directed courts to consider (1) the seriousness of the agency's errors; (2) to weigh the seriousness of the agency's errors against "the disruptive consequences of an interim change that may itself be changed"; (3) to consider "whether vacating a faulty rule could result in possible environmental harm, and … leave a rule in place when vacating would risk such harm"; and (4) to consider whether "fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *See, e.g., Pollinator Stewardship Council*, 806 F.3d at 532 (citations omitted). Courts apply the same approach in deciding whether  to vacate a voluntarily remanded rule. *See ASSE Int'l, Inc. v. Kerry*, 182 F. Supp. 3d 1059,

1064 (C.D. Cal. 2016) ("Courts faced with a motion for voluntary remand employ the same equitable analysis courts use to decide whether to vacate agency action after a ruling on the merits.") (internal punctuation and citation omitted); *see also Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1242-43 (D. Colo. 2011) (applying general vacatur standard in deciding to vacate a voluntarily remanded action); *Farmworker Ass'n of Fla. v. EPA*, No. 21-1079, 2021 U.S. App. LEXIS 16882, at *2-3 (D.C. Cir. June 7, 2021). Each factor in the analysis favors vacatur here.

## ARGUMENT

The extent of EPA's argument against vacating the NWPR during the remand period is a single paragraph reciting a partial legal standard for assessing whether to vacate a rule. Without stating why, EPA says only, "[i]n light of the Agencies' stated intent to address their substantial concerns with the NWPR through a new rulemaking, the Agencies request that the Court order a remand and are not including a request for vacatur." Dkt. 110 at 14. Notably, EPA does not address the two factors it concedes are relevant: the seriousness of the NWPR's deficiencies and the disruptive consequences of granting vacatur when an interim change may itself be changed. Dkt. 110 at 14. In fact, to the extent EPA makes any argument at all, EPA's circular argument would merely be that vacatur is not appropriate because it is not requesting it. This is not the proper analysis, and EPA's attempt to avoid vacatur of the NWPR must fail. The remainder of EPA's brief focuses only on whether remand is appropriate, which Waterkeeper does not dispute.[3] As discussed below, EPA's attempt to avoid vacatur fails each of the four *Pollinator Stewardship Council* factors. As a result, the Court should grant EPA's request for remand *and also vacate the NWPR.*

---

[3] Should EPA belatedly attempt to provide argument for why non-vacatur is appropriate here, Waterkeeper intends to request leave to file a sur-reply to address these arguments or, in the alternative, to request that the Court strike such arguments. At this stage, EPA has provided no real argument on this topic to which Waterkeeper can respond in this opposition brief, its only opportunity to provide its position on EPA's motion under the standard briefing schedule. *See* L.R. Civ. 7-3.

1      **I.      EPA Has Admitted Serious Errors in the NWPR and in the Process By Which the**

2              **NWPR was Promulgated That Weigh in Favor of Vacatur.**

3              EPA presents that voluntary remand is appropriate where an agency requests remand to

4      reconsider its decision "without confessing error." Dkt. 110 at 11 (citation omitted). While Waterkeeper

5      agrees that remanding the NWPR to EPA for further action is appropriate, EPA is wrong that this is a

6      situation where the agency has not confessed error. In actuality, EPA has confessed *several very serious,*

7      *material, environmentally destructive, and legally fatal errors* that necessitate vacatur of the NWPR as

8      part of its requested remand.

9              First, EPA has repeatedly said that it has "substantial concerns" regarding the legality of the

10     NWPR. For example, Radhika Fox, Principal Deputy Assistant Administrator for the Office of Water in

11     EPA, the office with "primary responsibility for the rulemaking process related to the CWA," said in a

12     sworn statement before this Court that "the Biden Administration's EPA and Army have substantial

13     concerns about the lawfulness of aspects of the NWPR and the harmful effects of the NWPR on the

14     nation's waters." Fox Dec. ¶¶ 1, 3, 8.[4] EPA also admitted that "the agencies have identified substantial

15     concerns with the NWPR and have determined that additional considerations should be given to certain

16     aspects of the NWPR through notice-and-comment rulemaking, including concern that when

17     interpreting the jurisdictional scope of the CWA, the NWPR did not appropriately consider the effect of

18     the revised definition of 'waters of the United States' on the integrity of the nation's waters, as well as

19     concern over the loss of waters protected by the CWA." Fox Dec. ¶ 10; Pinkham Dec. ¶ 10 (same). As

20     particular examples, EPA stated that "[e]phemeral streams, wetlands, and other aquatic resources

21     provide numerous ecosystem services, and there could be cascading and cumulative downstream effects

22

23     ---

       [4] EPA also submitted a declaration for Jaime A. Pinkham, Acting Assistant Secretary of the United
       States Army for Civil Works, the official with primary responsibility for the rulemaking process related
24     to the CWA. Pinkham Dec. ¶¶ 1, 4. The Pinkham Declaration provides the same substantive allegations
       as the Fox Declaration regarding EPA's assessment of the NWPR and the shortcomings of the NWPR.
25     This opposition will provide citations to both declarations where appropriate. For example, the
       corresponding admission of legal error for this sentence appears in Pinkham Declaration paragraph 8.
26     Pinkham Dec. ¶ 8.

27

from impacts to these resources, including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity. The agencies have substantial concerns about the consideration of these effects on the chemical, physical, and biological integrity of the nation's waters in the NWPR rulemaking process." Fox Dec. ¶ 20; Pinkham Dec. ¶ 20 (same).

Second, the concerns identified by EPA with the substance of the NWPR go to the heart of whether the NWPR complies with the law and are not limited to mere procedural failures or to concerns that may be cured merely by additional explanation. For example, EPA, through its declarations, admits that the NWPR failed to properly account for harm to the chemical, physical, and biological integrity of the Nation's waters.[5] In the context of the CWA this is the most fundamental failure possible because it represents that that the NWPR failed to comply with *the sole objective* of the CWA: "to restore and

---

[5] *See* Fox Dec. ¶ 10 (expressing concern that "the NWPR did not appropriately consider the effect of the revised definition of 'waters of the United States' on the integrity of the nation's waters, as well as concern over the loss of waters protected by the CWA."); Pinkham Dec. ¶ 10 (same); Fox Dec. ¶ 13 ("Based on a careful evaluation of the record of the NWPR, including the above-quoted statement, the agencies have substantial and legitimate concerns regarding the adequacy of consideration of the CWA's water quality goals in the development of the NWPR. As such, the agencies believe it is appropriate to reconsider these issues—and, in particular, the effects of the 'waters of the United States' definition on the chemical, physical, and biological integrity of the nation's waters—in a new rulemaking.") (citing *Cnty. of Maui,* 140 S. Ct. 1at 1468-69); Pinkham Dec. ¶ 13 (same); Fox Dec. ¶ 14 ("In light of the text, structure, and legislative history of the Act, and *Maui* and other Supreme Court decisions, the agencies have concluded there must be some consideration of the effects of a revised definition of 'waters of the United States' on the integrity of the nation's waters. Based on the record at the time the agencies promulgated the NWPR, significant concerns exist about the sufficiency of the agencies' consideration of the effects of the NWPR on the chemical, physical, and biological integrity of the nation's waters when determining the limits of the specific definitional language 'waters of the United States' in the NWPR." And providing as an example the effects of ephemeral waters on traditional navigable waters); Pinkham Dec. ¶ 14 (same); Fox Dec. ¶ 20 ("Ephemeral streams, wetlands, and other aquatic resources provide numerous ecosystem services, and there could be cascading and cumulative downstream effects from impacts to these resources, including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity. The agencies have substantial concerns about the consideration of these effects on the chemical, physical, and biological integrity of the nation's waters in the NWPR rulemaking process."); Pinkham Dec. ¶ 20 (same); *see also* Estrin Dec. ¶¶ 15-16, Exhibits 1, 2 (providing criticism by EPA's own Scientific Advisory Board that EPA failed to consider science and the objectives of the CWA in promulgating the NWPR).

maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (providing "the objective" of the CWA).

These admissions of the NWPR's failure to properly consider the CWA's objective of the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters is also reflected in EPA's "Memorandum for the Record." *See* U.S. EPA and U.S. Army Corps of Engineers ("Corps"), "Memorandum for the Record," attached as Exhibit 6 to Estrin Dec. For example, EPA again admits that "[e]phemeral streams, wetlands that do not meet the NWPR's revised adjacency criteria, and other aquatic resources not protected by the NWPR provide numerous ecosystem services, and the absence of protections for such resources could cause cascading, cumulative, and substantial downstream effects, including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity. These substantial effects on the chemical, physical, and biological integrity of the nation's waters were inadequately considered during the NWPR rulemaking process." Memorandum for the Record at 4. EPA's admitted fundamental failure to consider the objective of the CWA on its own justifies vacatur of the NWPR. *See Gresham v. Azar*, 950 F.3d 93, 102 (D.C. Cir. 2020) (objective of relevant statute is an important factor agency is required to consider).

Relatedly, EPA has admitted that the NWPR failed to consider science. Given the stated objective of the CWA, science is a necessary consideration in determining and setting CWA protections. *See* 33 U.S.C. § 1251(a). However, EPA now admits both that consideration of science was necessary and that EPA did not adequately consider the science when promulgating the NWPR. *See, e.g.,* Fox Dec. ¶ 12 ("Certain statements in the NWPR preamble call into significant question whether the agencies' consideration of science and water quality impacts in developing the rule was consistent with [the goals of the CWA]. For example, the agencies explicitly and definitively stated in numerous places in the NWPR administrative record that they did not rely on agency documents in the record that provided some limited assessment of the effects of the rule on water quality in determining the scope of the definition of 'waters of the United States.'") (citation omitted); Pinkham Dec. ¶ 12 (same); *see also* Estrin Dec. ¶¶ 15-16, Exhibits 1, 2 (providing criticism by EPA's own Scientific Advisory Board that

1    EPA failed to consider science and the objectives of the CWA in promulgating the NWPR). This is an

2    additional fundamental failure that supports vacatur here.

3         EPA has also admitted that the NWPR inaccurately under-estimated the decrease in jurisdiction

4    caused by the NWPR. For example, EPA, through its declarations, stated that "the reduction in

5    jurisdiction [under the NWPR] is notably greater than the deregulatory effects discussed in the rule

6    preamble and the economic analysis case studies." Fox Dec. ¶ 15; Pinkham Dec. ¶ 15 (same). This is

7    consistent with EPA's admission in its Memorandum for the Record that, "[a]lthough the agencies did

8    not quantify the estimated change in jurisdiction in the NWPR rulemaking process, including the

9    supporting documents in the record, the decrease in jurisdiction has been more dramatic than the

10   deregulatory effects the agencies had identified in the NWPR preamble or supporting documents in the

11   record for the rule." Memorandum for the Record at 2. This means that the harm caused by the NWPR

12   has been much worse than EPA discussed in its analyses.

13        Indeed, the NWPR has removed CWA protections from nearly all waters in some arid states.

14   *See, e.g.,* Fox Dec. ¶ 15 ("These changes have been particularly significant in arid states. In New

15   Mexico and Arizona, for example, of over 1,500 streams assessed under the NWPR, nearly every one

16   has been found to be a non-jurisdictional ephemeral resource, which is very different from the status of

17   the streams as assessed under both the Clean Water Rule and the pre-2015 regulatory regime."};

18   Pinkham Dec. ¶ 15 (same). EPA also admits that the NWPR's removals of jurisdiction are already

19   causing harm to various sensitive ecosystems. *See, e.g.,* Fox Dec ¶ 17 (identifying harms to waters);

20   Pinkham Dec. ¶ 17 (same). That EPA failed to consider these issues is a fundamental failure that

21   supports vacatur here.

22        EPA also admits that the NWPR unrealistically and incorrectly considered states' actions to

23   reduce their own clean water protections in response to the reductions in jurisdiction from the NWPR.

24   EPA had incorrectly and unrealistically asserted that states would not amend their own clean water

25   protections to bring them down to the new federal floor represented by the NWPR and that this retention

26   of state jurisdiction would ameliorate environmental harm from the NWPR. EPA provides this

27   admission in support of its stated need to remand the NWPR for further consideration. *See*

Memorandum for the Record at 4 ("The agencies are also aware of certain states that have already begun taking deregulatory steps to change their state regulatory practices to match the NWPR, contrary to the agencies' estimates in the "[l]ikely response category" for such states identified the NWPR's EA. *See* EA at 39-41 (estimating that some states are likely to continue their current dredged/fill permitting practices; however, some of those states have instead sought to reduce the scope of state clean water protections after the NWPR was finalized)."). However, this fundamental failure to assess harm from the NWPR also supports vacating the NWPR if the Court remands the Rule.

The above errors, taken from EPA's own sworn statements, submitted in this litigation and signed by the agency officials with rulemaking responsibility, and/or its public statements representing EPA's official position regarding the NWPR, are clearly "serious" and also show that EPA failed to consider various important aspects of the issue that EPA was required to consider. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983).[6] As a result, the NWPR should be vacated if the Court remands it. *See Bldg. Indus. Legal Def. Found. v. Norton*, 231 F. Supp. 2d 100, 104-05 (D.D.C. 2002) (finding vacatur appropriate even in the absence of a motion for summary judgment or a record, based on arbitrary nature of the analyses used to promulgate rules); *Salazar*, 795 F. Supp. 2d at 1242-43 (finding vacatur of agency action warranted even in the absence of a full merits decision, where agency action "suffered from significant deficiencies").

## II.  EPA Has Not Identified Any Disruptive Consequences of Vacatur, Much Less Consequences Disruptive Enough to Outweigh the Serious Errors in the NWPR.

EPA has not identified any disruptive consequences that would result from vacatur, and, even if it had, those consequences could not outweigh the serious errors identified above. *See Pollinator Stewardship Council*, 806 F.3d at 532. Notably, EPA has not given any "indication that [it] . . . or anyone else would be seriously harmed or disrupted" if the NWPR were vacated. *See ASSE Int'l*, 182 F. Supp.

---

[6] Though the Court can rely on EPA's own admissions regarding the serious errors in the NWPR as grounds for vacatur, Waterkeeper also points out the additional errors it has identified in the NWPR and the improper process used for its adoption here as well, which further support vacatur. *See, e.g.,* Estrin Dec. ¶¶ 15, 16.

3d at 1065. Vacatur is a "less drastic remedy" than an injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Vacatur is also less complicated because it would simply reinstate the status quo—*i.e.*, the regulation defining "waters of the United States" that predated the NWPR's effective date. *See Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (vacatur means, among other things, "to cancel or rescind" and "to make of no authority or validity" and "ha[s] the effect of reinstating the rules previously in force") (citation and quotations omitted). A "return to the status quo causes little or no disruption." *Burke v. Coggins*, No. 20-667, 2021 U.S. Dist. LEXIS 29999, at *25 (D.D.C. Feb. 18, 2021). The regulatory regime that predated the NWPR has applied for most of the past four decades and, is properly seen as "familiar, if imperfect." *In re EPA*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated on other grounds sub nom. In re U.S. Dep't of Def.*, 713 F. App'x 489 (6th Cir. 2018). And because EPA expressly intends to revise the NWPR on remand in light of their "substantial concerns" about its lawfulness and harmful effects, *see, e.g.,* Fox Decl. ¶ 8 and Pinkham Dec. ¶ 8, there is strong reason to think EPA will replace the NWPR on remand with a very different rule. *Cf. Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 46 (D.D.C. 2013) (where agency represented that the revised rule would *not* be materially different from the current rule, vacatur "may well be disruptive"). As a result, it will not be disruptive to vacate the NWPR now. However, even if there was a credible argument that vacating the NWPR and thus reinstating the Pre-2015 Regulatory Definition would be disruptive, such disruption would be outweighed by the serious errors in the NWPR and its promulgation process identified by both EPA and Waterkeeper. EPA never even attempts to carry its burden for equitable relief from vacatur, which cannot be fairly cured on reply.

## III.   The Court Should Vacate the NWPR Because Retaining the NWPR During Remand Will Cause Serious Environmental Harm and Prejudice Waterkeeper.

In environmental cases, the rare circumstances supporting non-vacatur typically are limited to instances when leaving the unlawful agency action in place will prevent serious environmental harm— the opposite of the situation here. *See Babbitt*, 58 F.3d at 1401–05 (leaving unlawful ESA listing rule in place to protect imperiled snail until new listing rule is completed); *Klamath Siskiyou Wildlands Ctr. v. Grantham*, 642 F. App'x 742, 745 (9th Cir. 2016) (leaving decision in effect while agency completed a

new NEPA analysis where vacatur of the challenged decision to issue grazing permits would result in reinstating prior permits containing terms less protective of National Forest); *Pacific Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1022 (E.D. Cal. 2013) (declining to vacate "environmentally superior" forest plan amendments because there would be "harmful environmental consequences" if the old plans were put back in place during remand). By contrast, the Ninth Circuit routinely vacates unlawful agency action that would cause environmental harm, even if there are adverse economic effects of vacatur on agencies or private parties. *See, e.g., Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1111–12 (9th Cir. 2016) (vacating Record of Decision for mine upon finding NEPA analysis unlawful); *Pollinator Stewardship Council*, 806 F.3d at 532–33 (vacating agency's approval of powerful new agricultural insecticides); *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1128 (9th Cir. 2012) (vacating decision authorizing gas pipeline upon finding NEPA and ESA violations). Vacatur is appropriate here as it would remove the harmful NWPR and replace it with the Pre-2015 Regulatory Definition, the longstanding interpretation of the CWA that is much more protective of waters. This would avoid harm to the environment and Waterkeeper during the remand period and would avoid much of the prejudice that Waterkeeper would otherwise experience if the NWPR is not vacated. *See, e.g.,* Estrin Dec. ¶¶ 10-11, 33-34.

A.      **EPA Has Admitted that the NWPR Has Caused and Will Cause Serious Environmental Harm.**

As discussed above, EPA has admitted that the NWPR has caused serious harm to the environment and that this harm to the environment will continue so long as the NWPR and its illegal definition of "waters of the United States" are in place. For example, EPA's press release regarding its decision to revise the NWPR admits that the NWPR is causing "destructive impacts to critical water bodies," EPA Press Release at 1; "is leading to significant environmental degradation*," id.* (quoting EPA Administrator Regan);[7] and "is significantly reducing clean water protections," *id.*[8] More specifically,

---

[7] *See also* Memorandum for the Record at 4 (referencing several specific instances of "significant, actual environmental harms" from NWPR identified by stakeholders).

EPA admits that "[o]f the 40,211 individual aquatic resources or water features for which the Corps made approved jurisdictional determinations under the NWPR between June 22, 2020 and April 15, 2021, approximately 76% were found to be non-jurisdictional … [and t]he agencies are also aware that this number is not the full universe of projects that no longer require Section 404 permitting under the NWPR…" Fox Dec. ¶ 15; Pinkham Dec. ¶ 15 (same). EPA's data also shows that it believes the rate of negative jurisdictional determinations is about 39% higher under the NWPR than it was in the approximately two-year period prior to the NWPR's effective date. *Compare* Memorandum for the Record at 2 (comparing rates of negative jurisdictional determinations between the two time periods); Fox Dec. ¶ 15; Pinkham Dec. ¶ 15. EPA also found that

> [i]n 2020-2021, [under the NWPR,] there has been a threefold (338%) increase from 2019-2020 and a fourfold (412%) increase from 2018-2019 in the number of projects being determined to not require section 404 permits under the CWA. These metrics likely capture only a small portion of projects that are occurring on the ground since there is typically no need for a project proponent to seek a 'no permit required' determination after having already received a wholly negative [advanced jurisdictional determination] and other project proponents may not feel the need to obtain any sort of [jurisdictional determination] at all if they believe their aquatic resources are non-jurisdictional under the NWPR. Many projects could be occurring without consultation with the Corps due to the non-jurisdictional bright lines established under the NWPR.

Memorandum for the Record at 3; *see also* Estrin Dec. ¶¶ 21-22 (providing analysis of harm from EPA database tracking jurisdictional determinations and showing that negative jurisdictional determinations under the NWPR continue to be issued at a very fast pace). EPA also admits that the NWPR will result in discharges without any regulation in states and tribal lands where regulation of waters beyond those covered by the CWA are not authorized and that the NWPR's elimination of protections for certain waters "could cause cascading, cumulative, and substantial downstream effects, including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity." *See*

---

[8] *See also* Fox Dec. ¶ 15 ("Staff at EPA and the Army have reviewed approved jurisdictional determinations and identified indicators of a substantial reduction in waters covered under the NWPR compared to previous rules and practices."); Pinkham Dec. ¶ 15 (same); Memorandum for the Record at 1-2 (explaining that EPA and the Corps "have identified numerous clear and consistent indicators of a substantial reduction in waters covered under the NWPR compared to previous rules and practice.").

Fox Dec. ¶ 18; Pinkham Dec. ¶ 18; Memorandum for the Record at 4; *see also* U.S. Senate Committee on Environment and Public Works, "June 21, 2021 Letter to Michael S. Regan and Jaime A. Pinkham," attached as Exhibit 8 to Estrin Dec. (Senate committee letter to EPA recounting EPA's reasoning to committee for needing new rule as including "significant environmental damage," "ongoing environmental harm," and reductions in findings of federal jurisdictions for waters). As a result, EPA not only does not dispute that the NWPR is causing serious, ongoing environmental harm, it openly admits it. This environmental harm weighs in favor of vacatur.

### B.      The NWPR Has Caused and Will Cause Serious Harm to Waterkeeper.

The NWPR's reductions in protections to waters of the United States are also causing Waterkeeper to suffer various injuries. *See, e.g.,* Estrin Dec. ¶¶ 3, 4, 6, 12, 13, 17-21, 32; *see also* Dkt. 93 ¶¶ 23-38 (identifying Plaintiffs and explaining why the NWPR causes them harm that would be redressed by vacatur of the NWPR). For example, EPA has explained that "[t]he lack of protections [under the NWPR] is particularly significant in arid states, like New Mexico and Arizona, where nearly every one of over 1,500 streams assessed has been found to be non-jurisdictional." Fox Dec. ¶ 16; Pinkham Dec. ¶ 16 (same).[9] Certain of Plaintiffs have identified specific interests in the waters of New Mexico that EPA has identified as being locations where harm from the NWPR is "particularly significant." *See id.* For example, Plaintiff WildEarth Guardians is "headquartered in Santa Fe, New Mexico [and] has been working for 30 years to protect and restore the wildlife, wild places, wild rivers, and health of the American West." Estrin Dec. ¶ 18. WildEarth Guardians is also the parent organization of Plaintiff Rio Grande Waterkeeper, which "works to safeguard clean water and healthy flows in the

---

[9] *See also* Memorandum of the Record at 3 ("Of particular concern to the agencies is the NWPR's disproportionate effect on arid regions of the country. The Corps' data show that in New Mexico, of the 258 streams assessed in AJDs, 100% were found to be non-jurisdictional ephemeral resources. In Arizona, of the 1,284 streams assessed in AJDs, 1,280, or 99.6%, were found to be non-jurisdictional ephemeral resources. Compounding potential resource losses, eliminating ephemeral streams from jurisdiction under the NWPR also typically eliminates jurisdiction over any nearby wetlands.").

Rio Grande and its tributaries from its headwaters in the San Juan Mountains of Colorado through Southern New Mexico." *Id.*

Waterkeeper also submitted evidence into the administrative record during the rulemaking for the NWPR demonstrating that it excludes all waters within a 14,605 square mile "closed basin," within the Rio Grande Basin, as well as roughly 90 percent of streams and rivers in New Mexico outside of that "closed basin" – waters that contribute significant flows to and influence the water quality of the Rio Grande and its tributaries. *Id.* ¶ 18a. In fact, "[i]n New Mexico, as of June 29, 2021, there were 176 total determinations under the [NWPR], with 176 negative jurisdictional determinations and 0 positive jurisdictional determinations... As of June 30, 2021, there were 197 total determinations [under the NWPR], with 195 negative jurisdictional determinations and 2 positive jurisdictional determinations. One of those negative jurisdictional determinations excluded an ephemeral stream from CWA protections at the Los Alamos National Laboratories." Estrin Dec. ¶ 22b (citations omitted). Notably, Waterkeeper provided evidence of a threat to Santa Fe New Mexico's water supply from eliminated jurisdiction over ephemeral streams receiving pollution discharges from Los Alamos National Laboratories and noted a lack of delegated CWA authority in New Mexico as part of its comments on the NWPR. *Id.* ¶ 18b. However, while this result is not a surprise, it is highly concerning as Los Alamos Laboratories is a notorious source of radioactivity and other pollution. *Id.* ¶ 18b. "Another negative jurisdictional determination excluded ephemeral streams and two open water mine pits from CWA protections based on exclusions in the [NWPR] at the United Nuclear Corporation St. Anthony Uranium Mine." *Id.* ¶ 22b (citations omitted). The elimination of CWA protection for these and many other waters allows unlimited discharges of pollutants, along with unregulated dredging and filling activities, in these unprotected waters, degrading the water quality of the waters used and enjoyed by Rio Grande Waterkeeper and Guardians' members and threatening the survival and recovery of numerous imperiled aquatic and riparian species, including endangered and threatened species listed under the ESA. *Id.* ¶ 18c.

Waterkeeper has also identified numerous examples of expected losses of CWA protections caused by the NWPR that are relevant to specific Plaintiffs and their members, including Waterkeeper

Alliance,[10] Missouri Confluence Waterkeeper, Snake River Waterkeeper, and Upper Missouri

Waterkeeper and to licensed U.S. Member Organizations, including Bayou City Waterkeeper, Boulder

Waterkeeper, Buffalo-Niagara Waterkeeper, Cape Fear Riverkeeper, Rogue Riverkeeper, San Francisco

Baykeeper, all of which are licensed U.S. Member Organizations of Waterkeeper Alliance. *See* Estrin

Dec. ¶¶ 4, 6, 12-13, 17-22, 32. And Waterkeeper identified harm to specific states, including California,

in the form of increased negative jurisdictional determinations. *See* Estrin Dec. ¶¶ 21, 22c. Plaintiffs

Humboldt Baykeeper, Russian Riverkeeper, Turtle Island Restoration Network, and Ecological Rights

Foundation are headquartered in California. *See* Dkt. 93 ¶¶ 24, 27, 28, 33, 34. The negative

jurisdictional determinations in California that are made under the faulty NWPR will thus cause harm to

these Plaintiffs and their members' interest. *See* Estrin Dec. ¶¶ 4, 6, 12-13, 17, 21-22, 32.

## C.       Failing to Vacate the NWPR Would Effectively Indefinitely Stay This Litigation Without Offering Waterkeeper Any Relief From Their Ongoing Injuries.

Remanding the NWPR without vacatur would leave the NWPR in place while depriving

Waterkeeper of its ability to challenge and redress the harms caused by the illegal Rule. Leaving the

NWPR in place would cause irreversible harm to the environment, including to waterways protected and

used by Waterkeeper's members. *See Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144-45 (9th Cir.

2020) (considering whether leaving the decision in place "would risk environmental harm"); *Util. Solid*

*Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018) (declining remand that would

prejudice vindication of environmental petitioners' claim). Effectively staying the litigation until EPA

eventually adopts a new rule replacing the NWPR at some unknown point in the future, an eventuality

that is not guaranteed to occur and for which even a tentative schedule has not been announced, would

thus be inequitable and would harm and prejudice Waterkeeper.

---

[10] *See* Estrin Dec. ¶ 3 (Indicating that Waterkeeper Alliance has an interest in all affected waters because it "seeks to protect water quality in every major watershed around the world, and to restore and maintain all waterways as drinkable, fishable, and swimmable consistent with the goals of the federal Clean Water Act ("CWA") and other laws.").

EPA's proposal to effectively stay this litigation and leave the NWPR in place is all the more concerning because EPA has indicated that it does not even intend to issue a *proposed* rule within the next year.[11] And a proposed rule is merely the first step in the revision process; after the proposal, EPA needs to accept public comment, review those comments, and then issue a final rule. In fact, EPA has proposed no timeline for finalizing a replacement for the NWPR on remand. *Cf. Util. Solid Waste Activities Grp.*, 901 F.3d at 437 ("First and foremost, the EPA has explained that it plans to reconsider these provisions *and has submitted a proposed timeline to the court,* thereby satisfying the requirement for remand that it 'take further action with respect to the original agency decision on review.'") (emphasis added and citation omitted). Remanding without vacatur thus would allow an illegal, harmful rule to remain in place indefinitely—while cutting off Waterkeeper's avenue for relief in this Court. *See Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1288 (D.C. Cir. 2000) (noting that court had previously denied a motion for voluntary remand where agency had "made no offer to vacate the rule" and so "would have left petitioners subject to a rule they claimed was invalid"); *see also Farmworker Ass'n*, 2021 U.S. App. LEXIS 16882, at *2 (granting vacatur where "EPA has admitted that it will not provide the timely reconsideration that is the central rationale for remand without vacatur"); *NRDC v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) ("an open-ended remand without vacating" does not give the agency an incentive to act within a reasonable time). Vacatur is therefore

---

[11] *See* Office of Info. & Regul. Affairs, *Agency Rule List – Spring 2021: Environmental Protection Agency*, https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPubId=202104&showStage=longterm&agencyCd=2000&csrf_token=A78CC39C90FC062F229EF77DD493770D5D5AAC9D49FF76BBD48212C1E4494716372688730D47A34A2BDEBF2502D92B3AC261 (last visited June 23, 2021) (listing "Revised Definition of 'Waters of the United States'" as one of EPA's "Long- Term Actions"); Office of Info. & Regul. Affairs, *Spring 2021 Unified Agenda of Federal Regulatory and Deregulatory Actions*, https://www.reginfo.gov/public/do/eAgendaHistory?operation=OPERATION_GET_PUBLICATION&showStage=longterm&currentPubId=202104 (last visited June 23, 2021) (stating that "Long-Term Actions" are those "for which the agency does not expect to have a regulatory action within the 12 months after publication of this edition of the Unified Agenda").

1    warranted so that Waterkeeper does not suffer the effects of an illegal rule while waiting for EPA to

2    complete indefinite remand proceedings.

3          While in a different context, cases addressing lengthy or indefinite stays are instructive here due

4    to their similarity to the voluntary remand without vacatur requested by EPA in this case. The Ninth

5    Circuit has explained that "[a] stay should not be granted unless it appears likely the other proceedings

6    will be concluded within a reasonable time in relation to the urgency of the claims presented to the

7    court." *See Leyva v. Certified Grocers of Cal., Ltd.,* 593 F.2d 857, 864 (9th Cir. 1979). In *Leyva*, the

8    court considered, under the "Fair Labor Standards Act . . . the strong congressional policy favoring

9    prompt payment of wages." *Id.; see also Hoeun Yong v. INS*, 208 F.3d 1116, 1119-20 (9th Cir. 2000)

10   (indefinite stay incommensurate with congressional and judicial preference for prompt resolution of

11   petitions for habeas corpus). Waterkeeper's lawsuit alleges that the NWPR is in violation of the APA,

12   National Environmental Policy Act ("NEPA"), the CWA, and the Endangered Species Act ("ESA"), all

13   statutes evidencing a strong congressional policy of protection of the environment and reasoned agency

14   decision making. *See, e.g., Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184-85 (1978) (Congress intended

15   "to halt and reverse the trend toward species extinction, whatever the cost…§ 7 reveals an explicit

16   congressional decision to require agencies to afford first priority to the declared national policy of

17   saving endangered species"); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090-91

18   (9th Cir. 2015) ("the equities and public interest factors always tip in favor of the protected species");

19   *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1294 (1st Cir. 1996) (characterizing CWA as "a bold and

20   sweeping legislative initiative" with "broad, systemic" goals) (citations omitted); *Tex. Mun. Power

21   Agency v. Adm'r of EPA*, 836 F.2d 1482, 1488 (5th Cir. 1988) ("The CWA is strong medicine. Section

22   301(a) prohibits the discharge by any person of any pollutant into the nation's waters except that which

23   the EPA expressly allows in an NPDES permit."); 42 U.S.C. § 4331(a) (Congress promulgated NEPA in

24   recognition of "the profound impact of man's activity on the interrelations of all components of the

25   natural environment… [and] further the critical importance of restoring and maintaining environmental

26   quality…"). The claims Waterkeeper presents to the Court are urgent and should be promptly litigated if

27

1  vacatur is not granted. As a result, remand without vacatur here would be inequitable and contrary to the

2  public interest.

3          On the other hand, vacatur would be equitable and in the public interest. Vacatur will stop the

4  ongoing pollution and environmental destruction across the country caused by the NWPR and restore

5  the longstanding CWA protections for the Nation's waters provided by the Pre-2015 Regulatory

6  Definition while EPA engages in the lengthy rulemaking process it has said it intends to undertake. *See*

7  EPA Press Release at 2 (referring to rulemaking including a "robust engagement process" and "input

8  from a wide array of stakeholders," which will necessarily take additional time as compared to other

9  rulemakings); Estrin Dec. ¶¶ 10-11, 33-34. Vacatur would also allow EPA to engage in the APA notice

10  and comment, NEPA analysis, and ESA consultation procedural duties that EPA has failed to comply

11  with in its multiple previous attempts to define waters of the United States since 2015 without harm

12  from the NWPR occurring in the interim. *See, e.g.,* Dkt. 93 ¶¶ 298-308, 328-38, 358-64 (alleged APA

13  notice and comment violations); Dkt. 93 ¶¶ 15, 183, 288, 290-97, 320-27, 350-57 (alleged NEPA

14  violations); Dkt. 93 ¶¶ 16, 162, 184, 289, 309-19, 339-49, 395-99 (alleged ESA consultation violations).

15  Vacatur would reinstate the environmental protections of the Pre-2015 Regulatory Definition and protect

16  the Nation's waters as EPA evaluates how it intends to consider the science and the law and to craft a

17  new rule. Vacatur would allow EPA to do all of these things while not subjecting Waterkeeper, the

18  people, and the environment to harm from a rule that EPA itself admits is wrong substantively and that

19  was adopted without the procedures required by law. *See, e.g.,* Estrin Dec. ¶¶ 10-11, 33-34.

20          **D.       EPA Has Failed to Allege Any Competing Harm that Vacatur Would Cause.**

21          Despite knowing full well about the harms that the NWPR is causing to waters, the environment,

22  and Waterkeeper and its members, EPA advances no competing harms that vacatur would cause. In fact,

23  EPA does not even claim vacatur would cause harm, instead asserting only, without explanation, that

24  EPA does not seek vacatur here. As a result, EPA's request for non-vacatur is facially insufficient and

25  the Court should grant Waterkeeper's request for vacatur.

26          While EPA cannot now cure this failure to allege harm from vacatur on reply, there is no

27  evidence that going back to the Pre-2015 Regulatory Definition that was in place for nearly four

1    decades, which would be the result of vacating the NWPR, would cause harm. However, as discussed

2    above, Waterkeeper and EPA have both identified thousands, if not tens of thousands, of instances of

3    irreparable harm that have already occurred to waters of the United States, and thereby to the species,

4    individuals, and organizations that rely on those waters to support their interests, in the year that the

5    NWPR has been in place and that will continue to compound so long as the NWPR is left in place. As a

6    result, even if EPA attempted to demonstrate financial harm or regulatory uncertainty from vacating the

7    NWPR, such harm or regulatory uncertainty would be insufficient to overcome the demonstrated harm

8    to the environment and Waterkeeper's interests identified here.

9            Moreover, such "harm" would not be properly considered here as weighing against vacatur

10   because enforcing compliance with the CWA cannot reasonably be considered harm for equitable relief

11   purposes. Congress recognized that CWA compliance would have serious costs and chose to enact the

12   law regardless. *See, e.g., EPA v. National Crushed Stone*, 449 U.S. 64, 80 (1980) (explaining that, prior

13   to passage of the CWA, Congress had a report that "estimated that there would be 200 to 300 plant

14   closings caused by the first set of pollution limitations" set out in the CWA). In fact, the CWA often

15   forces individuals and entities to adopt costly pollution control technologies regardless of cost. *See, e.g.,*

16   *In the Matter of: NPDES for City of Fayetteville*, 1988 EPA App. LEXIS 35, *13; 2 E.A.D. 594 (June

17   28, 1988) ("The meaning of [the CWA] is plain and straightforward.  It requires unequivocal

18   compliance with applicable water quality standards, and does not make any exceptions for cost or

19   technological feasibility. . . . "); *NRDC v. EPA*, 822 F.2d 104, 123 (D.C. Cir. 1987) ("[T]he most salient

20   characteristic of [the CWA] statutory scheme, articulated time and again by its architects and embedded

21   in the statutory language, is that it is technology-forcing.… The essential purpose of this series of

22   progressively more demanding technology-based standards was not only to stimulate but to press

23   development of new, more efficient and effective technologies"). As a result, even if it did have some

24   allegedly "harmful" consequences in a colloquial sense, vacatur of the NWPR is not harm in the sense of

25   deprivation of a reasonable expectation. Vacatur here would merely remove a rule that violates the

26   CWA and stop entities from relying on a rule that purports to allow those individuals and entities to take

27   actions that are prohibited by the CWA. *See, e.g.,* Estrin Dec. ¶¶ 10-11, 33-34. That this would create a

state of affairs less advantageous to certain individuals is irrelevant, this is a balance that Congress already struck in favor of the environment and the greater good when it passed the clean water protections in the Clean Water Act.

Because leaving the NWPR in place during remand would *cause* rather than *prevent* environmental harm, this case presents the inverse of cases where courts have declined to vacate rules that are being reconsidered on remand, and the Court should forthwith vacate the NWPR in conjunction with its order of remand.

## IV.   The Fundamental Failures of the NWPR, and EPA's Stated Intention to Abandon the NWPR on Remand, Support Vacating the NWPR.

As discussed above, Waterkeeper has identified various substantive fundamental failures with the NWPR as well as numerous procedural failures. Indeed, EPA itself has admitted various fundamental failures. As a result, the errors identified by both EPA and Waterkeeper represent "fundamental flaws in the agency's decision [that] make it unlikely that the same rule would be adopted on remand." *See, e.g., Pollinator Stewardship Council*, 806 F.3d at 532. However, in addition to these fundamental failures, EPA has made clear that it has no intention of retaining the illegal NWPR. EPA has stated unequivocally that it intends to create a new rule defining "waters of the United States" that differs significantly from the NWPR. *See* EPA Press Release at 1 (statements by both EPA Administrator Regan and Acting Assistant Secretary of the Army for Civil Works Pinkham); Fox Dec ¶ 8 ("The agencies, after completing a review of the NWPR, have decided to initiate another rulemaking to revise the term 'waters of the United States.'"); Pinkham Dec ¶ 8 (same); Fox Dec. ¶ 10 ("The agencies have … decided to initiate rulemaking to revise the term 'waters of the United States.'"); Pinkham Dec. ¶ 10 (same); Dkt. 110 at 1 ("As explained further in the accompanying memorandum of law, the Agencies have completed their review of the NWPR and have decided to commence a new rulemaking to revise or replace the rule."). This factor therefore also weighs in favor of vacating the NWPR, and vacating the NWPR would allow EPA to create a new rule "done under circumstances that ensure an objective evaluation free of the previous taint." *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000).

1

## **CONCLUSION**

2      An open-ended remand of the illegal NWPR, without vacatur, would prejudice Waterkeeper  and

3  cause irreversible environmental damage. Waterkeeper supports EPA's remand request, but further

4  respectfully requests that the Court vacate the NWPR as part of its order of remand.

5  Dated: July 2, 2021               Respectfully submitted,

6

7              By:        */s/ Stuart Wilcox*_____
Stuart Wilcox

8                  *Attorney for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27