Case 3:18-cv-03521-RS   Document 113-1   Filed 07/02/21   Page 1 of 20

Christopher Sproul (State Bar No. 126398)
Stuart Wilcox (State Bar No. 327726)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Emails: csproul@enviroadvocates.com
wilcox@enviroadvocates.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WATERKEEPER ALLIANCE, INC.; HUMBOLDT BAYKEEPER, a program of Northcoast Environmental Center; LAKE WORTH WATERKEEPER; MISSOURI CONFLUENCE WATERKEEPER; MONTERREY COASTKEEPER, a program of The Otter Project, Inc.; RIO GRANDE WATERKEEPER, a program of WildEarth Guardians; RUSSIAN RIVERKEEPER; SNAKE RIVER WATERKEEPER, INC.; SOUND RIVERS, INC.; UPPER MISSOURI WATERKEEPER, INC.; TURTLE ISLAND RESTORATION NETWORK; WILDEARTH GUARDIANS; ECOLOGICAL RIGHTS FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. ENVIRONMENTAL PROTECTION AGENCY; TAYLOR N. FERRELL, in his official capacity as Assistant Secretary of the Army for Civil Works; and U.S. ARMY CORPS OF ENGINEERS, <br><br> Defendants. | Civil Case No. 18-cv-3521 <br><br> **DECLARATION OF DANIEL E. ESTRIN IN SUPPORT OF PLAINTIFFS' PARTIAL OPPOSITION TO DEFENDANTS' MOTION FOR REMAND WITHOUT VACATUR** |

I, Daniel E. Estrin, declare as follows:

1.  I am the General Counsel and Advocacy Director for Waterkeeper Alliance ("Waterkeeper"). I have worked with the Waterkeeper movement in various capacities for more than 28 years. As Waterkeeper's General Counsel and Advocacy Director, I am responsible for supervising all of the organization's legal and advocacy work, including all litigation to which Waterkeeper is a party.

2.  Waterkeeper is a not-for-profit corporation organized under the laws of the State of New York and a charitable corporation under section 501(c)(3) of the Internal Revenue Code. Waterkeeper maintains its headquarters at 180 Maiden Lane, Suite 603, New York, New York 10038.

3.  Waterkeeper seeks to protect water quality in every major watershed around the world, and to restore and maintain all waterways as drinkable, fishable, and swimmable consistent with the goals of the federal Clean Water Act ("CWA") and other laws. The CWA is the bedrock of Waterkeeper's work to protect rivers, streams, channels, lakes, reservoirs, wetlands, bays, estuaries, and coastal waterways for the benefit of their communities. Waterkeeper works toward this vision through direct advocacy and through the grassroots advocacy of its Waterkeeper member and affiliate organizations, which Waterkeeper connects and supports to provide a voice for waterways and their communities worldwide.

4.  Waterkeeper is a membership organization with two classes of members—licensed organizational members and individual members. Waterkeeper currently connects more than 350 Waterkeeper member and affiliate organizations in 47 countries on six continents, including more than 150 Basinkeepers, Baykeepers, Bayoukeepers, Canalkeepers, Channelkeepers, Coastkeepers, Creekkeepers, Inletkeepers, Lakekeepers, Riverkeepers, Shorekeepers, Soundkeepers, and Waterkeepers ("U.S. Member Organizations"), and approximately 20 affiliate organizations licensed by Waterkeeper in the United States ("U.S. Affiliate Organizations"). Additionally, Waterkeeper has over 15,000 individual members, and our U.S. Member Organizations and U.S. Affiliate Organizations cumulatively have tens of thousands of individual members, that live, work, and recreate on waterways and in watersheds across the United States and whose interests are injured by regulatory actions that weaken or eliminate protections for waterways and the communities that rely on them.

5.      I am very familiar with the CWA, the various regulatory definitions of "waters of the United States" under the CWA, Supreme Court and lower court case law interpreting and applying the definition, and various agency guidance documents and interpretive statements regarding the definition. I have been in frequent communication with my staff about the 2020 Navigable Waters Protection Rule ("2020 NWPR"),[1] and its implications have been discussed and evaluated extensively by Waterkeeper and many of our U.S. Member Organizations. My understanding and opinions about the 2020 NWPR and the adverse impacts it is presently having and will continue to have on the Nation's waters, Waterkeeper Alliance, U.S. Member and Affiliate Organizations, and our respective individual members are informed by these discussions, our formal comments on the 2020 NWPR, recent statements from the Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers (the "Agencies"), and my nearly three decades of experience interpreting, enforcing, and protecting the CWA.

6.      The CWA regulatory definition of "waters of the United States" is of critical importance to the protection of human and community health, the economy, the functioning of our Nation's vast interconnected water resources and ecosystems, and the many endangered and threatened species that depend on clean water. If a water is not included with the definition of "waters of the United States," it can be dredged, filled, and polluted with impunity because the CWA's most fundamental human health and environmental safeguard – the prohibition of unauthorized discharges in 33 U.S.C. § 1311(a) – no longer applies.

7.      The Agencies first addressed the definition of "waters of the United States" by promulgating rules in the mid-1970s. Those regulations asserted jurisdiction over traditionally navigable waters, interstate waters, tributaries to those (and other) jurisdictional waters, wetlands adjacent to other jurisdictional waters, and any "other waters," the use, degradation, or destruction of which could affect interstate or foreign commerce. *See, e.g.*, 40 C.F.R. § 122.2 (2015); 33 C.F.R. § 328.3 (2015) ("Pre-2015 Regulatory Definition").

---

[1] The Navigable Waters Protection Rule was published in the Federal Register on April 21, 2020, *see* 85 Fed. Reg. 22250 (Apr. 21, 2020), and became effective on June 22, 2020.

8. On June 29, 2015, the Agencies promulgated the "Clean Water Rule" in an attempt to re-define "waters of the United States." *Clean Water Rule: Definition of 'Waters of the United States,'* 80 Fed. Reg. 37054 (June 29, 2015). The impact of the Clean Water Rule was sweeping; it resulted in a net loss of CWA jurisdiction as compared to the Agencies' 1970s Regulatory Definition and their longstanding interpretations of the CWA.

9. On October 22, 2019, the Agencies promulgated a rule repealing the Clean Water Rule ("Repeal Rule") and reinstating the regulatory text of the 1970s definition of "waters of the United States." *Definition of "Waters of the United States"—Recodification of Pre-Existing Rules*, 84 Fed. Reg. 56626 (October 22, 2019).

10. On April 21, 2020, the Agencies promulgated the 2020 NWPR, redefining "waters of the United States" for the third time in 5 years. The 2020 NWPR was designed to, and did, eliminate a huge number of waters across the Nation from CWA jurisdiction. This is the most extreme diminishment of CWA jurisdiction since the Act's inception nearly 50 years ago.

11. Under the 2020 NWPR, the definition of "waters of the United States" encompasses only "relatively permanent flowing and standing waterbodies that are traditional navigable waters in their own right or that have a specific surface water connection to traditional navigable waters, as well as wetlands that abut or are otherwise inseparably bound up with such relatively permanent waters." 2020 NWPR, 85 Fed. Reg. at 22273. The Agencies' adoption of this extremely narrow definition dramatically eliminated CWA protections for waters across the country, leaving many, and in some areas nearly all, rivers, streams, lakes, ponds, wetlands, and other waters vulnerable to dangerous pollution discharges and destructive dredging and filling.

12. Eliminating CWA protections for vast swaths of the Nation's waters harms drinking water supplies, fisheries, and recreational waters, as well as people, threatened and endangered species, and the Nation's vast, interconnected aquatic ecosystems that are exposed to dangerous levels of pollution and destruction in both directly impacted and downstream waters. When waters are excluded from the definition of "waters of the United States," all of the protections of the CWA – the discharge standards and permitting requirements for pollution discharges, dredging and filling standards and

3

1  permitting, water quality standards, effluent limitation guidelines, total maximum daily loads, water
2  quality certifications, and myriad other CWA standards and programs – become inapplicable and cannot
3  prevent or even mitigate the harm.

4      13.    The harm that is now occurring, and will continue to occur, from implementation of the
5  narrow 2020 NWPR definition was apparent in the Agencies' own administrative record for the
6  rulemaking process, but they refused to consider any of the scientific information in the record
7  demonstrating that their narrow jurisdictional definition eliminated protections for waters that are
8  essential to the integrity of the Nation's waters and would endanger drinking water supplies, recreational
9  waters, fisheries, endangered and threatened species, and myriad other beneficial uses of waters across
10 the Nation. *See, e.g.*, The Navigable Waters Protection Rule—Public Comment Summary Document
11 (Response to Comments), Topic 11, at 3, 8-9, EPA Docket ID No. EPA-HQ-OW-2018-0149-11574
12 (Apr. 20, 2020) ("2020 NWPR, RTC").

13     14.    The Agencies shaped their definition of "waters of the United States" in the 2020 NWPR
14 based on impermissible policy choices that are in opposition to the objectives, goals, policies, and
15 programs that Congress built into the CWA. *See, e.g.,* Revised Definition of "Waters of the United
16 States," 84 Fed. Reg. 4154, 4169 (February 14, 2019) ("Proposed NWPR") ("The agencies are
17 proposing this line-drawing based primarily on their interpretation of the language, structure, and
18 legislative history of the statute and the policy choices of the executive branch agencies.").

19     15.    The EPA's own Science Advisory Board ("SAB") criticized the 2020 NWPR, and how
20 the Agencies understood and represented the science that they used to support the rule. *See* EPA, SAB,
21 Draft Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the
22 Clean Water Act (Oct. 16, 2019), https://perma.cc/RBC7-V58V and EPA, SAB, Final Commentary on
23 the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act, (Feb.
24 27, 2020), https://perma.cc/76UW-LW9R. True and correct copies are attached hereto as Ex. 1 and 2,
25 respectively.

26     16.    In its final commentary, the SAB concluded that the 2020 NWPR "does not incorporate
27 best available science" and that "a scientific basis for the proposed Rule, and its consistency with the

objectives of the Clean Water Act, is lacking." *Id*. at 1. Additionally, the SAB found that the 2020 NWPR "decreases protection for our Nation's waters and does not provide a scientific basis in support of its consistency with the objective of restoring and maintaining 'the chemical, physical and biological integrity' of these waters." *Id*. at 2.

17. Several Plaintiffs in this action also submitted extensive written comments to the administrative record during the public comment period for the 2020 NWPR, including a comment letter containing extensive evidence demonstrating that (1) important water resources would lose CWA protections under 2020 NWPR without any sound legal or scientific basis, and (2) the Rule would cause serious harm to waters, people, aquatic systems, and endangered and threatened species and their designated critical habitats. *See, e.g.*, Comments of Waterkeeper Alliance on 2020 NWPR with supporting attachments ("Waterkeeper 2020 NWPR Comments"), submitted to the EPA Docket: EPA-HQ-OW-2018-0149 on April 15, 2019.[2]

18. For example, Plaintiff WildEarth Guardians ("Guardians") is a regional 501(c)(3) non-profit environmental advocacy and conservation organization headquartered in Santa Fe, New Mexico that has been working for 30 years to protect and restore the wildlife, wild places, wild rivers, and health of the American West. Guardians is the parent organization of Rio Grande Waterkeeper, a licensed U.S. Member Organization. Plaintiff Rio Grande Waterkeeper works to safeguard clean water and healthy flows in the Rio Grande and its tributaries, from its headwaters in the San Juan Mountains of Colorado through Southern New Mexico. Guardians and Rio Grande Waterkeeper represent hundreds of thousands of members and activists, including many members and supporters that reside in the Rio Grande watershed.

    a. The Waterkeeper 2020 NWPR Comments documented that the 2020 NWPR excludes all waters within a 14,605 square mile "closed basin," within the Rio Grande Basin, as well as roughly 90 percent of streams and rivers in New Mexico outside of the "closed basin" – waters that contribute significant flows to and influence the water quality of the Rio Grande and its tributaries. *See, e.g.*,

---

[2] Available at: https://www.regulations.gov/comment/EPA-HQ-OW-2018-0149-11319.

5

Waterkeeper 2020 NWPR Comments, at 105, fn. 395 and Attachment 11, at 50-64 (Rio Grande Case Study). A true and correct copy of Waterkeeper 2020 NWPR Comments Attachment 11 is attached hereto as Ex. 3.

    b. Many of these rivers and streams receive pollution discharges that were regulated under CWA, such as the currently-CWA-permitted pollution discharges from Los Alamos National Laboratories, a site that has become synonymous with radioactivity and other types of pollution, into an ephemeral stream above one of the City of Santa Fe's drinking water intakes within the Rio Grande Basin. *Id*. This change is all the more harmful given that New Mexico does not have either a delegated CWA program or its own state law water quality program to in any way ameliorate the unprecedented and dangerous loss of water quality protections resulting from the 2020 NWPR. *Id*.

    c. The elimination of CWA protection for these and many other waters allows unlimited discharges of pollutants, along with unregulated dredging and filling activities, in these unprotected waters, degrading the water quality of the waters used and enjoyed by Rio Grande Waterkeeper and Guardians' members and threatening the survival and recovery of numerous imperiled aquatic and riparian species, including endangered and threatened species listed under the federal Endangered Species Act.

19. As another example, Plaintiff Missouri Confluence Waterkeeper is a grassroots, citizen-led nonprofit conservation organization and a licensed U.S. Member Organization that is focused on clean water and dedicated to protecting fishable, swimmable, drinkable water for all Missourians. The Waterkeeper 2020 NWPR Comments documented, among other things, that the 2020 NWPR's exclusion of large numbers of rivers and streams that briefly flow subsurface and then reemerge as surface waters will have significant adverse impacts on waters throughout Missouri, including large, important downstream waterways such as the Missouri and Meramec Rivers. *See, e.g.*, Ex. 3 at 30-41 (Missouri Confluence Waterkeeper Case Study). Excluding these and other waters from CWA

protections against pollution discharges and dredging/filling, will degrade water quality; threaten public health; destroy habitat; and endanger wildlife, fish, amphibians, reptiles and other aquatic life, including ten endangered and one threatened ESA mussel species. *Id.*

20. In official comments for the administrative record, Plaintiffs also provided the Agencies with numerous other examples of harmful impacts to waters that will occur as a result of removing CWA protections rivers, streams, wetlands, lakes, and other waters around the country where U.S. Member Organizations are working to protect the interests of their members from water pollution. *See, e.g.*, Ex. 3 Waterkeeper 2020 NWPR Comments, Attachment 11. For example, the Waterkeeper 2020 NWPR Comments documented the expected loss of CWA jurisdiction from the 2020 NWPR to:

   a. Texas coastal prairie wetlands crucial to the health of Lower Galveston Bay, which is protected on behalf of its members by Bayou City Waterkeeper, a licensed U.S. Member Organization, *Id.* at 2-8;

   b. Ephemeral streams, reservoirs, ditches, and canals that receive pollution discharges and which flow into Boulder Creek – the primary drinking water supply for the Colorado cities of Boulder, Louisville, Lafayette, Erie, Superior, and Nederland – which is protected on behalf of its members by Boulder Waterkeeper, a licensed U.S. Member Organization, *Id.* at 9-14;

   c. Between an estimated 500 and 1,000 miles of ephemeral and ditched streams that flow into the Niagara River, the channel that connects two Great Lakes - Erie and Ontario, which is protected on behalf of its members by Buffalo Niagara Waterkeeper, a licensed U.S. Member Organization, *Id.* at 15-21;

   d. Hydrologically connected Pocosins and Carolina Bays, and ditched and ephemeral streams that receive animal waste pollution discharges, in the Cape Fear Basin of North Carolina, which is protected on behalf of its members by Cape Fear Riverkeeper, a licensed U.S. Member Organization, *Id.* at 22-29;

   e. Ephemeral streams that provide habit and water supply for federally threatened Chinook salmon, coho salmon, chum salmon and steelhead trout, and ditched

streams that receive animal waste, industrial and municipal pollution discharges in the Puget Sound Basin of Washington, which is protected on behalf of its members by Puget Soundkeeper, a licensed U.S. Member Organization, *Id*. at 42-49;

f. An estimated 9,165 miles of ephemeral streams in the Rogue River Basin in Oregon that provide drinking water for the region, as well as habitat and spawning grounds for federal threatened Southern Oregon/Northern California Coast coho salmon and steelhead; numerous canals and ditches that receive pollution discharges that are hydrologically connected to and influence the quality of the Rogue River; and the Agate Desert vernal pools that are the only vernal pools in Oregon and support unique species, such as the vernal pool fairy shrimp listed as threatened under the Endangered Species Act. These waters are protected on behalf of its members by Rogue Riverkeeper, a licensed U.S. Member Organization, *Id*. at 65-75;

g. More than 40 percent of the streams that flow into and influence the water quality of San Francisco Bay in California, as well as provide spawning grounds for endangered Chinook salmon, which are protected on behalf of its members by San Francisco Baykeeper, a founding U.S. Member Organization, *Id*. at 76-80;

h. All of the waters, including premiere trout streams and critical habitat for federally threatened bull trout, located within 5,185 square mile area in the upper Snake River Basin of Idaho that are connected to the Snake River by subsurface flows and springs, and 14,866 miles of ditches, ditched streams and canals that receive pollution discharges and flow into the Snake River. These waters are protected on behalf of its members by Snake River Waterkeeper, a licensed U.S. Member Organization, *Id*. at 81-89; and

i. An estimated 30,297 miles (85 percent) of the streams in the Upper Missouri River Basin of Montana that feed into and impact water quality in the Big Hole River (world-class trout fishery), Beaverhead River (premiere brown trout fishery), Jefferson River (Westslope cutthroat habitat and drinking water supply), Madison

River (Yellowstone cutthroat and Westslope cutthroat trout habitat), and the Gallatin River (Yellowstone Park and Downstream Recreation). These waters are protected on behalf of its members by Upper Missouri Waterkeeper, a licensed U.S. Member Organization, *Id*. at 90-106.

21. After the 2020 NWPR became effective, the massive scope and geographic extent of the loss of CWA protections for the Nation's waters began to be documented, to some extent, in a database maintained on an EPA webpage showing approved CWA jurisdictional determinations by the EPA and the U.S. Army Corps of Engineers. *See* EPA, Clean Water Act Approved Jurisdictional Determinations, https://watersgeo.epa.gov/cwa; *see also*, True and correct images of maps from the EPA database for all U.S. waters, New Mexico, California, and Missouri on June 29, 2021 and June 30, 2021 are attached as Ex. 4.

22. I have reviewed maps and data taken from this EPA database and my review found as follows:

   a. As of June 29, 2021, maps from that database show that out of the 14,435 approved CWA jurisdictional determinations made under the 2020 NWPR across the country, 13,290 waters were found to be non-jurisdictional and only 1,145 were found to be jurisdictional. *Id*. As of June 30, 2021, maps from that database show that out of the 31,520 approved CWA jurisdictional determinations made under the 2020 NWPR across the country, 23,819 waters were found to be non-jurisdictional and only 7,701 were found to be jurisdictional. *Id*.

   b. In New Mexico, as of June 29, 2021, there were 176 total determinations under the 2020 NWPR, with 176 negative jurisdictional determinations and 0 positive jurisdictional determinations under the 2020 NWPR. As of June 30, 2021, there were 197 total determinations, with 195 negative jurisdictional determinations and 2 positive jurisdictional determinations. One of those negative jurisdictional determinations excluded an ephemeral stream from CWA protections at the Los

Alamos National Laboratories (Project Id: SPA-2021-00044-ABQ Potrillo Canyon).[3] Another negative jurisdictional determination excluded ephemeral streams and two open water mine pits from CWA protections based on exclusions in the 2020 NWPR at the United Nuclear Corporation St. Anthony Uranium Mine (Project Id: SPA-2020-00169-ABQ).[4]

c. In California, as of June 29, 2021, there were 2,129 total jurisdictional determinations made under the 2020 NWPR, with 2,107 negative jurisdictional determinations and only 22 positive jurisdictional determinations. Notably, 1,717 of those jurisdictional determinations were made between January 20, 2021 and June 16, 2021 and resulted in the exclusion of large numbers of wetlands, ephemeral streams, and other waters from CWA protections. As of June 30, 2021, there were 2,368 total determinations, with 2,292 negative jurisdictional determinations and 76 positive jurisdictional determinations.

d. In Missouri, as of June 29, 2021, there were 191 total jurisdictional determinations under the 2020 NWPR, with 170 negative jurisdictional determinations and only 21 positive jurisdictional determinations. 106 of those jurisdictional determinations were made between January 20, 2021 and June 16, 2021 and resulted in the exclusion of large numbers of wetlands, ephemeral streams and other waters from CWA protections. As of June 30, 2021, there were 473 total determinations, with 374 negative jurisdictional determinations and 99 positive jurisdictional determinations.

---

[3] https://www.spa.usace.army.mil/Portals/16/docs/civilworks/regulatory/Jurisdiction/Approved%20JDs/New%20Mexico/2021-044.AJD.pdf?ver=hw4MtRMiZ1x8OLsCa9bikg%3d%3d

[4] https://www.spa.usace.army.mil/Portals/16/docs/civilworks/regulatory/Jurisdiction/Approved%20JDs/New%20Mexico/2020-169.AJD.pdf?ver=z1oT4bB1sIO1U0eF78njmw%3D%3D

23. On June 9, 2021, the Agencies announced that they had completed their review of the 2020 NWPR under President Biden's Executive Order 13990, and that at some unknown time in the future, they intend to "initiate a new rulemaking process that restores the protections in place prior to the 2015 WOTUS implementation," and later "anticipate[] developing a new rule that defines WOTUS . . . ." EPA, Army Announce Intent to Revise Definition of WOTUS, (June 9, 2021).[5] A true and correct copy of this press release is attached as Ex. 5. In the announcement, the Agencies noted that a "broad array of stakeholders – including states, Tribes, local governments, scientists, and non-governmental organizations – are seeing *destructive impacts to critical water bodies* under the 2020 rule." *Id*. (emphasis added).

24. EPA Administrator Regan stated that the "EPA and Department of the Army have determined that this rule is leading to *significant environmental degradation*," and Acting Assistant Secretary of the Army for Civil Works Jaime Pinkham stated that the 2020 NWPR "has resulted in a 25 percentage point reduction in determinations of waters that would otherwise be afforded protection." *Id*. (emphasis added).

25. The Agencies also determined that the 2020 NWPR is "significantly reducing clean water protections" and that the "lack of protections is particularly significant in arid states, like New Mexico and Arizona, where nearly every one of over 1,500 streams assessed has been found to be non-jurisdictional." *Id*. The Agencies further stated that they are "aware of 333 projects that would have required [CWA] Section 404 permitting prior to the Navigable Waters Protection Rule, but no longer do." *Id*.

26. On the same day as their announcement, June 9, 2021, the Agencies filed a Motion for Remand without Vacatur in an action challenging the 2020 NWPR in the U.S. District Court for the District of Massachusetts. *Conservation Law Foundation et al. v. EPA et al.,* No. 20-10820, DKT. 112 (D. Mass. June 9, 2021) ("*Conservation Law Foundation*"). The motion filed in the *Conservation Law Foundation* case is essentially the same as was filed here, and the Agencies filed their declarations from the *Conservation Law Foundation* case as their supporting declarations herein. In their supporting

---

[5] Available at: https://www.epa.gov/newsreleases/epa-army-announce-intent-revise-definition-wotus

11

Memorandum of Law in the *Conservation Law Foundation* case and herein, the Agencies stated that they "have identified substantial concerns with the NWPR" and "the effects of the NWPR on the nation's waters, including whether the NWPR adequately considered the CWA's statutory objective in determining the scope of the 'waters of the United States' and, as a result, whether the process adequately considered the effects of the NWPR on the integrity of the nation's waters." *Conservation Law Foundation,* Defendants' Memorandum of Law in Support of Motion for Voluntary Remand without Vacatur, DKT. 113 (June 9, 2021).

27. Declarations in support of the Motion for Remand without Vacatur in the *Conservation Law Foundation* case more definitively characterize the Agencies' findings regarding the legal errors and harm resulting from 2020 NWPR and contain findings consistent with the evidence of illegality and harm Waterkeeper submitted to the administrative record during the rulemaking comment period. *Conservation Law Foundation,* Declaration of Radhika Fox, DKT. 113-1 ("Fox Dec.") and Declaration of Jaime A. Pinkham, DKT. 113-2, (June 9, 2021).

28. For example, Principal Deputy Assistant Administrator for the EPA Office of Water, Radhika Fox, stated that after careful reassessment of the administrative record and the legal and scientific basis for the 2020 NWPR, the Agencies identified "substantial concerns about the lawfulness of aspects of the NWPR and the harmful effects of the NWPR on the nation's waters." Specifically, the Agencies found:

    a. "For example, the agencies explicitly and definitively stated in numerous places in the NWPR administrative record that they did not rely on agency documents in the record that provided some limited assessment of the effects of the rule on water quality in determining the scope of the definition of 'waters of the United States.' See, e.g., 85 Fed. Reg. at 22332, 22335 ("[T]he final rule is not based on the information in the agencies' economic analysis or resource and programmatic assessment.")." Fox Dec. at 4, ¶ 12.

    b. "The agencies now believe that consideration of the effects of a revised definition of 'waters of the United States' on the integrity of the nation's waters is a critical

      element in assuring consistency with the statutory objective of the CWA . . ." and "[b]ased on a careful evaluation of the record of the NWPR . . . the agencies have substantial and legitimate concerns regarding the adequacy of consideration of the CWA's water quality goals in the development of the NWPR." Id. at 4-5, ¶ 13.

    c.  "In light of the text, structure, and legislative history of the Act, and Maui and other Supreme Court decisions, the agencies have concluded there must be some consideration of the effects of a revised definition of 'waters of the United States' on the integrity of the nation's waters. Based on the record at the time the agencies promulgated the NWPR, significant concerns exist about the sufficiency of the agencies' consideration of the effects of the NWPR on the chemical, physical, and biological integrity of the nation's waters when determining the limits of the specific definitional language 'waters of the United States' in the NWPR. For example, the agencies are concerned that the NWPR did not look closely enough at the effect ephemeral waters have on traditional navigable waters when the agencies decided to categorically exclude all ephemeral waters." Id. at 5, ¶ 14.

    d.  "Staff at EPA and the Army have reviewed approved jurisdictional determinations and identified indicators of a substantial reduction in waters covered under the NWPR compared to previous rules and practices . . . Of the 40,211 individual aquatic resources or water features for which the Corps made approved jurisdictional determinations under the NWPR between June 22, 2020 and April 15, 2021, approximately 76% were found to be non-jurisdictional. Many of the non-jurisdictional waters are excluded ephemeral resources (mostly streams) and wetlands that are not adjacent under the NWPR. The agencies are aware of 333 projects that would have required Section 404 permitting prior to the NWPR, but no longer do under the NWPR. The agencies are also aware that this number is not the full universe of projects that no longer require Section 404 permitting under the NWPR, partly because to the extent that project proponents are not seeking any

      determinations for waters that the NWPR now excludes, such as ephemeral streams, the effects of such projects are not tracked in the Corps database. As a whole, the reduction in jurisdiction is notably greater than the deregulatory effects discussed in the rule preamble and the economic analysis case studies." Id. at 5-6, ¶ 15.

e. "These changes have been particularly significant in arid states. In New Mexico and Arizona, for example, of over 1,500 streams assessed under the NWPR, nearly every one has been found to be a non-jurisdictional ephemeral resource, which is very different from the status of the streams as assessed under both the Clean Water Rule and the pre-2015 regulatory regime." Id. at 6, ¶ 16.

f. States, tribes, scientists, and non-governmental organizations have informed the agencies that the reduction in CWA jurisdiction attributable to the 2020 NWPR is "resulting in significant, actual environmental harms," including from specific projects and discharges that would no longer be subject to CWA protections, from withdrawn permits, and from dredge and fill operations that are proceeding without permits or compensatory mitigation on "large swaths of wetlands in sensitive areas, in the floodplains of jurisdictional waters, or even within several hundred yards of traditional navigable waters . . ." Id. at 7, ¶ 17.

g. "Stakeholders have also identified for EPA many other wetlands and streams, newly deemed non-jurisdictional, which are likely to be filled for commercial and housing developments, mines, water pipelines, and other forms of development without CWA oversight." Id.

h. "Projects are proceeding in newly non-jurisdictional waters in states and tribal lands where regulation of waters beyond those covered by the CWA are not authorized, and, based on available information, will therefore result in discharges without any regulation or mitigation from federal, state, or tribal agencies." Id. at 7, ¶ 18.

i. "One project that stakeholders have identified for EPA is the construction of a high-pressure oil pipeline that would cut through a drinking water well field, which is

14

       expected to result in discharges to nearly 100 ephemeral streams that appear to be no longer jurisdictional under the NWPR; another project is the construction of a mine that would destroy hundreds of previously jurisdictional wetlands, deemed non-jurisdictional under the NWPR, next to a National Wildlife Refuge." Id.

j. "Some tribes have estimated that the NWPR removes more than 80% of stream miles within their jurisdictions from CWA protections, amounting to more than 1,400 miles of streams. These tribes lack the authority and the resources to independently regulate surface waters within and upstream of their reservations, and therefore cannot protect their scarce waters from upstream dischargers, such as uranium and coal mines." Id. at 8, ¶ 19.

k. Excluded "[e]phemeral streams, wetlands, and other aquatic resources provide numerous ecosystem services, and there could be cascading and cumulative downstream effects from impacts to these resources, including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity." Id. at 8, ¶ 20.

29. The results of the Agencies' review of the 2020 NWPR and their findings are further described and documented in a June 8, 2021 Memorandum for the Record with Supporting Documentation. EPA and Department of Army, Memorandum for the Record: Review of U.S. Army Corps of Engineers ORM2 Permit and Jurisdictional Determination Database to Assess effects of the Navigable Waters Protection Rule, (June 8, 2021)[6] and Attachment A: Data Analysis.[7] ("Memorandum for the Record"). True and copies of the Memorandum for the Record and Supporting Analysis are attached as Ex. 6 and Ex. 7, respectively.

30. The Memorandum for the Record further demonstrates some of the harms that are occurring as a result of the 2020 NWPR, documents significant loss of jurisdiction under the Army Corps of Engineers' regulatory programs, and more definitively states that the Agencies failed to

---

[6] https://www.epa.gov/sites/production/files/2021-06/documents/3_final_memorandum_for_record_on_review_of_data_web_508c.pdf
[7] https://www.epa.gov/sites/production/files/2021-06/documents/combined_4_thru_12_508.pdf

adequately consider the effects on the rule's elimination of CWA jurisdiction on the chemical, physical, and biological integrity of the Nation's waters. For example, the Agencies found that:

    a. "The Corps finalized 6,351 AJDs between the NWPR's effective date of June 22, 2020 and April 15, 2021. When this dataset was adjusted to account for differences in how determination forms were designed under the different regulatory regimes, the Corps found approximately 71% of AJDs identified non-jurisdictional aquatic resources and 29% identified jurisdictional aquatic resources.[3] In comparison, AJDs made under the 2015 Clean Water Rule and the pre-2015 regulatory regime from the time periods of June 22, 2018 to April 15, 2019, and June 22, 2019 to April 15, 2020, found that approximately 46% of AJDs included non-jurisdictional aquatic resources and 54% included jurisdictional aquatic resources." Ex. 7 at 2.

    b. "The Corps' ORM2 database contains AJDs that evaluated 40,211 individual aquatic resources or water features under the NWPR between June 22, 2020 and April 15, 2021; of these individual aquatic resources, approximately 76% were found to be non-jurisdictional by the Corps. Specifically, 69% of streams and wetlands were found to be non-jurisdictional, including 9,548 ephemeral features (mostly streams) and 12,895 wetlands that did not meet the NWPR's revised adjacency criteria (and thus are non-jurisdictional under the NWPR). Ditches were also frequently excluded (3,849 individual exclusions)." *Id*. at 2-3.

    c. "Of particular concern to the agencies is the NWPR's disproportionate effect on arid regions of the country. The Corps' data show that in New Mexico, of the 258 streams assessed in AJDs, 100% were found to be non-jurisdictional ephemeral resources. In Arizona, of the 1,284 streams assessed in AJDs, 1,280, or 99.6%, were found to be non-jurisdictional ephemeral resources. Compounding potential resource losses, eliminating ephemeral streams from jurisdiction under the NWPR also typically eliminates jurisdiction over any nearby wetlands." *Id*. at 3.

    d.    "The more telling aspect of these 968 [no permit required] actions in 2020-2021 is the comparison to prior years. In 2020-2021, there has been a threefold (338%) increase from 2019-2020 and a fourfold (412%) increase from 2018-2019 in the number of projects being determined to not require section 404 permits under the CWA. These metrics likely capture only a small portion of projects that are occurring on the ground since there is typically no need for a project proponent to seek a "no permit required" determination after having already received a wholly negative AJD and other project proponents may not feel the need to obtain any sort of JD at all if they believe their aquatic resources are non-jurisdictional under the NWPR. Many projects could be occurring without consultation with the Corps due to the non-jurisdictional bright lines established under the NWPR. While the Corps' ORM2 data do not represent all aquatic resources in the United States, they shed light on the trend and magnitude of losses under the NWPR." *Id*. at 3.

    e.    "The agencies are aware that projects are proceeding in newly non-jurisdictional waters in states and tribal lands where regulation of waters beyond those covered by the CWA are not authorized, and, based on available information, will therefore result in discharges without any regulation or mitigation from federal or state agencies . . . The agencies are also aware of certain states that have already begun taking deregulatory steps to change their state regulatory practices to match the NWPR, contrary to the agencies' estimates in the '[l]ikely response category' for such states identified [sic] the NWPR's EA. *See* EA at 39-41 (estimating that some states are likely to continue their current dredged/fill permitting practices; however, some of those states have instead sought to reduce the scope of state clean water protections after the NWPR was finalized)." *Id*. at 4.

    f.    Ephemeral streams, wetlands that do not meet the NWPR's revised adjacency criteria, and other aquatic resources not protected by the NWPR provide numerous ecosystem services, and the absence of protections for such resources could cause

cascading, cumulative, and substantial downstream effects, including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity. These substantial effects on the chemical, physical, and biological integrity of the nation's waters were inadequately considered during the NWPR rulemaking process." *Id*.

31. On June 21, 2021, ten U.S. Senators sent a letter to EPA Administrator Regan and Acting Assistant Secretary of the Army for Civil Works Jaime Pinkham detailing a briefing call EPA and the Army Corps of Engineers provided to Congressional staff after the Agencies' June 9 announcement. The Senators stated that the Agencies had informed them that their decision to replace the 2020 NWPR was based on "significant environmental damage," "ongoing environmental harm," "implementation challenges," and "a reduction in findings of federal jurisdiction resulting from the NWPR." *See* June 21, 2021 Letter from Ten Members of the U.S. Senate Committee on Environment and Public Works to EPA Administrator Regan and Acting Assistant Secretary of the Army for Civil Works Jaime Pinkham regarding the Navigable Waters Protection Rule Announcement, a true and correct copy of which is attached as Ex. 8.

32. The interests of Waterkeeper's members, and the members of our U.S. Member Organizations and U.S. Affiliate Organizations in clean water for drinking, fishing, swimming, recreational and aesthetic enjoyment, and conservation of aquatic species and wildlife are injured by the reduction and elimination of CWA protections for myriad rivers, streams, wetlands, lakes, and other waters under the 2020 NWPR. Many of these members live, recreate and work in watersheds that contain rivers, intermittent streams, ephemeral streams, lakes, wetlands, or other waters that have either entirely lost CWA protection or are downstream from waters that have lost CWA protection.

33. Remand and vacatur of the 2020 NWPR is necessary to redress the injuries to Waterkeeper Alliance, our U.S. Member Organizations and individual supporting members by restoring the regulatory definition of "waters of the United States" that protected our Nation's waters for nearly four decades, and by preventing further damage and destruction of the Nation's waters under the 2020 NWPR, which has led to an exponential increase in negative CWA jurisdictional determinations as

compared to the Pre-2015 Regulatory Definition. *See, e.g., supra*, ¶ 31(d); *see also, e.g.*, Ex. 8, Attachment A at 3-9

34.  The Pre-2015 Regulatory Definition is consistent with the CWA's objective and goals and will ensure that waters that are utilized and enjoyed by our members across the country will again be protected and their interests in clean water for drinking, fishing, swimming, recreational and aesthetic enjoyment, and conservation of aquatic species and wildlife will not be further injured as a result of unregulated pollution and destruction of these waters. As demonstrated above, if the 2020 NWPR is not vacated, the irreparable harm caused by uncontrolled pollution, dredging and filling of the nation's water will continue and increase in number, geographic scope and cumulative downstream human health and environmental impacts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. Executed this 2nd day of July, 2021, in Norwalk, Connecticut.

Daniel E. Estrin